**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **DOMINION RESOURCES, INC.,**<br>**DOMINION NUCLEAR CONNECTICUT, INC.,**<br>Plaintiffs,<br>v.<br>**UNITED STATES OF AMERICA,**<br>Defendant. | ) | Case No. 04-83C<br>Judge Bruggink |
| **DOMINION RESOURCES, INC.,**<br>**VIRGINIA ELECTRIC AND POWER COMPANY,**<br>Plaintiffs,<br>v.<br>**UNITED STATES OF AMERICA,**<br>Defendant. | ) | Case No. 04-84C<br>Judge Bruggink |

**PLAINTIFFS' MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

Of Counsel:

Paul M. Bessette
D. Bruce McPherson
MORGAN, LEWIS & BOCKIUS, LLP
1111 Pennsylvania Avenue, NW
Telephone: (202) 739-3000
Facsimile: (202) 729-3001

February 8, 2008

BRAD FAGG
MORGAN, LEWIS & BOCKIUS, LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone: (202) 739-5191
Facsimile: (202) 739-3001

Attorneys for Plaintiffs

**TABLE OF CONTENTS**

**Page**


I. INTRODUCTION AND STATEMENT OF THE CASE ..... 2

II. OVERVIEW OF DOMINION'S NUCLEAR PLANTS AND SPENT FUEL STORAGE ACTIVITIES ..... 9

A. Millstone Power Station. ..... 12

B. North Anna Power Station ..... 15

C. Surry Power Station. ..... 15

D. The Government's Contentions ..... 16

III. GOVERNING LEGAL PRINCIPLES ..... 17

A. The Applicable Legal Standards ..... 17

B. Government Arguments Regarding Burdens And "Non-Incremental" Costs. ..... 21

C. The Law Regarding Offsets And Avoided Loss. ..... 24

IV. ISSUES OF FACT AND LAW ..... 25

V. DISCUSSION ..... 27

A. The So-Called "Pick-Up Rate" Issue: If DOE Had Performed At A Reasonable Rate, Dominion Would Not Have Been Compelled To Undertake The Extensive Mitigation Projects Underlying Its North Anna and Surry Damages Claims. ..... 27

*1. The Court should supply a reasonable acceptance rate term.* ..... 27

*2. The fundamental objectives of the NWPA support enforcement of an acceptance rate sufficient to prevent utilities from incurring additional at-reactor storage costs for spent fuel after January 31, 1998* ..... 30

*3. The Standard Contract's quid pro quo exchange of obligations supports enforcement of an acceptance rate sufficient to prevent utilities from bearing additional at-reactor storage costs for spent fuel after January 31, 1998* ..... 31

*4. Dominion understood that DOE was obligated to collect spent fuel beginning in 1998 at a rate sufficient to prevent additional at-reactor storage costs after that date* ..... 33

*5. DOE understood that it was obligated to collect spent fuel beginning in 1998 at a rate sufficient to prevent additional at-reactor storage costs after that date* ..... 35

*6. Neither DOE's issuance of a lower rate schedule in the 1991 ACR, nor its approval of Delivery Commitment Schedules based upon those schedules, supports the imposition of a 900 MTU per year acceptance rate* ..... 43

**TABLE OF CONTENTS, Continued**

**Page**


7. *The government's asserted 900 MTU per year acceptance rate is severely flawed* ........ 45

B. DOE's Breach Was a "Substantial Causal Factor" of the North Anna ISFSI Costs ........ 47

C. The Government Is Not Entitled To A Damage Reduction Due To Alleged "Losses Avoided" For Specific Mitigation Projects And Plant Modifications ........ 49

1. *Millstone Unit 2 and Unit 3 Crane Upgrades* ........ 50

2. *Millstone Unit 2 Cask Loading Modifications* ........ 51

3. *Millstone Unit 3 Full Core Reserve Offload License Requirement* ........ 52

D. The Government Is Not Entitled To A Damage Reduction For Pre-Acquisition Millstone Damages ........ 54

E. The Government Is Not Entitled To A Damage Reduction Due To Hypothetical Costs Of Loading DOE Casks That Were Never Supplied, And Which DOE Has A Duty To Provide One Day ........ 55

F. The Government Is Not Entitled To A Damage Reduction Due To Dominion's Use Of Its Own Employees On Mitigation Activities ........ 56

G. The Government Is Not Entitled To A Damage Reduction For AFUDC Costs Incurred By Dominion ........ 58

H. The Government Is Not Entitled To A Damage Reduction For Costs ........ 60

I. Any Costs Still Challenged By The Government At The Time Of Trial On Adequacy-Of-Support Grounds Will Be Established By Dominion Under The Applicable Standards ........ 61

VI. CONCLUSION ........ 62

## TABLE OF AUTHORITIES

**Page**

### FEDERAL CASES

*Alvin Ltd. v. United States Postal Serv.*, 816 F.2d 1562 (Fed. Cir. 1987) ..................28, 34

*American Federal Bank, FSB v. United States*, 72 Fed. Cl. 586 (2006).......................... 19

*Bank of America, FSB v. United States*, 70 Fed. Cl. 246 (2006).................................... 19

*Bank of New York v. Southwire Co.*, 470 F.3d 264 (6th Cir. 2006)................................ 28

*Barco Urban Renewal Corp. v. Housing Authority of Atlantic City*, 674 F.2d 1001 (3d Cir. 1982)........................................................................................ 28

*Bluebonnet Savings Bank v. United States*, 266 F.3d 1348 (Fed. Cir. 2001).................. 62

*California Federal Bank v. United States*, 395 F.3d 1263 (Fed. Cir. 2005).................... 19

*Coast Federal Bank, FSB v. United States*, 48 Fed. Cl. 402 (2000)............................... 22

*Compare United States v. Winstar Corp.*, 518 U.S. 839 (1996) .................................... 30

*Convoy Co. v. Sperry Rand Corp.*, 672 F.2d 781 (9th Cir. 1982) .................................. 57

*David Nassif Associates v. United States*, 557 F.2d 249 (Ct. Cl. 1977) .......................... 28

*Dominion Resources, Inc. v. United States*, 77 Fed. Cl. 151 (2007) ........................*passim*

*Energy Capital Corp. v. United States*, 302 F.3d 1314 (Fed. Cir. 2002)......................... 20

*Firestone Tire & Rubber Co. v. United States*, 444 F.2d 547 (Ct. Cl. 1971)................... 28

*Franconia Associates v. United States*, 61 Fed. Cl. 718 (2004)................................22, 23

*Gevyn Construction Co. v. United States*, 827 F.2d 752 (Fed. Cir. 1987)......................... 9

*Glendale Federal Bank, FSB v. United States*, 239 F.3d 1374 (Fed. Cir. 2001).........22, 24

*Glendale Federal Bank, FSB v. United States*, 378 F.3d 1308 (Fed. Cir. 2004).........23, 24

*Granite Management Corp. v. United States*, 74 Fed. Cl. 155 (2006) ............................ 21

*Home Savings of America v. United States*, 399 F.3d 1341 (Fed. Cir. 2005).................. 20

*Howell v. United States*, 51 Fed. Cl. 516 (2002) .......................................................... 27

*Indiana Michigan Power Co. v. United States*, 57 Fed. Cl. 88 (2003)...................4, 29, 45

**TABLE OF AUTHORITIES, Continued**

**Page**

*Indiana Michigan Power Co. v. United States*, 422 F.3d 1369 (Fed. Cir. 2005).......*passim*

*Julius Goldman's Egg City v. United States*, 697 F.2d 1051 (Fed. Cir. 1983)................. 34

*KMS Fusion, Inc. v. United States*, 36 Fed. Cl. 68 (1996)........................................34, 46

*In re: Kellett Aircraft Corp.*, 186 F.2d 197 (3rd Cir. 1950)........................................... 23

*Library of Congress v. Shaw*, 478 U.S. 310 (1986)...................................................... 59

*Lisbon Contractors, Inc. v. United States*, 828 F.2d 759 (Fed. Cir. 1987) ...................... 20

*Locke v. United States*, 283 F.2d 521 (Ct. Cl. 1960) .................................................... 29

*Long Island Savings Bank, FSB v. United States*, 60 Fed. Cl. 80 (2004) ........................ 23

*Maine Yankee Atomic Power Company v. United States*, 225 F.3d 1336 (Fed. Cir. 2000)..........................................................................................2, 3, 17, 33

*National Australia Bank v. United States*, 452 F.3d 1321 (Fed. Cir. 2006)..................... 62

*Northern States Power Co. v. United States,* 78 Fed. Cl. 449 (2007)................4, 8, 29, 56

*Northern States Power Company v. United States*, 224 F.3d 1361 (Fed. Cir. 2000)....... 17

*Old Stone Corp. v. United States*, 450 F.3d 1360 (Fed. Cir. 2006)...........................21, 23

*Pacific Gas & Electric Company v. United States*, 73 Fed. Cl. 333 (2006) .......4, 8, 29, 56

*Rochester Gas and Electric Corporation v. United States*, 65 Fed. Cl. 431 (2005)..... 8, 54

*Roedler v. DOE*, 255 F.3d 1347 (Fed. Cir. 2001).....................................................30, 46

*Sacramento Municipal Utility District v. United States*, 70 Fed. Cl. 332 (2006)......... 8, 56

*San Carlos Irrigation & Drainage District v. United States,* 111 F.3d 1557 (Fed. Cir. 1997)............................................................................................. 25

*Southern Nuclear Operating Co. v. United States*, 77 Fed. Cl. 396 (2007)...............*passim*

*System Fuels v. United States*, 79 Fed. Cl. 37 (2007).............................................*passim*

*Tennessee Valley Authority v. United States*, 60 Fed. Cl. 665 (2004)............................. 18

*Tennessee Valley Authority v. United States*, 69 Fed. Cl. 515 (2006).......................*passim*

**TABLE OF AUTHORITIES, Continued**

**Page**

*United States v. Winstar Corp.*, 518 U.S. 839 (1996) ... 30

*Vermont Yankee Nuclear Power Corporation v. United States*, 73 Fed. Cl. 236 (2006) ... 8, 44, 54

*Westfed Holdings, Inc. v. United States*, 52 Fed. Cl. 135 (2002) ... 59

*White v. Delta Construction International*, 285 F.3d 1040 (Fed. Cir. 2002) ... 20

*Wickham Contracting Co. v. Fischer*, 12 F.3d 1574 (Fed. Cir. 1994) ... 59, 60

*Yankee Atomic Power Company v. United States*, 73 Fed. Cl. 249 (2006) ... 8, 19, 56

**FEDERAL STATUTES AND REGULATIONS**

Administrative Procedure Act, 5 U.S.C. § 706(1) ... 30

National Waste Policy Act of 1982, as amended, 42 U.S.C. §§ 10101 *et seq*

42 U.S.C. § 10131(a) ... 9
42 U.S.C. § 10131(a)(2) ... 31, 45
42 U.S.C. § 10131(a)(4) ... 30
42 U.S.C. § 10131(a)(7) ... 31
42 U.S.C. § 10131 (b)(2) ... 30
42 U.S.C. § 10131 (b)(4) ... 30
42 U.S.C. § 10221(a) ... 36
42 U.S.C. § 10222(a)(5) ... 30
42 U.S.C. § 10222(a)(5)(A) ... 45
42 U.S.C. § 10222(b)(1)(A) ... 32
42 U.S.C. § 10222(b)(2)(A) ... 31
42 U.S.C. § 10222(b)(3) ... 54

18 C.F.R. pt 101 ... 58, 59

48 Fed. Reg. 5458 (Feb. 4, 1983) ... 32

48 Fed. Reg. 16,590 (Apr. 18, 1983) ... 32

59 Fed. Reg. 27,007 (May 25, 1994) ... 10

**MISCELLANEOUS**

22 Am. Jur. 2d Damages § 69 ... 61

**TABLE OF AUTHORITIES, Continued**

**Page**

Corbin on Contracts § 57.10 (2005) .......... 24

Corbin on Contracts § 57.11 (2005) .......... 21

E. Allan Farnsworth, Contracts § 12.1, at 150-51 (3d ed. 2004)) .......... 19

H.R. Rep. No. 97-491 (1982), *reprinted in* 1982 U.S.C.C.A.N. 3792 .......... 9, 10

Restatement (Second) of Contracts § 204 (1981) .......... 28

Restatement (Second) of Contracts § 204 cmt. b (1981) .......... 28, 32

Restatement (Second) of Contracts § 204 cmt. d .......... 24, 28

Restatement (Second) of Contracts § 204 cmt. e .......... 28

Restatement (Second) of Contracts § 347 (1981) .......... 7, 21, 24

Restatement (Second) of Contracts § 347 cmt. c .......... 17, 18, 23

Restatement (Second) of Contracts § 347 cmt. d .......... 24

Restatement (Second) of Judgments, § 26(1)(b) .......... 63

Restatement (Second) of Judgments, § 26(1)(e) .......... 63

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **DOMINION RESOURCES, INC.,**<br>**DOMINION NUCLEAR CONNECTICUT, INC.,**<br>Plaintiffs,<br>v.<br>**UNITED STATES OF AMERICA,**<br>Defendant. | ) | Case No. 04-83C<br>Judge Bruggink |
| **DOMINION RESOURCES, INC.,**<br>**VIRGINIA ELECTRIC AND POWER COMPANY,**<br>Plaintiffs,<br>v.<br>**UNITED STATES OF AMERICA,**<br>Defendant. | ) | Case No. 04-84C<br>Judge Bruggink |

**PLAINTIFFS' MEMORANDUM OF**
**CONTENTIONS OF FACT AND LAW**

Pursuant to the Court's Pretrial Orders dated August 2, 2006, as supplemented, and ¶14(a) of Appendix A of the Rules of the United States Court of Federal Claims ("RCFC"), plaintiffs in Case No. 04-83C, Dominion Resources, Inc. and Dominion Nuclear Connecticut, Inc., and plaintiffs in Case No. 04-84C, Dominion Resources, Inc. and Virginia Electric and Power Company (also doing business as "Dominion Virginia Power") (collectively referred to for these purposes with its predecessors as "Dominion"), respectfully submit this Memorandum of Contentions of Fact and Law.

## I. INTRODUCTION AND STATEMENT OF THE CASE

a. Nature of the case. This is a spent nuclear fuel damages case. *See generally, Maine Yankee Atomic Power Company v. United States*, 225 F.3d 1336, 1342 (Fed. Cir. 2000); *Dominion Resources, Inc. v. United States*, 77 Fed. Cl. 151 (2007). The lawsuit involves damages resulting from the failure of the United States, acting through the Department of Energy ("DOE"), to perform its contractual obligation to remove spent nuclear fuel and high level waste (collectively for these purposes "spent fuel" or "SNF") generated at Dominion's Millstone Power Station, Units 1, 2, and 3 ("Millstone"), North Anna Power Station, Units 1 and 2 ("North Anna"), and Surry Power Station, Units 1 and 2 ("Surry").[1]

b. Legal obligations and breach by the government. Pursuant to the Nuclear Waste Policy Act of 1982, 42 U.S.C. §§ 10101 *et seq.* ("NWPA"), in June of 1983 the DOE, acting on behalf of the United States, entered into "Contracts for Disposal of Spent Nuclear Fuel and/or High Level Radioactive Waste" (the "Standard Contract") with nuclear power generators, including Dominion and its predecessors as the owner of the Millstone, North Anna, and Surry power stations.[2] Pursuant to the terms of the Standard Contracts, the federal government agreed to accept and dispose of spent fuel beginning no later than January 31, 1998 in exchange for payments from nuclear power generators.

For its part, Dominion has honored all of its contractual obligations under the Standard Contracts. Under the Standard Contracts, Dominion pays (and has paid since April 7, 1983) a

---

1 Millstone Units 1 and 2 and Surry Units 1 and 2 are wholly-owned by Dominion. Dominion is the majority owner of Millstone Unit 3, and minority ownership interests in Unit 3 are held by Massachusetts Municipal Wholesale Electric Co. and Central Vermont Public Service Corp. Dominion is also the majority owner of North Anna Units 1 and 2, and minority ownership interests are held by Old Dominion Electric Cooperative. Dominion is authorized to act for these purposes on behalf of the minority owners of Millstone Unit 3 and North Anna Units 1 and 2.

2 Dominion Nuclear Connecticut, Inc. is the current holder of the three Standard Contracts for Millstone Units 1, 2, and 3. Those contracts were originally executed by Northeast Utilities Service Company, an affiliate of the then-owner of the Millstone plants. Millstone was sold to Dominion, and the Standard Contracts assigned, in 2001. Virginia Electric and Power Company, referred to as "Dominion Virginia Power," was the original signatory and remains the current holder of the single Standard Contract for North Anna and Surry.

quarterly fee to DOE based on electricity production from nuclear fuel in exchange for DOE's obligation to dispose of spent nuclear fuel beginning no later than January 31, 1998. Indeed, to date Dominion has paid *nearly a billion dollars* in fees to the federal government for the disposal of spent fuel. Dominion fulfilled its obligations under the Standard Contracts in expectation that DOE likewise would perform its obligations and pick up and dispose of spent nuclear fuel beginning in 1998.

The government, however, has failed to fulfill its reciprocal obligation to begin accepting spent fuel for disposal as required. There is no dispute that DOE breached its contracts with "all the utilities that had signed the contract—the entire nuclear electric industry." *Maine Yankee Atomic Power Co. v. United States*, 225 F.3d 1336, 1342 (Fed. Cir. 2000). As such, there is no question that DOE's failure to pick up the spent fuel in a timely manner thus constitutes a partial breach of the government's contracts with Dominion. *See Indiana Michigan Power Co. v. United States*, 422 F.3d 1369, 1375 (Fed. Cir. 2005) ("*Indiana Michigan II*"). The only remaining issue to be resolved in the present case, therefore, is the measure of damages.

c. *Dominion's damages.* The damages incurred and claimed by Dominion in this proceeding are the "unnecessary interim storage costs" expended by Dominion through June 30, 2006, in order to mitigate the impacts of DOE's failure to accept Dominion's spent nuclear fuel and high level waste as required by the Standard Contracts. *Dominion*, 77 Fed. Cl. at 156. Specifically, in order to preserve its multi-billion dollar nuclear power generating assets and as a result of DOE's failures, Dominion was forced to: (1) conduct studies for potential inter-unit transfer of spent fuel at Millstone; (2) add additional racks to the Millstone Unit 3 spent fuel pool; (3) design and construct an Independent Spent Fuel Storage Installation ("ISFSI") and procure and load spent fuel dry storage casks onto the ISFSI at Millstone; (4) design and construct an ISFSI and procure and load spent fuel dry storage casks onto the ISFSI at North

Anna; and (5) construct a third spent fuel storage pad at the Surry ISFSI, and procure and load spent fuel dry storage casks at Surry, from the second cask loaded in 2000 onward. Dominion incurred $174,605,091 in connection with these activities.

d. Government defenses. The government will not contest that Dominion faced the need to increase on-site spent fuel storage at all of its sites—nor could it, given that the spent fuel discharge schedule and Dominion's actions in this regard are well-documented, historical facts. The government will offer no evidence, and will not contend, that any expenditure by Dominion was unreasonably made. The government will not dispute that the claimed costs were incurred by Dominion for the projects identified, and properly recorded and accounted for in Dominion's cost tracking systems (with possible very limited exceptions, currently amounting to something like 1% of Dominion's damages). With respect to some $75 million of the claimed costs, the government will offer no dispute whatsoever, nor any evidence that Dominion should not recover such costs.

But, the government will argue that Dominion is not entitled to recover nearly $100 million of the unnecessary interim storage costs that the government admits that Dominion actually incurred. None of the reasons offered for the extraordinary reductions that the government will seek are well-founded, and no reductions in Dominion's claimed damages should be taken.

i. A primary defense asserted by the government with regard to certain claimed North Anna and Surry costs involves hypothetical constructs and arguments about the government's legal obligations under the contracts, *i.e.,* the so-called "pick up rate" arguments that have been so thoroughly and persuasively rejected by the Court on prior occasions.[3] As

[3] *System Fuels v. United States*, 79 Fed. Cl. 37, 56 (2007); *see also Southern NuclearOperating Co. v. United States*, 77 Fed. Cl. 396, 417-21 (2006); *Northern States PowerCo. v. United States*, 78 Fed. Cl. 449, 462 & n.13 (2007); *Indiana Michigan Power Co. v. United States*, 57 Fed. Cl. 88, 99-100 (2003). *But see, contra, Pacific Gas & Electric Company v. United States*, 73 Fed. Cl. 333 (2006) ("PG&E"). *PG&E* is the only case

described more fully below, voluminous documentation and other evidence demonstrates that the parties understood the government to have agreed to accept spent nuclear fuel at an annual rate sufficient to eliminate the need to increase the capacity for Dominion's on-site spent fuel storage after January 31, 1998, and the applicable standards confirm that these were the government's obligations. The overwhelming weight of evidence establishes that the government should have accepted spent fuel at an annual industry-wide steady-state rate of acceptance of approximately 3,000 metric tons of uranium (MTU) per year, after a brief ramp-up period, to fulfill these obligations.

The government's arguments regarding its "pick-up rate" obligations are not only "severely flawed,"[4] they are virtually incoherent. At times, the government appears to argue that its only enforceable obligations are those contained in a 1991 Acceptance Capacity Report (ACR) document, but that document contains the express representation that the document is "not contractually binding" upon either party, and nothing in the contracts says that the ACR document can limit DOE's pick-up obligations in the manner that the government now argues. At other times the government appears to contend that only approved "Delivery Commitment Schedules" (DCS) based upon the 1991 rates represent enforceable contractual obligations. This is so even though such schedules were not viewed by DOE as binding commitments at the time they were approved, and even though it is impossible for a utility to have an approved DCS today. Moreover, the ACR capacity figures cease after ten years, and the DOE ceased approving DCS's after just a few years in the 1990's, but the government does not even state what its subsequent obligations under either formulation of its position might be. The logical and unavoidable assertion would be "zero," but that seems to be a bit much even for the government,

---

to hold to the contrary, and that case, along with *Southern Nuclear* and *System Fuels*, are currently on appeal. Dominion respectfully disagrees with the result reached by the trial court in PG&E, albeit on the different record then before it, for reasons that include those described in the text.

4 *System Fuels* 79 Fed. Cl. at 56.

as it has not so argued. The point, however, is that the government cannot even articulate a plausible alternative position regarding "pick up rate," and its purported defenses regarding such matters are not well founded.

ii. Beyond the pick-up rate contentions, the government will apparently make a nominal attempt to argue that the North Anna ISFSI would have been built by Dominion anyway, as a $23 million "insurance policy," because there would have been short and temporary losses of full core reserve under the 3000 MTU/year pick up rate assumptions that Dominion used for its damage calculations.[5] This is so even though Dominion, in the real world, has faced materially identical temporary losses of full core reserve in the past *without* pursuing extraordinarily expensive "insurance policy" measures. The government's position simply makes no sense in light of real world risks and management practices, and all of the documentation and testimony, including that of actual Dominion spent fuel managers and personnel responsible for making such determinations and recommendations, and including even the government's own retained nuclear management expert, will be to the contrary. Indeed, there will not be any competent evidence to support the government's position. An economist retained by the government, who will be quick to disavow any nuclear management expertise, will opine that "additional SNF storage capacity" would have been needed, but was "careful" not to state that an ISFSI would be required. The government's cost expert nevertheless simply deducted all costs for construction of the North Anna ISFSI, i.e. some $23 million, at the 3,000 MTU/year rate. He did so not upon the basis of any testimony or evidence, but pursuant to *instructions from DOJ counsel*. No witness will testify that the North Anna ISFSI would have

[5] Assumption of "ramp up rates" slightly different than the ones utilized by Dominion for its primary damages calculation would result in no losses of full core reserve whatsoever at North Anna. For example, there would be no such loss of full core reserve pursuant to the rates in DOE's 1987 Annual Capacity Report (ACR). That ACR incorporated the rates set forth in 1987 Mission Plan Amendments, which reached a 3000 MTU/year steady-state acceptance rate after assumptions of 1,200 MTU/year for five years, 2,000 MTU/year for year six, and 2,650 MTU/year for years seven through ten.

been built under the 3000 MTU/year pick up rate assumptions, and the government's challenges to that effect should be summarily rejected.

iii. The government will also argue that various plant modifications would "have had to have been done anyway" if DOE would have performed, or when it does perform, and upon that basis will seek to deduct various items from Dominion's actual damages. These defenses suffer from several fatal flaws. One fundamental error is that the government presumes that DOE would have performed with whatever non-DOE casks happened to be available in or around 1998—but the Contract required DOE to provide a cask "suitable for use" at Dominion's sites. Standard Contract, Article IV.B.2. Indeed, DOE has yet to commit to use of a particular cask for any of the Dominion sites, and additional modifications may well be necessary to accommodate whatever cask DOE actually shows up with. Legally, the government misses the mark, because the alleged deductions have nothing to do with savings arising from Dominion not having to perform its contractual obligations—deductions are proper only for "any cost or other loss that [the non-breaching party] has avoided <u>by not having to perform.</u>" Restatement (Second) of Contracts § 347 (1981) (emphasis added). Dominion <u>*has*</u> performed its obligations: it continues to pay money. As the Court has observed in this case (in a different but applicable context), the "only thing that is different from the contract scenario" is that Dominion has incurred unnecessary interim storage costs. *Dominion*, 77 Fed. Cl. at 156. In this partial breach case, performance will be whatever it will be if and when DOE ever shows up, but, in the interim, reimbursing all actually incurred interim costs "hardly puts plaintiffs in a better position." *Id.*

iv. The government will apparently contest all pre-acquisition damages at Millstone, categorically and presumably upon Anti-Assignment Act grounds. The NWPA and Standard Contracts, however, specifically trump any possible application of the Anti-Assignment statutes

by expressly providing that all "rights and duties" under the Standard Contracts are assignable. The former owner of the Millstone site indisputably assigned the "right" to pursue pre-closing damages to Dominion. The government's precise arguments in this regard have been uniformly rejected by this Court, *see Rochester Gas and Electric Corporation v. United States*, 65 Fed. Cl. 431 (2005); *Vermont Yankee Nuclear Power Corporation v. United States*, 73 Fed. Cl. 236, 241-43 (2006), and the present circumstances do not warrant any departure from those correct determinations.

v. The government, as it has unsuccessfully done in every spent fuel case to date, will arbitrarily "deduct" significant offsets for activities by Dominion that allegedly were "avoided" due to DOE's breach, namely, loading of hypothetical DOE casks that were never supplied. Here the government errs, however, for reasons that include the fact that such costs were plainly not "avoided," but, at most, merely deferred. *Cf. Dominion,* 77 Fed. Cl. at 156. Acceptance of the government's position would therefore impermissibly impose such costs twice upon Dominion. Also, as this Court has uniformly held, any purported benefits due to allegedly avoided DOE cask loading costs are "entirely speculative," and the government's argued reduction is unavailing for that reason as well. *System Fuels, Inc. v. United States*, 79 Fed. Cl. 37, 71 (2007) (*citing Tennessee Valley Authority v. United States*, 69 Fed. Cl. 515, 542 (2005); *Northern States Power Company v. United States*, 78 Fed. Cl. 449, 468-69 (2007); *Southern Nuclear Operating Co. v. United States*, 77 Fed. Cl. 396, 450-51 (2007); *Pacific Gas & Electric Company v. United States*, 73 Fed. Cl. 333, 416 (2006); *Yankee Atomic Power Company v. United States*, 73 Fed. Cl. 249, 286 (2006); and *Sacramento Municipal Utility District v. United States*, 70 Fed. Cl. 332, 372 (2006)).

vi. Finally, the government will dispute various additional incurred costs and claimed damages by Dominion, most often upon grounds that such costs are argued to be "non-

incremental." Specifically, the government will challenge: (a) certain internal labor cost damages, pursuant to arguments that have been squarely and persuasively rejected by the Court, *e.g., System Fuels,* 79 Fed. Cl. at 66-67, *Southern Nuclear*, 77 Fed. Cl. at 442-443. (b) certain overhead costs, upon similar grounds; (c) certain capital construction cost damages, upon the basis of arguments the government unsuccessfully advanced in *Tennessee Valley Authority v. United States*, 69 Fed. Cl. 515 (2006);[6] and (d) potentially, a very small sub-set of claimed damages on adequacy-of-documentation grounds. None of these challenges are well-founded or warrant any reduction in Dominion's damages.

## II. OVERVIEW OF DOMINION'S NUCLEAR PLANTS AND SPENT FUEL STORAGE ACTIVITIES

When spent nuclear fuel is removed from a reactor it is placed temporarily in a spent fuel pool connected to the reactor. Spent fuel pools are designed for non-permanent storage to allow the fuel to cool so it can then be shipped to a reprocessing plant or elsewhere for disposal. In 1977, however, the federal government barred reprocessing indefinitely, thus severely limiting the spent fuel disposal options of nuclear power generators. With its plans to reprocess blocked, "[t]he domestic nuclear industry was confronted not only with a shift in its technical future but with a sudden and unanticipated liability in the form of spent fuel stored a reactor sites with no near-term designation." H.R. Rep. No. 97-491, at 27 (1982), *reprinted in* 1982 U.S.C.C.A.N. 3792, 3794. In response to the disposal problem this would have created, the federal government passed the NWPA "to provide for the permanent disposal of high-level radioactive waste and such spent nuclear fuel as may be disposed of in order to protect the public health and safety and the environment." 42 U.S.C. § 10131(a). In the NWPA, the federal government thus confirmed its obligation to accept and provide for the disposal of spent nuclear fuel.

---

6 *But see, contra, System Fuels,* 79 Fed. Cl. at 70, *citing Wickham Contracting Co. v. Fischer,*12 F.3d 1574 (Fed. Cir. 1994) and *Gevyn Constr. Corp. v. United States,* 827 F.2d 752, 754 (Fed. Cir. 1987). We respectfully disagree with *System Fuels* (and agree with *TVA*) on this point.

In providing for the funding of the spent fuel disposal program, however, the government concluded that "the costs of such disposal should be the responsibility of the generators and owners of such waste and spent fuel." *Id.* To effectuate that determination, the NWPA authorized the Secretary of Energy to enter into a Standard Contract with each nuclear power generator. The intent of the Standard Contract was for utilities to pay into the Nuclear Waste Fund in a quid-pro-quo exchange for disposal services that would (1) ensure that utilities would not have to build any additional at-reactor storage after 1998 and (2) work off the backlog of SNF already stored on-site as of 1998. *See infra* Part V.A.

On May 25, 1994, after a decade of receiving timely payments from Dominion and other nuclear power generators totaling billions of dollars, DOE announced that it would not fulfill its contractual obligations in 1998. Notice of Inquiry, Waste Acceptance Issues, 59 Fed. Reg. 27,007, 27,008 (May 25, 1994); *Indiana Michigan II*, 422 F.3d at 1375. And, in fact, DOE did not commence performance in 1998, and the latest DOE projections are that it will not begin performance until 2020 or later. As a result of DOE's failure to begin picking up spent fuel as required under the Contract, Dominion was compelled to pursue several alternative, on-site storage strategies to avoid having to shut down its nuclear reactors.

Specifically, Dominion was forced to: (1) conduct studies for potential inter-unit transfer of spent fuel at Millstone; (2) add additional racks to the Millstone Unit 3 spent fuel pool; (3) design and construct an Independent Spent Fuel Storage Installation ("ISFSI") and procure and load spent fuel dry storage casks onto the ISFSI at Millstone; (4) design and construct an ISFSI and procure and load spent fuel dry storage casks onto the ISFSI at North Anna; and (5) construct a third spent fuel storage pad at the Surry ISFSI, and procure and load spent fuel dry storage casks at Surry, from the second cask loaded in 2000 onward. If DOE had timely performed its obligation under the Standard Contracts to begin removing spent fuel from

Dominion's plants beginning in 1998, Dominion could have continued to operate Millstone Units 2 and 3,[7] North Anna Units 1 and 2, and Surry Units 1 and 2, and generally maintain full core reserve[8] in each associated spent fuel pool without pursuing such mitigation activities.

The following table provides a summary of the costs Dominion has incurred through June 30, 2006[9] in pursuing these projects, each of which was necessary to ensure sufficient storage capacity at the various units and which would not have been incurred had DOE fulfilled its contractual obligation to begin accepting spent fuel beginning in 1998:

| Activity | Cost |
|---|---|
| Millstone Inter-Unit Transfer Study | $1,138,632 |
| Millstone Unit 3 Rack Project | $11,780,160 |
| Millstone ISFSI | $39,082,511 |
| North Anna ISFSI | $71,906,004 |
| Surry ISFSI | $50,697,784 |
| **Total:** | **$174,605,091** |

7 Millstone Unit 1 was shutdown in 1995 and is currently in the "SAFSTOR" condition.

8 The number of unoccupied storage locations available for temporary storage of spent fuel assemblies for outage and maintenance activities generally is referred to as the "reserve." A pool with sufficient reserve to hold all the assemblies in the reactor has full core discharge capability, or "full core reserve." Full core reserve thus implies that a nuclear power generator maintains empty spent fuel pool storage cells in the spent fuel storage pool equal to or greater than the number of fuel assemblies in the reactor core. This allows for the full core to be offloaded, should circumstances so require. While maintaining full core reserve is not a strict legal requirement, it is a widely-recognized prudent operating practice within the industry, and the primary driver of Dominion's decision-making regarding spent fuel storage. Dominion generally strives to maintain full core reserve at all of its nuclear plants for each reactor, although for a variety of reasons it has historically lost full core reserve on several occasions.

9 Pursuant to *Indiana Michigan II*, 422 F.3d 1369, damages may only be sought up until the time of trial, but Dominion is entitled under the law to pursue after-incurred damages in subsequent proceedings, free from government defenses of statute of limitations, merger, or the like. In order to allow the government sufficient opportunity to review historic cost documentation, Dominion agreed to a damages cut-off for these proceedings of June 30, 2006. In some other spent fuel cases, the government has taken the position that the complaints (filed before *Indiana Michigan II*) must be formally supplemented or amended to make clear the applicable damages cut-off date for the instant proceedings. The Court undoubtedly has the power to deem the complaint so amended or supplemented under RCFC 15, or, alternatively, Dominion would have no objection to so amending or supplementing its complaint.

A brief summary description of some of the projects which generated these costs is provided below.

**A. Millstone Power Station**

The Millstone Power Station is a three-unit site near New London, Connecticut. Each Millstone Unit has a separate spent fuel pool. Millstone Unit 1 is a 660 MWe General Electric Boiling Water Reactor ("BWR") that began commercial operation in 1970. Millstone Unit 1 was shut down in 1995 and currently is in the "SAFSTOR" condition. Spent fuel from Millstone Unit 1 continues to be stored in the Unit 1 spent fuel pool. Millstone Unit 2 is an 870 MWe Combustion Engineering Pressurized Water Reactor ("PWR") that began commercial operation in 1975. The current operating license for Unit 2 expires in 2035. Millstone Unit 3 is a 1,150 MWe Westinghouse PWR that began commercial operation in 1986. The current operating license for Unit 3 expires in 2045.

1. *Millstone Unit 1.* As noted above, Millstone Unit 1 was shut down in 1995 and spent fuel continues to be stored in the Unit 1 spent fuel pool. Unit 1 is currently in the "SAFSTOR" condition, meaning that all plant systems, except those systems required to maintain the spent fuel in the Millstone Unit 1 spent fuel pool, are no longer functional. The Unit 1 spent fuel pool has 3,229 available storage cells and contains 2,884 spent fuel assemblies. However, the normal plant spent fuel cooling water system (that operated during plant operation) has been replaced with a stand-alone cooling system specifically sized for the heat load associated with the 2,884 assemblies currently stored in the Unit 1 spent fuel pool. Based on the limited capacity of the spent fuel pool cooling system, the fact that racks in the Unit 1 spent fuel pool are designed to accommodate BWR fuel only, and because the Unit 1 spent fuel pool water is not borated, storage of Millstone Unit 2 or Unit 3 PWR fuel in the Unit 1 spent fuel pool does

not present a viable alternative. Current plans are to fully decommission Millstone Unit 1 around the same time as Millstone Units 2 and 3.

Had DOE performed in accordance with the Standard Contract, DOE would have had an obligation to remove spent fuel from Millstone Unit 1 beginning in 1998. However, not all of the spent fuel would have been removed from Unit 1 by June 30, 2006 and, therefore, Dominion does not presently intend to seek damages associated with wet storage of the Unit 1 spent fuel in the current proceedings.

2. *Millstone Units 2 and 3.* Dominion stores spent fuel from Millstone Units 2 and 3 in the respective spent fuel pool for each unit. As of June 30, 2006, the Unit 2 and Unit 3 spent fuel pools had 1,339 and 1,689 available storage cells, respectively.[10] Dominion constructed an ISFSI at Millstone and two casks have been loaded and stored at the ISFSI as of June 30, 2006. Eight empty HSMs also are stored at the ISFSI. Dominion uses the Transnuclear Standardized NUHOMS® (Nuclear Horizontal Modular Storage) system at the Millstone ISFSI.

The original capacity of the Unit 2 and 3 spent fuel pools were increased by "reracking" of spent fuel assemblies, or by adding additional racks. In 1986, Unit 2's spent fuel pool capacity was reracked from an existing 667 storage locations to its current capacity. Because that activity would have been necessary to maintain full core reserve even if DOE had performed, Dominion does not seek costs in connection with that project.

In 2000, 14 new rack modules were added to the existing 21 rack modules in the Unit 3 spent fuel pool. These new racks would not have to have been added if DOE had commenced accepting spent fuel in 1998 in accordance with its obligations, and the costs associated with that project are therefore being sought in this proceeding.

[10] Available storage cells, as used here and elsewhere in this submission, means total storage cells minus permanently unavailable cells.

Even with these racking projects, Millstone Unit 2 would have lost full core reserve in 2005, and Millstone Unit 3 also would also eventually lose full core reserve prior to the end of its expected license life, without additional storage capacity. Accordingly, one of the first priorities upon Dominion's acquisition of Millstone in 2001 was assessment of fuel storage options. After considering different potential storage strategies, Dominion determined that construction of a dry storage facility presented the best overall approach for the Millstone site, given DOE's delays in commencing acceptance of SNF, continued uncertainties regarding such acceptance, and other site-specific considerations. Dominion studied but ultimately decided against inter-unit transfers of spent fuel from the Unit 2 spent fuel pool to the Unit 3 spent fuel pool. Among the reasons for that determination, the Unit 2 and Unit 3 spent fuel pools are currently licensed to store spent fuel only from their respective generating units, and an NRC license amendment would be required to move the spent fuel from Unit 2 to Unit 3. The administrative proceedings associated with the license amendment were expected to take 18 to 24 months, excluding intervention. For these and other reasons, Dominion determined that dry storage was the preferred alternative.

Had DOE performed in accordance with the Standard Contract, the inter-unit spent fuel transfer study would not have been undertaken, the Millstone Unit 3 rack project would not have been necessary, nor the Millstone ISFSI constructed. Accordingly, Dominion's damages at Millstone include costs associated with the spent fuel inter-unit transfer study, the design and implementation of the Millstone Unit 3 rack project, and the design and construction of, and loading of spent fuel onto, the Millstone ISFSI through June 30, 2006.

**B. North Anna Power Station**

The North Anna Power Station is a two-unit site located near Mineral, Virginia. North Anna Units 1 and 2 are 890 MWe Westinghouse PWRs that began commercial operation in 1978 and 1980, respectively. Units 1 and 2 share a single spent fuel pool. The current operating

licenses for Units 1 and 2 expire in 2038 and 2040, respectively. The North Anna spent fuel pool has 1,684 available storage cells and contained 1,442 spent fuel assemblies as of June 30, 2006. Dominion generally maintains only one full core reserve in the shared pool for both North Anna Unit 1 and 2.

Dominion completed construction of the ISFSI at North Anna in 1998. The ISFSI was constructed pursuant to a "site-specific" NRC license for the North Anna site. The ISFSI is located southwest of the North Anna Power Station, near the center of the 1,043 acre North Anna site, within a separate protected area. The ISFSI is designed to accommodate three storage pads, but only one pad had been fully constructed during period relevant to this submission. The first cask was loaded in 1998. There were 24 casks stored on Pad 1 as of June 30, 2006. Pad 1 is designed to store a total of 28 casks. A second pad presently is under construction. Currently, Dominion uses the TN-32 metal cask storage system at the North Anna ISFSI. Dominion is in the process of transitioning to the NUHOMS cask storage system that is used at Millstone.

Had DOE performed in accordance with the Standard Contract, Dominion would not have constructed the North Anna ISFSI. Accordingly, Dominion's damages at North Anna include costs associated with the design and construction of, and loading of spent fuel onto, the North Anna ISFSI through June 30, 2006.

### C. Surry Power Station

The Surry Power Station is a two-unit site located near Jamestown, Virginia. Surry Units 1 and 2 are 810 MWe Westinghouse PWRs that began commercial operation in 1972 and 1973, respectively. Units 1 and 2 share a single spent fuel pool. The current operating licenses for Units 1 and 2 expire in 2032 and 2033, respectively. The Surry spent fuel pool has 1,042 available storage cells and contained 799 spent fuel assemblies as of June 30, 2006. Dominion

generally maintains only one single full core reserve in the shared pool for both Surry Units 1 and 2.

Surry constructed an ISFSI in 1986 (pad 1), and expanded it in 1995 (pad 2). Pad 1 contains 28 loaded dry storage systems, and Pad 2 contains 27 loaded dry storage systems as of June 30, 2006. A third pad has been constructed adjacent to Pad 1and contains 18 concrete storage modules. Spent fuel was loaded onto Pad 3 in 2007. Dominion primarily used the General Nuclear Systems, Inc. CASTOR V/21 dry cask storage system at the Surry ISFSI through 1996. Since then, Dominion has used the TN-32 system, but is transitioning to the NUHOMS® system for spent fuel loading onto the third pad. The new storage pad is designed to accommodate the NUHOMS dry storage system provided by Transnuclear.

Had DOE performed in accordance with the Standard Contract, Dominion would have ceased loading dry storage casks onto Pad 2 in 2000[11], and would not have constructed Pad 3 at the Surry ISFSI. Accordingly, Dominion's damages at Surry include cask purchase and loading costs for one cask in 2000, all casks thereafter through June 30, 2006, and costs associated with design and construction of Surry ISFSI Pad 3. Dominion is not seeking any costs associated with construction of Surry Pad 1 or 2 or any costs associated with the purchase and loading of casks on Pad 1 or 2 prior to 2000.

**D. The Government's Contentions**

As identified in the Introduction and Statement of the Case above, and as described further below, the government will contest some $100 million of the $174 million in costs incurred by Dominion in support of mitigation projects, upon the following grounds: (a) so-called "pick-up rate" defenses; (b) untenable assertions that Dominion would have constructed the North Anna ISFSI as an "insurance policy," (c) argued reductions for various plant

---

[11] Dominion loaded two dry storage casks onto Pad 2 in 2000. Dominion is only seeking costs associated with one of those casks.

modifications, based upon speculation regarding the specifics of how DOE might have performed, and assumptions regarding such performance that would themselves constitute breaches of the Standard Contracts; (d) categorical and legally incorrect Anti-Assignment defenses; (e) argued offsets for loading of hypothetical DOE casks that were never supplied, despite the undisputable fact that such loading costs were not "avoided" by Dominion, but only delayed; (f) unsupported and arbitrary exclusion of certain internal labor charges; (g) unwarranted exclusion of overhead costs, which costs are admitted to be properly applied and recorded to mitigation projects; (h) argued exclusion of incurred costs of construction projects, known as AFUDC; and (i) for a very small amount of claimed costs, possible argued reductions regarding adequacy-of-support grounds, or, more particularly, quibbles with the precise nature of the documentation supporting such costs.

## III. GOVERNING LEGAL PRINCIPLES

### A. The Applicable Legal Standards

The basic legal principles that control Dominion's claims against DOE for its partial breach of the Standard Contracts are straightforward. As an initial matter, the government has not disputed that its continuing failure to accept spent fuel constitutes a partial breach of the Standard Contracts it entered into with Dominion. *See generally, Northern States Power Company v. United States,* 224 F.3d 1361 (Fed. Cir. 2000); *Maine Yankee Atomic Power Company v. United States*, 225 F.3d 1336, 1342 (Fed. Cir. 2000). Thus, the only issue to be resolved in the present case is the measure of damages.

An injured party is entitled, besides seeking damages for what might have been, to recover for "any other loss" he actually suffered. Restatement (Second) of Contracts § 347 cmt. c. This includes incidental losses, that is, the costs the plaintiff actually incurred as a result of the reasonable efforts undertaken to minimize or mitigate the damages caused by a breach. *Id.* ("Incidental losses include costs incurred in a reasonable effort, whether successful or not, to

avoid loss."). To establish such incidental losses, a plaintiff does not use a "but-for world" to estimate his damages (as with certain other measures of expectation damages—see below), but, rather, must establish his actual costs in the real world. As the Federal Circuit has described, a plaintiff in a spent nuclear fuel damages case is required to show that: "(1) the damages were reasonably foreseeable by the breaching party at the time of contracting; (2) the breach is a substantial causal factor in the damages; and (3) the damages are shown with reasonable certainty." *Indiana Michigan II* at 1373; *see also*, *System Fuels,* 79 Fed. Cl. at 51; *Southern Nuclear*, 77 Fed. Cl. at 404.

"Foreseeablilty" does not appear, at least in the main, to be contested in this case. If a nuclear power generator has no place to store spent fuel, it can no longer operate its reactor and must replace the lost electricity generation with more expensive alternatives. The damages caused by allowing a spent fuel pool to fill up, therefore, would be staggering. There thus can be no serious dispute that it was foreseeable that nuclear power generators, such as Dominion, would take steps to mitigate the harm caused by DOE's failure to meet its contractual obligation to begin picking up spent fuel no later than January 31, 1998 as required under the Standard Contract. *E.g., Tenn. Valley Auth. v. United States*, 60 Fed. Cl. 665, 675 n.10 (2004) ("[T]he intent of the NWPA and the parties [to the Standard Contract] was to avoid the construction by utilities of additional at-reactor storage [after January 31, 1998]. DOE's failure to perform under the Standard Contract thus has led to the very thing the NWPA and the Standard Contract were designed to forestall." (internal citation omitted)).

The "substantial causal factor" showing involves a very straightforward factual inquiry in this case: Was DOE's delay in performing under the Standard Contract a substantial causal factor in Dominion's decision to pursue the at-reactor storage projects and modifications giving rise to the costs claimed here? *See Southern Nuclear Operating Co. v. United States*, 77 Fed. Cl.

396, 405 (2007) ("The breach must be a 'substantial causal factor' in the mitigation decisions.") Also, "in determining whether a decision was substantially caused by DOE's delay, reasonable not absolute certainty suffices." *Yankee Atomic Electric Co. v. United States*, 73 Fed. Cl. 249, 268 (2006). Given some of the arguments that the government can be expected to make, it is important to emphasize that a plaintiff need not *disprove* every possible alternative cause of a mitigation activity—it is axiomatic that the breach need *not* "be the sole factor or sole cause in the [claimed damages]." *California Fed. Bank v. United States*, 395 F.3d 1263, 268 (Fed. Cir. 2005) (citing E. Allan Farnsworth, Contracts § 12.1, at 150-51 (3d ed. 2004)); *Bank of America, FSB v. United States*, 70 Fed. Cl. 246, 251 (2006) (concluding that mitigation costs are recoverable "even if other business considerations later informed the [plaintiff's] decisions: no business judgment is exercised in a vacuum . . . [and] it is thus irrelevant that [plaintiff] may have had independent business reasons for" engaging in a transaction that mitigated the breach); *American Federal Bank, FSB v. United States*, 72 Fed. Cl. 586 (2006) ("despite the existence of secondary business reasons for American Federal's [mitigation activity], the court concludes that the bank has satisfied its burden to prove that the government's breach directly caused [the mitigation activity]").

Finally, largely as a result of the (exhaustive) pre-trial audit and discovery efforts by the parties, the requisite "reasonable certainty" of the measure of damages sought will be for the most part uncontested. To the extent that any costs remain by the time of trial that the government persists in challenging, those costs, which are all derived from Dominion's accounting systems, will be established with the requisite certainty. *E.g., System Fuels*, 79 Fed. Cl. at 59-60.

After the plaintiff has satisfied his burden of establishing his loss as a result of the breach, the burden of proof then shifts to the breaching party to show that the damages should be offset

by costs or other losses that the injured party has avoided by not having to perform. *See, e.g.*, *Lisbon Contrs., Inc. v. United States*, 828 F.2d 759, 769 (Fed. Cir. 1987) (affirming that the burden was on the government to establish a setoff to plaintiff's damages); *see also, generally, System Fuels,* 79 Fed. Cl. at 52, 71. This approach enforces two fundamental principles of contract law: (1) preventing the non-breaching party from recovering more than the benefit of his bargain, s*ee White v. Delta Constr. Int'l.*, 285 F.3d 1040, 1043 (Fed. Cir. 2002) ("[T]he non-breaching party should on no account get more than would have accrued if the contract had been performed" (internal quotation marks and citation omitted)); and (2) placing the risk of uncertainty with the breaching party, *see Energy Capital Corp. v. United States*, 302 F.3d 1314, 1327 (Fed. Cir. 2002) ("[T]he risk of uncertainty must fall on the defendant whose wrongful conduct caused the damages.").

The breaching party also bears the burden of proof to show that the mitigation-related activities were unreasonable. *System Fuels,* 79 Fed. Cl. at 52; *Southern Nuclear*, 77 Fed. Cl. at 407 ("[D]efendant bears the burden of establishing that mitigating decisions or expenditures were unreasonable."); *Tenn. Valley Auth. v. United States*, 69 Fed. Cl. 515, 523 ("To eliminate or reduce TVA's mitigation-related damages, the government bears the burden of showing that TVA's mitigation efforts were unreasonable."). "Mitigation is appropriate where a reasonable person, in light of the known facts and circumstances, would have taken steps to avoid damages." *Indiana Michigan II*, 422 F.3d at 1375. And "[w]hen mitigating damages from a breach, a party must only make those efforts that are fair and reasonable under the circumstances." *Home Savings of America v. United States*, 399 F.3d 1341, 1353 (Fed. Cir. 2005) (internal quotation marks omitted). The "over-arching requirement," therefore, is one of reasonableness: "The question is largely a factual inquiry into whether the injured party's post breach behavior was reasonable." *Corbin on Contracts* § 57.11, at 314 (2005). To limit

recovery for actual costs incurred for mitigation activities, the breaching party thus bears the burden of showing that the plaintiff's mitigation decisions were unreasonable. *See, e.g.*, *Old Stone Corp. v. United States*, 450 F.3d 1360, 1370 (Fed. Cir. 2006) ("The government has not shown that it was unreasonable for OSC to replace the entire amount of regulatory capital that was eliminated by FIRREA.").

**B. Government Arguments Regarding Burdens And "Non-Incremental" Costs**

In many of the spent fuel damages cases to date, the parties have engaged in extensive debates regarding the respective burdens of proof. For purposes of this case, however, such a debate would be largely academic, since the evidence will so clearly establish the propriety of the damages sought by Dominion under any plausible standard or burden of proof. Nevertheless, for the record, the government's anticipated efforts to shift burdens of uncertainty and persuasion to the non-breaching party in these circumstances should be rejected.

Separate and apart from the sort of mitigation damages being sought here, a court may measure the injured party's expectation interest by assessing the "loss in value" of the breaching party's performance. The expectation interest, subject to some limitations, can be measured by: "(a) the loss in the value to him of the other party's performance caused by its failure or deficiency, plus (b) any other loss, including incidental or consequential loss, caused by the breach, less (c) any cost or other loss that he has avoided by not having to perform." Restatement (Second) of Contracts § 347 (1981). To estimate loss in value of the party's performance with reasonable certainty, some cases have held that a plaintiff must present a plausible but-for world. *See, e.g.*, *Granite Mgmt. Corp. v. United States*, 74 Fed. Cl. 155, 169 (2006) (considering claim for lost value on sale of a company). Indeed, "expectancy damages" are often equated with a specific measure of loss in value, lost profits, and "[t]he problems of proof attendant on the burden placed on the non-breaching party of establishing lost profits—on

establishing what might have been—are well recognized." *Glendale Fed. Bank, FSB v. United States*, 239 F.3d 1374, 1380 (Fed. Cir. 2001). *Accord Coast Fed. Bank, FSB v. United States*, 48 Fed. Cl. 402, 429 n.25 (2000) (lost profits claim).

Significantly, however, this is not the measure of expectancy damage sought by Dominion here. As described above, Dominion is clearly seeking mitigation damages—the straightforward, largely uncontested, actual real-world dollars associated with activities taken to avoid shutting down its multi-billion dollar nuclear generating assets as a result of DOE's performance failures. Any uncertainties regarding the value of DOE's non-existent performance or a hypothetical but-for world are occasioned, of course, by DOE's massive breach. It is perverse for the government to now argue that the burden of disproving such uncertainties falls upon the innocent, non-breaching party, and potentially defeats recovery.

The government characterizes virtually all of its defenses as allegations that the plaintiff is seeking "non-incremental costs" that the government contends cannot be shown to be "caused" by DOE's breach. In so doing, the government clearly is attempting to frustrate the above-described sensible allocations of burdens applicable to this case. The distinction between the issue of causation (what Dominion did to mitigate DOE's breach) and appropriate mitigation (whether the mitigation efforts were reasonable under the circumstances) can be important for these purposes. Otherwise, "a breaching party could simply recast its mitigation defense in causation terms and thereby avoid the hurdles imposed by the established case law." *Franconia Assocs. v. United States*, 61 Fed. Cl. 718, 750 (2004). If claims challenging recovery of proven mitigation efforts are transformed into causation issues, defendants would not be bound by the concepts of "reasonable decisionmaking" that otherwise apply in such cases: "A breaching party could spin out a tangled web of damage-reducing hypothetical events in hopes that the injured

party would become ensnared in failing to disprove at least one of them." *Id.*[12] DOE's partial breach clearly resulted in the mitigation activities at issue in this case, it thus is up to the government to show that Dominion was unreasonable in its mitigation decisions. *See Old Stone*, 450 F.3d at 1370 (affirming that the burden was on the government to establish that plaintiff's mitigation efforts exceeded what was necessary to address the damage caused by the breach).

Once the Court determines that Dominion has demonstrated that the breach was a "substantial factor" in causing its damages, it then should address whether the government has met its burden to show that Dominion's "efforts at mitigation were unreasonable." *Long Island Savings Bank, FSB v. United States*, 60 Fed. Cl. 80, 90, 93 (2004). *See also In re: Kellett Aircraft Corp.*, 186 F.2d 197, 198 (3rd Cir. 1950) ("Where a choice has been required between two reasonable courses, the person whose wrong forced the choice can not complain that one rather than the other was chosen. The rule of mitigation of damages may not be invoked by a contract breaker as a basis for hypercritical examination of the conduct of the injured party . . . .").

Finally, it is worth repeating that how the government characterizes its defenses, or, for that matter, Dominion's damages claim, does not change the fact that Dominion's loses are recoverable: "[T]he general principle is that all losses, however described, are recoverable." Restatement (Second) of Contracts § 347 cmt. c. At trial, Dominion will show that it incurred reasonable and foreseeable costs as the direct result of projects and modifications undertaken to store spent fuel in an effort to mitigate DOE's delay in picking up spent fuel under the Standard Contract. Dominion, the non-breaching party, should be made whole. *Glendale*, 239 F.3d at 1380.

---

[12] In the *Winstar* context, the Federal Circuit cautioned litigants to avoid becoming entangled in endless theoretical disputes. *See Glendale Fed. Bank, FSB v. United States*, 378 F.3d 1308, 1313 (Fed. Cir. 2004) ("We remain optimistic that with the additional guidance and support given the trial court in this opinion the remainder of the Winstar cases can be disposed of either by settlement or by trial based on the particular facts of the case, and without further dispute over the theory on which damages may be calculated.").

### C. The Law Regarding Offsets And Avoided Loss

Damages are offset by avoided losses only if the offset is related to a party's performance under the contract and is not speculative. In particular, "any cost or other loss that [the non-breaching party] has avoided by not having to perform" must be subtracted from his damages. Restatement (Second) of Contracts § 347 (1981) (emphasis added). For example, "when a building contractor is wrongfully prevented from completing construction, the cost of completion that is saved is deducted from the contract price to which the contractor would have earned by full performance." Corbin on Contracts, Vol. 11, §57.10. And "when an employee is wrongfully discharged, the value of the employee's time and opportunity to work elsewhere is deducted from the promised wages that the employee would have earned if the discharge had not occurred." *Id.* The fact that an injured party may have suffered subsequent loses had the contract been performed is wholly immaterial. *See id.* In other words, "[t]he only saving that is to be deducted is the saving of expense with respect to performance by the plaintiff that the defendant's breach has made unnecessary." *Id.*; *see also* Restatement (Second) of Contracts § 347 cmt. d (1981) ("Loss avoided is subtracted only if the saving results from the injured party not having to perform rather than from some unrelated event." (emphasis added)). *Cf., Dominion Resources, Inc. v. United States*, 77 Fed. Cl. 151, 157 (2007) (argued damage reductions for "benefits" conferred not applicable where no "substitute transaction" implicated); *Indiana Michigan II*, 422 F.3d at 1374 (no substitute transaction possible because "the NWPA provided that DOE was exclusively responsible for SNF collection and disposal in the United States, thereby prohibiting [plaintiff] or any other nuclear utility from seeking alternative disposal means.").

Despite these guiding legal standards, the government nevertheless will seek offsets for alleged savings from events wholly unrelated to Dominion's performance under the Standard

Contract, and/or which are entirely speculative. As described further below, all such asserted offsets should be rejected. Crediting the government with costs Dominion may have allegedly avoided by its chosen mitigation activities (as opposed to by not having to perform under the Contracts) would not give Dominion the benefit of its bargain with DOE. Moreover, even if such subtractions might be appropriate in other contexts, in this case Dominion would have had the flexibility to reduce or avoid, by other means, the costs that DOE alleges were avoided if DOE had in fact performed, and the argued offsets are speculative and inappropriate for this additional reason. Finally, to establish an offset the government is bound by the same rules regarding a showing of damages, and "recovery for speculative damages is precluded." *Indiana Michigan II*, 422 F.3d at 1373 (quoting *San Carlos Irrigation & Drainage Dist. v. United States*, 111 F.3d 1557, 1562 (Fed. Cir. 1997)).

## IV. ISSUES OF FACT AND LAW

There are, at the end of the day, only few relatively discrete contested issues in this case. Pursuant to the exhaustive pre-trial government audit and discovery process, the voluminous underlying cost documentation has been thoroughly analyzed and reviewed by a full team of government auditors, experts and lawyers. With just a very few possible limited exceptions noted below, the government does not contest the accuracy or admissibility of the schedules, summaries, and other records that establish the amounts of the damages claimed by Dominion. Introduction and consideration of voluminous cost documentation, therefore, will not be necessary at trial.

The remaining contested issues in the case are:

A. the government's arguments regarding its so-called "pick up rate" obligations under the Standard Contracts;

B. the government's arguments regarding the necessity for the North Anna ISFSI;

C. the government's Anti-Assignment Act defenses to pre-acquisition costs at Millstone;

D. reductions in damages argued by the government to be losses avoided, because such activities (namely, certain plant modifications and mitigation projects) would allegedly have been necessary if DOE had performed, or if and when the DOE ever does perform, perhaps decades from now;

E. argued reductions in damages due to hypothesized costs of loading DOE casks that did not occur, despite the wholly speculative nature of such argued reductions and the fact that costs for loading of DOE casks will be incurred by Dominion if and when DOE ever does perform (and such reductions would therefore represent a double penalty to Dominion);

F. the government's challenge to internal Dominion labor costs, upon the basis of the same government arguments rejected in *System Fuels,* 79 Fed. Cl. at 66-67; *Tennessee Valley Authority*, 69 Fed. Cl. at 537-539, and *Southern Nuclear*, 77 Fed. Cl. 396 at 442-443;

G. the government's challenge to certain overhead charges, which the government admits were properly recorded and allocated to mitigation projects;

H. the government's challenge to costs associated with the use of funds necessary for the major capital projects involved, governed by federal regulation and referred to as Allowance For Funds Used During Construction (AFUDC);

I. the government's challenge to a very limited set of claimed costs for which the government contends that Dominion failed to provide adequate support, which, if not resolved prior to trial, will be established under the applicable standards through documentation and testimony of knowledgeable company personnel.

These matters are addressed, in turn, below.

## V. DISCUSSION

### A. The So-Called "Pick-Up Rate" Issue: If DOE Had Performed At A Reasonable Rate, Dominion Would Not Have Been Compelled To Undertake The Extensive Mitigation Projects Underlying Its North Anna and Surry Damages Claims.

Voluminous documents and other evidence will establish that, in entering into the Standard Contracts and assuming responsibility for the disposal of commercial spent nuclear fuel beginning in 1998, DOE obliged itself to accept spent fuel at a rate sufficient to both (1) preclude the need for nuclear power generators to provide additional at-reactor storage after January 31, 1998, and (2) to eliminate the backlog of spent fuel already accumulating at nuclear power plants around the country. If DOE had performed at a rate sufficient to achieve these objectives beginning in 1998, namely 3,000 MTU/year from the industry at large, Dominion would not have been compelled to undertake the extensive mitigation projects underlying its damages claim here. The government specifically challenges, on "pick up rate" grounds, the North Anna ISFSI and dry storage costs, and certain claimed storage costs at Surry. Note that the government does not contend that any Millstone damages are barred on so-called "pick-up rate" grounds.

*1. The Court should supply a reasonable acceptance rate term.*

Although the Standard Contract embodies a clear exchange of obligations, it does not specify on its face a precise amount of SNF that DOE was obligated to begin accepting in 1998. Nor does the Standard Contract define the rate at which DOE is obliged to accept SNF over the course of the Contract. In this circumstance, where parties to a contract fail to specify a term that is essential to a determination of their respective legal obligations, the omitted contract term is supplied by the court. *See Howell v. United States*, 51 Fed. Cl. 516, 523 (2002) (supplying a minimum reasonable order amount where government's minimum order obligation under a contract was not stated). As the Restatement (Second) of Contracts explains:

> When the parties to a bargain sufficiently defined to be a contract have not agreed with respect to a term which is essential to a determination of their rights and duties, a term which is reasonable in the circumstances is supplied by the court.

Restatement (Second) of Contracts § 204 (1981). The Restatement recognizes that there are various circumstances in which a term may be omitted from a contract and should be supplied by the court, and one specific circumstance it describes is where parties fail to include a term because "discussion of the issue may be unpleasant *or might produce delay or impasse*." Restatement (Second) of Contracts § 204 cmt. b (1981) (emphasis added).

In determining what a "reasonable" acceptance rate, the Court must examine both the provisions of the Standard Contract and evidence of the parties' contemporaneous intent. *See Firestone Tire & Rubber Co. v. United States*, 444 F.2d 547, 551 (Ct. Cl. 1971). The Court should endeavor to give effect to the "principal purpose of the parties" when they entered into the contract. *Alvin Ltd. v. United States Postal Serv.*, 816 F.2d 1562, 1565 (Fed. Cir. 1987) (citations omitted). Moreover, in determining what the parties' understanding and intent at the time of contracting, the Court must consider the available evidence in light of "community standards of fairness and policy" in order to determine "what is reasonable in the circumstances." *Restatement* § 204, cmt. d, e (emphasis supplied). *See also Barco Urban Renewal Corp. v. Housing Auth. of Atlantic City*, 674 F.2d 1001, 1007 (3d Cir. 1982) ("Determination of what is a reasonable time requires an inquiry into the circumstances surrounding the formation of the contract, its purpose, community standards of fairness, and public policy."). Thus, considerations of reasonableness should guide the Court's resolution of any ambiguity and selection of the term to be supplied. *See David Nassif Assocs. v. United States*, 557 F.2d 249, 262-63 (Ct. Cl. 1977). *See also Bank of New York v. Southwire Co.*, 470 F.3d 264, 272 (6th Cir. 2006) (applying § 204 and giving "preference to the party burdened with additional risk" as a result of post-contract developments). Even if the acceptance rate required under the Standard

Contract were difficult to determine, that, of course, should not bar Dominion's recovery. As the Court of Claims has made clear, "[d]ifficulty of ascertainment . . . does [not] exonerate the defendant that his misconduct, which has made necessary the inquiry into the question of harm, render that inquiry difficult." *Locke v. United States*, 283 F.2d 521, 524 (Ct. Cl. 1960).

In light of the overwhelming evidence, the only reasonable conclusion to be drawn is that the parties understood the Contract to require DOE not only begin accepting SNF starting no later than January 31, 1998, but also to continue to do so at a rate that, at a minimum, was sufficient to: (1) prevent commercial nuclear utilities from needing to create additional at-reactor storage of SNF; and (2) to promptly ramp up collection to a steady-state rate that was sufficient to eliminate the growing backlog of SNF accumulating at nuclear plants around the country. At a minimum then, the Court should enforce acceptance rate obligations that are sufficient to meet these fundamental obligations. *See System Fuels v. United* States, 79 Fed. Cl. 37, 55-58 (2007); *Northern States Power*, 78 Fed. Cl. 449, 457-61 & n.13; *Southern Nuclear*, 77 Fed. Cl. at 415-27; and *Indiana Michigan Power Co. v. United States*, 57 Fed. Cl. 88, 99-100 (2003) ("The parties understood that utilities were not to store additional waste on site after 1998. This was Congress' purpose in passing the Nuclear Waste Policy Act, and it was the parties' intent in signing the Standard Contract.").[13]

2. *The fundamental objectives of the NWPA support enforcement of an acceptance rate sufficient to prevent utilities from incurring additional at-reactor storage costs for spent fuel after January 31, 1998.*

Because the Standard Contract "implements a statutory enactment," the Court must take care to give meaning and effect to the fundamental objectives underlying the NWPA. *Roedler v. DOE*, 255 F.3d 1347, 1352 (Fed. Cir. 2001). Thus, in determining what constitutes a reasonable

[13] *But see, contra, Pacific Gas & Electric Company v. United States,* 73 Fed. Cl. 333 (2006) ("*PG&E*"). *PG&E* is the only case to hold to the contrary, and that case, along with *Southern Nuclear* and *System Fuels*, are currently on appeal. Dominion respectfully disagrees with the result reached by the trial court in *PG&E*, albeit on the different record then before it, for reasons that include those described in the text.

acceptance rate obligation, the Court must "inquire into the governing statute *and its purpose*" in determining what the parties intended at the time of contracting. *Id.* (emphasis added). *See also, System Fuels,* 79 Fed. Cl. at 52.

Perhaps the most fundamental purpose of the NWPA was to solve the problem of accumulation of spent nuclear fuel at reactor sites. In order to fulfill that purpose, DOE would be required to accept and dispose of SNF at a rate that is sufficient to (1) prevent utilities from bearing additional at-reactor storage costs for SNF after January 31, 1998, and (2) reduce the backlog of SNF accumulated at nuclear reactors around the country.

Under the NWPA, the Federal government assumed the responsibility for the permanent storage and disposal of SNF, beginning on January 31, 1998. *See* NWPA, 42 U.S.C. § 10131(a)(4), (b)(2). In exchange, Congress imposed on nuclear utilities the obligation to pay for the costs of the government's spent fuel disposal program. *Id.* at § 10131(a)(4), (b)(4). Critically, Congress chose not to implement the NWPA by exercising its regulatory and taxing powers, but rather required that its provisions be implemented by contract. *Id.* at § 10222(a)(5). Congress clearly intended to impose binding contractual obligations on DOE, and government contracts are enforced under traditional rules of commercial reasonableness and a governmental breach results in liability for damages. *Compare United States v. Winstar Corp.*, 518 U.S. 839, 866 (1996) *with* Administrative Procedure Act, 5 U.S.C. § 706(1) (limited scope of review for agency action).

By its very terms then, the NWPA fundamentally implemented a *quid- pro-quo* exchange of obligations in which utilities paid substantial fees, and in exchange the federal government assumed responsibility for spent fuel storage and disposition costs beginning no later than January 31, 1998. That "day certain," therefore, delineates a point of demarcation on which

federal responsibility for SNF begins and, concurrently, the utilities' responsibility for incurring additional SNF storage costs ceases.

The terms of the NWPA also make clear that the government took it upon itself to assume the responsibility for disposing of commercial SNF because "a national problem has been created by the accumulation of spent nuclear fuel from nuclear reactors[.]" NWPA, 42 U.S.C. § 10131(a)(2). Because of this growing national problem, Congress found it appropriate to "establish the Federal responsibility" for the permanent disposition of SNF in order to "ensure that such waste and spent fuel do not adversely affect the public health and safety and the environment for this or future generations." *Id.* at § 10131(a)(7). Consequently, although the NWPA did not establish a specific numeric rate at which the government was required to accept and dispose of SNF, it is evident that the government intended the NWPA to impose upon the DOE the obligation to accept SNF from utilities at a rate sufficient to alleviate the "national problem" caused by the growing backlog of SNF accumulating at nuclear plants around the country. Thus, in enacting the NWPA, the government intended to assume the responsibility not only to accept and dispose of SNF, but also to do so at a rate that fulfilled these underlying objectives and to bind DOE to that commitment.

*3. The Standard Contract's quid-pro-quo exchange of obligations supports enforcement of an acceptance rate sufficient to prevent utilities from bearing additional at-reactor storage costs for spent fuel after January 31, 1998.*

The NWPA was signed into law on January 7, 1983. Because the NWPA required that contracts between DOE and utilities be signed by June 30, 1983, 42 U.S.C. § 10222(b)(2)(A), DOE determined that it did not have sufficient time to negotiate the terms of the contracts with each commercial nuclear utility individually. *See* Proposed Rule, Standard Contract for Disposal of Spent Nuclear Fuel and/or High Level Radioactive Waste, 48 Fed. Reg. 5458, 5459 (Feb. 4, 1983). Instead, DOE chose to develop a standard contract to be used with all utilities through

notice and comment rulemaking. *Id.* Although DOE submitted its draft of the Standard Contract for public comment, DOE provided for very little opportunity for input from utilities. In fact, DOE generally refused to include terms in the contract that were not otherwise set out as requirements in the NWPA. *See* Final Rule, Standard Contract for Disposal of Spent Nuclear Fuel and/or High Level Radioactive Waste, 48 Fed. Reg. 16,590, 16,590-98 (Apr. 18, 1983). As a result, although some utilities and industry groups requested that the Standard Contract confirm DOE's obligations through identification or express acknowledgment of an acceptance rate or term, DOE did not include such a term in the final Standard Contract. Significantly, however, DOE made no statement or suggestion at the time that it *disagreed* that its obligations were to preclude the need for at-reactor storage after 1998, and all of the evidence is to the contrary.

The Restatement recognizes that an essential missing term is to be supplied by the Court where the parties omitted the term "because discussion of it might be unpleasant or might produce delay or impasse." Restatement (Second) of Contracts § 204 cmt. b. That was, manifestly, the circumstance here. The NWPA prohibited the Nuclear Regulatory Commission from issuing renewed or amended licenses to any operator who had not "entered into a contract with the Secretary" or who was not "actively and in good faith negotiating with the Secretary for a contract," 42 U.S.C. § 10222(b)(1)(A), and the utilities were therefore not afforded the same opportunities to object to the omission of an acceptance rate term that they would have had in a private contractual negotiation process. Indeed, the Federal Circuit has recognized that the NWPA "effectively made entry into such contracts mandatory for the utilities." *Maine Yankee*, 225 F.3d at 1337.

Despite this abbreviated and imbalanced drafting process, there is no contemporaneous evidence that the parties intended or understood the Contract to permit the government to dispose

of SNF at a rate that would require utilities to make substantial additional expenditures—beyond payments to DOE—for storage of spent nuclear fuel after January 31, 1998.

The utilities secured these government obligations by committing to extraordinary contractual fee obligations. Overall, the commercial nuclear utilities have paid a combined estimated $14.954 billion into the Nuclear Waste Fund through December 31, 2006,[14] and are obliged to continue to contribute billions more over the life of the program. For its part, Dominion has paid approximately $112,450,459 million in one-time fees, and has paid a total of $963,912,863 million for Surry, North Anna, and Millstone.

In effect, the Court's acceptance rate inquiry must determine what constitutes a reasonable obligation to  on the government as a *quid-pro-quo* exchange for the billions of dollars in fees paid by utilities thus far under the Contract. Absent a reasonable acceptance rate, the industry's contractual bargain would be meaningless. The staggering amount that Dominion and other utilities agreed to pay, and in fact have paid, to DOE is reasonable only because the government repeatedly reassured the utilities that it intended to assume responsibility for permanent storage and disposal of SNF beginning on January 31, 1998.

*4. Dominion understood that DOE was obligated to collect spent fuel beginning in 1998 at a rate sufficient to prevent additional at-reactor storage costs after that date.*

In supplying a reasonable acceptance rate under the Standard Contract, the Court should interpret the parties' contractual obligations "in accordance with the parties' understanding as shown by their conduct before the controversy." *Julius Goldman's Egg City v. United States*, 697 F.2d 1051, 1058 (Fed. Cir. 1983). Indeed, the Court's function is to effectuate the "original intention[s]" and "principal purpose of the parties" at the time of contract formation. ++

---

[14] Estimated payments to the Nuclear Waste Fund are available at http://www.nei.org/filefolder/u.s._state_by_state_used_fuel_and_payments_to_nwf.xls.

*Ltd.*, 816 F.2d at 1565 (citations omitted). To determine the intent of the parties, the court may look to "all of the relevant circumstances surrounding the transaction," including the "conduct of the parties before the advent of the controversy, oral statements, writings, the recitals to a contract, prior negotiations, and other conduct by which the parties manifested their assent." *KMS Fusion, Inc. v. United States*, 36 Fed. Cl. 68, 76 (1996), *aff'd mem.*, 108 F.3d 1393 (Fed. Cir. 1997).

The managers for Dominion who were present at the time of the Standard Contract will testify that their understandings were consistent with DOE being obligated to accept spent nuclear fuel at a rate sufficient to prevent further expenditures for at-reactor storage after January 31, 1998. In particular, Dominion witnesses will confirm the core understanding that DOE would pick up fuel on a schedule that would preclude utilities, including Dominion, from having to provide additional at-reactor storage capacity after January 31, 1998. Picking up less than this, according to Dominion personnel, would not satisfy the objective of the contract and would mean that utilities would effectively pay twice for the services they were paying for under the Standard Contract. The evidence from the Dominion side of the table will therefore confirm the company's understanding that the essential contractual *quid pro quo* involved Dominion receiving, in exchange for its substantial payments to DOE, performance sufficient to prevent further expenditures on storage after January 31, 1998.

*5. DOE understood that it was obligated to collect spent fuel beginning in 1998 at a rate sufficient to prevent additional at-reactor storage costs after that date.*

The overwhelming weight of contemporaneous evidence will likewise demonstrate that DOE understood and intended that the government would accept SNF at a rate such that no utility would have to create additional SNF storage capacity after January 31, 1998. For example, the September 15, 1983 Draft Mission Plan summarized DOE's prior planning

meetings and decisions, explaining that DOE planned to implement the program with an acceptance rate "such that no utility would have to build additional storage facilities after 1998." The December 20, 1983 Draft Mission Plan also stated that DOE intended to implement the spent fuel disposal program with an "acceptance rate in the first five years such that no utility will have to provide additional storage capacity after January 31, 1998. Subsequently, the acceptance rate will be equal to or greater than the actual discharge of spent fuel each year." Excerpts from Draft Civilian Radioactive Waste Management Program Mission Plan, Volume I, Overview and Current Program Plans, at 2-1 (Dec. 20, 1983) ("1983 Draft Mission Plan"). In developing the 1983 Draft Mission Plan, the NWPA Project Office issued a "Mission Plan Strategy" memorandum describing the "central criteria" for DOE's waste acceptance schedule as:

> [1] an acceptance rate during the first 5 years such that no utility would have to build additional storage facilities after 1998[; and]
> [2] an acceptance rate after the first 5 years equivalent to the actual rate of utility discharge of spent fuel each year.

Mission Plan Strategy, at 1 (Sept. 15, 1983). And Michael T. Lawrence, then-Acting Director of the OCRWM, in his February 22, 1984 Statement to the House Subcommittee on Energy Conservation and Power, declared that the waste acceptance schedule set forth in the Draft Mission Plan was intended to fulfill the fundamental objective of the NWPA because it would "initially preclude the need for additional at-reactor storage by nuclear utilities after January 31, 1998[.]" Statement at 2.

These statements of DOE's understanding of its obligations under the Standard Contract and the NWPA are particularly significant considering that DOE developed the Mission Plan to fulfill its statutory obligation to "provide an informational basis sufficient to permit informed decisions to be made in carrying out the repository program." NWPA, 42 U.S.C. § 10221(a). As such, the 1983 Draft Mission Plan is a document that should provide authoritative, if not

dispositive, evidence of the government's contemporaneous understanding of its obligations under the NWPA and the Standard Contract. *See, e.g.*, Deposition of Alan Brownstein, 414:3-12 (April 10, 2002) (affirming that "the DOE made an effort in the mission plans to be as accurate and informative as possible").[15] It thus is particularly significant that this critical program document unequivocally evinces that DOE intended to develop and implement a SNF disposal acceptance schedule at a rate at least sufficient to enable commercial nuclear utilities to avoid additional at-reactor storage costs.

DOE officials throughout this period also repeatedly confirmed that the government intended to administer the spent fuel program at a rate sufficient to fulfill these two fundamental objectives. For instance, Robert Morgan, then-Acting Director of the Office of Civilian Radioactive Waste Management ("OCRWM"), expressly and unequivocally confirmed this understanding of DOE's obligations at an OCRWM informational meeting held in December of 1983, where he stated that:

> I think that most of you know that the Act requires that we receive waste from the utilities by January 1, 1998. Technically, the Act does not specify how much waste or spent fuel we must be receiving at that time. In fact, if we accepted one spent fuel element in 1998 we would technically be in accordance with the Act. However, *we did not believe that meets the intent of the Act.* The basic strategy which we've outlined in the mission plan, is that beginning in 1998, utilities will not have to provide any additional storage facilities on site. During the first year of operation of the repository in 1998, *we should be receiving fuel at a rate so that no utility would have to add any further storage facilities either on site or at another location.*

Excerpts from Proceedings of the 1983 Civilian Radioactive Waste Management Information

---

15 Dominion intends to call certain current and former DOE witnesses to testify live at trial. For efficiency, however, Dominion intends to move, under the Rules, for admission of a limited number of prior sworn statements by other DOE officials, on grounds including (but perhaps not limited to) the fact that such statements are admissions by a party opponent, under Fed. R. Evid. 801(d)(2). Dominion thereby expects to greatly reduce the number of current and former DOE personnel that will be required to testify on these matters. Although the potential record is daunting (covering thousands of pages of testimony and hundreds of thousands of pages of documents), Dominion anticipates that the prior testimony designations will be of a reasonable scope.

Meeting: Program Overview, at 1 (Dec. 12-15, 1983)(emphasis added).[16]

Echoing this same understanding, Michael J. Lawrence, then Acting Director of OCRWM, testified in February of 1984 before the House Subcommittee on Energy Conservation and Power that achieving the "fundamental objective[s]" of the NWPA required "an appropriate waste acceptance schedule" that would "initially preclude the need for additional at-reactor storage by nuclear utilities after January 31, 1998." Statement of Michael J. Lawrence before the Subcommittee on Energy Conservation and Power, House Committee on Energy and Commerce, at 3 (Feb. 22, 1984). *See also* Letter from Michael J. Lawrence, Manager, DOE's Richland Operations Office, to Ben C. Rusche, Director, OCRWM, enclosure 1 at 1 (July 23, 1984) ("Based upon our interpretation of the NWPA, the minimum acceptance rate should be based upon the rate at which spent fuel is generated by civilian nuclear power reactors. This would be consistent with the NWPA intent that no power reactor would require additional spent fuel storage after January 31, 1998.") ("to eliminate the need for additional at-reactor storage after January 31, 1998, the initial waste acceptance rate for 1998 should be about 2,800 MTU plus some amount up to 630 MTU . . . .")

Taken together, the DOE program documents and repeated statements from DOE officials demonstrate that DOE understood the NWPA to require, and intended the Standard Contract to implement, an acceptance rate sufficient to: (1) avoid the need for the nation's nuclear utilities to develop additional SNF storage at nuclear plant sites after 1998; and (2) reduce the backlog of SNF accumulating at nuclear plants around the country. *See* Deposition of Billy M. Cole, 131:23—132:1; 175:17-23 (March 12, 2002) ("[T]he whole purpose of the Nuclear Waste Policy Act was to keep the utilities from having to add new storage so they could

16 Robert Morgan has since confirmed on multiple occasions that this statement reflected the DOE's "strategy . . . to preclude the need for additional at reactor storage after January 31, 1998 . . . [and] ultimately to remove from at-reactor storage all waste more than five years old." Deposition of Robert L. Morgan, 113:13-22 (November 15, 2006).

keep operating. . . . Not only did they want to help utilities so they wouldn't have to add additional capacity, they wanted to make sure that you had to work off the backlog.").

The evidence this conclusion is overwhelming. For decades, the industry has generated (and today generates) approximately 2,000 MTU of spent fuel per year. A 3,000 MTU steady-state acceptance rate has been consistently identified as the reasonable and appropriate acceptance rate in a wide variety of DOE documents that span the life of the program. Some examples include:

- DOE's July 1983 report on the adequacy of fees under the Standard Contract assumed the repository would open in 1998 with "a design receipt rate of 3,000 metric tons (MT) a year, although a receiving rate of 1,800 MT annually is assumed for the first five years." Report on Financing the Disposal of Commercial Spent Nuclear Fuel and Processed High-Level Radioactive Waste by U.S. Department of Energy at 8 (July 1983). Critically, DOE deemed the utilities' contract fee of 1 mill/kwhr sufficient to cover the entire cost of disposing of 3,000 MTU per year. *Id.* at 2.

- At the December 1983 Civilian Radioactive Waste Management Information Meeting, Robert Morgan, Interim Director of DOE's Spent Nuclear Fuel Program, stated that "beginning in 1998, utilities will not have to provide any additional storage facilities on site. During the first year of operation of the repository in 1998, we should be receiving fuel at a rate so that no utility would have to add any further storage facilities either on site or at another location." Proceedings of the 1983 Civilian Radioactive Waste Management Information Meeting: Program Overview at 11 (Dec. 12-15, 1983).

- In his testimony in February of 1984 before the House Subcommittee on Energy Conservation and Power, Michael J. Lawrence, then Acting Director of OCRWM, explained that "to eliminate the need for additional at-reactor storage after January 31, 1998, the initial waste acceptance rate for 1998 should be about 2,800 MTU." Statement of Michael J. Lawrence before the Subcommittee on Energy Conservation and Power, House Committee on Energy and Commerce (Feb. 22, 1984).

- The waste acceptance schedule set forth in the 1984 Draft Mission Plan showed DOE accepting 3,000 MTU of SNF per year after a five year ramp-up period. *See* Draft Mission Plan for the Civilian Radioactive Waste Management Program at 2-2 (Apr. 1984).

- The final draft of DOE's Preliminary Analysis of the Total System Life Cycle Cost ("TSLCC") of the SNF disposal program assumed a "design receipt rate" of "1800 MTU per year for the first five years of operation, and 3000 MTU per year thereafter." Excerpts from Final Draft of Preliminary Analysis of the Total

System Life Cycle Cost of the Commercial High-Level Radioactive Waste Disposal Program at 2-3 (Apr. 27, 1984).

- Confirming its 1983 conclusion, the DOE's fee adequacy report for 1984 again found the utilities' contract fee of 1 mill/kwhr sufficient to cover a receipt rate of "1,800 MTU/yearly for the first five years, and then 3,000 MTU/yearly thereafter." *See* Nuclear Waste Fund Fee Adequacy: An Assessment at 3 (July 1984).

- In its 1985 fee adequacy report, the DOE's fee adequacy analyses again assumed a 3,000 MTU steady-state rate after a five year ramp-up period. *See* Nuclear Waste Fund Fee Adequacy: An Assessment at 3 (Feb. 1985). This consistent use of the 3,000 MTU steady-state rate as the basis for calculating the adequacy of the utilities' contractual fee evinces that the heart of the contractual bargain between DOE and the utilities is that DOE would operate the spent fuel disposal program at a 3,000 ton rate.

- DOE's 1985 analysis of the TSLCC also indicates that one of the "Key Assumptions for the Reference Case" is a repository design receipt rate of 3,000 MTU after a five year ramp-up period. *See* Analysis of the Total System Life Cycle Cost for the Civilian Radioactive Waste Management Program at 2-3 (Apr. 1985).

- OCRWM's Final 1985 Mission Plan also indicates that DOE intended to accept "3000 MTU" of SNF per year by the sixth year after DOE began accepting SNF. *See* Mission Plan for the Civilian Radioactive Waste Management Program, Volume I at 26 (June 1985).

- As with each of the previous analyses, DOE's 1986 fee adequacy report again assumed a 3,000 MTU steady-state rate after a five year ramp-up period. *See* Nuclear Waste Fund Fee Adequacy: An Assessment at 4 (Mar. 1985).

- DOE's 1986 TSLCC report, like all previous TSLCC reports, assumed that the repository would receive spent fuel at an annual rate of 3,000 MTU starting five years after DOE began accepting waste in 1998. *See* Analysis of the Total System Life Cycle Cost for the Civilian Radioactive Waste Management Program, Volume I: The Analysis and Its Results at 11 (Apr. 1986).

- Even in DOE's 1987 proposal to Congress to construct and operate a facility for the monitored retrievable storage ("MRS") of SNF, DOE committed to accept spent fuel "at a rate of 2500 to 3000 MTU per year" after a brief ramp-up period. *See* Monitored Retrievable Storage Submission to Congress, Volume I: The Proposal at 20 (Mar. 1987).

- DOE first acknowledged that it likely would be unable to begin acceptance of spent nuclear fuel in 1998 as required under the NWPA in its 1987 Mission Plan Amendment. *See* OCRWM Mission Plan Amendment at 6 (June 1987). Nonetheless, in that document, DOE still indicated that it intended to operate the spent fuel disposal program at a 3,000 MTU steady-state acceptance rate once the

program became fully operational. *Id.* at 61-62 (planning the spent fuel acceptance rate for the total system to be 3,000 MTU per year, after ramp up of 1,200 for five years, 2,000 for year six, and 2,650 for years seven through ten).

- DOE's 1987 Annual Capacity Report ("ACR") incorporated the 1987 Mission Plan Amendment rates. The Standard Contracts required issuance of the ACRs, beginning in 1987. Specifically, the 1987 ACR established a rate of 2,650, after a ramp up, as set forth in the 1987 Mission Plan Amendment (i.e., 1,200 for five years, 2,000 for year six, and 2,650 for four years). *See* 1987 Annual Capacity Report at 7 (June 1987).

- In its 1988 Draft Mission Plan Amendment, DOE again projected a steady-state repository receipt rate of 3,000 MTU by the sixth year after DOE began accepting SNF. *See* Draft 1988 Mission Plan Amendment at 19 (June 1988).

- Consistent with the 1988 Draft Mission Plan projection, DOE's 1988 ACR also projected an acceptance rate of 3,000 MTU by the sixth year after DOE began accepting SNF. *See* 1988 Annual Capacity Report at 5 (June 1988).

- In a November 1990 response to comments document, DOE considered the possibility that a repository may not be operational in 1998, stating that an MRS facility would provide DOE with a provisional means of fulfilling its contractual obligations because the MRS facility "is expected to preclude the need for additional at-reactor storage space for spent fuel storage [sic] between 1998 and 2010 and beyond." Comment Response Document for The Secretary of Energy's Report to Congress on Reassessment of the Civilian Radioactive Waste Management Program at 14 (Nov. 1990).

- In a 1990 addendum to its 1989 TSLCC analysis, DOE, although projecting significant delays in the beginning of the disposal program, nonetheless projected a 3,000 MTU steady-state acceptance rate after a five year ramp-up period. *See* Preliminary Estimates of the Total-System Cost for the Restructured Program: An Addendum to the May 1989 Analysis of the Total-System Life Cycle Cost for the Civilian Radioactive Waste Management Program at A-1 (Dec. 1990).

- Likewise, DOE's 1990 ACR projected an "upper bounding case" waste acceptance schedule that ramped up after five years to a steady-state rate of 3,000 MTU. *See* 1990 Annual Capacity Report at 7 (Dec. 1990).

- In its 1995 TSLCC assumptions package, DOE detailed the major assumptions underlying its assessment of the total cost of the SNF disposal program. *See* Memorandum from Ronald A. Milner, Department of Energy, to Director, OCRWM at 1 (Feb. 16, 1995). One of the assumptions that DOE relied on to calculate costs over the life of the program was that DOE would accept SNF at a 3,000 MTU steady-state rate after a four year ramp-up period. *See* 1995 TSLCC Assumptions Package at 14-15, 22-23 (Feb. 1995).

- In determining the viability of the Yucca Mountain site, DOE relied on an annual receipt rate of 3,000 MTU to determine whether the repository could safely be

built at the site. *See* Viability Assessment of a Repository at Yucca Mountain, Volume 2: Preliminary Design Concept for the Repository and Waste Package at 3-2 (Dec. 1998).

- Relatively recently, in detailing the necessary requirements for a permanent repository for commercial SNF, DOE once again relied on a projected 3,000 MTU steady-state acceptance rate. *See* Civilian Radioactive Waste Management System, Waste Acceptance System Requirements Document, Revision 4, at 46 (Jan. 2002).
- DOE's 2004 APR/ACR also indicate an acceptance rate of 3,000 MTU by the fifth year after DOE begins accepting SNF. *See* Acceptance Priority Ranking & Annual Capacity Report at 2 (July 2004).

As these samples of the documentary evidence reveal, DOE consistently identify a 3,000 MTU steady-state acceptance rate as the necessary acceptance rate.

Testimony by current and former DOE officials further confirms that the government understood a 3,000 MTU rate to be necessary to achieve the goals of the NWPA, and thus a reasonable obligation under the Contract:

- "My recollection is that the [Repository] was to receive 3,000 tons a year . . . which was in excess of the generation rate of around 2,000." Deposition of Lake Barrett, 52:7-10 (April 22, 2002).
- "Q: So based on your prior testimony, Mr. Barrett, the 3,000 rate would be consistent with your understanding of the intent of the act to reduce over a reasonable period of time the backlog of spent nuclear fuel throughout the nation, correct? . . . A: Yes." Deposition of Lake Barrett, 59:4-11 (April 22, 2002).
- "Q: Again, just so the record is clear, your goal and the organization's goal is to achieve a reasonable receipt rate going towards the steady state of 3,000 tons per year, correct? . . . A: That has been our goal to do that. Q: And it continues to be your goal today, correct? A: Correct." Deposition of Lake Barrett, 118:16—119:4 (April 22, 2002).
- "The receipt rate [should be] a nominal 3,000 tons per year steady state when the generation rate was approximately 2,000 tons per year. The system capacity and take rate [should be] exceeding the generation rate in the nation." Deposition of Lake Barrett, 1164:19—1165:1 (May 10, 2002).
- "Q: All right, but the DOE goal or objective was to eliminate the need for utilities to provide on-site storage after the DOE began acceptance of spent nuclear fuel, is that correct? A: That was a goal." Deposition of Alan Brownstein, 412:16-21 (April 10, 2002).

- "[The] basic purpose of the Nuclear Waste Policy Act was to try to help keep the utilities from having to run out of storage space, so the utilities are in there for generating electricity and not storing fuel. You know, the government had a responsibility to help them because they, like I said, they stopped reprocessing. This is a basic strategy, and a part of the primary mission was to keep them from having to add more storage. That was one of the major goals of the program." Deposition of Billy M. Cole, 81:1-13 (March 12, 2002).

- "[W]e wanted to accept fuel at a rate that would allow the utilities not to require additional at-reactor fuel storage. That means you don't have to consolidate, rerack, you don't have to go for dry storage." Deposition of Patrick McDuffie, 71:14-18 (March 18, 2002).

- The basis of the 3,000 MTU rate was "to try and keep up with spent fuel discharges and the need for alleviating the need for additional on-site dry storage at the purchaser sites." Deposition of Thomas Pollog, 12:23-25 (April 12, 2002).

- "Q: Was it your understanding that after 1998, the Department of Energy would become responsible for providing or eliminating the need for additional on-site storage? A: Yes." Deposition of Robert M. Rosselli, 140:6-10 (April 15, 2002).

- "[W]e would eventually get up to about 3,000 metric tons a year, which we believed was the accepted spent fuel generation rate of the nuclear power plants at that time. And it was over that ramp-up period that we hoped to get to the point where we would preclude the utilities from having to provide additional on-site storage." Deposition of Victor W. Trebules, Jr., 53:12-19 (April 17, 2002).

- "As best as I could remember, we had two overriding goals or objectives that we were trying to meet. One was to begin waste acceptance in 1998. The other was to reach a rate for which the amounts of additional at-reactor storage would be minimal or none." Deposition of Victor W. Trebules, Jr., 97:8-13 (April 17, 2002).

As this and other testimonial evidence will demonstrate, DOE understood that an acceptance rate of 3,000 MTU per year was necessary to effectuate the NWPA's objectives and avoid additional at-reactor storage costs and to work off the spent fuel backlog existing at that time. In light of the overwhelming weight of supporting evidence, it is clear that a "reasonable" acceptance rate is one that obligates DOE to reach a steady-state acceptance rate of 3,000 MTU per year.

6. *Neither DOE's issuance of a lower rate schedule in the 1991 ACR, nor its approval of Delivery Commitment Schedules based upon those schedules, supports the imposition of a 900 MTU per year acceptance rate.*

Even after several trials addressing this precise issue, the government's position regarding its acceptance rate obligations remains unclear and convoluted. At times the government has contended that the only enforceable pick-up rate obligations are those contained in the 1991 Acceptance Capacity Report ("ACR"). At other times, however, the government has asserted that only the acceptance amounts contained in approved Delivery Commitment Schedules ("DCSs"), based upon the 1991 rates, represent enforceable contractual obligations. Under either formulation, the government's position is untenable.

Under the Standard Contract, DOE was required to issue an annual capacity report no later than July 1, 1987. Contract at Art. IV.B.5.[17] The Contract also required DOE to issue an annual priority ranking ("APR") beginning April 1, 1991. *Id.* The APR assigns an acceptance priority ranking to units of SNF based on the age of the spent fuel as measured by its reactor discharge date. The ACR projects annual acceptance amounts and applies the priority rankings from the APR to allocate the annual acceptance amounts to individual utilities. Such documents, however—including the 1991 ACR—contained express statements that ACR documents were "for planning purposes only," and consistently recited that they were "not contractually binding" on either the government or utilities, *see* 1991 Annual Capacity Report at 1, while nothing in the Standard Contracts says that the ACR document can limit DOE's pick-up obligations in the manner that the government now argues. And as the overwhelming evidence discussed above reveals, during the early years of the spent fuel program, DOE routinely published acceptance rate schedules showing a 3,000 MTU steady-state acceptance rate.

[17] That 1987 ACR incorporated acceptance rates from the 1987 Mission Plan Amendment, which recited a 3000 MTU/year steady state acceptance rate, after a ramp up of 1,200 MTU for five years, 2,000 MTU in year six, and 2,650 MTU's in years seven through ten.

Starting in 1991, however, DOE, anticipating its eventual breach of its obligation to begin accepting spent fuel in 1998, began implementing a strategy to reduce its liability and exposure. Toward this end, DOE's 1991 through 1995 ACRs included acceptance rates that dramatically departed from the rates stated in all earlier program documents. Supposedly in response to the NWPA Amendments of 1987, which limited the capacity of DOE's proposed monitored retrievable storage ("MRS") facility, those documents listed an acceptance rate that ramped up only to a 900 MTU steady-state rate. That rate, however, was flatly and admittedly inconsistent with the law. Rather, it reflected an arbitrary, and selective, assumption that one part of the NWPA restrictions imposed by the 1987 amendments (*i.e.,* "linkages" between the opening of an MRS and construction authorization for a permanent repository) would be amended by Congress, and another (*i.e.,* capacity limits of an MRS) would not.

Likewise, the contention that the DCS process somehow establishes a binding acceptance rate is utterly unavailing. For the Delivery Commitment Schedules ("DCSs") due under Article V.B. of the Contacts in 1992, DOE dictated that utilities use the 900 MTU/year rate allocations from its then-existing ACRs. *See generally, Vermont Yankee Nuclear Power Corporation v. United States,* 73 Fed. Cl. 236, 244 (2006) (description of DCS process). The assertion that that approved DCSs provide a contractually binding acceptance rate suffers from a host of flaws, including the fact that: (1) such schedules were not viewed by DOE as binding commitments at the time they were approved; (2) DOE unilaterally ceased approving such schedules after a few years in the 1990's, and (3) it is impossible for a utility to have an approved DCS today. The contracts also provide for Final Delivery Schedules (FDS), but no such FDS was ever approved by DOE.

7. *The government's asserted 900 MTU per year acceptance rate is severely flawed.*

The government's proposed 900 MTU acceptance rate, whether based directly on the "not contractually binding" 1991 ACR itself, or on the "approved DCS" theory at times advocated by DOE, cannot correctly be accepted as the limit of DOE's obligation under the NWPA and the Standard Contracts. *See generally, System Fuels,* 79 Fed. Cl. at 55-58; *Southern Nuclear*, 77 Fed. Cl. at 396.

First, a 900 MTU acceptance rate simply would not meet the goals of the NWPA. From the very outset of the program, DOE understood that commercial nuclear utilities would be discharging in excess of 2,000 MTU of spent fuel per year in and after 1998. *See* 1983 Draft Mission Plan at 2-3; Deposition of Lake Barrett, 1331:12-17 (May 10, 2002). Clearly, if the commercial nuclear industry is generating 2,000 metric tons of SNF each year, the government's "900-ton rate would cause the Department of Energy to fall farther behind each year." *Indiana Michigan*, 57 Fed. Cl. at 99. Thus, it was understood by all parties that an acceptance rate at least above the 2,000 MTU threshold was necessary to keep pace with the annual output of spent fuel. *See* 1983 Draft Mission Plan at 2-3.

Second, the government's minimalist interpretation of its obligations under the Contract directly conflicts with the NWPA's mandate that "the Secretary shall take title to the high-level radioactive waste or spent nuclear fuel involved as expeditiously as practicable upon the request of the generator or owner of such waste or spent fuel" NWPA, 42 U.S.C. § 10222(a)(5)(A). (emphasis added), and is inconsistent with the clear congressional intent that DOE address the "accumulation" of spent fuel at reactor sites. 42 U.S.C. § 10131(a)(2).

Third, the underlying basis of the 900 MTU rate, while never valid, in any event no longer exists. The 900 MTU rate was purportedly developed in response to the NWPA amendments and the limits imposed on any future MRS facility. Significantly, the 1987 Nuclear

Waste Policy Amendments Act explicitly prohibited DOE from constructing an MRS facility until the agency received a construction license from the NRC for a permanent geologic repository—a so-called statutory "linkage" that was never amended or satisfied. DOE's position, therefore, is that its pick-up obligations are defined by an effectively illegal rate. The government asserts that its obligations under the Contract should be based not upon an interpretation of the Contract in light of the statute pursuant to which it was promulgated, *see Roedler*, 255 F.3d at 1352, but upon a presumed change in the law by Congress that never occurred.

Fourth, the Court should reject the government's proposed 900 MTU rate, whether the government "backs into" that rate through its DCS arguments or otherwise, because the government plainly is advocating a lower rate in an effort to limit its liability in this and other lawsuits arising out of its partial breach of the Standard Contract. To determine the intent of the parties, the Court may look to "all of the relevant circumstances surrounding the transaction," including the "conduct of the parties before the advent of the controversy, oral statements, writings, the recitals to a contract, prior negotiations, and other conduct by which the parties manifested their assent." *KMS Fusion,* 36 Fed. Cl. 68, 76. (emphasis added.) The 900 MTU rate thus must be rejected because it was developed and asserted with the clear goal of limiting the government's exposure. Indeed, DOE personnel repeatedly have made clear that the government continued to utilize the 900 MTU rate to limit the government's anticipated liability. *See, e.g.*, Deposition of David Zabransky, 243:16-20 (June 6, 2002) ("If you're asking me was it my opinion that they were trying, the department was trying to minimize its obligations by using [the 900 MTU rate in the 1995] ACR? That's still my belief. I believe they were trying to do that.").

Fifth, the 900 MTU rate should be rejected because it is inconsistent with fundamental DOE assumptions underlying almost all program documents and testimony of contemporaneous

intent. The government's contentions cannot be squared with the compelling evidence establishing that the parties understood that, in exchange for the billions of dollars in fees paid to DOE, utilities would not be responsible for additional at-reactor storage costs after 1998. That, clearly, was the carrot for utilities, and the essence of the deal. Under the law, and in order to give these contracts any sort of meaning at all, DOE must be held accountable for reasonable performance obligations. The government's 900 MTU rate position does not accomplish that. The government's present efforts to avoid such reasonable performance obligations are severely flawed, and should be rejected.

Finally, and even beyond the inapplicability of its pick-up rate defense, it should be noted that the government in any event overstates the impact of application of the 900 MTU/year rate. In fact, the North Anna ISFSI would still have been unnecessary, even pursuant to application of that rate. The government's quarrel with this proposition will not be based upon any evidence, but, rather, upon "instructions of counsel" to a retained economist expert, to the effect that allocations at the lower rate should not be shared between the Dominion plants. That position has no logical or legal basis, and does not justify the damage reductions sought by the government.

**B. DOE's Breach Was a "Substantial Causal Factor" of the North Anna ISFSI Costs.**

Under the 3000 MTU/year pick-up rate assumptions that the evidence will establish to be reasonable, and which Dominion has used for purposes of calculating its claimed damages, there would have been minor, short, and limited intermittent losses of full core reserve at North Anna during some (but not all) periods between the end of 1998 and 2000. The government will apparently argue that Dominion would have undertaken the construction of the North Anna ISFSI as a $23 million "insurance policy," even under the assumptions of reasonable DOE performance.

Such an argument is patently untenable. First, there will be no competent evidence whatsoever to support the government's claims. An economist retained by the government, who is quick to disavow any nuclear management expertise, will opine that "additional SNF storage capacity" would have been necessary at North Anna. Putting aside for the moment the fallacy of that proposition (see below), the economist was "careful" not to say that a dry storage ISFSI would be required at North Anna. A temporary rack, for example, could have ameliorated the temporary losses of full core reserve assuming for argument's sake it were necessary to do so, at a tiny fraction of the cost of dry storage. Yet, counsel from DOJ nevertheless instructed the government's cost expert to assume Dominion would have built the ISFSI at North Anna and "deduct" all North Anna ISFSI costs, which he dutifully did. The problem, however, is that no evidence will support that deduction. The government's defense is a house of cards that cannot withstand even a breath of scrutiny.

Second, all of the persuasive evidence in this case will confirm that temporary losses of full core reserve such as those that would have occurred at North Anna under assumptions of reasonable DOE performance could have been acceptably managed, without extraordinarily expensive measures such as construction of a $23 million dry storage facility. The government's *own nuclear management expert* will confirm that construction of a dry storage facility in such circumstances would "make no sense." Indeed, Dominion has actually managed such losses of full core reserve in the real world in the past. This exact type of argument, supported by the exact same retained economist upon which DOJ relies here, has been previously rejected in analogous circumstances by the Court. *Southern Nuclear*, 77 Fed. Cl. at 427 ("Rather than build expensive dry storage, any loss of [full core reserve] would have been tolerated because DOE's continuing performance in the non-breach world would have restored [full core reserve] in a relatively short time.")

Third, the assumptions upon which Dominion's damage calculations are based are, in the interests of simplicity, conservative. For example, application of the ramp up rates reflected in DOE's 1987 ACR document (which are in turn based upon DOE's 1987 Draft Mission Plan) would result in no losses of full core reserve at North Anna whatsoever. Moreover, the assumptions used by Dominion do not include various potential—but clearly viable—alternatives that would have been available to address temporary needs, such as the contractual provisions for exchanges of allocations, *e.g., TVA*, 69 Fed. Cl. at 533, and contractual provisions for increases in allocations of 20%. *TVA*, 69 Fed. Cl. at 532 ("Given the proportionately large cost of building and operating dry storage facilities, TVA would have had several options available in the but-for scenario to deal with its spent fuel while still avoiding dry storage.") Even if it were absolutely necessary to completely avoid even temporary losses of full core reserve (and all of the evidence will be to the contrary), such avoidance could have been achieved without construction of a dry storage facility at North Anna. The government will not meet "its burden of showing that [plaintiff] would have had to pursue dry storage even if DOE had performed under the contract." *TVA*, 69 Fed. Cl. at 533.

### C. The Government Is Not Entitled To A Damage Reduction Due To Alleged "Losses Avoided" For Specific Mitigation Projects And Plant Modifications.

The government will seek several significant reductions to Dominion's claimed damages for costs associated with certain plant modifications that Dominion made, on the grounds that such projects would have been necessary had the government performed. Such defenses suffer from a number of common and fatal defects, chief among them the unsupported government assumption that DOE-supplied casks would have been precisely the same size and dimensions as the storage casks actually and necessarily utilized by Dominion for mitigation purposes in the real world. In other cases the government's assumptions about hypothetical transportation casks are inconsistent, and utterly fail to account for the contractual duty for DOE to provide casks

"suitable for use" at the Dominion sites. Some of the main claimed reductions are addressed, below.

1. *Millstone Unit 2 and 3 Cask Crane Upgrades*

In order to move a "heavy load" (generally defined as weighing greater than 1,700 lbs) from a nuclear plant's spent fuel pool, the plant operator is required to comply with certain Nuclear Regulatory Commission (NRC) regulations that require it to: (a) move such loads by a "single failure proof crane" or, alternatively, (b) prepare an analysis that considers the potential impacts of a drop of that heavy load, and implement mitigation measures where required. For the North Anna and Surry plants, Dominion chose the latter option to move heavy loads from the spent fuel pools. Significantly, Dominion has not upgraded either the North Anna or Surry cask cranes to "single failure proof," even though Dominion moves greater than 100 ton loaded spent fuel dry storage casks from the spent fuel pools to the North Anna and Surry ISFSIs. For Millstone Units 2 and 3, Dominion through 2004 similarly moved heavy loads from the spent fuel pools without a single failure proof crane. To implement the Millstone ISFSI project and accommodate the associated movement of up to 125 ton spent fuel dry storage casks, however, Dominion determined to upgrade the Millstone Unit 2 and 3 cask cranes to single failure proof. The evidence will confirm that Dominion upgraded the Millstone Unit 2 and 3 cask cranes not because it had to for reasons unrelated to DOE's breach or merely because "heavy loads" had to be moved, but, rather, because use of a single failure proof crane simplified movement of the extremely heavy cask, weighing up to 125 tons, required for the Millstone dry storage project, and minimized possible delays to the ISFSI project due to possible public intervention.[18] The government does not dispute the reasonableness of the crane upgrades at Millstone, and

[18] Specifically, alternatives to single failure proof upgrades may have involved technical specification changes, and opportunities for intervention under NRC regulations.

Dominion will easily establish that DOE's breach was a "substantial causal factor" in this element of Dominion's damages claim. *Indiana Michigan II*, 422 F.3d at 1373.

Nevertheless, the government will seek to reduce Dominion's recovery by the more than $7 million expended to upgrade the Millstone Unit 2 and 3 cask cranes. In support the government will rely entirely upon the testimony of a retained expert, who will assert that Dominion would have undertaken such actions in order to move a hypothetical 25 ton DOE-supplied cask, postulated by the expert.[19] That assertion will not be supported by the facts or testimony by knowledgable Dominion personnel. In particular, the government will offer no credible reason why Dominion could not have prepared an analysis or implemented mitigation measures—*as it did at North Anna and Surry*—in order to move a hypothetical 25 ton DOE-supplied cask at either Millstone Unit 2 or 3. Instead, the government will simply assert that because Dominion chose to upgrade the Millstone Unit 2 and 3 cranes for the 125 ton dry storage casks required by DOE's breach, it would have been a "prudent" management decision to do the same for a hypothetical DOE-supplied cask that weighed 1/5 of the cask actually used at Millstone. The government's arguments on this score will be unsupported and speculative, and the government will not meet its burden to establish that a reduction in Dominion's damages is warranted.

### 2. *Millstone Unit 2 Cask Loading Modifications*

As part of the Millstone ISFSI project, Dominion installed several plant modifications at Millstone Unit 2 in order to facilitate the loading and closure of the NUHOMS spent fuel dry storage casks, most of which were custom designed for the NUHOMS system used at Millstone. The plant modifications included installation of a work platform that fit tightly around the outside diameter of the dry storage cask, cask vacuum drying support systems, external gas racks

[19] That expert has no experience in the design, construction, or operation of a dry storage facility. And, the expert will admit that he "has no idea" what sort of cask DOE might have supplied, or might ever supply.

and tubing for the three gases (nitrogen, helium, and argon) used in the NUHOMS cask closure process, and 480 vac power to operate cask welding and vacuum drying equipment. The government will seek to reduce Dominion's claimed damages by the estimated cost to design and install these modifications on the grounds that such modifications would have been necessary had the government performed. The government will base this defense on opinions expressed by a retained expert who admittedly "has no idea what type of cask the government would have provided," and formulated his opinions without even considering the DOE's contractual obligation to arrange for casks "suitable for use" at the site, and to provide "special tools, equipment, lifting trunnions, spare parts and consumables needed to use and perform incidental maintenance on the cask(s)." Standard Contract, Article IV.B.2.

Even if it were necessary to implement certain modifications in order to support loading of some as-yet-unidentified DOE-supplied cask (and who knows whether that will be the case?), it is, to say the least, highly unlikely that those modifications would be precisely the same modifications that Dominion actually installed to support the specific NUHOMS system at Millstone. Further, the government has never provided to Dominion, or any other Purchaser under the Standard Contract for that matter, the specifications or designs of the "special tools, equipment, lifting trunnions, spare parts and consumables" it is obligated to supply along with the DOE-supplied cask. Accordingly, the government's effort to reduce Dominion's damages claim (by $219,224) based on the unsupported presumption that Dominion would have undertaken these same exact modifications to support a DOE-supplied cask is speculative, and should be rejected.

*3.* *Millstone Unit 3 Full Core Reserve Offload License Requirement*

The government intends to argue that Dominion's damages claim should be reduced by $427,909 for costs associated with amending the Millstone Unit 3 plant operating license to

remove restrictions associated with the number of times a full core offload could be performed, on the argued basis that such activities were unrelated to DOE's failure to accept Dominion's spent fuel. In support of its position, the government apparently intends again to rely on a retained expert.[20]

Dominion does not dispute that eliminating a full core offload restriction, by itself, would be unrelated to the government's breach. However, the evidence regarding the actual amendment in this case, including official correspondence to and from the NRC, will establish that the principal component of the full core offload license amendment here was a revised Millstone Unit 3 spent fuel pool heat load calculation. That heat load calculation assumed the addition of 1,104 spent fuel assemblies to the Unit 3 spent fuel pool, due to the Millstone Unit 3 rack addition project. The heat load calculation included in the full core offload license amendment directly supported, and was in fact a precondition to, NRC approval of the Millstone Unit 3 rack addition project. *And the government does not challenge that Millstone Unit 3 rack project on causation grounds.* The evidence will also establish that if the additional racks to the Unit 3 pool had not been necessary, Dominion would not have performed the revised heat load calculation solely to support a full core offload license amendment. Dominion's position is further supported by contemporaneous accounting records which establish that the vendor costs associated with the revised heat load calculation were in fact charged to the Unit 3 rack addition project. For all of these reasons, the government's effort to reduce Dominion's damages by the $427,909 incurred by Dominion in connection with the challenged license amendment should be rejected.

---

[20] That expert claims that his "position is also shared by Dominion personnel based on deposition testimony," but admits he did not reference or recall the testimony of the Dominion engineer actually responsible for managing this project.

**D. The Government Is Not Entitled To A Damage Reduction For Pre-Acquisition Millstone Damages.**

The government apparently intends to argue that all damages incurred in connection with the Millstone site prior to its acquisition by Dominion are barred by the Anti-Assignment Act and Assignment of Claims Act. The asset purchase agreement for Millstone, however, assigned to Dominion, along with title to the spent nuclear fuel, the right to prosecute and recover claims for all damages, whenever incurred. The prior owners of Millstone were identified in the caption of the original complaint in the Millstone action, and Dominion has consistently represented, and confirmed, to both the government and the Court that it is the single proper party plaintiff for all Millstone claims.

The government has asserted this precise "anti assignment" argument on two prior occasions in spent nuclear fuel damage cases, and on both occasions the Court has thoroughly and definitively rejected the government's position. *Rochester Gas and Electric Corporation v. United States*, 65 Fed. Cl. 431 (2005); *Vermont Yankee Nuclear Power Corporation v. United States*, 73 Fed. Cl. 236, 241-43 (2006). Both the NWPA and the Standard Contracts explicitly provide that the "rights and duties of a party to a contract under this section may be assignable." 42 U.S.C. § 10222(b)(3); *see* Standard Contract Article XIV ("the rights and duties of the Purchaser may be assignable"). Without belaboring the point, the government's position, necessarily, depends upon the proposition that the "right" to pursue pre-closing contract damages is not a "right" of a party to the contract that is expressly assignable under both the statute and the contract itself. That is just not a plausible position. The government's "anti assignment" defenses should be rejected.

**E. The Government Is Not Entitled To A Damage Reduction Due To Hypothetical Costs Of Loading DOE Casks That Were Never Supplied, And Which DOE Has A Duty To Provide One Day.**

The government will seek a substantial offset for the costs Dominion purportedly "saved" or "avoided" by not having to load DOE casks. The government's position, however, does not take into account DOE's future performance. If the government shows up one day in the real world, there will be a cost to load DOE's casks. That cost would be in addition to the hypothetical "savings" that the government seeks to deduct now, and Dominion will effectively incur such costs twice, rather than once. Also, the government never committed to supply a particular type or size of cask to Dominion, and the government's extrapolations about hypothetical DOE loading, therefore, represent pure speculation.

This is, necessarily, a case for partial breach. *Indiana Michigan II*, 422 F.3d at 1373-74. Dominion is seeking damages for DOE's delay in picking up its spent fuel, but Dominion still retains its right to insist that DOE come one day. Accordingly, Dominion did not "avoid" the costs of loading DOE's casks as a result of DOE's delay in picking up the fuel. These costs have only been deferred until the time that DOE finally performs. If Dominion's claim is reduced by the cost of loading DOE's cask in the but-for world, when DOE arrives to pick up spent fuel Dominion still will incur, effectively for a second time, the costs of loading DOE's casks in real world.

The Court's prior observations about alleged benefits in connection with the government's argued one-time fee offsets are fully applicable here. With its one-time fee defenses, the government argued that reductions in damages should be taken because Dominion avoided having to pay the "one time fee" due to DOE's failures – precisely the same argument it now makes with respect to allegedly avoided DOE loading costs. The Court held:

> That observation is true, but irrelevant, because it ignores what actually happened. Plaintiffs still have the SNF, the government still has the obligation to pick it up,

> and plaintiffs still have to pay the one-time fee when it becomes due. The only thing that is different from the contract scenario is that plaintiffs claim to have been forced to absorb unnecessary interim storage costs. If the government reimburses such costs, it hardly puts plaintiffs in a better position.

*Dominion Resources,* 77 Fed. Cl. 151, 156 (2007). Likewise, Dominion will "still have to" load DOE casks when DOE performs. The logic of the prior ruling in this case is compelling and correct, and requires rejection of the government's arguments regarding the alleged damage reductions.

In other spent fuel damage cases, this Court has uniformly rejected the government's efforts to reduce damages due to allegedly avoided DOE loading costs. *See System Fuels, Inc. v. United States*, 79 Fed. Cl. 37, 70-71 (2007) (*citing Tennessee Valley Authority v. United States*, 69 Fed. Cl. 665, 542 (2006); *Northern States Power Company v. United States*, 78 Fed. Cl. 449, 468-69 (2007); *Southern Nuclear v. United States*, 77 Fed. Cl. 396, 450-51 (2007); *Pacific Gas & Electric Company v. United States*, 73 Fed. Cl. 333, 416 (2006); *Yankee Atomic Power Company v. United States*, 73 Fed. Cl. 249, 286 (2006); and *Sacramento Municipal Utility District v. United States*, 70 Fed. Cl. 332, 372 (2006)). "Any benefit inhering in TVA because of delayed loading costs would be entirely speculative." *Tennessee Valley Auth.*, 69 Fed. Cl. at 542; *see also Sacramento Mun. Utility Dist.,* 70 Fed. Cl. at 372 ("Since DOE and SMUD both contemplate that DOE will still perform under the Standard Contract at some future date, any benefit to SMUD, because of delayed loading costs, would be entirely speculative."). These rulings are eminently correct, and no departure from the Court's consistent holdings will be warranted in this case.

### F. The Government Is Not Entitled To A Damage Reduction Due To Dominion's Use Of Its Own Employees On Mitigation Activities.

The government will object to Dominion's damages claim to the extent that it includes certain costs for internal labor. The government's position, however, ignores the fact that

because Dominion relied on its employees to assist in the mitigation activities it was necessarily deprived of the time its employees could have spent on other projects or tasks. The costs associated with that time is thus recoverable. *See TVA*, 69 Fed. Cl. at 539 (confirming that test for recoverability is "whether use of the internal resources by TVA deprived it of the ability to employ those resources on other projects"); *Southern Nuclear*, 77 Fed. Cl. at 396.

The government likely will contend, as it does in every spent fuel damages case, that there is a threshold amount an employee must spend on a mitigation project in a given year before his or her time becomes recoverable. That threshold, or "screen," was just made up by the government's expert out of thin air. The government's position is that the cost for labor on the mitigation activities where the employee does not meet the government's arbitrary threshold is a fixed cost. Whether a cost is "fixed," however, is not relevant to the issue of whether it is recoverable. *See TVA*, 69 Fed. Cl. at 539 ("That TVA would have paid its employees in all events is not material to this inquiry."). In reaching this conclusion, the Court in *TVA* was persuaded by cases like *Convoy Co. v. Sperry Rand Corp.*, 672 F.2d 781 (9th Cir. 1982), in which the "fixed cost" analysis was rejected: "The issue is not whether Convoy would have paid the supervisors' salaries if the defendant had not breached the contract, but whether the breach deprived Convoy of the services it paid for." *Id.* at 785. Under this correct analysis there is no logical threshold of amount of time a particular employee must spend on a mitigation project. If government's breach deprived Dominion of any of the services it paid for, that amount should be recoverable. And Dominion was deprived of <u>all</u> the time that its employees spent on mitigation activities. It is clearly a commercially reasonable decision to pull resources from throughout the company as opposed to segregating a group of employees to work full-time on mitigation activities.

As the Court noted in *Southern Nuclear*, the government's position creates a perverse incentive. If the rule in these spent nuclear fuel cases were that a company employee's time under a certain hour threshold is not recoverable, the natural consequence by a rational utility would be to prohibit its employees from undertaking tasks associated with mitigation activities involving spent fuel, and to instead utilize outside contractor or supplemental labor. Such outside labor, however, would almost surely be more expensive than utilization of internal resources, and the resulting damages in subsequent proceedings would accordingly increase. The government's arguments in this regard are not well founded, and efficiency and common sense further dictate that the government's argued reductions be rejected.

Moreover, the time Dominion's employees spent on various projects was recorded and allocated accurately. In *Convoy* the Ninth Circuit awarded costs, despite the contention that employee estimates (ten years after the event) of how much time was spent on the relevant activities were too speculative. Although the evidence in *Convoy* was sufficient, Dominion's evidence is even better. An employee's time was billed to particular projects contemporaneously and in the normal course of business. Dominion, therefore, has complete and accurate business records, which the government has had an opportunity to examine and audit, to discern precisely what time was spent on mitigation activities. The government's attempts to limit recovery of Dominion's claim for internal labor should be rejected.

### G. The Government Is Not Entitled To A Damage Reduction For AFUDC Costs Incurred By Dominion.

In the normal course of business, Dominion calculates the Allowance for Funds Used During Construction ("AFUDC") for each capital project, and includes such costs as part of the recorded total cost of the project. Including AFUDC in the cost of capital projects is "an industry-wide practice that is consistent with requirements promulgated by the Federal Energy Regulatory Commission." *TVA*, 69 Fed. Cl. at 541 (citing 18 C.F.R. pt. 101 Uniform System of

Accounts Prescribed for Public Utilities and Licensees Subject to the Provisions of the Federal Power Act, Electric Plant Instructions, ¶ 3.A(17)).

Within Dominion, major site projects typically are assigned a discrete project identification code, and project costs are tracked within Dominion's corporate accounting general ledger system by the discrete project code. Dominion's damages claim is based on the costs charged to the project codes associated with its various mitigation activities, as captured by its corporate accounting system. AFUDC charges to a discrete project are based on the individual project's characteristics, including the timing of charges to the project and the in-service date. AFUDC "includes the net cost for the period of construction of borrowed funds used for construction purposes and a reasonable rate on other funds when so used." *Id.*

The government's expert will assert that Dominion, by including AFUDC in its claim, has improperly included what amounts to pre-judgment interest in its calculation of asserted damages. AFUDC, however, is not interest on the cost to mitigate DOE's breach.[21] Rather, it is part of the cost Dominion actually incurred to mitigate DOE's breach. The Federal Circuit has recognized that the cost of funds used as a result of a breach is recoverable: "Although interest on equity capital is not recoverable, a contractor may recover interest actually paid on funds borrowed because of the government's delay in payments and used on the delayed contract." *Wickham Contracting Co. v. Fischer*, 12 F.3d 1574, 1582 (Fed. Cir. 1994). In *Wickham*, a contractor recovered interest paid on funds that it borrowed to finance a construction contract that was delayed due to the government's breach.

[21] Although it represents a real cost and harm arising from DOE's breach, Dominion does not seek "cost of capital" or after-the-fact calculated interest expense, based upon hurdle rates and expert opinions, of the sort rejected by the Court in *Southern Nuclear*, 77 Fed. Cl. at 396, and in recognition of the rule in cases such as *Library of Congress v. Shaw*, 478 U.S. 310 (1986). However, AFUDC, unlike such prejudgment interest claims, is different. It is a cost incurred in real time and recorded contemporaneously in the books and records of the company. Even if one calls it "interest," it is clearly not interest "on a claim," but, rather, interest as "an element of damages." *Westfed Holdings, Inc. v. United States*, 52 Fed. Cl. 135, 163 (2002), *aff'd in relevant part*, 407 F.3d 1352 (Fed. Cir. 2005). As such, it is recoverable.

To recover under *Wickham*, a plaintiff must show that "borrowed funds were used in connection with the . . . project." *Id.* at 1583. The government will apparently contend, as it did unsuccessfully in *TVA*, that this means that in order to recover AFUDC, Dominion must demonstrate that it borrowed funds specifically to finance the particular mitigation projects for which costs are claimed. The government's expert will argue that Dominion has not demonstrated that it borrowed funds specifically to finance the claimed mitigation activities. Like most utilities, however, Dominion does not issue debt instruments for specific capital projects. Rather, on a regular basis, it issues short- and long-term general debt. This capital structure is commercially reasonable and widely-accepted. *TVA*, 69 Fed. Cl. at 542. Indeed, it conforms to the FERC standard for calculating the cost of the funds used in capital projects. Dominion obviously had to gather substantial financial resources to carry out the various mitigation activities caused by DOE's failure to begin accepting SNF on January 31, 1998. AFUDC is part of the cost incurred in this effort and should be included in Dominion's damages.[22]

### H. The Government Is Not Entitled To A Damage Reduction For Overhead Costs.

The government also will argue that Dominion's claim should be reduced because the costs asserted by Dominion for overheads represent an allocation of various charges that have allegedly not been shown to be specifically affected by breach related activities. The government's arguments miss the mark. It is true that Dominion's claimed overhead costs are not directly assignable to a specific project (that is, after all, the essence of an "overhead" charge), but, rather, are allocated proportionately to all eligible projects in the normal course of business. That does not, however, render these real costs unrecoverable.

[22] *But see, contra, System Fuels,* 70 Fed. Cl. at 70, *citing Wickham* and *Gevyn Constr. Corp. v. United States,* 827 F.2d 752, 754 (1987). For the reasons stated above, we respectfully disagree with *System Fuels* (and agree with *TVA*), and believe that the proper rule of law should not penalize Dominion for simply utilizing general, rather than specific, debt instruments.

As with internal labor, the government argues that these overhead costs are "fixed" and "not affected by" the spent fuel mitigation activities. The use of these internal resources on the mitigation activities, however, deprived Dominion of their use on other projects. A portion of these services were clearly used by and related to the mitigation activities, and thus the allocated portion of the costs Dominion incurred maintaining these internal resources is properly charged to the mitigation activities.

Importantly, if no overhead charges are allocated to the mitigation projects, Dominion's other projects would assume a disproportionate amount of these expenses. It would make the other projects, in effect, more expensive. The government will be unable to provide a persuasive explanation of why activities conducted to mitigate its breach should not assume their fair proportion of the overhead expenses. Overhead, by definition, is a cost of doing business, and for a time part of Dominion's "business" was mitigating DOE's breach. Recovery of these costs, therefore, is necessary to secure fair and complete compensation:

> When a breach by one party imposes a delay on the ability of the other party to perform its obligations under the contract, the damages are to be measured by the direct cost of all labor and material, plus fair and reasonable overhead expenses properly chargeable during the reasonable time required to complete performance.

22 Am. Jur. 2d Damages § 69.

### I. Any Costs Still Challenged By The Government At The Time Of Trial On Adequacy-Of-Support Grounds Will Be Established By Dominion Under The Applicable Standards.

Pursuant to the pre-trial disclosure and audit process, Dominion has expended extraordinary resources producing cost and accounting data, responding to literally hundreds of individual audit requests, and assisting the team of government experts, accountants, and lawyers review and analyze tens of thousands of pages of invoices, time records, purchase orders, data base entries, and other documentation, in many cases literally line-by-line. And yet the government still insisted upon comprehensive depositions of Dominion employees on cost

support issues. As a result of that process, however, the amount and nature of the vast majority of the claimed costs have been established to the government's satisfaction. While the government contests recoverability of various elements of the claim on the grounds described in the sections above, in the main there appears to be no dispute that Dominion spent the dollars claimed on the projects identified.

As of the submission of this Memorandum, the government continues to challenge approximately 1% of the claimed damages on adequacy of documentation grounds. Although Dominion has provided supplemental information to the government, and continues to attempt to work with the government to reduce or eliminate these remaining issues prior to trial, the government may persist in challenging the support for certain costs. To the extent that the government does raise any issue regarding the support for any remaining aspects of Dominion's claim, Dominion will introduce documents and evidence that will be more than sufficient to justify recovery under the applicable standards. It is of course well settled that a plaintiff need not prove the damages claimed with "mathematical precision," and "[i]t is enough if the evidence adduced is sufficient to enable a court or jury to make a fair and reasonable approximation." *Bluebonnet Savings Bank v. United States*, 266 F.3d 1348, 1355 (Fed. Cir. 2001); *National Australia Bank v. United States*, 452 F.3d 1321, 1327 (Fed. Cir. 2006). Dominion will easily meet that standard for all of its claimed costs.

## V. CONCLUSION

Judgments should be entered for Dominion for those costs incurred as a result of DOE's breaches through June 30, 2006, in the amount of $174,605,091. Specifically, an award of $52,001,303 should be entered in the "Connecticut" action, No. 04-83, and an award of $122,603,788 should be entered in the "Virginia" action, No. 04-84. In its order, the Court also should confirm Dominion's right to pursue in subsequent proceedings damages incurred after

June 30, 2006, pursuant to the exceptions to the rules of merger and bar set out in the Restatement (Second) of Judgments, §§ 26(1)(b) and (e), as expressly adopted by the Federal Circuit in *Indiana Michigan II*, 422 F.3d at 1377.

Respectfully submitted,

s/ Brad Fagg

Brad Fagg
MORGAN, LEWIS & BOCKIUS, LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone: (202) 739-5191
Facsimile: (202) 739-3001

Attorneys for Plaintiffs

Of Counsel:

Paul M. Bessette
D. Bruce McPherson
MORGAN, LEWIS & BOCKIUS, LLP
1111 Pennsylvania Avenue, NW
Telephone: (202) 739-3000
Facsimile: (202) 729-3001

February 8, 2008

CERTIFICATE OF FILING

I hereby certify that on this 8th day of February, a copy of the foregoing was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Brad Fagg