# Attachment I

[1:] - [3:] 4/22/2002 Barrett, Lake H., Deposition Vol. 1, 4/22/02

page 1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - X
YANKEE ATOMIC ELECTRIC COMPANY; : Case Nos. 98-126C,
CONNECTICUT YANKEE ATOMIC POWER : 98-154C, 98-474C,
COMPANY; MAINE YANKEE ATOMIC : 98-483C, 98-484C,
POWER COMPANY; FLORIDA POWER & : 98-485C, 98-486C,
LIGHT COMPANY; NORTHERN STATES : 98-488C, 98-614C,
POWER COMPANY; DUKE POWER, a : 98-621C, 99-447C,
Division of DUKE ENERGY CORP.; : 00-440C, 00-695C,
INDIANA MICHIGAN POWER COMPANY; : 00-703C, 01-115C,
SACRAMENTO MUNICIPAL UTILITY : 01-116C, 01-249C
- - - - - - - - - - - - - - - - - X

(Caption continued on the next page)

Deposition of LAKE H. BARRETT
Washington, D. C.
Monday, April 22, 2002
9:31 a.m.

Job No.: 11792-4
Pages 1 through 272, Volume 1
Reported by: Diane Gomez, RPR

page 2

DISTRICT; SOUTHERN NUCLEAR :
OPERATING COMPANY, et al.; :
COMMONWEALTH EDISON COMPANY; :
BOSTON EDISON COMPANY; GPU :
NUCLEAR, INCORPORATED; WISCONSIN :
ELECTRIC POWER COMPANY; POWER :
AUTHORITY OF THE STATE OF NEW :
YORK; OMAHA PUBLIC POWER DISTRICT;:
NEBRASKA PUBLIC POWER DISTRICT; :
and TENNESSEE VALLEY AUTHORITY, :
Plaintiffs :
v. :
THE UNITED STATES, :
Defendant :
- - - - - - - - - - - - - - - - - X

page 3

Deposition of LAKE H. BARRETT, held at the offices of:

ARNOLD & PORTER
555 12th Street, Northwest
Washington, D. C. 20004
(202) 942-5000

Pursuant to agreement, before Diane Gomez, Registered Professional Reporter and Notary Public in and for the District of Columbia.

[10:21] - [11:8] 4/22/2002 Barrett, Lake H., Deposition Vol. 1, 4/22/02

page 10

Q What is your current position, Mr. Barrett?
A I'm the deputy director of the Office of

page 11

Civilian Radioactive Waste Management.

Q For how many years have you been employed by the Department of Energy?
A Since mid-'85 in various different positions.
Q And prior to 1985 what was your position?
A I worked for the Nuclear Regulatory Commission since the end of '74 in various positions.

[38:14] - [38:15] 4/22/2002 Barrett, Lake H., Deposition Vol. 1, 4/22/02

page 38
Q When did you join the Department of Energy?
A Summer of '85 or spring of '85.

[38:14] - [40:2] 4/22/2002 Barrett, Lake H., Deposition Vol. 1, 4/22/02

page 38
Q When did you join the Department of Energy?
A Summer of '85 or spring of '85.
Q What was your position between the summer of '84 and the spring of '85?
A I was the branch chief of the engineering branch in the office -- the Division of Waste Management in the Office of Nuclear Materials Safety and Safeguards of the Nuclear Regulatory Commission.
Q Please describe for me your
page 39
responsibilities in that position.
A I was responsible for engineering for uranium mill tailings, low-level waste disposal sites and high-level waste disposal sites for the Nuclear Regulatory Commission is what my duties were.
Q Did you work with issues relating to the disposal of spent nuclear fuel in that position?
A Yes.
Q And can you describe for me your work on those issues?
A It was the engineering aspects of repository reviews for all media, including the development of branch technical positions and regulatory guidance and the regulations for high-level waste is what you asked about.
Q I asked about spent nuclear fuel.
A Well, okay, spent nuclear fuel and high-level waste.
Q Using the term "spent nuclear fuel" to cover both?
A Right.
Q Did you work with officials at the
page 40
Department of Energy in this position?
A Yes.

[44:5] - [44:20] 4/22/2002 Barrett, Lake H., Deposition Vol. 1, 4/22/02

page 44
Q What was your initial position at the Department of Energy?
A Division director, systems and transportation or something to that effect.
Q And what did that position involve?
A I was responsible for the development of the transportation systems to move spent fuel and high-level waste to the DOE facilities from their current locations was the primary job, and also for the systems engineering for the entire program.
Q Entire program you're referring to what?
A The civilian and all the different sites that we were looking at, the systems engineering requirements documents and the systems engineering structure for all of the civilian radioactive waste

**management program.**

[51:17] - [52:17] 4/22/2002 Barrett, Lake H., Deposition Vol. 1, 4/22/02

page 51
**Q In 1986 how many MTUs per year did you attempt to design a system to accept?**
**A I don't recall a specific number, but it was -- I don't recall a specific number. It's in the records.**
**Q Would 3,000 refresh your recollection?**
page 52
**A That's probably about right.**
**Q And how did you come to the 3,000 number?**
**MR. CRAWFORD: Objection, foundation.**
**A I'd have to go back and look at records, which I have not done. It is the evolution of the design receipt rates for the first repository, second repository, the MRS in the system. My recollection is the MRS was to receive 3,000 tons a year circa that time prior to the amendments act, which was in excess of the generation rate of around 2,000.**
**Q That was important, wasn't it, that it be in excess of the generation rate?**
**MR. CRAWFORD: Objection, vague.**
**A Well, important? Yes, in my opinion it was significant that you design a system to remove the backlog of materials that were accumulating under the intent of the act.**

[53:16] - [57:2] 4/22/2002 Barrett, Lake H., Deposition Vol. 1, 4/22/02

page 53
**Q The goal was to make the take rate high enough so that you could eliminate the backlog within a reasonable amount of time without making the rate so high that the complexities would send the cost through the ceiling, correct?**
**MR. CRAWFORD: Objection, vague. Objection, foundation.**
page 54
**A In a general sense.**
**Q Again, what do you mean when you say in a general sense?**
**A We did not -- you all get into the contract. We did not consider the contract issues at that time, so we were balancing the size of the system, the uncertainties of an MRS would or wouldn't be approved, the repositories, where they might be, how many we would have. So it was a complicated balancing of many interests, and so to -- it would be inappropriate to say that we had a numerical number to move the backlog or anything like that because I don't recall anything like that.**
**Q You didn't have a numerical number to move the backlog but you had a goal to move the backlog, correct?**
**A Within a reasonable --**
**MR. CRAWFORD: Objection, vague.**
**A Within a reasonable sense, yes. In a general sense I mean.**
**Q And in establishing these goals you were considering the requirements, of course, of the**
page 55
**Nuclear Waste Policy Act of 1982, correct?**
**MR. CRAWFORD: Objection, foundation.**
**A We knew that the general policy laid out in the act for the federal, you know, intention to dispose of the nation's waste and spent fuel.**
**Q And you understood the policy behind the act would call for the elimination of the backlog of spent nuclear fuel within a reasonable amount of time,**

correct?
MR. CRAWFORD: Objection. Foundation.
A Reduction as opposed to elimination. As long as they operate, you don't eliminate it. So reduction, yes.
Q And just explain what you meant by as long as they operate you don't eliminate it?
A Well, when -- when reactors operate, there is always going to be some inventory of spent fuel there. We were working to minimize the backlog and reduce the backlog that was at the sites.
Q So in order to be able to minimize the backlog, the acceptance rate would have to be at some level higher than the rate at which spent nuclear fuel
page 56
was being produced, correct?
MR. CRAWFORD: Objection to the form. Objection, vague.
A Our intention was to design a system that would reduce the backlog to a reasonable sense.
Q And in order for that to happen, as a matter of mathematics or simple equation, the acceptance rate would have to be something in excess of the rate at which new spent nuclear fuel was being created, correct?
MR. CRAWFORD: Objection to the extent it mischaracterizes his prior testimony.
A In a general sense, yes.
Q And in 1986 you believed that the 3,000 take rate that you were targeting at that point would accomplish the goals you have been alluding to, correct?
MR. CRAWFORD: Objection.
Q And the goal I'm referring to is the reduction of the built up backlog.
MR. CRAWFORD: Objection to the foundation. Objection to the extent it mischaracterizes his prior
page 57
testimony.
A Yes.

[58:13] - [59:11] 4/22/2002 Barrett, Lake H., Deposition Vol. 1, 4/22/02

page 58
Q Was the 3,000 MTU take rate related to the Department of Energy's estimate of the utilities' discharge rate?
MR. CRAWFORD: Objection, foundation. Objection, speculation.
A I personally don't know. I assume -- I don't know.
Q You assumed what?
A That when they -- the production rate at the time was around 2,000. So I assumed that the
page 59
3,000 that existed was chosen in consideration with the production rate, you know, the cost and the transportation and the other issues involved.
Q So based on your prior testimony, Mr. Barrett, the 3,000 rate would be consistent with your understanding of the intent of the act to reduce over a reasonable period of time the backlog of spent nuclear fuel throughout the nation, correct?
MR. CRAWFORD: Objection, speculation. Objection, foundation.
A Yes.

[95:10] - [97:8] 4/22/2002 Barrett, Lake H., Deposition Vol. 1, 4/22/02

page 95
(Deposition Exhibit Barrett 1 was marked for identification and was retained by counsel.)

Q Mr. Barrett, the court reporter has handed you a document marked for identification as Barrett 1. Do you have that before you?
A Uh-huh.
Q Is this document the mission plan for the civilian radioactive waste management program?
A Looks like it.
Q Have you ever seen this document before?
A I've seen it.
Q Have you ever read any portions of this document?
page 96
A I'm sure at one time or another I did. Not for ten plus years.
Q But back in the 1980s you would have read this document, correct?
A Prob -- yes. Well, I would say I read it -- I don't think I ever read it in its entirety. I knew it existed.
Q And you read portions of it, correct?
A I'm sure I did.
Q And do you believe you read it when you first came to the office in preparation for your new position?
A I don't recall that specifically, but I'm sure I read parts of it.
Q You understand the purpose for the mission plan?
A It's required by the act. I was never really quite sure what Congress had in mind.
Q You were not involved, am I correct, in the drafting of this mission plan?
MR. CRAWFORD: Objection, vague.
A I don't recall writing drafts or anything
page 97
on this.
Q The plan was issued after you came to the office, correct?
A Shortly thereafter -- you probably have it in my records somewhere when I came. I think I came in May and this was issued in June and it probably went to press in May. So I don't recall, have any substantial memory of this document.

[116:14] - [122:6] 4/22/2002 Barrett, Lake H., Deposition Vol. 1, 4/22/02

page 116
Q And what acceptance schedule did the standard disposal contract provide for?
MR. CRAWFORD: Objection, foundation. Objection to the extent it calls for speculation.
A I think the contract references other documents that references things, and I don't specifically know.
Q So is it your testimony that it provided for a schedule but you don't sitting here today know
page 117
what that schedule is?
MR. CRAWFORD: Objection. Argumentative.
A The receipt rate of January -- excuse me, the receipt date of January 31, 1998, clearly was always a goal. Okay. Regarding the acceptance rate of so many tons year one, year two, year three, okay, you know, that has changed over time. My focus has always been to create a siting process that got us a site to allow us to have the -- a reasonable receipt rate going toward the steady state 3,000 tons per year, and that's where my focus has always been, not on contract details. Okay. I am not a lawyer, I'm an engineer, okay, so I have not gone into the contract in any great detail at all.
Okay, now regarding your question here

about the acceptance schedule in the contract, actually I don't recall seeing a metric ton per year in the contract.
Q Let me step back a second, Mr. Barrett. You just referred to a reasonable receipt rate going toward the steady state 3,000 tons per year.
A Right.
page 118
Q "That's where my focus has always been." Do you recall that testimony?
A That's what I just said I think.
Q Does that continue to be your focus to this very day, sir?
A Yes.
Q And does that continue to be the focus of the Department of Energy's spent nuclear fuel program?
MR. CRAWFORD: Objection to the form. Objection to the foundation. Objection, vague.
A We are still trying to perform under the Nuclear Waste Policy Act to receive the waste into the federal system as soon as we can under the constraints of the law. So, yes, that remains my goal and the organization's goal.
Q Again, just so the record is clear, your goal and the organization's goal is to achieve a reasonable receipt rate going towards the steady state of 3,000 tons per year, correct?
MR. CRAWFORD: Objection to the extent it mischaracterizes prior testimony. Objection, foundation. Objection, vague.
page 119
A That has been our goal to do that.
Q And it continues to be your goal today, correct?
A Correct.
Q And it was your goal in 1985, correct?
A Correct.
Q And it was the goal of the department in 1982 when the standard contracts were signed, correct?
MR. CRAWFORD: Objection, vague. Objection, calls for speculation. Objection to the extent it mischaracterizes his prior testimony.
A I wasn't there in '82 so I don't know about '82, but in '85 and today it has always been our intent to try to do what we can from a technical point of view to receive the materials at a reasonable rate.
Q And the reasonable rate is the rate that would ramp up -- is a rate that would ramp up towards 3,000 MTUs per year, correct?
MR. CRAWFORD: Objection, vague. And foundation.
Q I believe your counsel cut you off. What was your answer, sir?
page 120
A That has been our intent.
Q Let's go back to paragraph three, page seven. You referred to January 31st, 1998, as being a goal. Was it something more, wasn't it a contractual commitment and a statutory command?
MR. CRAWFORD: Objection, argumentative. Objection, best evidence. Objection to the extent it calls for a legal conclusion.
A As an engineer, okay, and as a program administrator, okay, and dependent on what the contract said or what courts said, we were always trying to achieve that goal.
Q And why did you establish that goal for yourself?
A Because --
Q And your department?
A It was set in the law, okay, that our goal was to try to create a facility and to create a system

that would meet that goal of January 31st, 1998, to start to receive fuel. And it has always been an important objective and goal.
Q To start to receive fuel on January 31st,
page 121
1998, at a ramp-up level that would -- in a reasonable amount of time and at a 3,000 per year MTU acceptance rate, correct?
MR. CRAWFORD: Objection to the form. Objection to the mischaracterization of prior testimony. Objection to the extent it assumes facts not in evidence.
A It was a systems goal to receive the material at a reasonable rate, okay, of which the 3,000, ramp up to 3,000 tons was a reasonable rate. It was never a -- in my opinion it was never a legal requirement to do 3,000 tons per year.
Q You base the goal on the statute, correct? That's what you've testified to, correct?
A Yes.
Q Back to paragraph three --
A Excuse me. Let me go back to that. When you say the statute does not say 3,000, okay, that was a judgment part. It is the receipt in January 31, 1998, is in the statute. The rate to my knowledge is not in the statute.
Q So why did you set the 3,000 MTU goal?
page 122
A That was a --
MR. CRAWFORD: Objection to the fact that that question assumes facts not in evidence.
A That was in our judgment a reasonable rate, steady state rate to move up to under the circumstances we were in.

[198:1] - [198:10] 4/22/2002 Barrett, Lake H., Deposition Vol. 1, 4/22/02

page 198
Q So it's your understanding or your knowledge that each of the various system studies to which you just referred that were undertaken in the -- from the mid-1980s to I think you said the mid-1990s, supported an acceptance rate of 3,000 MTU per year, correct?
MR. CRAWFORD: Objection, vague. Objection, assumes facts not in evidence. Objection, mischaracterizes prior testimony.
A Yes.

[217:3] - [217:17] 4/22/2002 Barrett, Lake H., Deposition Vol. 1, 4/22/02

page 217
Q What is a DCS?
A Well --
MR. CRAWFORD: Objection. Asked and answered.
Q I understand the title.
A Delivery commitment schedule.
Q Do you understand what role it played in the overall SNF process?
MR. CRAWFORD: Objection, foundation.
A These were all part of the administrative details of the contract that I did not pay much management policy attention to.
Q So in your view was a DCS what you referred to, Mr. Barrett, I think the term was administrivia?
A That's correct.

[273:] - [275:] 4/23/2002 Barrett, Lake H., Deposition Vol. 2, 4/23/02

page 273

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**- - - - - - - - - - - - - - - - - x**
**YANKEE ATOMIC ELECTRIC COMPANY; : Case Nos. 98-126C,**
**CONNECTICUT YANKEE ATOMIC POWER : 98-154C, 98-474C,**
**COMPANY; MAINE YANKEE ATOMIC : 98-483C, 98-484C,**
**POWER COMPANY; FLORIDA POWER & : 98-485C, 98-486C,**
**LIGHT COMPANY; NORTHERN STATES : 98-488C, 98-614C,**
**POWER COMPANY; DUKE POWER, a : 98-621C, 99-447C,**
**Division of DUKE ENERGY CORP.; : 00-440C, 00-695C,**
**INDIANA MICHIGAN POWER COMPANY; : 00-703C, 01-115C,**
**SACRAMENTO MUNICIPAL UTILITY : 01-116C, 01-249C**
**- - - - - - - - - - - - - - - - - X**
**(Caption continued on next page)**

**Continued Deposition of LAKE H. BARRETT**
**Washington, D. C.**
**Tuesday, April 23, 2002**
**9:36 a.m.**

**Job No.: 11792-5**
**Pages 273 through 526, Volume 2**
**Reported by: Diane Gomez, RPR**

page 274

**DISTRICT; SOUTHERN NUCLEAR :**
**OPERATING COMPANY, et al.; :**
**COMMONWEALTH EDISON COMPANY; :**
**BOSTON EDISON COMPANY; GPU :**
**NUCLEAR, INCORPORATED; WISCONSIN :**
**ELECTRIC POWER COMPANY; POWER :**
**AUTHORITY OF THE STATE OF NEW :**
**YORK; OMAHA PUBLIC POWER DISTRICT;:**
**NEBRASKA PUBLIC POWER DISTRICT; :**
**and TENNESSEE VALLEY AUTHORITY, :**
**Plaintiffs :**
**v. :**
**THE UNITED STATES, :**
**Defendant :**
**- - - - - - - - - - - - - - - - - X**

page 275

**Continued Deposition of LAKE H. BARRETT, held at the offices of:**

**ARNOLD & PORTER**
**555 12th Street, Northwest**
**Washington, D. C. 20004**
**(202) 942-5000**

**Pursuant to agreement, before Diane Gomez, Registered Professional Reporter and Notary Public in and for the District of Columbia.**

[340:17] - [342:2] 4/23/2002 Barrett, Lake H., Deposition Vol. 2, 4/23/02

page 340

**Q How long would the repository have been required to operate in order to reduce the backlog of spent nuclear fuel had the repository design receipt rate been established at 900 MTU per year?**

**MR. CRAWFORD: Objection to the extent it calls for speculation. Objection to the foundation.**

page 341

A Longer.
Q How much longer?
MR. CRAWFORD: Objection. Same objections.
A I don't know. I would have to calculate. It would be longer.
Q Forever?
MR. CRAWFORD: Same objections.
A It depends on -- if the removal rate is less than the production rate, then it doesn't close until the reactors close and then it catches up eventually.
Q Well, isn't it your understanding as the former acting director of the office and today deputy director that a 900 MTU repository design receipt rate would not be sufficiently high to reduce the existing backlog of spent nuclear fuel?
MR. CRAWFORD: Objection, foundation. Objection to the extent it calls for speculation.
A It's a function of time.
Q What do you mean by that?
A It would take a much longer time at 900 than say at 3,000 to work off the backlog. When the
page 342
reactors run their licensed lifetimes and close, eventually you'll catch up.

[345:4] - [345:16] 4/23/2002 Barrett, Lake H., Deposition Vol. 2, 4/23/02

page 345
Q Probably. Now, let's return to the scenario I asked you to consider a few moments ago, that the repository design receipt rate is set at a level of 900 MTUs. Do you recall we discussed that?
A Yes.
Q And do you recall that you indicated that in order to eliminate the backlog under an annual receipt rate of 900 MTUs, it could take 80, 90, even more years? Do you recall that?
MR. CRAWFORD: Objection to the foundation. Objection to the hypothetical.
A It will take considerably longer at 900 versus the 3,000.

[349:8] - [350:11] 4/23/2002 Barrett, Lake H., Deposition Vol. 2, 4/23/02

page 349
Q To your knowledge, Mr. Barrett, have all TSLCC or fee adequacy studies issued on or after 1982 assumed a 3,000 per annum MTU acceptance rate or a repository design receipt rate?
MR. CRAWFORD: Objection to the foundation.
A Some had more.
Q Some had more? Which ones had more?
A Ones that had two repositories in it had rates higher than 3,000.
Q What was the highest annual aggregate rate of any of the TSLCC or fee adequacy studies that you're referring to?
MR. CRAWFORD: Objection. Best evidence.
A Some of the earlier ones, pre-'87, had two repositories at steady state which would run higher at
page 350
nominal 6,000 tons.
Q Per year?
A Per year. All recent ones, since '87 or so to my knowledge are basically steady state at 3,000.
Q And by recent ones -- I'm sorry.
A In the 1990s the TSLCCs had a state steady receipt rate at 3,000 tons per year.
Q And what about the most recent study?
A I believe the most recent ones --
MR. CRAWFORD: Objection, best evidence.

**A -- is 3,000 tons per year steady state.**

[527:] - [529:] 4/26/2002 Barrett, Lake H., Deposition Vol. 3, 4/26/02

page 527

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**- - - - - - - - - - - - - - - - - - x**
**YANKEE ATOMIC ELECTRIC COMPANY; : Case Nos. 98-126C,**
**CONNECTICUT YANKEE ATOMIC POWER : 98-154C, 98-474C,**
**COMPANY; MAINE YANKEE ATOMIC : 98-483C, 98-484C,**
**POWER COMPANY; FLORIDA POWER & : 98-485C, 98-486C,**
**LIGHT COMPANY; NORTHERN STATES : 98-488C, 98-614C,**
**POWER COMPANY; DUKE POWER, a : 98-621C, 99-447C,**
**Division of DUKE ENERGY CORP.; : 00-440C, 00-695C,**
**INDIANA MICHIGAN POWER COMPANY; : 00-703C, 01-115C,**
**SACRAMENTO MUNICIPAL UTILITY : 01-116C, 01-249C**
**- - - - - - - - - - - - - - - - - - X**
**(Caption continued on the next page)**

**Continued Deposition of LAKE H. BARRETT**
**Washington, D. C.**
**Friday, April 26, 2002**
**8:10 a.m.**

**Job No.: 11792-8**
**Pages 527 through 825, Volume 3**
**Reported by: Diane Gomez, RPR**

page 528

**DISTRICT; SOUTHERN NUCLEAR :**
**OPERATING COMPANY, et al.; :**
**COMMONWEALTH EDISON COMPANY; :**
**BOSTON EDISON COMPANY; GPU :**
**NUCLEAR, INCORPORATED; WISCONSIN :**
**ELECTRIC POWER COMPANY; POWER :**
**AUTHORITY OF THE STATE OF NEW :**
**YORK; OMAHA PUBLIC POWER DISTRICT; :**
**NEBRASKA PUBLIC POWER DISTRICT; :**
**and TENNESSEE VALLEY AUTHORITY, :**
**Plaintiffs :**
**v. :**
**THE UNITED STATES, :**
**Defendant :**
**- - - - - - - - - - - - - - - - - - X**

page 529

**Continued Deposition of LAKE H. BARRETT, held at the offices of:**

**ARNOLD & PORTER**
**555 12th Street, Northwest**
**Washington, D. C. 20004**
**(202) 942-5000**

**Pursuant to agreement, before Diane Gomez, Registered Professional Reporter and Notary Public in and for the District of Columbia.**

[581:20] - [583:5] 4/26/2002 Barrett, Lake H., Deposition Vol. 3, 4/26/02

page 581

**Q How did you use the term "four six nine," was it the four-six-nine rate or -- you used it in an**

earlier answer.
page 582
MR. CRAWFORD: Objection. Asked and answered.
A It's the rate of 400 tons year number one, year number two 600 tons, year number three 900 tons out to year ten at 900. It's in some table that's attached to something that has to do with the contract, and that's what I meant by the four-six-nine rate.
Q To the best of your knowledge how is that four-six-nine rate, as you just explained it, calculated?
A It's my recollection that table was established based on the plans of the program in the early nineties with an MRS and linkages stated by statute. Modified by, you know, whatever it had to do with the linkages and then what was thought, reasonably thought linkages could be modified.
Q So the four-six-nine rate was based on the assumption, if I understand what you're saying right now, sir, that there would be an MRS and the linkages would be repealed, correct?
A Well, not completely repealed, but some --
page 583
no, not all linkages would be changed, but reasonable linkages that we thought reasonably could be changed, like build the thing based on a volunteer site. So that's what the four six nine to my recollection is based on.

[771:3] - [772:3] 4/26/2002 Barrett, Lake H., Deposition Vol. 3, 4/26/02

page 771
(Deposition Exhibit Barrett 40 was marked for identification and was retained by counsel.)
Q In order to clarify the indecipherable prior questions, let's go and put the 1992 ACR in the record, because I have now discerned that we did not put that in the record before, and that's what we were referring to.
The court reporter has handed you Exhibit Number 40, which is the 1992 annual capacity report dated March '93, 1993, bearing Bates PA-102630 through 102678. Do you have that before you?
A Yes.
Q I would like to turn your attention to page three of this document, specifically pages three and four, captioned Waste Acceptance Projections. Are you there?
A Yes.
Q And if you look towards the bottom of page three, it refers to the Table 2-1 on the next page which would result in the receipt of 8,200 MTU of SNF
page 772
at the MRS facility during the first ten years. Do you see that?
A Yes.

[772:4] - [774:14] 4/26/2002 Barrett, Lake H., Deposition Vol. 3, 4/26/02

page 772
Q We discussed that MRS facility and the assumptions on which the first ten years of operations were based a number of times in this deposition. Do you recall that?
A Yes.
Q And that MRS facility involved what you have referred to as a volunteer, correct?
A Correct.
Q And it involved a volunteer, and it would have required the enactment of congressional

legislation repealing or modifying the linkages, correct?
A Some of the linkages.
Q Some of the linkages, correct?
A Some of the linkages, yes.
Q And had that happened, had you had a volunteer and some of the necessary legislation, the MRS you projected could have gone into effect in 1998, correct?

page 773

A Correct.
Q And, in fact, page four of this exhibit shows your projected schedule with such an MRS, correct?
A Correct.
Q And it shows a first-year acceptance rate of 400, second year 600, and years two through ten of 900 MTUs, three through ten of 900 MTUs per year, correct?
A Correct.
Q And that adds up to a total MTU take of 8,200 within the congressional limit at that point of 10,000 MTUs, correct?
A Correct.
Q But, again, this Table 2-1 is based on two assumptions that you -- or perhaps three assumptions that you have discussed throughout this deposition. First, an MRS facility that is based on a volunteer and that Congress deems it appropriate to enact authorizing legislation including the repeal or amendment of certain of the linkages, correct?
MR. CRAWFORD: Objection to the foundation

page 774

for that and objection, it assumes facts not in evidence. And just objection as to vague.
Q Correct?
A Except you used the word "authorized." It's already authorized.
Q That the necessary congressional legislation would have been enacted to modify or repeal the linkages, correct?
A Yes.
Q Now, we also discussed today that by the end of 1993 that type of MRS facility involving a volunteer and the modification or repeal of linkages had become a low probability, correct?
A Yes.

[826:] - [828:] 5/8/2002 Barrett, Lake H., Deposition Vol. 4, 5/8/02

page 826

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - x
YANKEE ATOMIC ELECTRIC COMPANY; : Case Nos. 98-126C,
CONNECTICUT YANKEE ATOMIC POWER : 98-154C, 98-474C,
COMPANY; MAINE YANKEE ATOMIC : 98-483C, 98-484C,
POWER COMPANY; FLORIDA POWER & : 98-485C, 98-486C,
LIGHT COMPANY; NORTHERN STATES : 98-488C, 98-614C,
POWER COMPANY; DUKE POWER, a : 98-621C, 99-447C,
Division of DUKE ENERGY CORP.; : 00-440C, 00-695C,
INDIANA MICHIGAN POWER COMPANY; : 00-703C, 01-115C,
SACRAMENTO MUNICIPAL UTILITY : 01-116C, 01-249C
- - - - - - - - - - - - - - - - - - - X

(Caption continued on the next page)

Deposition of LAKE H. BARRETT, VOLUME 4
Washington, D.C.
Wednesday, May 8, 2002
9:31 a.m.

Job No.: 11792-10
Pages: 826 through 1103

Reported by: Diane Gomez, RPR

page 827

DISTRICT; SOUTHERN NUCLEAR :
OPERATING COMPANY, et al.; :
COMMONWEALTH EDISON COMPANY; :
BOSTON EDISON COMPANY; GPU :
NUCLEAR, INCORPORATED; WISCONSIN :
ELECTRIC POWER COMPANY; POWER :
AUTHORITY OF THE STATE OF NEW :
YORK; OMAHA PUBLIC POWER DISTRICT;:
NEBRASKA PUBLIC POWER DISTRICT; :
and TENNESSEE VALLEY AUTHORITY, :
Plaintiffs :
v. :
THE UNITED STATES, :
Defendant :
- - - - - - - - - - - - - - - - - X

page 828

Deposition of LAKE H. BARRETT, VOLUME 4, held at the offices of:

ARNOLD & PORTER
555 12th Street, Northwest
Washington, D.C. 20004
(202) 942-5000

Pursuant to agreement, before Diane Gomez, Registered Professional Reporter and Notary Public of the District of Columbia.

[948:10] - [949:7] 5/8/2002 Barrett, Lake H., Deposition Vol. 4, 5/8/02

page 948

Q Okay. And in today's stand-alone repository scenario, what is the relevance of 400, 600, 900 acceptance rate?
MS. HERRMANN: Objection. Foundation.
A Because of some contractual matter as relates to the contract is my understanding.
Q And what contractual matter are you referring to?
MS. HERRMANN: Objection. Calls for a legal conclusion.
A This gets into the contract issues. There is no technical limit four, six, nine as it relates to the repository.

page 949

Q So as it relates to a stand-alone repository, the acceptance rate of 400, 600, 900 MTUs per year have no relevance, correct?
MS. HERRMANN: Objection to the extent it mischaracterizes prior testimony.
Q Correct?
A Has no technical design aspect to it.

[951:19] - [953:7] 5/8/2002 Barrett, Lake H., Deposition Vol. 4, 5/8/02

page 951

Q Getting back to the ACR, what is the relevance of an ACR with an acceptance rate of 400,

**600, 900 MTUs per year in today's environment where there is a stand-alone repository?**

page 952

**MS. HERRMANN: Objection. Vague, calls for a legal conclusion.**
**A I don't know.**
**Q Is there any?**
**MS. HERRMANN: Same objections.**
**A Only as it relates to the legalities of contracts.**
**Q The 400, 600, 900 MTUs standard was pertinent in the context where an MRS would have gone into effect in 1998 and have been in operation for ten to 12 years prior to repository, correct?**
**A That's my understanding.**
**Q And that's the only circumstance in which a 400, 600, 900 MTU take-rate had any relevance, correct?**
**A That was the basis at that time.**
**Q At that time, you're referring to what time?**
**A Back in the eighties when that was -- late eighties, early nineties when that was established, that's correct.**
**Q So in the late eighties, early nineties**

page 953

**when the 400, 600, 900 MTU take-rate was established, the only relevance that take-rate had was in the context where an MRS would commence operations in 1998 and would operate by itself for ten to 12 years prior to the time that a repository, a permanent repository, began operations, correct?**
**A Correct.**

[1104:] - [1106:] 5/10/2002 Barrett, Lake H., Deposition Vol. 5, 5/10/02

page 1104

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**- - - - - - - - - - - - - - - - - - x**

| | |
|---|---|
| **YANKEE ATOMIC ELECTRIC COMPANY;** | **: Case Nos. 98-126C,** |
| **CONNECTICUT YANKEE ATOMIC POWER** | **: 98-154C, 98-474C,** |
| **COMPANY; MAINE YANKEE ATOMIC** | **: 98-483C, 98-484C,** |
| **POWER COMPANY; FLORIDA POWER &** | **: 98-485C, 98-486C,** |
| **LIGHT COMPANY; NORTHERN STATES** | **: 98-488C, 98-614C,** |
| **POWER COMPANY; DUKE POWER, a** | **: 98-621C, 99-447C,** |
| **Division of DUKE ENERGY CORP.;** | **: 00-440C, 00-695C,** |
| **INDIANA MICHIGAN POWER COMPANY;** | **: 00-703C, 01-115C,** |
| **SACRAMENTO MUNICIPAL UTILITY** | **: 01-116C, 01-249C** |

**- - - - - - - - - - - - - - - - - - X**

**(Caption continued on the next page)**

**Continued Deposition of LAKE H. BARRETT**
**Washington, D. C.**
**Friday, May 10, 2002**
**8:06 a.m.**

**Job No.: 11792-11**
**Pages 1104 to 1437, Volume 5**
**Reported by: Diane Gomez, RPR**

page 1105

**DISTRICT; SOUTHERN NUCLEAR :**
**OPERATING COMPANY, et al.; :**
**COMMONWEALTH EDISON COMPANY; :**
**BOSTON EDISON COMPANY; GPU :**
**NUCLEAR, INCORPORATED; WISCONSIN :**
**ELECTRIC POWER COMPANY; POWER :**
**AUTHORITY OF THE STATE OF NEW :**
**YORK; OMAHA PUBLIC POWER DISTRICT;:**
**NEBRASKA PUBLIC POWER DISTRICT; :**
**and TENNESSEE VALLEY AUTHORITY, :**
**Plaintiffs :**
**v. :**

THE UNITED STATES, :
Defendant :
- - - - - - - - - - - - - - - - - - X

page 1106

Continued Deposition of LAKE H. BARRETT, held at the offices of:

ARNOLD & PORTER
555 12th Street, Northwest
Washington, D. C. 20004
(202) 942-5000

Pursuant to agreement, before Diane Gomez, Registered Professional Reporter and Notary Public in and for the District of Columbia.

[1163:10] - [1166:7] 5/10/2002 Barrett, Lake H., Deposition Vol. 5, 5/10/02

page 1163
Q But you do disagree with the statement that there is not a clearly documented rationale for 3,000 MTU per year receipt rate, correct?
A Correct.
Q Because you believe that there is, in fact, a clearly documented rationale for a 3,000 MTU per year receipt rate, correct?
A Yes.
Q And could you explain to me that rationale that you believe has been clearly documented by the department?
A There was one in the old mission plans. It basically was that the rate of 3,000 tons per year
page 1164
exceeded a generation rate of a nominal 2,000 tons per year and allowed a catchup of a thousand tons per year delta. And for where the program was at that time that was sufficient, and I felt that was sufficient at that time.
Q Sufficient to do what?
A Sufficient as a design basis for the facility. I didn't want to basically put resources, inasmuch as I was involved in this, into further refinements and expenditures of money on fine-tuning when we needed to focus on do we have a site and can we ever do this.
Q And fine-tuning, for example, whether it should be higher than 3,000?
A Correct.
Q And when you just stated "allowed a catchup of a thousand tons per year delta," what did that statement refer to?
A The receipt rate of a nominal 3,000 tons per year steady state when the generation rate was approximately 2,000 tons per year. The system capacity and take-rate was exceeding the generation
page 1165
rate in the nation.
Q Why was that important?
A Because we would like to catch up and, you know, remove the waste that had been accumulating at

whatever the start date of the facility would be.
Q Did you consider that to be your mission under this statute, the 1982 Nuclear Waste Policy Act?
MS. HERRMANN: Objection. Vague, calls for a legal conclusion.
A Repeat the question again.
Q You stated "We would like to catch up and, you know, remove the waste that had been accumulating at whatever the start date of the facility would be." Do you recall that statement?
A Yes.
Q Why would you have liked to have caught up, as you stated in that answer?
A Because waste existed in the United States, both commercial waste and defense waste, and we were to start, either be it '98 or some other date, there would be an inventory existing, and you wanted to work off that inventory as soon as practicable.
page 1166
Q Why did you want to work off that inventory of spent nuclear fuel as soon as practicable?
A Because I believe that's the intent of the act.
Q By "the act" you're referring to the Nuclear Waste Policy Act of 1982?
A Correct.

[1331:7] - [1331:17] 5/10/2002 Barrett, Lake H., Deposition Vol. 5, 5/10/02

page 1331
Q You used a term often in your testimony, the term "generation rate." Do you recall using that term?
A Yes.
Q What does that term mean?
A To me that's the amount of spent fuel that the nation's nuclear power reactors produce per year, which is approximately 2,000 tons per year.
Q Has it always been approximately 2,000 tons per year?
A I think it's been pretty close.

[1332:19] - [1333:16] 5/10/2002 Barrett, Lake H., Deposition Vol. 5, 5/10/02

page 1332
Q My understanding from your testimony -- and please correct me if I'm wrong -- was that the 3,000 MTU steady-state rate or receipt rate as you just used that term, was chosen in part because it exceeded the
page 1333
discharge rate or the generation rate by utilities. Is that right?
A Correct.
Q What other factors went into choosing a 3,000 MTU receipt rate?
A The 3,000 rate that we have was established before I was ever involved in the program. It's my understanding that it was looked at then as a proper balance for total life-cycle costs as well as near-term cash flow requirements and performance. If you make the number too high, then you have -- you would quickly work off the backlog, and then you would have a lot of idle capacity. If it was too low, you would have reactors needing to put in dry storage, and 3,000, based on an early 1980s, seemed like a reasonable number to use.

[1334:6] - [1335:10] 5/10/2002 Barrett, Lake H., Deposition Vol. 5, 5/10/02

page 1334
Q And am I right in understanding that the

3,000 steady-state rate has been used as the steady-state rate in the majority of design documents for the facility that DOE will eventually use to take and emplacement spent nuclear fuel?
A Yes, it's around 3,000.
Q And am I also right in understanding that the 3,000 steady-state rate has been the rate that is used in the majority of documents issued by DOE with regard to total system life-cycle costs?
A Correct.
Q With regard to those documents, the documents issued in connection with estimating total system life-cycle costs, what is that document supposed to reflect, the TSLCC document?
A Our best estimates of what the costs would be, you know, year by year for the program. And to
page 1335
determine those you would have some assumption as to what the receipt rate would be, and we used 3,000.
Q And is the receipt rate of 3,000 used because that's what your intention at the time you issued that TSLCC report, is that the intention at that time, to use that rate for whatever facility you would have running when you begin to accept spent nuclear fuel?
MS. HERRMANN: Objection. Foundation.
A At steady state, yes.

[1368:10] - [1369:14] 5/10/2002 Barrett, Lake H., Deposition Vol. 5, 5/10/02

page 1368
Q My understanding is that one of the goals of the Civilian Radioactive Waste Management Program was to design a system that could take spent nuclear fuel at a rate that would eliminate the need for utilities to provide for additional on-site storage after January 31st, 1998. Is that correct?
A No.
Q What is not correct about that statement?
A I never considered the design of the system to solely try to avoid spent-fuel pool overflows. I tried to design the system to be as large as you could reasonably make it to avoid not only spent-fuel overflows but pool rerackings to allow shut-down
page 1369
reactors to empty their sites. For all those other reasons in addition to. So the way you phrased it I don't think is correct.
Q Thank you for clarifying. It actually did clarify a misimpression I had, so I'm glad I asked the question.
And is it your testimony that prior to you actually coming to the Office of Civilian Radioactive Waste Management DOE had established that a steady-state rate of 3,000 MTUs on an annual basis would achieve all those objectives that you just specified in your prior answer?
MS. HERRMANN: Objection. Foundation.
A In a general sense, yes.

[1369:22] - [1371:14] 5/10/2002 Barrett, Lake H., Deposition Vol. 5, 5/10/02

page 1369
Q But in your tenure at the program did you
page 1370
ever see any evidence that would indicate that that 3,000 MTU rate was not sufficient to address all of those needs as you specified a couple of answers ago?
A I saw no reason nor saw no reports that said 3,000 was a bad choice. There were some studies done in the late eighties, also in the early nineties that, you know, it didn't say there was an obvious

better number. That 2,000 was better or 4,000 was better. And 3,000 appeared to be okay. So I didn't pay much attention. So I was satisfied. It wasn't conscious per se. I saw no reason why I should change it. Let's phrase it that way.
Q And I'll take it a step further. Do you believe that the 3,000 annual steady-state rate is a reasonable rate for DOE to plan to use in terms of taking spent nuclear fuel from utilities?
A I think it's a reasonable rate. There may be better rates that if we -- if the nation gets a little clearer that we're going to really perform I think we will refine that number and we may, based on events of September 11th, maybe it will be raised.
Q And would you agree that the 3,000 annual

page 1371

steady-state rate is a rate that is consistent with achieving the objectives that you enumerated earlier?
A Generally so, yes.
Q In your opinion would a steady-state rate of 2,000 MTUs on an annual basis be consistent with achieving those same objectives?
A I would think that's low.
Q Why?
A Because that's about what the generation rate is, and if we start with that, matching the generation rate at 2010 -- if we steady state at 2010, all the fuel that's in dry storage and a lot of the shut-down reactors, it will be difficult to avoid new storages or prolong decommissionings.

[1:] - [1:] 5/14/2002 Barrett, Lake H., Deposition Vol. 1, 5/14/02

page 1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| YANKEE ATOMIC ELECTRIC COMPANY, CONNECTICUT YANKEE ATOMIC POWER COMPANY, MAINE YANKEE ATOMIC POWER COMPANY, Plaintiff, | Case No. 98-126C, 98-154C, 98-474C |
| vs. | (Senior Judge Merrow) |
| UNITED STATES OF AMERICA, Defendant. | Volume I |

Washington, D.C.
Tuesday, May 14, 2002

Deposition of LAKE H. BARRETT, a witness herein, called for examination by counsel for the Plaintiffs in the above-entitled matter, pursuant to notice, the witness being duly sworn, taken at the offices of Spriggs & Hollingsworth, 1350 Eye Street, N.W., Washington, D.C., commencing at 9:30 a.m., Tuesday, May 14, 2002, and the proceedings being taken down by Stenotype by CAPPY HALLOCK, RPR-CRR, and transcribed under her direction.

CONTAINS CONFIDENTIAL INFORMATION
PURSUANT TO THE PROTECTIVE ORDER

[120:22] - [121:6] 5/14/2002 Barrett, Lake H., Deposition Vol. 1, 5/14/02

page 120

Q. What schedule would DOE have followed had it begun to take SNF from purchasers by January 31, 1998 pursuant to this contract?
MS. HERRMANN: Objection. Foundation.

page 121

Mr. Barrett is not here as a 30(b)(6) witness.
A. We would have operated our system at our plant which was, you know, whatever the operation rate which transiented and leveled

**out at 3,000 metric tons per year after five years. That's what we were planning to do.**

# Attachment II

[1:] - [3:] 4/9/2002 Brownstein, Alan, Deposition Vol. 1 April 9, 2002

page 1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - - -x

YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C)(Wilson, J.) :
NORTHERN STATES POWER COMPANY :
(98-484C)(Wiese,J.) :
DUKE POWER, A Division of :
DUKE ENERGY CORP. :
(98-485C)(Sypolt,J.) :
INDIANA MICHIGAN POWER COMPANY :
(98-486C)(Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C)(Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY, :
et al. :
(98-488C)(Yock, S.J.) :
COMMONWEALTH EDISON COMPANY :
(98-621C)(Hewitt, J.) :
BOSTON EDISON COMPANY :
(99-447C)(Allegra, J.) :
GPU NUCLEAR, INCORPORATED :

page 2

(00-440C)(Bush, J.) :
WISCONSIN ELECTRIC POWER COMPANY :
(00-697C)(Merow, S.J.) :
POWER AUTHORITY OF THE STATE OF NEW YORK :
(00-703C)(Damich, J.) :
OMAHA PUBLIC POWER DISTRICT :
(01-115C)(Bush, J.) :
NEBRASKA PUBLIC POWER DISTRICT :
(01-116C)(Sypolt, J.) :
TENNESSEE VALLEY AUTHORITY :
(01-249C)(Bruggink, J.) :
Plaintiffs, :
v. :Discovery
THE UNITED STATES, :Judge:
Defendant. :(Judge

- - - - - - - - - - - - - - - - - - - - -xSypolt)

McLean, Virginia
Tuesday, April 9, 2002

Deposition of ALAN BROWNSTEIN, a witness, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness being duly sworn by CATHERINE S. BOYD, a Notary Public in and for the Commonwealth of Virginia, taken at the offices of Shaw Pittman, LLP, 1650 Tysons

page 3

Boulevard, McLean, Virginia 22102-4859, at 9:30 a.m., Tuesday, April 9, 2002, and the proceedings being taken down by Stenotype by CATHERINE S. BOYD and transcribed under her direction.

[9:18] - [10:2] 4/9/2002 Brownstein, Alan, Deposition Vol. 1 April 9, 2002

page 9

Q. Mr. Brownstein, would you state your name for the record, please?
A. Alan Brownstein.
Q. And by whom are you employed, sir?
A. Department of Energy.
Q. And what is your title?
A. I'm a director of the Regulatory Coordination Division, and I'm on detail right

page 10
now as a special advisor to the, special, senior policy advisor to the director.

[33:7] - [36:6] 4/9/2002 Brownstein, Alan, Deposition Vol. 1 April 9, 2002

page 33
Q. What were your duties with respect to implementing the terms of the standard disposal contract?
MR. BANES: Objection -- overbroad.
BY MR. TOMASZCZUK:
Q. I believe that's the term that you used.
You said one of your duties was to implement the terms of the standard disposal contract, is that correct?
A. Sure.
Q. And what --
A. Well, let me give examples. The contract required issuance of something called the Annual Capacity Report. That had never been done before, and so as an example, I was responsible for developing that.
I was responsible for interacting with the utilities and answering their questions.
page 34
I was responsible for implementing various items as a refund program as we had lost a lawsuit, actually we lost two lawsuits, and I was responsible for refunding money to the utilities, responsible for collecting data on spent fuel from the utilities, the RW-859.
Those are examples.
Q. Did there come a point in time in your career at DOE when you, when your duties changed from your duties that you just described as a nuclear industry specialist?
A. The, the position itself evolved over time.
Let me give a broad outline, see if that's responsive to your question.
Q. Please.
A. In 1985 when I started that position, I was basically a one-person show doing these type of activities with contractor support.
Over time, that position evolved into a branch of which I was the branch chief, and eventually that position evolved into a division, and each time, the responsibilities got a little bit broader.
Q. Okay. Thank you for that. That's
page 35
helpful.
When did the duties that you were performing as a specialist evolve into a branch chief position.
A. I do not recall the exact dates. I believe in the late '80s, it went to a branch, and I believe in the early '90s, it went to a division.
I just don't recall the exact times.
Q. And when it became a division, what was the name of the division?
A. Well, let's see. They do this internally.
The branch was called I believe Utility Interface and Logistics Branch.
I'm hesitating because I believe the division underwent several names, and I actually just don't recall it. I have to review my resume.

I didn't do that before I came here.
Q. Does the division, whatever its name, still exist today?
A. It does. I mean it's continued to evolve.
Q. And is it the Regulatory Coordination

page 36

Division?
A. It is not.
Q. It is not. Okay. What is its current name, if you know?
A. I don't know. I left, I left that area in early '95.

[242:] - [244:] 4/10/2002 Brownstein, Alan, Deposition Vol. 2, April 10, 2002

page 242

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
- - - - - - - - - - - - - - - - - - - - -x
YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C)(Wilson, J.) :
NORTHERN STATES POWER COMPANY :
(98-484C)(Wiese,J.) :
DUKE POWER, A Division of :
DUKE ENERGY CORP. :
(98-485C)(Sypolt,J.) :
INDIANA MICHIGAN POWER COMPANY :
(98-486C)(Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C)(Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY, :
et al. :
(98-488C)(Yock, S.J.) :
COMMONWEALTH EDISON COMPANY :
(98-621C)(Hewitt, J.) :
BOSTON EDISON COMPANY :
(99-447C)(Allegra, J.) :
GPU NUCLEAR, INCORPORATED :

page 243

(00-440C)(Bush, J.) :
WISCONSIN ELECTRIC POWER COMPANY :
(00-697C)(Merow, S.J.) :
POWER AUTHORITY OF THE STATE OF NEW YORK :
(00-703C)(Damich, J.) :
OMAHA PUBLIC POWER DISTRICT :
(01-115C)(Bush, J.) :
NEBRASKA PUBLIC POWER DISTRICT :
(01-116C)(Sypolt, J.) :
TENNESSEE VALLEY AUTHORITY :
(01-249C)(Bruggink, J.) :
Plaintiffs, :
v. :Discovery
THE UNITED STATES, :Judge:
Defendant. :(Judge
- - - - - - - - - - - - - - - - - - - - -xSypolt)

McLean, Virginia
Wednesday, April 10, 2002

Continued deposition of ALAN BROWNSTEIN, a witness, recalled for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness being previously duly sworn by CATHERINE S. BOYD, a Notary Public in and for the Commonwealth of Virginia, taken at the offices of Shaw Pittman,

page 244

LLP, 1650 Tysons Boulevard, McLean, Virginia 22102-4859, at 9:26 a.m., Wednesday, April 10, 2002, and the proceedings being taken down by

**Stenotype by CATHERINE S. BOYD and transcribed under her direction.**

[278:12] - [278:15] 4/10/2002 Brownstein, Alan, Deposition Vol. 2, April 10, 2002

page 278

**MR. TOMASZCZUK: Ms. Reporter, I would like to have marked as Brownstein No. 24 -- I got it right -- the Annual Capacity Report issued in December of 1990.**

[282:5] - [282:22] 4/10/2002 Brownstein, Alan, Deposition Vol. 2, April 10, 2002

page 282

**Q. Okay. In any event. It is true, is it not, that the conditions for the lower bounding case reflected in Table 2.2 never materialized, right?**
**MR. BANES: Objection. Calls for a legal conclusion.**
**THE WITNESS: Could you clarify what you mean?**
**BY MR. TOMASZCZUK:**
**Q. Sure. There was no MRS?**
**A. That's correct.**
**Q. Right. And the language that you referred to on page 5, it indicates, does it not, that the lower bounding case requires MRS siting, and then refers to the 10,000 MTU storage limitation?**
**A. That's correct. That process never, never materialized.**

[326:20] - [326:25] 4/10/2002 Brownstein, Alan, Deposition Vol. 2, April 10, 2002

page 326

**Q. Good afternoon, Mr. Brownstein. I remind you you're still under oath, but she won't redo the swearing process again.**
**I think at the break we were looking at the ACR for December 1991, Brownstein Exhibit 30.**

[331:24] - [333:21] 4/10/2002 Brownstein, Alan, Deposition Vol. 2, April 10, 2002

page 331

**Q. And my subsequent question to the effect that, you know, is that consistent with**

page 332

**the linkages, the construction linkages, and I understood you to say yes, and I'm trying to reconcile that testimony and that portion of the document with what appears at page 4, which seems to say that if the linkages are maintained, we can't start until 2007.**
**(The witness reviewed the document.)**
**THE WITNESS: Well, let's go back in pieces.**
**If we had an MRS, we could start accepting at an MRS, you know, as early as 1998.**
**I think that's, there were a series of assumptions associated with that.**
**BY MR. TOMASZCZUK:**
**Q. But I understand you to be saying on page 4 that if the linkages were maintained, you couldn't do that --**
**MR. BANES: Objection. Go ahead.**
**BY MR. TOMASZCZUK:**
**Q. In 1998?**
**MR. BANES: Objection. Calls for a legal conclusion, but you can go ahead.**

**THE WITNESS: Well, let's go back to the paragraph on page 4.**
**Let's read it in its entirety.**

page 333

**BY MR. TOMASZCZUK:**
**Q. Sure.**
**A. The acceptance rates in Table 2.1 do not reflect an MRS facility schedule linkages with the repository development that were imposed by the Nuclear Waste Policy Act, but are consistent with the 10,000 MTU storage capacity limit contained in NWPA for an MRS facility before repository starts operation.**
**Okay. So these acceptance rates assumed commencement, assume commencement of facility operations in 1998.**
**There appears -- I mean there is a series of if then statements for each of these.**
**Independently, I'm comfortable with them. I understand them.**
**I'm just trying to understand where this disconnect is that, that you see.**
**Can we go point out which sentence-by-sentence that you're uncomfortable with?**

[367:14] - [368:25] 4/10/2002 Brownstein, Alan, Deposition Vol. 2, April 10, 2002

page 367

**Q. So if a utility today requested delivery 63 months from today, it needed to, it is required to submit its DCS today?**
**MR. BANES: Objection. Calls for legal conclusion.**
**You may answer.**
**THE WITNESS: The, the contract laid out a process of a series of interactions between the government and the utilities that would eventually lead to waste acceptance.**
**It was, it was a choreographed dance if you will.**

page 368

**We provide information. They begin the thinking process, and that included the DCSs, all the way up to the FDSs where the FDSs, both sides got serious in terms of things like what cask to bring, what date we should show up.**
**The contract laid out the terms to, to begin that process.**
**You would not expect the department to commit to a specific date of a specific month, you know, years ahead of time really for the benefit of the utility because you could not have the government, you could not have the utility saying show up at my door on this particular day at this particular time when they in fact may be going, undergoing a fuel outage so they wouldn't want us to show up.**
**Our view of the contract was it laid out that process on how we would interact as two bodies, to come together at an appropriate time.**
**That was the significance in my mind of it, irrespective of a date.**
**It set those, set that series of procedures on, on how we would interact together.**
**That's how I interpret the contract.**

[376:22] - [378:5] 4/10/2002 Brownstein, Alan, Deposition Vol. 2, April 10, 2002

page 376

**Q. If the, as I understand these**

instructions, if the ACR on which the DCSs are based is a planning document, which I understand it to be, are the DCSs also planning documents?
page 377
MR. BANES: Objection. Calls for a legal conclusion.
THE WITNESS: In my mind, they are. In order to get, if we can just set aside a specific date for a second, in order to get the government with the right equipment to be able to get through the gate of the utility at the right time, there has to be planning that takes place.
For example, we need to know years in advance how many BWR and PWR casks we should make sure are available through whatever means.
We ought to know how many truck casks and how many rail casks we ought to have available.
In order to do that, we need to understand whose fuel we're going to accept, so there has to be communication between the utilities and us years in advance in order to, to allow that marriage to occur at the end, irrespective of the date.
I believe -- as you know, I did not negotiate this contract in '83, but I believe that was the intent of the process that was laid which we have talked about the ACR, the APR, the
page 378
DCSs and the FDSs.
I think that, in that sense, that's a planning arrangement. That's a way to respond to your question, but I think that is responsive.

[411:24] - [412:21] 4/10/2002 Brownstein, Alan, Deposition Vol. 2, April 10, 2002

page 411
Q. And I think we got into this a little yesterday, but it's your understanding I take it
page 412
that the D.C. Circuit has now held that the DOE was required to begin SNF acceptance in 1998?
A. I have never read the decision, but that's my understanding of it.
Q. And I believe we also had some testimony from you that it was DOE's objective or goal to eliminate the need for utilities to provide on-site storage after the DOE began acceptance, is that correct?
MR. BANES: Objection -- vague.
THE WITNESS: It's correct, and I used the term and testified to such to distinguish between intent and goal and objectives as opposed to a contractual commitment.
BY MR. HIRSCH:
Q. All right, but the DOE goal or objective was to eliminate the need for utilities to provide on-site storage after the DOE began acceptance of spent nuclear fuel, is that correct?
A. That was a goal.

[413:13] - [414:12] 4/10/2002 Brownstein, Alan, Deposition Vol. 2, April 10, 2002

page 413
Q. What was your understanding of the purpose of the mission plans?
A. Really very elementary understanding, that, that the law required that we issue a mission plan.

**The purpose of the mission plan was to describe what our goals and objectives were, and describe the program in general terms.**
**Q. And I take it that at least while you were at the DOE, the DOE made an effort to be as accurate as possible in the mission plans in terms of describing what its current plans and objectives were?**
page 414
**A. I believe that's true for all the RW documents.**
**Since the beginning, I think we've tried as a goal if you will to be an open and transparent program, and to, to try to put as much information out in the public as we could, and make that as accurate as we could.**
**Q. Okay. So it would be correct to say that the DOE made an effort in the mission plans to be as accurate and informative as possible, is that correct?**
**A. Yes.**

[246:] - [246:] 6/14/2002 Brownstein, Alan, Deposition Vol. 2, June 14, 2002

page 246
**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**- - - - - - - - - - - - - - - - - - - - X**
**YANKEE ATOMIC ELECTRIC COMPANY :**
**(98-126C)(Merow, S.J.) :**
**CONNECTICUT YANKEE ATOMIC POWER COMPANY :**
**(98-154C)(Merow, S.J.) :**
**MAINE YANKEE ATOMIC POWER COMPANY :**
**(98-474C)(Merow, S.J.) :**
**Plaintiffs, :**
**v. :**
**THE UNITED STATES, :**
**Defendant. :**
**- - - - - - - - - - - - - - - - - - - - X**
**Washington, D.C.**
**Friday, June 14, 2002**
**Continued deposition of ALAN BROWNSTEIN, a witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to agreement, the witness being previously duly sworn, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., 20005-3305, at 8:40 a.m., Friday, June 14, 2002, the proceedings being taken down by Stenotype by JAN A. WILLIAMS, RPR, and transcribed under her direction.**

[423:20] - [427:4] 6/14/2002 Brownstein, Alan, Deposition Vol. 2, June 14, 2002

page 423
**Q. Okay. What about at some subsequent time prior to the time that you ceased working on these matters? I'm looking for my notes here. I think it was March 1995. Did you have any discussions with anyone that would have given you, Alan Brownstein, an understanding of the legal significance of approved**
page 424
**DCSs?**
**MR. CRAWFORD: Same objection.**
**THE WITNESS: Not that I recall.**
**BY MR. STOUCK:**
**Q. And subsequent to that, in '95, you have had no such discussions; is that right or is that not right?**
**MR. CRAWFORD: Same objection.**
**THE WITNESS: I think I testified earlier that I may have reviewed a DOJ, you know, document, a reply.**
**BY MR. STOUCK:**

Q. In this litigation?
A. In this litigation.
Q. Was that subsequent to the last time we were here in this deposition room?
A. No.
Q. It was prior to that?
A. Yes.
Q. Was it prior to your first deposition?
A. Yes.
Q. Do you know whether it was prior to or after the DOJ document was filed in court or was it a DOJ document that was filed in court?
MR. CRAWFORD: Objection to the extent it

page 425

calls for speculation.
THE WITNESS: I reviewed it -- a draft DOJ document. And I testified to that before too.
BY MR. STOUCK:
Q. Okay. Again I really apologize.
A. Yeah.
Q. It's been a long deposition, I just did not recall that. I'm not trying to ask you the same questions over.
A. And I believe, you know, that addressed some of that issue. So that's what jogged my memory.
Q. So based on that you have an understanding or at least at the time you read this you had an understanding of what DOJ's current position about the legal significance of this is?
MR. CRAWFORD: Well, objection, asked and answered and to the extent that that may have mischaracterized anything he previously testified to.
THE WITNESS: There was discussion about --
MR. CRAWFORD: And I'm going to instruct the witness not to reveal anything about any discussions with any DOJ lawyers about any kind of matter discussed with respect to this litigation at all.

page 426

THE WITNESS: Okay. Well, that's fine. I think somewhere in that draft there was, you know, some views expressed about what the government's -- Department of Justice's views were with respect to the legal effect of the DCSs. I read those words.
BY MR. STOUCK:
Q. Approximately when was that, do you recall, within the last year?
MR. CRAWFORD: Objection to the extent it calls for speculation.
THE WITNESS: Yeah, within a year, within the last year.
BY MR. STOUCK:
Q. Okay. Can you place it any more specifically than that in time?
MR. CRAWFORD: Objection, asked and answered.
THE WITNESS: No.
BY MR. STOUCK:
Q. But, prior to reading that draft and prior to whatever discussions grew out of that draft, you had no understanding of the legal significance, you had no discussions with anyone who would have given you any other basis for having any understanding of the legal significance of the DCSs; is that right?

page 427

A. That's right. And why I brought that up is because, you know, my reaction was, well, that's interesting, when I read that it was interesting. I never discussed it or thought about that before.

[427:16] - [428:5] 6/14/2002 Brownstein, Alan, Deposition Vol. 2, June 14, 2002

page 427

**Q. So, therefore, you had no understanding of what liabilities and obligations on the part of both parties are locked in by the DCS submittal and approval process contemporaneous with this document in August of '91; is that right?**
**A. That's right.**
**Q. And you had no understanding about those matters as of the time you stopped working on waste acceptance matters in March 1995?**
**A. That's accurate.**

page 428

**Q. And you had no understanding about those matters at least prior to the time that whatever understanding you gained by reading this draft that you just referred to?**
**A. That's correct.**

# Attachment III

[1:] - [1:] 6/4/1999 Kouts, Christopher A., 6/4/99

page 1

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**- - - - - - - - - - - - - - - - X**
**YANKEE ATOMIC ELECTRIC COMPANY, Plaintiff,**
**v.**
**THE UNITED STATES, Defendant.**
**: Case No. 98-126C**
**: Senior Judge Merow**
**- - - - - - - - - - - - - - - - X**

**Washington, D.C.**
**Friday, June 4, 1999**

**Deposition of CHRISTOPHER A. KOUTS, a witness herein, called for examination by counsel for Plaintiff in the above-entitled matter, pursuant to notice, the witness being duly sworn by MARY GRACE CASTLEBERRY, a Notary Public in and for the District of Columbia, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., at 10:00 a.m., Friday, June 4, 1999, and the proceedings being taken down by Stenotype by MARY GRACE CASTLEBERRY, RPR, and transcribed under her direction.**

[12:9] - [12:15] 6/4/1999 Kouts, Christopher A., 6/4/99

page 12

**Q. What is your current position at DOE?**
**A. My current position is, I serve as a liaison, a headquarters liaison for the Yucca Mountain project in Nevada, and I work on special projects that the project is working on and facilitate their consummation, if you will, and issuance through headquarters.**

[1:1] - [2:21] 4/11/2005 Kouts, Christopher A., Deposition 4/11/05

page 1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

--------------------------------x

SOUTHERN NUCLEAR OPERATING )
COMPANY, ALABAMA POWER )
COMPANY, and GEORGIA POWER )
COMPANY )
Plaintiffs, ) No. 98-614C
v. )
THE UNITED STATES, )
Defendant. )

--------------------------------x

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

--------------------------------x

SOUTH CAROLINA ELECTRIC & GAS )
COMPANY and SOUTH CAROLINA )
PUBLIC SERVICE AUTHORITY, )
Plaintiffs, ) No. 04-0101C
v. )
THE UNITED STATES OF AMERICA, )
Defendant. )

--------------------------------x

page 2

Deposition of CHRISTOPHER A. KOUTS
Washington, D.C.
Monday, April 11, 2005
9:26 a.m.

Job No.: 1-53961
Pages 1 - 155
Reported By: Joan V. Cain

Deposition of CHRISTOPHER A. KOUTS, held at the law offices of:

ARNOLD & PORTER
555 Twelfth Street, Northwest
Washington, D.C. 20004-1206
(202) 942-5000

Pursuant to Notice, before Joan V. Cain, Certified Court Reporter and Notary Public in and for the District of Columbia.

[32:3] - [32:21] 4/11/2005 Kouts, Christopher A., Deposition 4/11/05

page 32

Q Prior to the submittal of this letter to the contract holders, what would -- and, say, between 1998 and July 28 of 2004 -- let's say between January 31 of 1998 and July 28 of 2004, what would DOE have done had a contract holder submitted a Delivery Commitment Schedule to DOE?
MS. HERRMANN: Objection, speculation.
A I don't know.
Q Well, does the contract limit the submission of DCS to only when the DOE asks for them?
A That's a legal question.
Q To your knowledge?
A The contract holder can do whatever it wants in terms of submitting information.
Q Would DOE have processed it prior to July 28th of '04?
MS. HERRMANN: Objection, speculation.
A I don't know.

[128:22] - [130:1] 4/11/2005 Kouts, Christopher A., Deposition 4/11/05

page 128

**Q What is the Department's position regarding**

page 129

**the effect that new DCS submissions would have on those old DCS submissions?**

**MS. HERRMANN: Objection, foundation. Calls for a legal conclusion.**

**A The Department has responded to questions on that issue essentially to the extent that the former DCSs -- before the Department will approve new DCSs under this or under the 2004 APR/ACR report, that essentially an agreement would need to be reached that the former DCSs were no longer under consideration.**

**BY MR. BLANTON:**

**Q What do you mean by no longer under consideration?**

**A That these would supplant -- that the new DCS -- approved DCSs would supplant whatever had occurred in the past.**

**Q And the prior DCS would no longer have any effect?**

**A The prior DCS was a planning document, and this DCS would also be a planning document. It basically reflects that this is the most current**

page 130

**planning that the Department has.**

[144:16] - [145:8] 4/11/2005 Kouts, Christopher A., Deposition 4/11/05

page 144

**Q So at the time of Kouts' Exhibit 2, July 28th, aside from whether or not it was addressed in this letter, had DOE reached a conclusion on that topic?**

**A My understanding is that the Department's view was that this was a new -- that this was a new planning process, that the former ones were the**

page 145

**subject of litigation. This past planning for facilities and time frames that the Department essentially was not -- did not -- or was unable to meet. As a result, those were no longer the planning basis from the standpoint of the Department, and this was to initiate a new planning process based on the Department's understanding of where it was on July 28, 2004.**

[1731:] - [1731:25] 10/26/2005 Kouts, Christopher Southern Nuclear Testimony Vol. 8 (Tria

page 1731

**1731**

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**SOUTHERN NUCLEAR OPERATING )**
**COMPANY, ALABAMA POWER )**
**COMPANY, and GEORGIA POWER ) NO. 98-614C**
**COMPANY, )**
**Plaintiffs, )**
**v. )**
**THE UNITED STATES, )**
**Defendant )**

**Courtroom Number 5**
**Court of Federal Claims**
**717 Madison Place NW**
**Washington, D.C.**

**Wednesday, October 26, 2005**

VOLUME 8

The parties met, pursuant to the notice of the Judge, at 10:00 a.m.

BEFORE THE HONORABLE JAMES F. MEROW

[1832:5] - [1832:22] 10/26/2005 Kouts, Christopher Southern Nuclear Testimony Vol. 8 (Tria

page 1832

Q Now, did I understand your testimony correctly that by March of 1995, the Office of Nuclear Waste Negotiator had been eliminated?
A That's correct. I believe it went out of existence or that office went out of existence in late 1994.
Q And the purpose, as I understand it, of the Office of Nuclear Waste Negotiator was to go out and negotiate with different states to try to get somebody to host a monitored retrievable storage facility. Is that correct?
A That was one of his duties. He was also charged with trying to find a willing host for a repository.
Q Okay. Another thankless job, I'm sure. At any rate, by March of 1995, the Nuclear Waste Negotiator is history?
A That's correct.

[1833:18] - [1834:10] 10/26/2005 Kouts, Christopher Southern Nuclear Testimony Vol. 8 (Tria

page 1833

Q Glad you mentioned that. Let me ask you about that. There were several pieces of legislation that were calling for interim storage facilities that percolated through the mid to late '90s, correct?
A That's correct.
Q And at that time, President Clinton was in office, correct?
A Yes, he was.

page 1834

Q And therefore, he appointed the Secretary of Energy, correct?
A He did.
Q Are you aware that the Clinton administration vetoed legislation calling for centralized interim storage when it was passed by both houses of Congress?
A Yes, I am. That was in the year -- I believe it was in 2000 that that occurred.
Q I believe it was too.

[2633:] - [2633:23] 6/14/2006 Testimony of Thomas Pollog & Christopher Kouts Pacific Gas

page 2633

2633

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

------------------------------x
PACIFIC GAS & ELECTRIC :
COMPANY, :No. 04-74C
Plaintiff, :
vs. :
THE UNITED STATES, :
Defendant. :
------------------------------x

Courtroom 5
National Courts Building
717 Madison Place NW
Washington, D.C.

**Wednesday, June 14, 2006**

**VOLUME 8**

**The parties met, pursuant to the notice of the Judge at 9:00 a.m.**

**BEFORE THE HONORABLE EMILY C. HEWITT**

[2745:11] - [2745:15] 6/14/2006 Testimony of Thomas Pollog & Christopher Kouts Pacific Gas

page 2745
**Q. Your understanding, whatever understandings you have about DOE's contractual obligations under the standard contract, you have obtained since June 4, 1999, correct?**
**A. That's correct.**

[2747:1] - [2747:12] 6/14/2006 Testimony of Thomas Pollog & Christopher Kouts Pacific Gas

page 2747
**Q. Thank you. And as of June 4, 1999, you did not understand what a delivery commitment schedule is, correct?**
**A. I was aware of what they were, but in terms of the intricacies of them, no, I was not.**
**Q. Prior to June 4, 1999, did you understand what a delivery commitment schedule was?**
**A. I had heard the term. I knew that they existed. I was not intimately involved with their development or their approval.**

[2748:4] - [2748:12] 6/14/2006 Testimony of Thomas Pollog & Christopher Kouts Pacific Gas

page 2748
**Q. Mr. Kouts, as of June 4, the time of this deposition that you've got in your hand, as of June 4, 1999, you would not have been able to testify about the significance of delivery commitment schedules in a case such as this because you did not have enough of an understanding at that time to do that, is that correct?**
**A. Yes.**

[2751:20] - [2753:6] 6/14/2006 Testimony of Thomas Pollog & Christopher Kouts Pacific Gas

page 2751
**Q. I'm not asking what the document says. I'm asking you about what you know. And isn't it true that as of January 1986, DOE's commitment to begin receiving radioactive waste for disposal in 1998 was unequivocal?**
**A. Yes.**
page 2752
**2752**
**Q. And to that end, it was DOE's position that it would procure a fleet of casks capable of beginning deliveries to the MRS as early as 1996, isn't that correct?**
**A. Yes.**
**Q. And isn't it also correct, Mr. Kouts, at that time, DOE planned to ensure that equipment for transporting radioactive waste would be available to make shipments beginning in 1996?**
**A. Yes.**
**Q. And OCRWM, at that time, was**

supporting the developments of, excuse me, supporting the development of casks on a schedule that would allow the availability of NRC certified prototypes by the early 1990s, isn't that correct?
A. May I ask a question? When you say, "at that time," what time are you referring to?
Q. Referring to the time that this plan was in force, was operative.
A. Yes.
Q. And one of the reasons that strategy of having casks developed on a schedule that would allow the availability of NRC's certified
page 2753
2753
prototypes by the early 1990s, one reason why that strategy was being pursued was that it would ensure that the transportation system would be ready for disposal system start-up and operations, correct?
A. Yes.

[2755:24] - [2756:3] 6/14/2006 Testimony of Thomas Pollog & Christopher Kouts Pacific Gas

page 2755
Q. OCRWM would not have published a transportation business plan that contained a
page 2756
2756
schedule for development of transportation casks that was unreasonable, would it?
A. At that time, that's correct.

[2761:23] - [2761:24] 6/14/2006 Testimony of Thomas Pollog & Christopher Kouts Pacific Gas

page 2761
THE COURT: So we're on PX-82, the June 1985 final first iteration.

[2767:8] - [2770:18] 6/14/2006 Testimony of Thomas Pollog & Christopher Kouts Pacific Gas

page 2767
Q. Okay. And so in the mid-1980s, before the 1987 amendments, DOE was looking at a facility that had a great deal more capability than the MRS that you were looking at after the '87 amendments, isn't that correct?
A. Yes.
Q. And isn't it also true that an MRS, such as the one that DOE was contemplating at the time of this mission plan, would be able to accept waste at a rate well above 3,000 MTU?
A. No.
Q. Turn to page 80, please. If you look at the sentence that, beginning at the very bottom, "accordingly," and this is in a section entitled, "Basis for the design of the MRS facility." Do you see that?
A. Yes.
Q. Let me read the sentence that I've
page 2768
2768
directed you to. It starts, "accordingly," at the bottom of page 80, "According" -- no l-y, "According to the current designs being developed for the proposal to Congress, the integral MRS facility would be able to accept waste at a rate of up to 3,600 MTU." Do you see that?
A. Yes, I do.
Q. And that certainly was true also,

correct?
A. Yes.
Q. Okay. It goes on, I'm still reading, this is the top of page 81, "This waste acceptance rate could preclude the addition of new at-reactor storage capacity and would allow the orderly removal of aging fuel from reactor sites." Do you see that?
A. Yes.
Q. True statement?
A. That's what the document says, yes.
Q. And it's true?
A. At that time, yes.
Q. And it also says that it, referring to the MRS, is that right, is that your understanding?

page 2769

**2769**

A. Yes.
Q. "It could also accommodate the growth of the reactor population forecasted by the Energy Information Administration in its middle growth case." Do you see that?
A. Yes.
Q. And the facility would have sufficient capacity to prepare and ship waste to the first repository and to the second repository if deemed appropriate, correct?
A. Yes.
Q. I'll continue reading. "The design would provide capability to simultaneously accept spent fuel, package the spent fuel for direct shipment to the repository or storage at the MRS facility, retrieve fuel from storage, and ship to the repository." Do you see that?
A. Yes.
Q. And so on, and let me, just for completeness, it goes on to say, "The MRS facility would be designed to simultaneously accept and unload current generation truck or rail shipping casks, disassemble and consolidate spent fuel of nearly all designs, and load into canisters spent fuel of all

page 2770

**2770**

current designs.
To prepare waste packages for the repository, the facility would include space in the receiving and handling building to overpack the canister materials if ongoing systems studies confirm this operation to be appropriate at the MRS facility." Do you see that?
A. Yes.
Q. And that was all, again, part of DOE's vision for the MRS as of the time of this mission plan?
A. Yes.
Q. Now, I think, if you take a look at page 17 again, it may be easier just to look at the document. Are you there? Tell me when you're there.
A. Yes.

[2773:14] - [2773:23] 6/14/2006 Testimony of Thomas Pollog & Christopher Kouts Pacific Gas

page 2773

Q. Now, Mr. Kouts, would it be consistent with your understanding of the Department of Energy's contract obligations to Pacific Gas & Electric Company and the other standard contract holders, would it be consistent with

**those obligations for the nation to be in a situation where it had no viable assured method for the permanent disposal of spent nuclear fuel and high-level waste?**
**A. In my opinion, no.**

[2774:7] - [2774:11] 6/14/2006 Testimony of Thomas Pollog & Christopher Kouts Pacific Gas

page 2774
**Q. Here's my question, the 1987 amendments nulled and voided the Department's monitored retrievable storage proposal as submitted under Section 141, is that correct?**
**A. That's a fair statement, yes.**

[2775:21] - [2776:4] 6/14/2006 Testimony of Thomas Pollog & Christopher Kouts Pacific Gas

page 2775
**All right. Mr. Kouts, you were involved in the design of the MRS facility we were just discussing, correct?**
**A. Yes.**
**Q. And the MRS facility that you were**
page 2776
**2776**
**involved in the design of had an acceptance capacity in excess of 3,000 MTUs per year, correct?**
**A. Yes.**

[2777:2] - [2777:5] 6/14/2006 Testimony of Thomas Pollog & Christopher Kouts Pacific Gas

page 2777
**Q. And 3,000 MTU per year is a reasonable acceptance rate for the DOE spent fuel program, correct?**
**A. A reasonable steady state rate, yes.**

[2797:14] - [2798:9] 6/14/2006 Testimony of Thomas Pollog & Christopher Kouts Pacific Gas

page 2797
**Q. And it says, "The currently estimated schedule for an MRS facility, if authorized, would allow the DOE to start operations by the end of fiscal year 1996." Do you see that?**
**A. Yes, I do.**
**Q. And that correlates with the schedule we just looked at, 2,200, pre-'98, which let's say, for sake of discussion, means starting in '96, 3,000 in 1998, correct, according to the schedule in this plan?**
**A. Yes.**
**Q. And then the next sentence says,**
page 2798
**2798**
**"Implementation of MRS, according to this schedule, will provide assurance that the DOE's acceptance of spent fuel in 1998 and subsequent years will be at sufficient rates to meet obligations." Do you see that?**
**A. Yes, I do.**
**Q. And that's a reference to the contract obligations, isn't it, Mr. Kouts?**
**A. I believe so, yes.**

[3339:] - [3339:22] 4/12/2007 Systems Fuels and Entergy Arkansas vs US, Transcript, 4/12/07

page 3339
**3339**
**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**-------------------------------------x**

SYSTEM FUELS, INC., and ENTERGY :
ARKANSAS, INC., :
Plaintiffs, :NO. 03-2623C
vs. :
THE UNITED STATES, :
Defendant. :
-------------------------------------x

Courtroom 6
National Courts Building
717 Madison Place NW
Washington, D.C.

Thursday, April 12, 2007

The parties met, pursuant to the notice of the Judge at 9:03 a.m.

BEFORE THE HONORABLE CHARLES LETTOW

[3371:10] - [3373:20] 4/12/2007 Systems Fuels and Entergy Arkansas vs US, Transcript, 4/12/07

page 3371

Q. Mr. Kouts, could you identify Defendant's Exhibit 57 -- or the excerpt from which, the document from which this excerpt is taken?

A. Yes, I can. This is the, I think, only finalized program mission plan amendment. If you remember, the mission plan was required by the Act to provide a road map in terms of how we were going to implement the program, and at this point in time, it was felt that since there were some major changes to the program, that we needed to provide an amendment to the mission plan. And this document has essentially that amendment, along with comments on the draft amendment that was issued prior to this and the Department's responses to those

page 3372

comments.

Q. Were you involved in the preparation of this document?

A. I believe I was involved in reviewing it. I might have been involved in responding to comments related to MRS issues.

Q. And what was your position within the program at the time this document was issued?

A. I was still working as part of the MRS team.

MS. SULLIVAN: Your Honor, at this time, we would move for admission of Defendant's Exhibit 57.

MR. SILBERG: No objection.

THE COURT: Admitted.

(Defendant Exhibit Number DX-57 was received in evidence.)

BY MS. SULLIVAN:

Q. Could I direct your attention to page six of this document, the paragraph that begins, "as already mentioned," if you could read that paragraph into the record, please?

A. "As already mentioned, several important milestones have been achieved. However, the experience gained in achieving

page 3373

those milestones and advances in the technical planning of the program, coupled with the decrease in the budget for fiscal 1987 and uncertainty about fiscal year 1988, have led the DOE to reassess and rebaseline the program

for the first repository and to revise its schedule, see table one.
The new schedule shows a five-year extension of the date for waste acceptance at the first repository, from 1998 to 2003. As explained later, the DOE could nonetheless start accepting waste in 1998 at an MRS facility."
Q. What was the state of DOE's planning at the time this document was issued?
A. Essentially, that the MRS was going to be our only vehicle to receive materials in the 1998 timeframe and that that had to be linked to the repository's beginning operation in 2003.

[3411:8] - [3412:21] 4/12/2007 Systems Fuels and Entergy Arkansas vs US, Transcript, 4/12/07

page 3411
Q. Mr. Kouts, could you identify Plaintiff's Exhibit 222 for the record?
A. Yes, this was an acceptance priority ranking and annual capacity report document that was issued in March of 1995.
Q. Could I direct your attention to page four of this document? And there's a table of rates set forth on that page. What was the basis for the rates set forth on that page?
A. The basis essentially, was essentially the same basis that existed for the 1991 report, except for one difference, is that we did not have any years associated with the initiation of operation. And the reason for that is that, at this point in time, the chances of having an MRS available in the 1998 timeframe without very specific directive legislation were diminishing rapidly.
page 3412
Q. And when you say, "diminishing rapidly, "what do you mean?
A. They were coming to the point where the Department could not implement it by the 1998 timeframe.
Q. And why was that?
A. Just the amount of time to do everything we needed to do, even to construct the facility was, again, being very challenged. The legislation that you would need in order to have the facility available in the 1998 timeframe essentially would have had to by-pass NEPA, would have had to by-pass NRC licensing, and even then, at that point, it might have been challenging still to get the facility operational by that time.
So that's not to say that, had we received very directed legislation and appropriations to do that, we couldn't have done it, but it was, it was becoming very challenging to do.

[3435:18] - [3444:6] 4/12/2007 Systems Fuels and Entergy Arkansas vs US, Transcript, 4/12/07

page 3435
Q. Mr. Kouts, you said DOE made every effort it reasonably could have to make a facility available in 1998. Did the administration of which DOE is a part make every effort to make a facility available in 1998?
A. That varied on the administration.
Q. Isn't it true that after 1995, when
page 3436

you were working on the design for the centralized interim storage facility and there was legislation pending, that you discussed that President Clinton said he would veto that legislation?
A. Yes, he did. My comments were -- if I could add, if you would allow me?
Q. Certainly?
A. I was referring to the Department, the Department's part of the administration. However, the President obviously makes his own decisions and makes his own decision on the budget, so when I speak for the Department, certainly, within the program, we were doing everything we could in order to bring it about.
Q. When you had on the stand the -- if we could have Elmo? DX-279, you said that there were particularly large differences between the requested and the appropriated funds in '87, '88, '89, and '90?
A. That's correct.
Q. The appropriation, the request in 1987, did that include any money for a second repository program?
A. I would have to go back and look at
page 3437
the individual budget request. My sense is, for '87, that it probably did, but I have to review the individual budget submission on that.
Q. And do you know how much that was?
A. No, I do not.
Q. Okay. And I believe you also testified that the second repository program at some point was taken off the table either by DOE or by Congress, is that correct?
A. That's correct.
Q. And once that was taken off the table, that money would not have served a useful function had it been appropriate, isn't that right?
A. That's correct.
Q. Now, in the 1987, '88 timeframe, DOE was also characterizing several sites for the first repository, isn't that correct?
A. That's correct.
Q. And was money in the request to characterize all three sites?
A. During that timeframe, yes, it was.
Q. Okay. And Congress took two of those sites off the table, didn't it?
page 3438
A. Yes, they did.
Q. So it wouldn't have made sense to appropriate money to characterize sites that the DOE could no longer characterize, isn't that correct?
A. That's true, except if I could add, when you terminate sites, you also have to pay the costs of terminating those programs which, if you have employees there, you have to pay severance costs, you have to essentially mothball the facilities or do something with the property of those facilities.
So even though those efforts were terminated, there were still residual costs that the program had to incur in order to terminate those facilities, as well as the repository effort, so there were still expenditures that were allocated to those efforts for probably a year or two after that, in order to just close down those programs.

Q. And what's the magnitude of those expenditures?
A. In the case of the salt project, it was fairly significant, since there were a variety of people who had relocated to Texas,
page 3439
and, again, there were severance costs associated with a fairly large contingent of our program. So I don't have those specific numbers, but it wasn't -- it was in the tens, you know, multiple tens of millions of dollars in order to do that.
Q. And what were the costs that had been requested for the characterization of that site?
A. That's hard for me to comment on without looking at the budget submission, but it was probably in the hundreds of millions of dollars for the three sites.
Q. So the characterization costs, the ones that were no longer possible to spend, were significantly greater than your shutdown cost, is that correct?
A. That's correct.
Q. And that would have been true at the other sites as well?
A. Yes.
Q. But you haven't done the analysis to show how much money was really not appropriated because of programs that DOE could no longer implement, have you?
page 3440
A. I have not done that analysis, no.
Q. How much in these years was appropriated for the MRS program which was not -- how much was requested for the MRS program which was not appropriated?
A. I'd have to go back and look at the budget submission. It was probably in the tens of millions of dollars.
Q. But you haven't done that analysis?
A. I don't have that information with me at this time, no.
Q. You haven't done the analysis whether you have the information with you or not?
A. I have not analyzed that, no.
Q. And how much money was requested for the activities associated with the Nuclear Waste Negotiator during the period of time when that was alive?
A. That would have been incorporated in the MRS request. The funding for the grant program and for design studies and so forth would be incorporated in the MRS request that you asked me about earlier.
Q. But you don't know how much Nuclear Waste Negotiator related funds were not
page 3441
appropriated, do you?
A. I can't answer that at this time, no.
Q. Okay. You also said that DOE had made every effort that it could to make a facility available by 1998. DOE never initiated, after the 1987 amendments, its own siting studies, did it?
A. No, it did not.
Q. Was that something that DOE could reasonably have done, if it chose to do so?
A. Well, it would not have made sense to initiate that effort, based on the limitations of the MRS, as identified in the Nuclear Waste Policy Act amendments.

Q. But those were the same limitations that affected the negotiator, weren't they?
A. No, they were not.
Q. The linkages didn't apply to the negotiator?
A. I wasn't referring to the linkages, the question I believe you asked me had to do with siting, and specifically, under the Act, the Department could not identify a site for an MRS under its siting authority until the repository site was approved, the Office of the

page 3442

Nuclear Waste Negotiator could work -- wasn't limited to doing siting under those requirements, so he was not part of the Department.
As a result, he could go out and negotiate with sites and the expectation was that, assuming he found a willing host site, he would provide that agreement to the Congress for their approval, which would have had stipulations in it to the extent that would have addressed the schedule linkages identified in the Act. So the Negotiator wasn't constrained in the same manner that the Department was at that time.
Q. Well, the Department wasn't constrained from going out and evaluating potential sites, was it? It just couldn't choose a site?
A. That's correct, but if you look at the timeframe, Mr. Silberg, we didn't recommend the site for Yucca Mountain until -- I believe the Secretary did that on -- what was it, February 13th or 14th of 2001, so to initiate a siting process in the late '90s or the late '80s, if you will, with the eventual selection or the

page 3443

recommendation of the site 10 to 12 years away, didn't make a lot of sense to the Department, and as a result, that's why we didn't implement that.
Q. But you assumed in the 1991 ACR and other places that Congress would change the law to allow an MRS to go forward. Why didn't you make that same assumption with respect to a DOE siting process?
A. Well, if you remember the 1989 reassessment report of the Secretary, essentially, the policy of the Department was we were going to work through the Nuclear Waste Negotiator to obtain a site, and that was the expectation in the 1991 APR/ACR, and that was the strategy that the Department was embarking on at that time.
We were focusing our efforts on supporting the Negotiator to provide a site to us, so we could make 1998 operations. We were not embarking on our own siting activities.
Q. So you determined -- or the Department determined that DOE siting efforts would not be reasonable?
A. The Secretary, in his reassessment

page 3444

report, basically made the determination that the Department did not have a lot of success in its MRS sitings and therefore wanted to -- he directed that the Department not involve itself in that and rely on the third-party efforts of the Nuclear Waste Negotiator.

[3448:1] - [3448:16] 4/12/2007 Systems Fuels and Entergy Arkansas vs US, Transcript, 4/12/07

page 3448

**Q. Now, did you ever do a TSLCC type analysis that included the MRS?**
**A. Did the program do it?**
**Q. Yes.**
**A. Or did I personally do it?**
**Q. Did the program do it?**
**A. Yes, the program did do that.**
**Q. And when was that done?**
**A. That would have been done when an MRS was an active component of the system, which would have been in the late '80s, '90s, up until the point that, I believe, in 1985, where we essentially removed the MRS, since it didn't appear it was going to be implemented.**
**Q. You mean 1995?**
**A. 1995, I'm sorry, that's correct.**

[3449:21] - [3450:23] 4/12/2007 Systems Fuels and Entergy Arkansas vs US, Transcript, 4/12/07

page 3449

**Q. Do you remember testifying about the 1995 TSLCC report in prior cases, Mr. Kouts?**
**A. I believe I remember testifying about a preliminary TSLCC report that was issued in late 1995, yes.**

page 3450

**Q. And it's your understanding that the late 1995 TSLCC used repository acceptance rates and not MRS acceptance rates?**
**A. You know, I'd have to go back and look at the report. If we had made a decision at that time that the MRS was not going to be available, then we would have focused primarily on the repository only acceptance rate.**
**Q. But at that time, you were still relying, were you not, on the 1995 ACR report, which assumed a repository?**
**A. I believe that was issued earlier in the year than that preliminary report on total system life cycle costs was issued.**
**Q. Now, isn't it -- so between the March issuance of the 1995 ACR and the issuance later in the year, you changed the program to delete the MRS?**
**A. I didn't change the program. The analysts who were doing the total system life cycle cost at that time made a different assumption in terms of their analytical assumption basis.**

[3459:13] - [3465:4] 4/12/2007 Systems Fuels and Entergy Arkansas vs US, Transcript, 4/12/07

page 3459

**Q. And it's true, is it not, that all of the ACRs state that they are not to be considered contractually binding, isn't that correct?**
**A. I'd have to go back and look at the individual ACRs and verify that fact, but my perspective is that they probably should not indicate that they are contractually binding.**
**Q. Well, do they affirmatively indicate they are not contractually binding?**
**A. Again, I'd have to go and review each of the documents. I'm sure the 2004 did not, and that was the one I was specifically**

page 3460

**directed -- that I specifically directed the development of.**

Q. I'm sorry, that one says it is not contractually binding?
A. That's correct.
Q. Well, let's just look at one or two, and then maybe we can move on. Let's look at the first one, which is 1987, which is Defendant's Exhibit 56. I'm calling your attention to the top of page two, on the fourth line, I guess it's the sixth line, it says, "As specified in the contract, the ACR is for planning purposes only and, thus, is not contractually binding on either DOE or the purchasers," is that correct?
A. That's correct.
Q. And you remember that language being in the 1991 ACR?
A. Not specifically, I'll be happy to review it. Actually, I found it for you, Mr. Silberg, it's in the bottom of page one.
Q. Right, so that does appear in the 1991. Do you have any reason to believe that this language doesn't appear in all of them?
A. No.

page 3461

Q. Is there anything in any of the ACRs that say that the delivery commitment schedule is contractually binding?
A. I don't believe so, but I'd have to review the documents to know for sure, to assure myself of that, but my expectation would be that there would be nothing in those documents to indicate that.
Q. And it's also true, is it not, that all the DCSes say that DOE will further define and specify system operating and waste acceptance parameters as the program progresses, do you remember that language in all of the DCSes?
A. Yes.
THE COURT: Ms. Sullivan.
MS. SULLIVAN: Objection, Your Honor, beyond the scope of the direct. We haven't laid any foundation for Mr. Kouts' testimony about this, and also vague.
THE COURT: Well, overruled. The DCSes are part and parcel of the exercise and the natural outgrowth of the ACRs.
MS. SULLIVAN: I don't disagree, Your Honor, and also, my objection is more the

page 3462

reference to generally all the DCSes, rather than --
THE COURT: Oh, that's true.
MS. SULLIVAN: Than providing specifics.
MR. SILBERG: I can go through the one, I was trying to short-circuit the process.
BY MR. SILBERG:
Q. Is it true, Mr. Kouts, that all the DCSes include a statement to the effect that DOE will further define and specify system operating and waste acceptance parameters as the program progresses?
THE COURT: Ms. Sullivan.
MS. SULLIVAN: Same objection, and I'm not clear, is he actually saying that the DCSes themselves say that?
MR. SILBERG: I'm sorry, the ACRs, if I said DCSes --
THE COURT: Well, now, we're getting confused. I think you might be talking about either the ACRs or the instructions for the

DCSes, but not --
MR. SILBERG: In this case, if I said DCS, strike that, I meant to say ACRs. I

page 3463

apologize for the confusion.
MS. SULLIVAN: Thank you, Your Honor.
THE COURT: Thank you.
THE WITNESS: ACRs, yes.
BY MR. SILBERG:
Q. And is it true that, at least starting in the 1990 ACR, that DOE said it would inform purchasers at the earliest feasible time when it had further defined and specified system operating and waste acceptance parameters?
A. I would have to review the document verify that.
Q. Well, let's take a look at, as an example, the 1991 ACR report, which, what number are we using for that?
THE COURT: PX-168.
BY MR. SILBERG:
Q. PX-168, and ask you to look at page four, second paragraph, the third sentence.
A. The first paragraph, third sentence, which is, starts with, "DOE recognizes that"?
Q. Let me see if I'm in the right -- third paragraph?
A. Third paragraph.
Q. Third sentence. "DOE will further

page 3464

define and specify system operating waste acceptance parameters as the program progresses and inform purchases accordingly at the earliest feasible time"?
A. I see that, yes.
Q. And that same language was in the 1992 ACR, to your knowledge?
A. I would have to review it, and my assumption would be that probably similar language is incorporated into it.
Q. And do you have any reason to doubt that some of the language appears in all the other ACRs?
A. Usually, the documents were fairly consistent among themselves.
Q. Now, in March 1995, DOE issued an ACR that assumed an MRS, is that correct?
A. Yes.
Q. And assumes acceptance at an MRS rate of 900 metric tons per year?
A. And a steady state rate of 900 metric tons per year, yes.
Q. Right. Now, when did DOE inform utilities that the MRS and the waste acceptance parameters of an MRS were no longer operative?

page 3465

A. I don't know the answer to that question.
Q. Did it ever?
A. I don't know the answer.

[3468:17] - [3476:8] 4/12/2007 Systems Fuels and Entergy Arkansas vs US, Transcript, 4/12/07

page 3468

Q. But DOE never undertook any steps since the Negotiator was out of business in 1995, never took, never undertook any steps either to recreate the Negotiator or to undertake its own siting program?
A. We didn't undertake those specific steps, but as I testified earlier, I was involved in my efforts within the program to

develop a design for a facility that could be
page 3469
deployed very quickly, assuming that legislation was passed.
So although the Negotiator went away, and that was unsuccessful, and there was Congressional direction also, as you may remember, that basically directed the Department to no longer issue certain grants for the Negotiator, that was done the previous year, but the Department still, as a contingency, it was also developing that topic of safety in its analysis report, and I had personal knowledge of that since I was one of the people in the program that was doing that.
Q. But you weren't looking for a site?
A. No, we were not looking for a site at that time, that's correct.
Q. In September of 1991, it's correct, is it not, that the General Accounting Office issued a study on the MRS facility, are you familiar with that study?
A. I remember the issuance of the study. I don't remember the specifics of it. I'd be happy to review it, if you have it available.
Q. I do, Plaintiff's Exhibit 198. I've handed you a document, GAO/RCDE, 91-194, U.S.
page 3470
General Accounting Office report to Congressional requestors, September 1991, entitled, "Nuclear waste operation of monitored retrievable storage facility is unlikely by 1998." Is this the document you're reflecting on?
A. Yes.
Q. And calling your attention to page five of that document --
MS. SULLIVAN: I'm sorry, Mr. Silberg, I'd like to lodge a foundation objection, Your Honor. This is a report by GAO, a different branch. There's been no foundation laid for Mr. Kouts' testimony about this document.
MR. SILBERG: Mr. Kouts said he was aware of the document, and I believe he said that.
THE COURT: He did say that. That's about as far as we've gotten.
BY MR. SILBERG:
Q. Mr. Kouts, you're aware of the General Accounting Office?
A. Yes, I am.
Q. Can you tell us what it is?
A. It's essentially an office that
page 3471
supports requests for Congressional review and for individual review of different aspects of the government.
Q. Are you aware that DOE regularly receives reports by GAO?
A. Yes, I am.
Q. And are you aware that DOE received this report by GAO?
A. I assumed it received it, yes.
MR. SILBERG: Your Honor, I would ask admission of this document.
MS. SULLIVAN: Your Honor, there's still been no foundation laid that Mr. Kouts is the proper witness to talk about this document, and he's not a 30(b)(6) witness with regard to the Department of Energy's views on this document, and, again, it's a Congressional document. He's not the proper witness.

THE COURT: The Court can ask about three questions and solve all this, but I'm reluctant to do so. Mr. Silberg, why don't you ask those three questions? Well, let me start with the first one. Mr. Kouts, what were your responsibilities in September of 1991?
THE WITNESS: In September of 1991, I
page 3472
was supporting strategic and contingency planning for the program.
THE COURT: Did that include an MRS?
THE WITNESS: Yes, generally looking at, certainly, the contingency of having an MRS available, yes.
THE COURT: Now, Mr. Silberg, I've gotten you started.
BY MR. SILBERG:
Q. And in the context of that, were you aware at that time or thereafter of this report?
A. Yes, I believe I read it when it was issued.
Q. And this report deals with GAO's analysis of the MRS program?
A. My assumption is that its an analysis primarily of the schedule aspects of an MRS, yes.
MR. SILBERG: I repeat the request.
THE COURT: Ms. Sullivan?
MS. SULLIVAN: The only foundation is that Mr. Kouts read the report at the time it was issued, not that he had any involvement in it, contributed to it, we would renew our
page 3473
foundation objection.
THE COURT: Well, except that this is, the GAO might be an arm of Congress, but it's still part of the government, and as a consequence of that --
MS. SULLIVAN: Your Honor --
THE COURT: I'm sorry, go ahead.
MS. SULLIVAN: I'm not sure the report of GAO can be construed as admissions against the administrative branch.
THE COURT: It can't.
MS. SULLIVAN: Okay.
THE COURT: It can't, I don't think there's any doubt about that. But on the other hand, at least, at least there's not in the Court's mind, I might be wrong, I basically agree with you, but on the other hand, there is a public record and a report.
MS. SULLIVAN: I think that's true, Your Honor, my concern goes to Mr. Kouts being the proper witness to talk about this, and I'll draw a parallel to my direct examination where I asked him about the MRS Commission report, where Mr. Kouts was directly involved in the activities of the MRS Commission from the DOE
page 3474
side, and I asked him based on that knowledge.
I don't think we've established the foundation for the admission of, in his testimony, about this document, in the same vein that I did with that report.
THE COURT: Well, it might be admissible under Federal Rule of Evidence 803(a). That doesn't mean that Mr. Kouts agrees with it or agrees with all the statements or assumptions.
MS. SULLIVAN: Or is the proper witness to talk about it.

THE COURT: Well, it was part of his responsibilities to know about these things at the time, that's why -- I'm sorry to help counsel out, but that's why I asked the two questions I did. I find it very hard not to help counsel out, but the objection is actually overruled.
MS. SULLIVAN: Thank you, Your Honor.
THE COURT: Now, you move for admissibility.
MR. SILBERG: I do.
THE COURT: It's admitted under Federal Rule of Evidence 803(a). That's not to
page 3475
say that Mr. Kouts doesn't agree with it or disagree with it.
BY MR. SILBERG:
Q. Calling your attention to page five, which has a Bates number of 1344 on the bottom, in the middle paragraph, this indicates that GAO's conclusion, and I'll read, is highly -- "believes it is highly unlikely that DOE can develop an MRS facility by 1998." Is that GAO's conclusion?
A. That's what the document says.
Q. And did DOE understand that to be GAO's conclusion at the time?
MS. SULLIVAN: Objection, Your Honor, I don't think we've laid a foundation that Mr. Kouts knew how DOE viewed this document.
THE COURT: Well, he might have. That's the point. I'll just correct the record, page five is actually 1344. And where are you on page five, Mr. Silberg?
MR. SILBERG: In the middle paragraph, matters for Congressional consideration.
THE COURT: All right. Thank you.
MR. SILBERG: First sentence.
THE COURT: Now, let's focus your
page 3476
question.
BY MR. SILBERG:
Q. When you read this report, Mr. Kouts, did you understand this to set forth GAO's position that it believes it was highly unlikely that DOE can develop an MRS facility by 1998?
A. Yes.

[3478:7] - [3487:5] 4/12/2007 Systems Fuels and Entergy Arkansas vs US, Transcript, 4/12/07

page 3478
Q. Mr. Kouts, we were talking about the GAO report of 1991, Plaintiff's Exhibit 198, and if I could ask you to turn to page three of that report? I think, just before we broke for lunch, we were talking about the first of the GAO's reasons for its conclusion that an MRS by 1998 was highly unlikely.
And if you look down on the bottom paragraph, Bates 1342, I think we -- on Bates page 1342, GAO says that, "DOE's plans depend on the Negotiator completing and Congress approving siting agreement by the end of 1992. That would permit early development of an MRS facility."
Now, the Negotiator did not complete the siting agreement by the end of 1992, did it?
A. No, it did not.
Q. Okay. Did it ever complete a siting
page 3479

agreement?
A. No, we did not.
Q. Second part of that argument says that, and in the next sentence, GAO states, "Because the Negotiator expects the process to take considerable time, he does not believe that these activities could be completed by then," meaning 1990 and 1992. And that, in fact, turned out to be the case, isn't that correct?
A. That's correct.
Q. The second reason that GAO provided in this report for concluding that it was highly unlikely to have an MRS by 1998 was that affected states strongly opposed DOE's siting activities for an MRS facility. Do you see that on the bottom of page 1342, the last line continuing over?
A. Yes, I do.
Q. And that was certainly correct, was it not, that Tennessee opposed the MRS in that facility?
A. Yes, the state of Tennessee did.
Q. Opposed the siting of that facility in Tennessee?

page 3480

A. Yes.
Q. And that Nevada vigorously opposes Yucca Mountain?
A. That's correct.
Q. And then it goes on at the end of that top paragraph of 1343, GAO says, "Finally, Congress would have to rescind, as DOE has requested, the links between the MRS facility and repository schedules to prevent the facility from adversely affecting the incentive to complete a repository." And Congress never took such action, did it?
A. No, it has not to this date.
Q. Was such a bill in the 1991 to 1995 timeframe, was such a bill ever reported out of committee?
A. Not that I'm aware of.
Q. And after 1995, did DOE ever ask the administration to propose legislation to allow it to undertake siting of an MRS?
A. From my perspective in the program, I'm unaware of any such request.
Q. And we agreed that no agreement with a candidate site was ever negotiated, that's correct?

page 3481

A. That's correct.
Q. So you don't know what assurances a candidate host site might have required with such an agreement?
A. That's correct, although in your document on page two here, in that same paragraph that you've been focusing on, it was the view that, if you look at the bottom of page two, I believe.
Q. What's the Bates number on that?
A. Page three, I'm sorry, it's the Bates 1342, it does say in the last full sentence on that page that, "The Negotiator also believes that any prospective host for the facility would require some type of assurance that the MRS facility would not become a permanent substitute for the repository."
Q. But those assurances might not have been restricted at -- might not have been as restrictive as the restrictions in the linkages

as they existed in the 1987 amendments?
THE COURT: Ms. Sullivan.
MS. SULLIVAN: Objection, speculation.
THE COURT: Mr. Kouts, you may answer, if you know.

page 3482

THE WITNESS: I have no way of knowing.
BY MR. SILBERG:
Q. Isn't it true -- well, Mr. Kouts, you were involved with discussions with the host communities around the Clinch River site, weren't you?
A. Yes.
Q. In connection with the DOE proposal for an MRS that was submitted to Congress ultimately in 1986 or 1987?
A. Yes.
Q. And isn't it true that in those discussions, that people at Clinch River actually proposed linkages that were less restrictive than the ones that DOE ultimately proposed?
A. I'd have to go back and review it. In general, I think the Department was in general agreement with the local hosts, but I'd have to go back and look at the specific recommendations of the Clinch River task force, if you will, for the MRS facility.
Q. Isn't it true that those recommendations, and we've talked about it in

page 3483

other testimony, included operation up to a 3000 metric ton limit, even though the repository had not yet been licensed?
MS. SULLIVAN: Objection, Your Honor, vague as to those recommendations. I'm not sure if he's talking about DOE's or somebody else's.
MR. SILBERG: We're talking about the Clinch River task force, the local people's recommendations to DOE.
THE COURT: Thank you for clarifying. The objection then is overruled with the qualification.
THE WITNESS: I'm trying to understand your question, Mr. Silberg. Are you referring to a 3000 ton.
BY MR. SILBERG:
Q. I believe it was a 300 ton capacity limit prior to the repository being licensed.
A. That could be true. I'd have to, again, I'd have to review those specific documents. I just don't have a specific recollection. I remember they did have a capacity limit. I don't remember the specifics of it.

page 3484

Q. Okay. And if we turn for a minute to page 22 of this document, which is Bates 1361, and let me, about halfway down that paragraph, you see the sentence that starts, "the Negotiator told us"?
A. Yes.
Q. Could you just read that into the record, please?
A. "The Negotiator told us that, even with a very aggressive effort, it is unlikely that he can negotiate and gain approval of an agreement by late 1992."
Q. And do you disagree with the statement that's attributed to the Negotiator?

**A. I have no basis to disagree with it.**
**Q. So you would agree that it would have been --**
**THE COURT: Ms. Sullivan.**
**MS. SULLIVAN: Objection, Your Honor, the question implicates hearsay because the Negotiator said something in the document, and he's being asked about that statement.**
**THE COURT: Well, there's an objection, but it's based on the fact that the report is reciting what the Negotiator's**
page 3485
**position was, and I'm not sure that Mr. Kouts would have personal knowledge of what the Negotiator's position was.**
**BY MR. SILBERG:**
**Q. Did you have dealings with the Nuclear Waste Negotiator in this timeframe?**
**A. I did have some interactions with his staff on occasion, but it was not on a regular basis.**
**Q. Are you aware of what he believed to be the likelihood that he could negotiate an agreement with the host community?**
**MS. SULLIVAN: Your Honor.**
**THE COURT: Ms. Sullivan.**
**MS. SULLIVAN: It's still a hearsay objection, and speculation.**
**THE COURT: Well, that's not actually -- are you aware of what he believed? He could become aware of it through all sorts of means, so it's not a hearsay objection.**
**MS. SULLIVAN: Thank you, Your Honor.**
**THE WITNESS: I have no recollection of what the Negotiator was specifically planning on at that point in time. I'm just reflecting what the document here is, and**
page 3486
**that's, I have no reason to doubt the GAO's presentation here, but I don't have any confirming information in my memory that that was the case.**
**BY MR. SILBERG:**
**Q. Did DOE take issue with this statement when it received the GAO report?**
**A. All I can do is go back to the statement in the document here, which said that this -- I believe it's on page, regarding agency comments on page 1344, page five of the document, Bates number 1344, where it basically said that GAO discussed the facts in the report with DOE officials, who generally agreed with their accuracy. But I have no knowledge as to whether or not that was a specific fact that the Department attested to its accuracy.**
**Q. But you're not aware of DOE taking issue with the statement, are you?**
**THE COURT: Ms. Sullivan.**
**MS. SULLIVAN: Well, foundation, I think that's what Mr. Kouts just testified to.**
**THE COURT: Well, yes, but it's the second time it's been asked. Let's find out.**
**THE WITNESS: Could you repeat the**
page 3487
**question?**
**(The reporter read the record as requested.)**
**THE WITNESS: I have no knowledge, one way or the other.**

[3493:24] - [3494:6] 4/12/2007 Systems Fuels and Entergy Arkansas vs US, Transcript, 4/12/07

page 3493
**Q. Is your recollection that the linkage**
**would have allowed MRS to go into operation,**
page 3494
**even though the repository had not been**
**licensed for no more than 300 metric tons?**
**A. According to my testimony in that**
**trial, yes. I, again, I have no reason to**
**doubt myself, but I had the document in front**
**of me at that time.**

[3518:9] - [3519:7] 4/12/2007 Systems Fuels and Entergy Arkansas vs US, Transcript, 4/12/07

page 3518
**Q. The office that's referred to there is**
**the Nuclear Waste Negotiator office?**
**A. That's correct.**
**Q. And do you agree that that was true at**
**that time?**
**A. The Office of the Negotiator was still**
**continuing for another year, and this was the**
**Secretary's perspective that that was the case.**
**It was certainly unlikely at that point that it**
**appeared that the Negotiator was going to be**
**successful.**
**Q. But you're not challenging the**
**Secretary's statement to Congress that the**
**Negotiator had not been able to find a site**
**that would permit spent fuel receipt by January**
**1998?**
**A. I'm not challenging the Secretary's**
page 3519
**perspective, no.**
**Q. And the Secretary speaks for the**
**entire Department?**
**A. Yes, he does.**
**Q. Including the Office of Civilian**
**Radioactive Waste Management?**
**A. Yes, he does.**

[3521:15] - [3524:1] 4/12/2007 Systems Fuels and Entergy Arkansas vs US, Transcript, 4/12/07

page 3521
**Q. Did you assume favorable Congressional**
**action to changing the linkage while you were**
**reviewing the 1991 ACR?**
**A. I believe the 1991 ACR was based on**
**the premise that there would have been a**
**removal of the schedule linkages in the MRS, so**
**that was certainly my assumption when I**
**reviewed that document, and my sense is that**
**was the perspective of the Department when it**
**issued it.**
**Q. But you don't know what the basis for**
page 3522
**that premise was, do you?**
**A. Well, back in 1991, we had an active**
**program with the Nuclear Waste Negotiator, and**
**we were supporting that office's efforts to**
**identify a facility, site for that facility, so**
**my sense is that the premise for it and the**
**assumption was that the Negotiator was going to**
**be successful.**
**Q. So you, A, assumed the Negotiator**
**would be successful, is that correct --**
**A. Yes.**
**Q. -- in finding a site? B, that he**
**would negotiate an agreement with a volunteer**
**host community that would contain linkages that**
**would allow the assumption that's made in the**

**1991 ACR, is that correct?**
**A. That's correct.**
**Q. And then you assumed that Congress would enact that agreement into law, is that correct?**
**A. That's correct.**
**Q. And you assumed that an application would be filed for that facility with the NRC?**
**A. A license application, yes, that's correct.**

page 3523

**Q. And you assumed that the NRC would favorably review that application?**
**A. That's correct.**
**Q. And you assumed that that favorable review of the application would be completed before January 31, 1998?**
**A. That's correct. In addition, the assumption was that we were going to have the budget to implement the program and that there would be no litigation that would slow us down along the way, so there were a variety of assumptions that played into it, in addition to the ones that you identified.**
**Q. And you assumed, if the NRC issued a favorable licensing decision, that that would not be held up by litigation?**
**A. That was the operating assumption of the program at the time.**
**Q. And you assumed that if the license was not held up by litigation, that you could construct the facility and have it operational by January 31, 1998?**
**A. That's correct.**
**Q. And is there a document which explains the basis for all those favorable assumptions?**

page 3524

**A. Not one that comes to mind, no.**

[3537:22] - [3541:9] 4/12/2007 Systems Fuels and Entergy Arkansas vs US, Transcript, 4/12/07

page 3537

**Q. But as of 1992, when the Department terminated all facility site work from MRS, you continued to say that the MRS was the contractual basis for the acceptance rate,**

page 3538

**isn't that correct?**
**A. It was the only basis that we had to have a facility well in advance of the repository, that would have been close to 1998, to meet that commitment, that's correct.**
**Q. But you couldn't get there, isn't that what the Secretary said, you could not get there with an MRS?**
**THE COURT: Ms. Sullivan.**
**MS. SULLIVAN: Objection, vague as to timeframe and what statement by the Secretary.**
**THE COURT: We do have a difference between 1991 and 1992, and I think Mr. Kouts is aware of that.**
**THE WITNESS: The Secretary evolved his strategies also. Based on the events transpired in the implementation of the program in 1989, Admiral Watkins was very committed to working with the Nuclear Waste Negotiator when he believed, as indicated in his letter to Bennet Johnston in December of 1992, that that didn't seem to be a viable option.**
**He was trying to provide another option for Congress to provide the Department the authority in order to receive these**

page 3539
materials at a DOE site.
So what I think this is reflective of is the fact that the Department tried to evolve and do everything it could, as I stated earlier, in response to Ms. Sullivan's questioning, took every reasonable action that it could take, informing the Congress, informing its constituency, if you will, the Department's constituency of its challenges in implementing this and trying to change the strategy as to make this happen in 1998.
So I think what you're suggesting here is, did we evolve? Yes, we evolved, and we had to evolve because circumstances indicated that each strategy we took basically didn't work out as we had anticipated.
BY MR. SILBERG:
Q. But in 1995, you were still putting forward an acceptance rate based on a linked -- an unlinked MRS, where you had, two years before, stopped work on that project?
MS. SULLIVAN: Objection, mischaracterizes witness' testimony.
BY MR. SILBERG:
Q. Stopped work on siting that project.
page 3540
THE COURT: Well, and you're referring, Mr. Silberg, to the APR/ACR that was issued in 1995, in March?
MR. SILBERG: Yes, sir, yes, sir.
THE COURT: Thank you. Mr. Kouts, you may answer.
THE WITNESS: If you remember that APR/ACR, it was still holding on to the potential that we would somehow get authorization, and it did not have a 1998 date in it, it had a year one, year two, year three, year four, so the Department was, if you will -- the chances of an MRS in '98 were certainly evaporating.
However, the Department still had hopes that some kind of legislation would be passed, and as you know, Mr. Silberg, there was legislation that was being contemplated in Congress in that timeframe to provide the Department with sites.
So it was not totally out of the realm of possibility that that authorization could have still come forward.
BY MR. SILBERG:
Q. That legislation was not put forward
page 3541
by DOE, was it?
A. No, it was not.
Q. And it was not put forward by the administration, was it?
A. No, it was not, but it was still being considered in Congress.
Q. And the administration said they would veto that legislation?
A. That's correct.

[3545:5] - [3547:18] 4/12/2007 Systems Fuels and Entergy Arkansas vs US, Transcript, 4/12/07

page 3545
Q. Mr. Kouts, do you remember why President Clinton vetoed the legislation that you were discussing with Mr. Silberg?
MR. SILBERG: Objection, incorrectly characterizes his testimony.
THE COURT: Right. I can help you

**out, Ms. Sullivan.**
**MS. SULLIVAN: I'm sorry, I missed that.**
**THE COURT: It's just that President Clinton said he would veto it if it were passed by Congress. It's not that he actually did it. That was enough.**
**BY MS. SULLIVAN:**
**Q. Mr. Kouts, do you recall why President Clinton said he would veto --**
**MR. SILBERG: Objection, lack of foundation, if this witness can't talk about things from a DOE perspective on cross-examination, I'm not sure why he can talk about it on redirect.**

page 3546

**THE COURT: Well, President Clinton might have expressed a view, but in any event, we'll see what happens. Overruled.**
**THE WITNESS: My recollection of the President's objection to the deployment of interim storage was that he believed that -- I believe it was related to the fact that the program should focus its efforts on a repository and site a repository prior to the time that an interim storage site was ultimately selected, as I remember the general argument put forth, I believe, by the administration at that time.**
**So he was not supportive of interim storage until there was a repository site identified, and I think there were several other things that were being considered that were part of it, but that's, to the best of my recollection, what the objections were.**
**BY MS SULLIVAN:**
**Q. And when was the site for Yucca Mountain finally recommended?**
**A. It was recommended by Secretary Abraham in February of 2002.**
**Q. And when, the legislation that you**

page 3547

**were discussing with Mr. Silberg that President Clinton said he would veto, when was that legislation being considered?**
**A. In the mid-'90s, and let me just also, several of the pieces of legislation would have identified Yucca Mountain, and I probably should have, should have clarified my previous comment, would have identified Yucca Mountain as the site where we should move these materials, and that's what was contained in several of the industry bills.**
**And the President was of a view that, before you would move materials there, you had to make sure that was the ultimate repository site, and until that occurred, he would not be supportive of interim storage at Yucca Mountain. That's the best, to my recollection, of his objections to it.**

[3560:9] - [3561:10] 4/12/2007 Systems Fuels and Entergy Arkansas vs US, Transcript, 4/12/07

page 3560

**Q. Okay. Thank you. Mr. Kouts, when the Department issued the 1994 ACR, did the Department believe that it could perform at an MRS?**
**A. The 1995 or the '94?**
**Q. '94 ACR issued in March of '95?**
**A. We did, but, again, we recognized in that, that it would probably not be in 1998.**

**As you remember, the waste acceptance schedule went to a year one, year two, year three, but we still had some hopes, again, that there would be some legislation that would give us authority in order to implement it, so that was what that acceptance schedule was based on, without a start date, if you will, for the facilities, since 1998 seemed highly unlikely.**

**Q. At the time the 1998 ACR was issued in**

page 3561

**March of 1995, if DOE were to accept fuel from the utilities pursuant to the standard contract prior to 2010 at a repository, where would that acceptance have been?**

**A. It would have had to have been at a monitored retrievable storage facility, and essentially, the linkages would have had to be broken, et cetera, et cetera. So that's the only facility that, potentially, we could have had available before 2010.**

# Attachment IV

[1:] - [3:] 5/1/2002 Milner, Ronald A., Deposition Vol. 1, 5/1/02

page 1

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**- - - - - - - - - - - - - - - - - - - - -x**
**YANKEE ATOMIC ELECTRIC COMPANY :**
**(98-126C)(Merow, S.J.) :**
**CONNECTICUT YANKEE ATOMIC POWER COMPANY :**
**(98-154C)(Merow, S.J.) :**
**FLORIDA POWER & LIGHT COMPANY :**
**(98-483C)(Wilson, J.) :**
**NORTHERN STATES POWER COMPANY :**
**(98-484C)(Wiese,J.) :**
**DUKE POWER, A Division of :**
**DUKE ENERGY CORP. :**
**(98-485C)(Sypolt,J.) :**
**INDIANA MICHIGAN POWER COMPANY :**
**(98-486C)(Hodges, J.) :**
**SACRAMENTO MUNICIPAL UTILITY DISTRICT :**
**(98-488C)(Yock, S.J.) :**
**SOUTHERN NUCLEAR OPERATING COMPANY, :**
**et al. :**
**(98-488C)(Yock, S.J.) :**
**COMMONWEALTH EDISON COMPANY :**
**(98-621C)(Hewitt, J.) :**
**BOSTON EDISON COMPANY :**
**(99-447C)(Allegra, J.) :**
**GPU NUCLEAR, INCORPORATED :**

page 2

**(00-440C)(Bush, J.) :**
**WISCONSIN ELECTRIC POWER COMPANY :**
**(00-697C)(Merow, S.J.) :**
**POWER AUTHORITY OF THE STATE OF NEW YORK :**
**(00-703C)(Damich, J.) :**
**OMAHA PUBLIC POWER DISTRICT :**
**(01-115C)(Bush, J.) :**
**NEBRASKA PUBLIC POWER DISTRICT :**
**(01-116C)(Sypolt, J.) :**
**TENNESSEE VALLEY AUTHORITY :**
**(01-249C)(Bruggink, J.) :**
**Plaintiffs, :**
**v. :Discovery**
**THE UNITED STATES, :Judge:**
**Defendant. :(Judge**
**- - - - - - - - - - - - - - - - - - - - -xSypolt)**

**McLean, Virginia**
**Wednesday, May 1, 2002**

**Deposition of RONALD A. MILNER, a witness, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness being duly sworn by CATHERINE S. BOYD, a Notary Public in and for the Commonwealth of Virginia, taken at the offices of Shaw Pittman, LLP, 1650 Tysons**

page 3

**Boulevard, McLean, Virginia 22102-4859, at 9:30 a.m., Wednesday, May 1, 2002, and the proceedings being taken down by Stenotype by CATHERINE S. BOYD and transcribed under her direction.**

[9:20] - [9:22] 5/1/2002 Milner, Ronald A., Deposition Vol. 1, 5/1/02

page 9

**Q. And where are you employed, Mr. Milner?**
**A. U.S. Department of Energy.**

[15:16] - [15:24] 5/1/2002 Milner, Ronald A., Deposition Vol. 1, 5/1/02

page 15

**Q. And then you joined the office that**

I'll refer to as the OCRWM in or around 1984?
A. Correct.
Q. And have you been with OCRWM without interruption since 1984?
A. Yes.
Q. So you have been in OCRWM by my math roughly 18 years?
A. Roughly 18 years.

[16:21] - [17:4] 5/1/2002 Milner, Ronald A., Deposition Vol. 1, 5/1/02

page 16
Q. All right. What was your title when you joined OCRWM in 1984?
A. I was a branch chief, but I can't recall the exact title.
Q. What were your duties?
page 17
A. I was responsible for preparation of the total system life cycle cost analysis, fee adequacy analysis, preparation of the original Mission Plan.

[65:21] - [65:25] 5/1/2002 Milner, Ronald A., Deposition Vol. 1, 5/1/02

page 65
MR. TOMASZCZUK: Ms. Reporter, I would like to mark as Milner Exhibit 4 the draft Mission Plan overview dated December 20, 1983, and this is an excerpt from that document in the interest of killing a few less trees.

[69:14] - [69:24] 5/1/2002 Milner, Ronald A., Deposition Vol. 1, 5/1/02

page 69
Q. The next page of this document, 2-2, under the heading waste acceptance schedule, and this paragraph states that the department has prepared a waste acceptance schedule which specifies in the aggregate the quantities of commercial nuclear waste that the program will accept beginning in 1998.
This schedule is presented in Table 2-1, and then turning to Table 2-1 whenever you're ready --
(The witness reviewed the document.)

[72:21] - [73:22] 5/1/2002 Milner, Ronald A., Deposition Vol. 1, 5/1/02

page 72
Q. Okay. This table goes on to, under the column remaining backlog MTU, do you see that?
A. Yes.
Q. In the right-hand side? It shows a
page 73
pre-1998 backlog of 40,809 metric tons?
A. Yes.
Q. Correct? And that number basically decreases over time, and the table shows a backlog as of 2020 of 23,775 metric tons, right?
A. Correct.
Q. Showing that the backlog is being reduced over time?
A. Correct.
Q. And was that a fair statement of DOE's intentions at or about this time, to work off the backlog of spent nuclear fuel that utilities were storing?
MR. SHULTIS: Objection. Calls for a legal conclusion, and Mr. Milner is not a

30(b)(6) witness.
THE WITNESS: Well, at this specific point in time, I don't know what the department's intent was.
At the point I joined the program, my understanding of the intent was to work off the backlog.

[73:25] - [74:23] 5/1/2002 Milner, Ronald A., Deposition Vol. 1, 5/1/02

page 73
MR. TOMASZCZUK: Mr. Milner, I'm going
page 74
to hand you what I'm going to ask the court reporter to mark as Milner Exhibit 5.
It is the Mission Plan for OCRWM, Volume 1.
It's an excerpt dated June 1985.
(Milner Exhibit No. 5 was marked for identification.)
MR. SHULTIS: Alex, just for the record, and you might have already done this, but I just want it shown that this exhibit is pages through page 29 of Volume 1 of the 1985 Mission Plan.
MR. TOMASZCZUK: That's fair. I believe I identified it as an excerpt.
The Mission Plan goes on for several hundred pages.
What he has in front of him is an excerpt which consists of Part 1, Section 1, and Part 1, Section 2.
Section 1 is the introduction.
Section 2 is program strategy.
MR. SHULTIS: Thank you.

[83:15] - [83:23] 5/1/2002 Milner, Ronald A., Deposition Vol. 1, 5/1/02

page 83
MR. TOMASZCZUK: Ms. Reporter, could you mark as Milner Exhibit 6 the Table of Contents to the June 1985 Mission Plan which I had alluded to in one of my questions this morning, but it was not contained in the copy that I provided you?
(Milner Exhibit No. 6 was marked for identification.)

[84:17] - [85:24] 5/1/2002 Milner, Ronald A., Deposition Vol. 1, 5/1/02

page 84
Q. Can I direct your attention to the page 29 of the June '85 Mission Plan?
A. Page 29?
Q. Page 29 should be the last page.
A. Um-hm.
Q. Of this excerpt.
A. Um-hm.
(The witness reviewed the document.)
BY MR. TOMASZCZUK:
page 85
Q. This page 29 appears to identify for DOE objectives for a waste acceptance system, and it lists them one, two, three, four?
A. Um-hm.
Q. Right?
A. Correct.
Q. And the first states accept civilian spent fuel at an annual rate that will allow the

utilities to maintain orderly operations of their nuclear power plants, recognizing that the oldest spent fuel will have the highest priority for acceptance consistent with the DOE's current contracts with the waste generators?
A. Yes.
Q. All right? What is your understanding of the phrase in that quote that will allow the utilities to maintain orderly operations of their nuclear power plants?
A. My personal opinion of that was that given the limitations of the spent fuel pools of various utilities, that in essence we would pick up the fuel before a utility ran out of pool storage capacity which would then force it to shut down.

[197:] - [199:] 5/2/2002 Milner, Ronald A., Deposition Vol. 2, 5/2/02

page 197

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
- - - - - - - - - - - - - - - - - - - - - -x
YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C)(Wilson, J.) :
NORTHERN STATES POWER COMPANY :
(98-484C)(Wiese,J.) :
DUKE POWER, A Division of :
DUKE ENERGY CORP. :
(98-485C)(Sypolt,J.) :
INDIANA MICHIGAN POWER COMPANY :
(98-486C)(Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C)(Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY, :
et al. :
(98-488C)(Yock, S.J.) :
COMMONWEALTH EDISON COMPANY :
(98-621C)(Hewitt, J.) :
BOSTON EDISON COMPANY :
(99-447C)(Allegra, J.) :
GPU NUCLEAR, INCORPORATED : 0198

page 198

(00-440C)(Bush, J.) :
WISCONSIN ELECTRIC POWER COMPANY :
(00-697C)(Merow, S.J.) :
POWER AUTHORITY OF THE STATE OF NEW YORK :
(00-703C)(Damich, J.) :
OMAHA PUBLIC POWER DISTRICT :
(01-115C)(Bush, J.) :
NEBRASKA PUBLIC POWER DISTRICT :
(01-116C)(Sypolt, J.) :
TENNESSEE VALLEY AUTHORITY :
(01-249C)(Bruggink, J.) :
Plaintiffs, :
v. :Discovery
THE UNITED STATES, :Judge:
Defendant. :(Judge
- - - - - - - - - - - - - - - - - - - - - -xSypolt)

McLean, Virginia
Thursday, May 2, 2002

Continued deposition of RONALD A. MILNER, a witness, recalled for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness being duly sworn by CATHERINE S. BOYD, a Notary Public in and for the Commonwealth of Virginia, taken at the offices of Shaw Pittman, LLP, 1650 Tysons 0199

page 199
Boulevard, McLean, Virginia 22102-4859, at 9:51 a.m., Thursday, May 2, 2002, and the proceedings being taken down by Stenotype by CATHERINE S. BOYD and transcribed under her direction.

[327:22] - [327:24] 5/2/2002 Milner, Ronald A., Deposition Vol. 2, 5/2/02

page 327
MR. TOMASZCZUK: I have now the 1991 ACRs. It's amazing.
Can we mark it as Exhibit 42?

[334:20] - [335:11] 5/2/2002 Milner, Ronald A., Deposition Vol. 2, 5/2/02

page 334
Q. Mr. Milner, the rates contained at page 5 of the 1991 ACR, Milner Exhibit 42, those rates are based on use of an MRS, correct?
A. That's correct.
Q. And that MRS, one of the assumptions is that MRS also has placed on it certain 335

page 335
statutory linkages or restrictions?
A. That's correct.
Q. At the time that this document was prepared, December 1991, OCRWM had other documents reflecting the design capacity of the geologic repository, is that right?
A. Correct. I believe so.
Q. And those documents reflected a steady-state spent nuclear fuel acceptance schedule of 3,000 MTU?
A. I believe that's correct, yeah.

[389:8] - [389:17] 5/2/2002 Milner, Ronald A., Deposition Vol. 2, 5/2/02

page 389
MR. TOMASZCZUK: Ms. Reporter, can we mark as Milner Exhibit 51 the March 1995 APR ACR?
(Milner Exhibit No. 51 was marked for identification.)
BY MR. TOMASZCZUK:
Q. Are you familiar with this document, Mr. Milner?
A. In general terms, yes.

[403:] - [404:] 5/3/2002 Milner, Ronald A., Deposition Vol. 3, 5/3/02

page 403
IN THE UNITED STATES COURT OF FEDERAL CLAIMS
- - - - - - - - - - - - - - - - - - - - X
YANKEE ATOMIC ELECTRIC COMPANY, (98-126C)
CONNECTICUT YANKEE ATOMIC POWER COMPANY(98-154C)
MAINE YANKEE ATOMIC POWER COMPANY (98-474C) :
FLORIDA POWER & LIGHT COMPANY(98-483C) :
NORTHERN STATES POWER COMPANY (98-484C) :
DUKE POWER, A Division of DUKE ENERGY CORP. (98-485C) :
INDIANA MICHIGAN POWER COMPANY (98-486C)
SACRAMENTO MUNICIPAL UTILITY DISTRICT (98-488C) :
SOUTHERN NUCLEAR OPERATING COMPANY, et al., (98-614C):
COMMONWEALTH EDISON COMPANY (98-621C) :
BOSTON EDISON COMPANY (99-447C) :
GPU NUCLEAR, INCORPORATED (00-440C) :
WISCONSIN ELECTRIC POWER COMPANY, (00-697C):
POWER AUTHORITY OF THE STATE OF NEW YORK (00-703C) :
OMAHA PUBLIC POWER DISTRICT (01-115C) :

**NEBRASKA PUBLIC POWER DISTRICT (01-116C):**
**TENNESSEE VALLEY AUTHORITY (01-249C) :**
**Plaintiffs, v. :**
**UNITED STATES OF AMERICA, :**
**Defendant.**
**Washington, D.C. Friday, May 3, 2002**
**Continued Deposition of RONALD MILNER, a witness herein, called for examination by counsel for**

page 404

**Plaintiffs in the above-entitled matter, pursuant to notice, the witness being previously duly sworn by CATHERINE S. BOYD, Notary Public in and for the Commonwealth of Virginia, taken at the offices of Shaw Pittman, 1650 Tysons Boulevard, McLean, Virginia, at 9:15 a.m., Friday, May 3, 2002, and the proceedings being taken down by Stenotype by CYNTHIA R. SIMMONS, RMR, CRR, and transcribed under her direction.**

[411:7] - [411:13] 5/3/2002 Milner, Ronald A., Deposition Vol. 3, 5/3/02

page 411

**Q. Mr. Milner, you recall, we had the March 1995, APR, ACR out late in the day yesterday?**
**A. I do.**
**Q. And if I could direct your attention to page 4 in the document. This is the table with the projected acceptance rate for spent nuclear fuel?**
**A. Correct.**

[412:3] - [412:22] 5/3/2002 Milner, Ronald A., Deposition Vol. 3, 5/3/02

page 412

**Q. This table as I understood your testimony yesterday reflects the, and adopts the MRS capacity limits, correct?**
**A. I believe it does, yes.**
**Q. And those MRS capacity limits are essentially imposed on the geologic repository here, is that right?**
**MR. SHULTIS: Objection as to characterization.**
**THE WITNESS: I can't answer -- I don't know.**
**BY MR. TOMASZCZUK:**
**Q. I mean, we know as of this point in time there was no MRS in the works, correct?**
**A. I believe we had determined yesterday that this particular APR ACR did assume an MRS.**
**Q. But did we also not determine that as of this point in time all work at DOE on an MRS siting had stopped?**
**A. That's correct.**

[555:8] - [556:12] 5/3/2002 Milner, Ronald A., Deposition Vol. 3, 5/3/02

page 555

**Q. The capacity limit of 15,000 metric tons, do you know where the Department would have come up with that number?**
**A. I believe that was the request or recommendation of the local community at the time.**
**Q. At the time as we saw in the previous page this was assuming that the MRS would operate for only about five years prior to being able to move additional waste from the MRS and start feeding into the repository?**
**A. It was intended to operate for five years before it began shipping waste and it certainly was going to operate longer than five years.**
**Q. But over the course of that five years,**

would this limit on the capacity of 15,000 metric tons have been a significant restraint on the ability of the Department to operate this facility?
A. It certainly would have been a constraint.
page 556
15,000, I believe, was the limit wherein the capacity could never exceed that of the MRS.
Q. However, if divided over the course of five years, this capacity doesn't exceed amounts that the DOE had previously projected that it was going to be receiving on an annual basis?
A. That's correct.
Q. In fact that would equal exactly 3,000 metric tons a year which had previously been the steady state operation under previous projections?
A. That's correct. Whether that was a mathematical coincidence, I don't know.

[572:25] - [574:18] 5/3/2002 Milner, Ronald A., Deposition Vol. 3, 5/3/02

page 572
Q. Sure, under prior planning with the MRS
page 573
facility that started in 1998, a utility would have submitted a DCS form assuming a 900 ton metric rate?
A. For the fifth year of operation.
Q. For the fifth year of operations, right?
A. Correct.
Q. Now, in reality, there's actually going to be, in the fifth year of actual operations as currently projected, beginning in 2010 there's going to be 3,000 metric tons that are accepted.
MR. SHULTIS: Objection, mischaracter -- assumes facts not in evidence and Chris, I'm having a hard time with your question insofar as you're asking about in reality and about projections. They're two different things. Can you help me out there?
BY MR. TOMPKINS:
Q. Sure. Current projections for forecasts and what utilities are planning, or rather, the Department is currently planning on receiving in the year 2010 is 3,000 metric tons for the fifth year of operation of the repository. This 3,000 metric tons is higher in the fifth year of operations than under prior plans?
A. Correct.
Q. So because of this difference, when the
page 574
Department goes and prepares an APR, all the allocations for the fifth year will be different than they were originally in the '90s?
A. Yes, okay.
Q. Okay. So a utility that submitted a DCS for an allocation based on the rates in the early '90s may have a different allocation under current forecasts?
MR. SHULTIS: Calls for speculation.
THE WITNESS: I would assume, yes.
BY MR. TOMPKINS:
Q. Okay. Do you know what the Department is, or the program OCWRM is currently planning on doing about the fact that the allocations may be different with the DCS forms? Are they going to go back and have utilities prepare a new DCS form based on these rates?
A. Actually we've not addressed that yet.

[1:] - [1:] 5/7/2002 Milner, Ronald A., Deposition Vol. 1, 5/7/02

page 1
IN THE UNITED STATES COURT OF FEDERAL CLAIMS

```
- - - - - - - - - - - - - - - - - - -)
YANKEE ATOMIC ELECTRIC COMPANY    )
(98-126C)(Merow, S.J.)            )
CONNECTICUT YANKEE ATOMIC POWER   )
COMPANY                           )
(98-154C)(Merow, S.J.)            ) Volume I
MAINE YANKEE ATOMIC POWER COMPANY) Washington, D.C.
(98-474C)(Merow, S.J.)            ) Tuesday
               Plaintiffs,        ) May 7, 2002
               v.                 )
 THE UNITED STATES,               )
               Defendant.         )
- - - - - - - - - - - - - - - - - - -)
```

Deposition of RONALD A. MILNER, a witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to agreement, the witness being duly sworn by CHERYL A. LORD, a Notary Public in and for the District of Columbia, taken at the offices of SPRIGGS & HOLLINGSWORTH, 1350 I Street, N.W., Washington, D.C., at 3:48 p.m., Tuesday, May 7, 2002, and the proceedings being taken down by Stenotype by CHERYL A. LORD, RPR, CRR, and transcribed under her direction.

[31:4] - [32:11] 5/7/2002 Milner, Ronald A., Deposition Vol. 1, 5/7/02

page 31

Q. I mean, assuming then, that the purchasers followed the instructions and submitted DCSs based on the schedules in the 1991 annual capacity report, then the DCSs would be based upon a waste acceptance schedule that was inconsistent with the statutory linkages in the Nuclear Waste Policy Act?
MR. SHULTIS: Objection. It calls for a legal conclusion.
A. You're talking schedule linkage?
BY MR. SKALABAN:
Q. Yes, sir.
A. Well, I just don't view it as inconsistent in the sense that certainly in my opinion at the time there was a possibility of that schedule linkage being removed.
Q. But it was -- but the schedule linkage was there?
A. Yes.
Q. And so as the law then existed and as it exists now, because I don't believe -- scratch that.
As the law then existed, the DCSs were based on a waste acceptance schedule that was

page 32

inconsistent with the Nuclear Waste Policy Act's schedule linkages as they existed at this time?
A. Sitting here today looking at that, that would be my opinion.
Q. And to your knowledge, the schedule linkages have never been changed. There's -- I'm sorry.
Let me ask a more artful question.
There hasn't been a change in the law removing those schedule linkages?
A. No, there has not.

[4614:1] - [4614:20] 8/11/2004 Yankee Atomic Electric Trial Transcript Vol. 21

page 4614

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

```
YANKEE ATOMIC ELECTRIC           )  Case Nos.
COMPANY, CONNECTICUT YANKEE      )   98-126C
ATOMIC POWER COMPANY, and MAINE  )   98-154C
YANKEE ATOMIC POWER COMPANY,     )   98-474C
```

**Plaintiffs, )**
**v. )**
**THE UNITED STATES, )**
**Defendant. )**

**Courtroom Number 5**

**National Courts Building**
**717 Madison Street, Northwest**
**Washington, D.C.**

**Wednesday, August 11, 2004**

**VOLUME 21**

[4711:20] - [4712:1] 8/11/2004 Yankee Atomic Electric Trial Transcript Vol. 21

page 4711
**BY MS. SULLIVAN:**
**Q Good afternoon, Mr. Milner.**
**A Good afternoon.**
**Q Mr. Milner, are you currently employed in the Office of Civilian Radioactive Waste Management at the Department of Energy?**
page 4712
**4712**
**A Yes, I am.**

[4749:16] - [4750:6] 8/11/2004 Yankee Atomic Electric Trial Transcript Vol. 21

page 4749
**Q Now, it's true that the Department of Energy's intentions with respect to the repository design receipt rates had stayed constant pretty much to the present day, 3,000 MTU per year?**
**A I'm sorry, would you repeat that?**
**Q It's true, is it not, that the Department of Energy's intentions with respect to the repository design receipt rates have stayed constant to the present day, 3,000 MTU per year?**
**A Yes, uh-huh.**
page 4750
**4750**
**Q And that -- that 3,000 MTU steady-state acceptance rate has been used fairly consistently in the OCRWM published documents, correct?**
**A As far as the steady-state rate, yes.**
**Q And that's a reasonable rate?**
**A Yes, I think so.**

# Attachment V

[1:] - [2:] 4/15/2002 Rosselli, Robert M., Deposition Vol. 1, 4/15/02

page 1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

YANKEE ATOMIC ELECTRIC COMPANY CONNECTICUT YANKEE ATOMIC POWER COMPANY MAINE YANKEE ATOMIC POWER COMPANY FLORIDA POWER & LIGHT COMPANY NORTHERN STATES POWER COMPANY DUKE POWER, A Division of DUKE ENERGY CORP. INDIANA MICHIGAN POWER COMPANY SACRAMENTO MUNICIPAL UTILITY DISTRICT SOUTHERN NUCLEAR OPERATING COMPANY, et al. COMMONWEALTH EDISON COMPANY BOSTON EDISON COMPANY GPU NUCLEAR, INCORPORATED WISCONSIN ELECTRIC POWER COMPANY POWER AUTHORITY OF THE STATE OF NEW YORK OMAHA PUBLIC POWER DISTRICT NEBRASKA PUBLIC POWER DISTRICT TENNESSEE VALLEY AUTHORITY,

Plaintiffs, vs. Case Nos. 98-126C, 98-154C, 98-474C 98-483C, 98-484C, 98-485C 98-486C, 98-488C, 98-614C 98-621C, 99-447C, 00-440C UNITED STATES, 01-116C, 01-249C DEFENDANT.

____________________________

VOLUME I DEPOSITION OF ROBERT M. ROSSELLI

Taken on behalf of Sacrament Municipal Utility District April 15, 2002

\- - -

BE IT REMEMBERED THAT, pursuant to the Washington Rules of Civil Procedure, the deposition of Robert M. Rosselli was taken before Marta M. Rice, a Certified Shorthand Reporter, and a Notary Public for the State of Washington, on April 15, 2002, commencing at the hour of 9:34 a.m., the proceedings being reported at the Hampton

page 2

Inn, 486 West Bradley, Richland, Washington.

[16:18] - [19:7] 4/15/2002 Rosselli, Robert M., Deposition Vol. 1, 4/15/02

page 16

Q. Now, is this the first point at which you began working on waste management issues for the Government, or had you had certain responsibilities in that area prior to that point?

A. I think it's fair to say that this was the first time that I got substantively involved on waste management sites.

page 17

Q. And this would be sometime around 1980, 1981?

A. Yes, it was around that time. I think it was a couple of years doing that before, roughly a couple of years before the Nuclear Waste Policy Act passed.

Q. And how long were you in that position?

A. I'm going, to the best of my knowledge, say it was about a couple of years, year-and-a-half to two years.

Q. And what was your next position?

A. Director, I believe it was called the resource management division in the office of Civilian Radioactive Waste Management.

Q. And what were your responsibilities as director of that division?

A. There were organizational development, human resources management, contract administration, information resources, budget and finance.

Q. And did you have people working for you in that position?

A. Yes, I did.

Q. Approximately how many? Do you recall?

A. No, I don't.

page 18

Q. More than 10?

A. Yes.

Q. More than 20?

A. I really don't remember.
Q. How long did you hold that position?
A. Until 1984.
Q. Let me back up a step. You'd been an executive assistant in the office of civilian waste. Then, you became director of resource management division at the office of Civilian Radioactive Waste Management. Why did you take that position? What led to that change of position?
A. To the best of my recollection, sometime in the span of the -- while I was working in the waste program, initially, they had both defense and commercial waste in that same organization. Then they split out. At some point in there, they split out the defense waste, and essentially what we were working on was the civilian side. And so when the Waste Policy Act passed, they just grabbed that entity that was commercial and gave us a new name.
Q. You were doing the same work?
A. Essentially, it was the same work, yes,

page 19

it was.
Q. And you said you held that position until 1984?
A. That's right. May of '84.
Q. And what happened then?
A. I transferred to the Richland operations office here in Richland, Washington.

[21:14] - [22:11] 4/15/2002 Rosselli, Robert M., Deposition Vol. 1, 4/15/02

page 21

Q. And what were your responsibilities as deputy manager for business services?
A. I had all the administrative activities -- budget, finance, human resources, procurement. I had responsibility for the infrastructure. I had responsibility for the office of special concerns. I had responsibility for, what we called, the future outcome, it's economic development aspects and how we support community economics, the development. Initially, I had responsibility for the laboratory, Pacific Northwest National Laboratory.

page 22

Q. How long were you in this position?
A. Until current.
Q. Is that your current position today?
A. Yes, it is.
Q. Mr. Rosselli, after the time that you left the office of Civilian Radioactive Waste Management, which you estimated was approximately May of 1984, in your other positions within the department, have you had any involvement in waste management issues?
A. Yes.

[134:23] - [135:5] 4/15/2002 Rosselli, Robert M., Deposition Vol. 1, 4/15/02

page 134

Q. Mr. Rosselli, you've been handed Exhibit 13 to your deposition. It's a document entitled, Civilian Radioactive Waste Management

page 135

Program Mission Plan, Volume I, Overview and Current Program Plans, December 20, 1983. And it includes in large type "draft." You were still at OCWRM in December of 1983. Correct?
A. Yes, I was.

[139:24] - [140:10] 4/15/2002 Rosselli, Robert M., Deposition Vol. 1, 4/15/02

page 139
**Q. The last sentence on this page, page 2-1, "Until 1998, each utility will be**
page 140
**responsible for providing its own additional on-site interim storage, unless the utility applies for and is certified for the federal interim storage program." Do you see that?**
**A. Yes.**
**Q. Was it your understanding that after 1998, the Department of Energy would become responsible for providing or eliminating the need for additional on-site storage?**
**A. Yes.**

[147:15] - [149:17] 4/15/2002 Rosselli, Robert M., Deposition Vol. 1, 4/15/02

page 147
**Q. But my question was, would the Department receiving a -- with the Department accepting a single spent fuel element in 1998, would that have complied with the Department's obligations under the Act, as you understood them?**
**MR. MILLER: Same objections.**
**THE WITNESS: Well, technically, I would assume that our obligation was to start accepting spent fuel by 1998, January 1998. So if we took one, we would be meeting our**
page 148
**obligation under the Act.**
**BY MR. NESLIN:**
**Q. Is that all the Act required the Department to do, is to accept one spent fuel assembly, sir?**
**MR. MILLER: Same objection.**
**THE WITNESS: I do not believe that the Act was specific in terms of one or many.**
**BY MR. NESLIN:**
**Q. But I'm asking you about the intent behind the Act. You had an understanding of the intent behind the Act in preparing the contract and working on the Mission Plan, didn't you?**
**A. Yeah. I don't think the intent was that if we only accept one. And I think that Mr. Morgan stated that here in a public address.**
**Q. You would agree with what Mr. Morgan said here?**
**A. Yes. Yes, I would.**
**Q. It goes on to the say that, "The basic strategy which we've outlined in the Mission Plan is that, beginning in 1998, utilities will not have to provide any additional storage facilities on-site." Is that a true statement?**
page 149
**A. That is.**
**Q. And was that, in fact, what the utilities were paying for?**
**MR. MILLER: Objection. Calls for speculation and a legal interpretation.**
**BY MR. NESLIN:**
**Q. Do you understand my question, sir?**
**A. I think the utilities were paying for disposal services.**
**Q. And were they paying for disposal services sufficient that they would not have to add additional storage on site?**
**MR. MILLER: Same objections.**
**THE WITNESS: After 1998, yes.**

BY MR. NESLIN:
Q. You would agree?
A. Yes.

[176:9] - [176:15] 4/15/2002 Rosselli, Robert M., Deposition Vol. 1, 4/15/02

page 176
Q. Mr. Rosselli, Exhibit 23 is a document captioned, The Mission Plan: Volume I, Overview and Current Program Plans by Robert M. Rosselli. Four Fuel Cycle Conference '84, Atomic Industrial Forum, Inc., Westin Peachtree Plaza, Atlanta, Georgia. April 3, 1984. Could you review the first three pages?

[179:9] - [181:2] 4/15/2002 Rosselli, Robert M., Deposition Vol. 1, 4/15/02

page 179
Q. The top of page 6, the last sentence in the carry-over paragraph, "This approach is designed to ensure that all utilities will be able to establish firm planning schedules for the disposition of their radioactive wastes early enough to determine their on-site interim storage needs prior to 1998." Those, too, were your words?
A. Yes.
Q. You consider those to be accurate, at the time you wrote them?
A. Yes.
Q. What did you mean by, "utilities establishing firm planning schedules?"
A. Delivery commitments.
Q. And it was your expectation that this would enable them to on-site interim storage
page 180
needs prior to 1998?
MR. MILLER: Objection. Asked and answered.
THE WITNESS: Yes.
BY MR. NESLIN:
Q. And by prior, you're referring to the period prior to 1998?
A. Yes.
Q. After 1998 the Department would either begin receiving such waste or would implement some interim measure, such as interim storage or a monitored retrievable storage facility?
MR. MILLER: Objection. Mischaracterizes the document.
MR. NESLIN: You may answer, sir.
THE WITNESS: It was in the Department's plan that after 1998 they would provide some capability, whether it was at the reactor site or some other means to store the waste.
BY MR. NESLIN:
Q. So that in any event, the utilities would not have to provide additional waste on-site after 1998?
page 181
A. Additional storage capacity on-site after 1998, yes.

# Attachment VI

[1:1] - [1:23] 4/21/1999 Slater, Nancy H., Deposition Vol. 1, 4/21/99

page 1

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**- - - - - - - - - - - - - - - - X**
**YANKEE ATOMIC ELECTRIC :**
**COMPANY, :**
**Plaintiff, : Case No. 98-126C**
**v. : Senior Judge**
**: Merow**
**THE UNITED STATES, :**
**Defendant. :**
**- - - - - - - - - - - - - - - - X**
**Washington, D.C.**
**Wednesday, April 21, 1999**
**Deposition of NANCY H. SLATER, a witness herein, called for examination by counsel for Plaintiff in the above-entitled matter, pursuant to agreement, the witness being duly sworn by JAN A. WILLIAMS, a Notary Public in and for the District of Columbia, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., at 10:10 a.m., Wednesday, April 21, 1999, and the proceedings being taken down by Stenotype by JAN A. WILLIAMS, RPR, and transcribed under her direction.**

[5:25] - [6:3] 4/21/1999 Slater, Nancy H., Deposition Vol. 1, 4/21/99

page 5

**Q. I appreciate that. Where do you work?**

page 6

**A. At the U.S. Department of Energy in the Office of Civilian Radioactive Waste Management in the Regulatory Coordination Division.**

[19:21] - [20:18] 4/21/1999 Slater, Nancy H., Deposition Vol. 1, 4/21/99

page 19

**Q. What were your duties in this 1991 to 1993 period when you were an industrial specialist?**
**A. I was involved in the preparation of the annual capacity report, the acceptance**

page 20

**priority ranking, answering questions both internal and external about the terms and conditions of the contract. Let's see. And whatever else may have arisen at the time.**
**I know, when we came in, we were on the tail end of a rulemaking, net versus gross, as sold was that clarification. So I wrapped part of that up. I believe I terminated a couple of nonutility contracts at the contract holder's request because they either no longer had the material or had, in fact, in one case I believe sold it to the government.**
**Q. Do you remember any other issues you worked on during that period?**
**A. '91 to '93, I think we began to discuss delivery commitment schedules at that point. Would that be about right? That would be about right.**

[161:14] - [162:1] 4/21/1999 Slater, Nancy H., Deposition Vol. 1, 4/21/99

page 161

**Q. Ms. Slater, you've been handed what we've had marked as Slater Exhibit 8. Do you recognize this document?**
**A. No, I don't recall this. This is my handwriting. And these appear to be the meeting**

**minutes from a standard contract task force that would have been a utility group task force in August 29, 1991, five days after I joined DOE.**
**And it looks like it focuses on completing DCS's. And I believe you will note in item 3 that we discussed that range of discharge dates which was one of the issues that was**
page 162
**unclear.**

[163:18] - [164:22] 4/21/1999 Slater, Nancy H., Deposition Vol. 1, 4/21/99

page 163
**Q. On the second page of Slater Exhibit 8, you have it looks like certain items or issues 1, 2, 3, 4. Could you tell me what the second one is talking about?**
**A. Let me read it for a moment.**
**Okay. Submission of the first DCS's was timed, it's explicitly mandated in the contract, 63 months prior to the delivery year,**
page 164
**and assumes that delivery would commence in 1998, January 31, '98.**
**If 1998 were not the year when delivery commenced, utilities would have submitted DCS's for 1998. The question was do they get to go back now and revise their DCS's or are they just overcome by events, are they calendar year specific or year one, is it 1998 or year one.**
**Q. Year one of what?**
**A. Of any range of dates. So, if it were year one, no one would have to revise anything. If it's 1998, do I make them go back and revise all their DCS's, do I -- if they have to go back and revise their DCS's, can I revise a DCS or would I have to treat it as an exchange in a given year. So there were procedural questions about that, and that's what this issue is discussing.**
**Q. You say year one, you mean year one of DOE's acceptance of spent fuel under the waste acceptance system?**
**A. Yes.**

[206:1] - [206:22] 4/22/1999 Slater, Nancy H., Deposition Vol. 2, 4/22/99

page 206
**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**- - - - - - - - - - - - - - - X**
**YANKEE ATOMIC ELECTRIC :**
**COMPANY, :**
**Plaintiff, : Case No. 98-126C**
**v. : Senior Judge**
**: Merow**
**THE UNITED STATES, :**
**Defendant. :**
**- - - - - - - - - - - - - - - X**
**Washington, D.C.**
**Thursday, April 22, 1999**
**Continued deposition of NANCY H. SLATER, a witness herein, called for examination by counsel for Plaintiff in the above-entitled matter, pursuant to agreement, the witness being previously duly sworn, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., at 2:10 p.m., Thursday, April 22, 1999, and the proceedings being taken down by Stenotype by JAN A. WILLIAMS, RPR, and transcribed under her direction.**

[244:5] - [246:4] 4/22/1999 Slater, Nancy H., Deposition Vol. 2, 4/22/99

page 244

Q. So it was not intended that the delivery commitment schedule process be a gotcha process?

A. A static process.

Q. Right, that, gee, you only requested five and now, even though we can accommodate 20, you've wanted all along to do 20, we're not going to let you because you only asked for five, that was not the intention?

A. That's correct, it was not our intention to do that.

Q. And we might have covered this yesterday, but let me just make sure it's clear, that the delivery commitment schedule was intended to indicate how much spent fuel the utility wanted to deliver up to the limit of their allocation?

A. In part, because recall that the discharge date of the fuel earned you a slot in the acceptance priority ranking, but the fuel you could actually deliver did not have to be the

page 245

fuel that earned you the slot.

So simply going to the APR and drawing a line at 300 MTU wasn't a good way of predicting what you were likely to get, because people who had older plants might decide to put their older plant's fuel in dry storage and might want to empty the pools at some of the younger plants.

So the DCS was intended to provide us with an indication of the age of the fuel, the location of the fuel. Multiplant utilities could deliver from any site as long as they met the conditions established in the standard contract.

So it wasn't as clear as looking at the APR. The DCS was intended to provide a little bit more sound information for planning purposes.

Q. Focusing just on quantity then, the DCS was not intended to indicate what quantity the utility really wanted to deliver, it was limited to the allocation provided in the APR?

A. Right. Now, theoretically they could have delivered -- they could have said, jeez, I don't want to disrupt my operations and I'm not going to deliver at all. But they could not ask for -- they could not have more than what they

page 246

were allocated because of the equity issue. There's only so much system capacity. If I accept more from someone else, I accept less from someone else.

[1:] - [1:] 6/13/2002 Thompson, Nancy Slater, Deposition 6/13/02

page 1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| YANKEE ATOMIC ELECTRIC COMPANY, MAINE YANKEE ATOMIC POWER CO., and CONNECTICUT YANKEE ATOMIC POWER CO., Plaintiffs | Case No. 98-126C 98-474C, 98-154C (Senior Judge Merrow) |
| -v- | |
| UNITED STATES OF AMERICA, Defendant | |

**Washington, D.C.**
**Thursday, June 13, 2002**
**Deposition of NANCY SLATER THOMPSON, a witness herein, called for examination by counsel for the Plaintiff in the above-entitled matter, pursuant to notice, the witness being duly sworn, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., at 9:40 a.m., Thursday, June 13, 2002, and the proceedings being taken down in Stenotype by DEBORAH K. WILKINS, RPR, and transcribed under her direction.**

[5:2] - [5:4] 6/13/2002 Thompson, Nancy Slater, Deposition 6/13/02

page 5

**What is your current position?**
**A. I am the acting division director of the regulatory coordination division.**

[94:16] - [99:6] 6/13/2002 Thompson, Nancy Slater, Deposition 6/13/02

page 94

**Q. A little while ago you referred to the ACR as a planning document. What did you mean by that?**
**MS. SULLIVAN: Objection. The documents speak for themselves.**
**You may answer.**
**A. As we have discussed in my prior deposition and previously in this deposition, the ACR represents a planning basis. The acceptance rates are subject to influences by future budget**

page 95

**constraints, lack of a facility, unavailability of transportation casks.**
**For example, no one would have contemplated at the time that I did these that we would have an RSA, Regional Services Agreement, that would in fact contract out with someone else to provide the transportation which would have financial effects and could have scheduling and capacity effects. It's a planning document. And in fact when I sat on the utilities side of the table the industry recognized that not only was the ACR for planning purposes only, but that in fact their DCSs were for planning purposes, and they filled DCSs out consistent with that planning presumption because providing a range of discharge dates which might be over a 10-year period certainly doesn't permit a system to do more than plan.**
**Q. A couple sentences before the end of your answer, you said it was understood by the industry that both the ACRs and the delivery commitment schedules were for planning purposes only. By using the word "only," did you mean to exclude -- what did you mean to exclude?**
**A. That we viewed the DCSs as fungible,**

page 96

**and we have been through that in prior deposition as well; that the industry recognized that in fact they wouldn't be providing us with specifics about what they wanted us to accept until they submitted a final delivery schedule; and the final delivery schedule actually does represent the commitment on their part to this reactor, this time, this amount of fuel, this age fuel, so greater specificity with the FDS, ball park with the DCS.**
**It was important for the utilities to give us DCSs because of their very fungibility. If you didn't submit a DCS, you couldn't exchange your slot in the cue, and given that those**

exchanges were possible, I don't know how one would perceive a DCS as anything other than for planning purposes.

Q. Let's go back first just to the ACRs and the statement that they are for planning purposes only.

When you say that ACRs were for planning purposes only, does that mean that the ACRs were not meant to be binding on the Department of Energy?

MS. SULLIVAN: Objection, vague. Objection to the extent it calls for a legal

page 97

conclusion.

A. I can't speak to that legal issue or speak for a contracting officer. In my estimation, that's a question you would have to ask someone else.

Q. When you published the 1995 ACR, did you understand that you were committing the Department of Energy to accept the amount of spent fuel noted in the waste acceptance projections in that document?

MS. SULLIVAN: Objection to the extent it calls for a legal conclusion. Objection, the document speaks for itself. Objection, vague.

A. My understanding is entirely consistent with the sentence at the bottom of page 1 in the -- I guess this would be Exhibit 3, which is the 1995 ACR. As specified in the Standard Contract, the ACR is for planning purposes only, and this is not contractually binding on either DOE or the purchasers. And so were I to reason this out and not make a legal decision, I would have to say as a simple engineer my clear reading of that language would say if it's in the contract, everyone, including the utility, would be well aware of that.

page 98

Q. What about the delivery commitment schedules? Was it your understanding that those similarly were for planning purposes only and not contractually binding on either the utilities or the department?

MS. SULLIVAN: Objection to the extent it calls for a legal conclusion. Objection, vague.

A. In my personal opinion, they were for planning purposes only and in fact were completed in such a way that not much but planning could be done based on the information contained in them. In addition, given the fungibility of the DCSs, that's why there is a final delivery schedule which is somewhat more than a planning document. And I do recall siting across the table from numerous utility representatives, clearly recognizing that the DCSs were planning purposes, and they in fact did not view themselves as binding themselves to deliver specifically what was described on the DCS.

Q. During the time that you worked in the waste acceptance division at the Department of Energy, do you recall anyone either within DOE or in industry who thought that the delivery

page 99

commitment schedules were binding on either industry or the department?

MS. SULLIVAN: Objection, vague. Objection to the extent it calls for a legal conclusion.

A. No, I don't.

# Attachment VII

[1:] - [3:] 4/17/2002 Trebules, Victor W., Jr., Deposition 4/17/02

page 1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
-------------------------------------------X YANKEE ATOMIC ELECTRIC COMPANY
(98-126C)(Merow, S.J.) :CONNECTICUT YANKEE ATOMIC POWER COMPANY
(98-154C)(Merow, S.J.) : MAINE YANKEE ATOMIC POWER COMPANY :
(98-474C)(Merow, S.J.) :FLORIDA POWER & LIGHT COMPANY :
(98-483C)(Wilson, J.) :NORTHERN STATES POWER COMPANY :
(98-484C)(Wiese, J.) : DUKE POWER, a Division of DUKE ENERGY CORP.:
(98-485C)(Sypolt, J.) : INDIANA MICHIGAN POWER COMPANY :
(98-486C)(Hodges, J.): SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C)(Yock, S.J.) : SOUTHERN NUCLEAR OPERATING COMPANY, et al. :
(98-614C)(Merow, S.J.) : COMMONWEALTH EDISON COMPANY :
(98-621C)(Hewitt, J.) : BOSTON EDISON COMPANY :
(99-447C) (Allegra, J.) GPU NUCLEAR, INCORPORATED :
(00-440C)(Bush, J.) : WISCONSIN ELECTRIC POWER COMPANY :
(00-697C)(Merow, S.J.) : POWER AUTHORITY OF THE STATE OF NEW YORK :VOLUME
(00-703C)(Damich, J.) : I OMAHA PUBLIC POWER DISTRICT :
(01-115C)(Bush, J.) NEBRASKA PUBLIC POWER DISTRICT :Discovery
(01-116C)(Sypolt, J.) :Judge: TENNESSEE VALLEY AUTHORITY :(Judge
(01-249C)(Bruggink, J.) :Sypolt)
Plaintiffs, :PAGES
V. :1 - 241

page 2

THE UNITED STATES, :
Defendant. :
-------------------------------------------X

Deposition of Victor W. Trebules, Jr.
Washington, DC
Wednesday, April 17, 2002

Reported by: Denise Dobner Vickery, RMR, CRR
JOB NO. 144458

page 3

April 17, 2002
9:32 A.M.

Deposition of Victor W. Trebules, Jr., held at the offices of:

Jenner & Block
601 13th Street, NW
12th Floor
Washington, DC 20005

Pursuant to notice, before Denise Dobner Vickery, a Registered Merit Reporter, Notary Public of the District of Columbia.

[17:7] - [18:17] 4/17/2002 Trebules, Victor W., Jr., Deposition 4/17/02

page 17

**Q. I guess what I'm trying to get at is I'd like to have just a brief chronology of the different positions you've been in with dates, if possible.**

**So you started out as a program analyst in the Office of Civilian Radioactive Waste Management in the approximately 1983-1984 time frame. What I'd like you to do is going forward to the present with dates, if possible, just state the various positions you've held in the OCRWM.**

**A. Okay. Around the 1984-'85 time frame, as I said, I believe I was a program analyst. I think in 1985 or '86 I became the senior technical adviser and technical assistant to the Director of Office of Civilian Radioactive Waste Management. I don't remember the exact time frame, but when Admiral Watkins became Secretary of Energy, I was detailed to his**

page 18

**office for I think little over half a year as an adviser to the Secretary.**

**I then came back into the Office of Civilian Radioactive Waste Management I think in 1990 or 1991, and I was the Acting Director of what was called the M&O Management Division with responsibility to bring on board the M&O contractor for the program. I think that was 1991. About the a year or two after that, I became the Director of the Storage Division. The primary responsibility was to work on a proposed monitored retrievable storage facility.**

**A few years after that, I became the Director of the Program Management Division. And let's see. About four years ago I transferred out to Las Vegas to the Yucca Mountain site characterization office, and I'm currently the Director of the Office of Project Control.**

[44:17] - [45:17] 4/17/2002 Trebules, Victor W., Jr., Deposition 4/17/02

page 44

**Q. Okay. Do you have knowledge as to he what rate of acceptance of spent fuel the repository was designed to operate at this time?**

**MR. SHULTIS: Objection, asks for legal conclusion.**

**THE WITNESS: Again, going back to the**

page 45

**mission plan of some 17 years ago, we had put in the mission plan what were called waste acceptance schedules, which were again planning targets of what we thought the system could do if it were developed, you know, in total as we had laid it out. Starting in 1998 with one repository operating. We had laid out what we thought were practical waste acceptance rates.**

**What I mean by that is it allowed for a ramp-up. I think the number that we started with was for the first repository, for example, 400 metric tons and then it increased. I don't remember the other numbers, but it increased 400 to 600 up to a rate of about 3,000 metric tons per year for a single repository, but at that time we also had authorization to pursue a second repository. That was a provision in the Nuclear Waste Policy Act that we laid out waste acceptance schedules for that two-repository system.**

[48:5] - [50:20] 4/17/2002 Trebules, Victor W., Jr., Deposition 4/17/02

page 48

**MR. EIDUKAS: I'm going to go ahead and mark this as Number 3 and for the record I'm having marked Bates MS 069588 --**

**MR. STOUCK: 528?**

**MR. EIDUKAS: I'm sorry.**

**MR. STOUCK: I didn't hear.**

MR. EIDUKAS: I'm sorry. I'll repeat. It's actually three pages. The first page is Bates number SN 069588D and then it skips some Bates numbers and then you have SN 069599 through 600. It's a document entitled "Proceedings of the 1983 Civilian Radioactive Waste Management Information Meeting," December 12th through 15th, 1983 in Washington, DC and the date of the actual document is February 1984.
(Thereupon, the reporter marked for identification Deposition Exhibit No. 3.)
BY MR. EIDUKAS:
Q. Mr. Trebules, as you can see, this is three
page 49
pages from what appears to be a larger document. But if you can just take a moment to take a look at these and let me know if you're familiar with this.
A. (Pause). I note that from the two pages you gave me, it's only page 11 and 12. So I assume it was from a larger document.
Q. That's correct.
A. That's not included here.
Q. That's correct.
A. All right. I've looked over these two pages.
Q. Okay. Do you recall, have you seen these pages before?
A. I don't ever remember seeing these two pages.
Q. Okay. These refer to -- purport to refer to apparently a meeting or a conference that was held in mid-December 1983, during which Robert Morgan at the time appears to have been the Acting Director of Civilian Radioactive Waste Management gave this presentation or talk about the mission plan.
A. Right.
Q. Were you present for such a conference or meeting, whatever you want to call it?
page 50
A. I don't remember being at this meeting. I'm not even sure that I was working in the program at this time.
Q. Right.
A. This was in 1983.
Q. At the top of the middle page, page 11, on the right-hand side, the first full paragraph there says: "We have just received a preliminary draft of Volume I of the mission plan and we hope to have this available to interested parties, the states and others by Christmas."
Does that refresh your recollection as to whether or not work had been performed in preparing a mission plan prior to your arrival at the Office of Civilian Radioactive Waste Management?
A. I honestly don't remember that. I could only speculate that when he said we have just received a preliminary draft, it might have been a draft prepared by the support service contractor at the time, but I honestly don't remember that.

[52:11] - [54:4] 4/17/2002 Trebules, Victor W., Jr., Deposition 4/17/02

page 52
Q. When you worked in the program, do you know whether or not it was the intent of DOE to receive fuel at a rate beginning in 1998 that no utility would have to add any further storage facilities?
MR. SHULTIS: Same objections and relevance.
THE WITNESS: When I started working in the program on the mission plan, I remember that we discussed the objective of reaching waste acceptance rates that would preclude the utilities from having to provide additional on-site storage. That was our objective or planning target.

page 53

I believe what happened early on was that when we sent the draft mission plan out for public review and comment, we got a number of comments that said our schedules were too optimistic and we, I believe, revised those schedules in the actual document that went out in June of 1985 to the point where it didn't quite meet the intent of the words described here.

We started out as best as I could remember with a number like 400 metric tons in 1998, and we incorporated a ramp-up period that after four or five years or so we would eventually get up to about 3,000 metric tons a year, which we believed was the accepted spent fuel generation rate of the nuclear power plants at that time.

And it was over that ramp-up period that we hoped to get to the point where we would preclude the utilities from having to provide additional on-site storage. And then when the second repository came into operation, then we could, when that one reached full capacity, be able to reduce the backlog.

So, again, I'm speculating that when this

page 54

was written that was the intent, but that was changed after we got comments on those early draft versions of the mission plan. We adjusted those waste acceptance schedules a bit.

[57:15] - [60:14] 4/17/2002 Trebules, Victor W., Jr., Deposition 4/17/02

page 57

Q. Okay. The sentence and this paragraph goes on to say, "Technically, the act does not specify how much waste or spent fuel we must begin receiving at that time. In fact, if we accepted one spent fuel element in 1998, we would technically be in accordance with the Act. However, we did not believe that that meets the intent of the Act."

Do you recall having any discussions back when

page 58

you were working on the mission plan as to regarding whether or not accepting one spent fuel element in 1998 would be in accordance with the Nuclear Waste Policy Act?

MR. SHULTIS: Objection, calls for speculation. Asking for a legal conclusion.

THE WITNESS: As I understood your question, do I recall having discussions, the answer is yes. I was involved in many discussions or speculation as about what that meant and would accepting only one fuel assembly satisfy the intent of the act. And as best as I can remember, I don't know that we ever got a clear determination, you know, from those involved that that was the case.

BY MR. EIDUKAS:

Q. Did you personally draw any conclusions regarding that?

MR. SHULTIS: Objection, relevance. Calls for a legal conclusion.

THE WITNESS: Again, would you repeat the question. Did I?

BY MR. EIDUKAS:

page 59

Q. I'm sorry. You had said that you recall there being discussions regarding whether or not accepting one spent fuel element in 1998 would comply with the Nuclear Waste Policy Act.

My question was whether or not you personally reached a conclusion as to whether or not accepting only one spent fuel element in 1998 would comply with the act?

**MR. SHULTIS: Same objection.**
**THE WITNESS: I'm not quite sure how to answer that because at the time I was, you know, a fairly low level staff person. I was given an assignment. So I'm not sure if my conclusion would have mattered much. I mean, I'm not trying to be frivolous, but I don't know that I consciously thought of the implications of that at the time. I mean --**
**BY MR. EIDUKAS:**
**Q. Have you -- I'm sorry. I was going to ask you whether or not you have since come to such a conclusion or thought about the implications.**
**MR. SHULTIS: Same objections and relevance.**

page 60

**THE WITNESS: I think I would personally feel that one could argue since the Act was not specific, if we only accepted one fuel assembly, you know, we met the intent of the words. However, I also would be sympathetic to the additional phrase in here that where it says, "However, we did not believe that that meets the intent of the Act."**
**I believe the intent of the Act was for the government to develop the facilities to solve the nuclear waste problem, which isn't accepting just one assembly, and we were to develop the facilities. And we were trying to do that as expeditiously as we could, you know, to really deal with the overall problem of the accumulation of spent fuel.**

[78:1] - [79:17] 4/17/2002 Trebules, Victor W., Jr., Deposition 4/17/02

page 78

**MR. EIDUKAS: Mark this as 4.**
**(Thereupon, the reporter marked for identification Deposition Exhibit No. 4.)**
**BY MR. EIDUKAS:**
**Q. Mr. Trebules, I have marked as Exhibit 4 -- this version doesn't have Bates stamps on it. This is a December 20, 1983 marked as "Draft, Civilian Radioactive Waste Management Program Mission Plan, Volume 1, Overview and Current Program Plans." This appears to be a December 20, 1983 draft of the mission plan. Are you familiar with this document?**
**A. Could I have a few minutes to look at it?**
**Q. Sure, sure.**
**A. (Pause).**
**MR. SHULTIS: Ted, ours has Bates numbers.**
**MR. EIDUKAS: Let me read it into the record. For the record, the Bates stamp of the exhibit is CTR-042-1065 through 1190. Thank you.**
**(Counsel and witness conferring).**
**MR. EIDUKAS: There's a question pending. If you want to ask questions of the witness, you can ask them on the record, but I prefer you don't have**

page 79

**these consultations while there's a question pending.**
**MR. SHULTIS: What is the question pending?**
**MR. EIDUKAS: Are you familiar with this document, and you'll have a turn to ask questions of the witness when I'm done.**
**THE WITNESS: I'm ready to answer.**
**BY MR. EIDUKAS:**
**Q. Sure. I believe the question was: Are you familiar with this document?**
**A. To be honest with you, I don't remember specifically seeing this document before. I believe this was probably prepared before I joined the Civilian Radioactive Waste Management Program. However, I'm very familiar with some of the material in here and the reasons why we changed it in the eventual mission plan**

that got published in June of 1985.

[84:10] - [85:16] 4/17/2002 Trebules, Victor W., Jr., Deposition 4/17/02

page 84

MR. EIDUKAS: Would you mark this as Exhibit 5.

(Thereupon, the reporter marked for identification Deposition Exhibit No. 5.)

BY MR. EIDUKAS:

Q. Mr. Trebules, I've had marked as Exhibit 5 a document titled "A Mission Plan for the Radioactive Waste Management Program, Volumes 1 and 2 of Two Volumes, Overview and Current Program Plans." This appears to be -- and it's dated April 1984 up in the right-hand corner. It says that it's a draft that was reprinted in July of 1984. Feel free to take a look at this.

page 85

My first question is going to be: Are you familiar with this document? I can also say for reference that this was the same document that was marked as Exhibit Number 11 of Mr. Robert Morgan's deposition.

MR. STOUCK: Can you give us Bates numbers?

MR. EIDUKAS: There are no Bates numbers on the document.

THE WITNESS: (Pause). All right.

BY MR. EIDUKAS:

Q. Are you familiar with this document?

A. Yes, I am.

Q. Is this a draft of the mission plan that you worked on?

A. Yes, it is.

[96:19] - [101:19] 4/17/2002 Trebules, Victor W., Jr., Deposition 4/17/02

page 96

Q. Referring to the acceptance schedule in Exhibit 5 that you have in front of you, how was that prepared?

MR. SHULTIS: Objection, vague.

page 97

BY MR. EIDUKAS:

Q. And what I mean by how was it prepared, I don't mean how was it typed. I mean, how were these numbers decided upon? How was this schedule developed?

MR. SHULTIS: Objection, vague. Asks for a legal conclusion.

THE WITNESS: As best as I could remember, we had two overriding goals or objectives that we were trying to meet. One was to begin waste acceptance in 1998. The other was to reach a rate for which the amounts of additional at-reactor storage would be minimal or zero.

As Table II-1 in Exhibit 5 shows, in the second column, the annual spent fuel generation rate, these were numbers that we got from the Department of Energy's Energy Information Administration. Based on their analysis of the nuclear power plants in operation and the expected amount of spent fuel that they'd be generating, and as you can see in this table, the numbers start at in 1998 at 2,700 metric tons. They go up a little bit. They approach 3,000 metric tons.

page 98

So, for the first 10 years of operation, our target was sort of to reach an acceptance rate of about 3,000 metric tons, which would more than the generation rate from all the nuclear plants.

We did recognize, though, at that time we

still had a backlog, which is shown in column 4, you know, of over 40,000 metric tons that already was in storage. So, again, our two objectives or goals were to try to begin, as you know, as soon as possible, you know, 1998 or as soon as possible thereafter. And as we indicated before, those were what we characterize as optimistic schedules and reach an acceptance rate of 3,000 metric tons, which would preclude the utilities from having to provide any additional on-site storage.
Then when we got a second repository in operation, again, this is shown in Table 2.1 in column 6, a second repository would come into operation about a half a dozen years after the first, and we expected that to ramp-up faster because we would have experience from operating the first repository. And when those two repositories were then operating in tandem, at that point then we'd be able to start reducing the backlog,

page 99

which is indicated in the column on the far right.
You know, eventually to the point where we'd between the two repositories accommodate all the expected spent fuel, which at that time was still judged to be 140,000 metric tons.

BY MR. EIDUKAS:

Q. Okay. So, just looking at the -- let's take the first repository acceptance rate that starts at 400 and ramps up to 3,000 and then stays at 3,000 until it looks like 2025 or 2026 where it goes to has 100 and then stops.
I guess, how were those numbers actually -- how did you actually come up with those numbers? Was there a source or a basis for the actual numbers you have here in this for that schedule?
MR. SHULTIS: Objection, vague.

BY MR. EIDUKAS:

Q. I mean, do you understand what I'm asking? I mean, in other words, is this representing a physical limitation that was projected or recognized? Were these numbers picked out and then the idea was to design repository around them? I guess what I'm

page 100

trying to get at what, I guess, first the source for these numbers?
A. Okay.
MR. SHULTIS: Objection, compound.
THE WITNESS: It's a compound answer. It's somewhat complicated, but again my recollection is that going back to the Nuclear Waste Policy Act, which indicated that the country planned on developing two repositories, and there were various reasons for that, but the plan was to develop two repositories. And based on the projections at the time, again, the source that I'm familiar with is the Department of Energy's Energy Information Administration, which projected we'd have a total of about 140,000 metric tons of spent nuclear fuel to accommodate or dispose of.
There was a provision in the law that said the first repository could not emplace more than 70,000 metric tons until the second repository goes into operation, and I think there were various reasons for that. But that was sort of a guideline that we used that said the first repository should be designed, if the geology permits, to accommodate 70,000 metric tons

page 101

and then the other 70,000 metric tons would go in a second repository.
It was that in combination with what I indicated earlier that the objective was to get an acceptance rate of about 3,000 metric tons, which at that time was the anticipated annual spent fuel generation rate from the nuclear power plants in operation. So if you just do the math, you have a

capacity for repository of 70,000 metric tons divided by 3,000 metric tons per year. That would indicate that that repository would operate for about 25 years as this table shows.
And then the second repository would be in operation. Again, a capacity of about 70,000 metric tons, at about 3,000 metric tons per year. That one would operate for about 25 years, and the sum of those two would accommodate all the anticipated spent fuel to be generated by the nuclear power plants in operation at that time.

[104:2] - [107:6] 4/17/2002 Trebules, Victor W., Jr., Deposition 4/17/02

page 104
Q. Okay. You had set forth the two objectives and the second was that you wanted the rate to reach -- to basically reach -- you wanted to basically reach a rate that would equal the waste generation rate. So that the need for additional reactor storage would be either minimal or zero.
My question is: What was the source of that objective? Why was that an objective you had?
A. Okay. Could you give me a minute --
Q. Sure.
A. -- to review some of these previous documents. Because I think there were words in one of those that I remember being presented to me when I joined the program. Let me just... Is it Bob Morgan?
Q. It's Number 3.
A. Yes. Let me quote from Exhibit 3, page 11, column 2, the large paragraph in that column about halfway through the paragraph. There's a sentence that begins "The basic strategy which we've outlined in the mission plan is that beginning in 1998, utilities will not have to provide any additional storage
page 105
facilities on-site."
It goes on to say, "During the first year of operation of the repository in 1998, we should be receiving fuel at a rate so that no utility would have to add any further storage facilities either on-site or at another location." And if you look at the progress of these documents, this one dated --
Q. February '84?
A. -- February '84 but reflecting a meeting in December of 1983, and Exhibit 4 in the draft mission plan dated December 20, 1983, which had that more optimistic waste acceptance schedule with the higher numbers. Starting in 1998, 1800 metric tons for a few years. Then rising to 3,000 metric tons.
You can see how that realization that that might have been too optimistic evolved because in the exhibit, the last exhibit you gave me, Exhibit 5, those numbers have been adjusted downward. You know, the ramp-up rate to the numbers, you know, showing beginning at 400 metric tons ramping up to 900, 1800, 3,000 metric tons. But that was an objective, you know, to try to accommodate the nuclear power plants
page 106
and not have them generate or not have them have to add any on-site storage.
Q. I think you said when you started, someone gave you that language or told you that language. Do you know who it was?
MR. SHULTIS: Object.
THE WITNESS: I don't remember specifically, but it's similar to what, you know, appeared in that other exhibit.
BY MR. EIDUKAS:
Q. Robert Morgan?
A. And that became sort of a program -- again, it

**was a program objective that we were trying to meet.**
**Q. Okay. Do you know why that was a program objective?**
**MR. SHULTIS: Objection, calls for speculation.**
**THE WITNESS: Yeah. I would be speculating. I mean, I'm inclined to answer and say that, you know, we were trying to accommodate the utilities, who are in fact our customers. That's what the program was designed, you know, to deal with, which**
page 107
**is the spent fuel being generated by nuclear power plants. And we knew it would be a financial burden for them to add on-site storage. So we were trying to develop a program, again, to accept waste in 1998, but again with all the caveats that that was optimistic and success oriented.**

[109:18] - [111:15] 4/17/2002 Trebules, Victor W., Jr., Deposition 4/17/02

page 109
**Q. Okay. I was referring back to that sentence we've been looking at here. It seems to be suggesting that the acceptance rate that's found on the next page in the schedule is based -- it says, you know, based on the emplacement capacity currently projected.**
page 110
**I guess what I'm trying to understand is whether or not this rate reaching the steady rate of 3,000, is that based on, you know, taking the design the way that the repository was designed at this time and determining what this sentence called the emplacement capacity was. In other words, how fast could they accept waste there and that's how the schedule was developed.**
**MR. SHULTIS: Objection, asked and answered.**
**THE WITNESS: Yeah. I think I indicated as best as I could what we considered or what the objectives were in developing the waste acceptance schedules, and then that in turn would be used as input to the designers who design the facilities to meet or, you know, accomplish those objectives. You could design the facilities to operate at different rates if that was required, but these waste acceptance schedules would be used as designed input into that process for those facilities.**
**BY MR. EIDUKAS:**
**Q. I guess maybe that's what my question is**
page 111
**getting at. What came first, the objective or the design in terms of these rates. Was the objective given and then the design built around that objective, or did you take what the design was and then back out what can this design accommodate?**
**MR. SHULTIS: Objection, asked and answered.**
**BY MR. EIDUKAS:**
**Q. If you know.**
**A. I honestly don't know. I mean, I would probably have to research that, you know, to see what we talked about in the design area of the repositories. Again, my familiarity is working on the waste acceptance schedules, you know, to accomplish the two objectives that I previously talked about.**

[120:9] - [124:2] 4/17/2002 Trebules, Victor W., Jr., Deposition 4/17/02

page 120
**Q. And I believe you testified -- and if I'm mischaracterizing your testimony, please correct me -- that you were talking about and you were comparing**

Exhibits 4 and 5 in this schedule, the waste schedules there, and talked about how caveats were given as to whether or not these schedules might change. I believe you testified to that. It was possible these schedules, these specific schedules right here might change.
Am I correct in understanding that that was your testimony?
A. Yes.
Q. Okay. But it is also fair to say that the objective of these schedules remained constant, and one
page 121
of those objects being that it would ramp up to equal, at least equal the waste generation rate. So that it would either eliminate or, you know, reduce to either minimal or zero the need for utilities to build additional on-site storage after 1998?
MR. SHULTIS: Objection, calls for legal conclusion.
THE WITNESS: Again, as best as I can remember, we had two overriding objectives. One was to begin acceptance in 1998 and the other one was to ramp up, you know, as fast as realistically possible, you know, with all the engineering constraints to preclude the need for utilities to add additional on-site storage. But we did anticipate that the schedules would change and, in fact, in Exhibit 5 on page 2-1, just quickly looking at the section that's entitled "(A) Waste Acceptance Schedule."
BY MR. EIDUKAS:
Q. Yes.
A. The second paragraph begins by saying that: "This waste acceptance schedule will eventually be further developed to show not only the aggregate
page 122
acceptance schedule, but also an acceptance program ranking by utility and fuel element." So we anticipated that these waste acceptance schedules would continue to evolve, you know, would change based on, you know, new or updated information.
The next sentence goes on to read: "The schedule will serve as a planning base, which will be updated annually, with responsible latest projections." So, again, we anticipated that they would be updated.
Q. To stop you there, that sentence that you referred to is that "The schedule will serve as a planning basis, which will be updated annually in response to the latest projections of nuclear power growth." Is that connected to the objective you stated that the schedule was intended to ramp up and then to meet the generation rate?
MR. SHULTIS: Objection, looking for a legal conclusion.
THE WITNESS: My recollection is that the main reason we said "The schedule will serve as a planning basis, which will be updated annually in response to the latest projections," the projections
page 123
that we were monitoring closely were the EIA projections, the Energy Information Administration projections. And I believe at the time the Nuclear Waste Policy Act was passed, those projections indicated there were would be 140,000 metric tons of spent fuel generated. And if I can look back quickly to Exhibit 4 here.
BY MR. EIDUKAS:
Q. Sure.
A. Again, when the Act was passed in the end of 1982, the number was 140,000 metric tons, which divided by two was the basis for the 70,000 metric ton limit. By the time this draft of the mission plan was published in December of '83, those projections had

**already fallen to 133,000 metric tons, and one of the factors obviously was Three Mile Island in 1977 I think. You know, that the number of power plants under construction was dropping. Some were being canceled.**
**And let me just look here. Well, this one still says 133,000 metric tons. But, you know, we thought that the total amount of spent fuel to be generated might continue to decrease. You know, so we**
page 124
**wanted to make sure we could accommodate that.**
Q. Okay. To your knowledge, was the objective

[177:18] - [178:11] 4/17/2002 Trebules, Victor W., Jr., Deposition 4/17/02

page 177
**Q. Okay. But the decision was made apparently that there might be a design change, but there was not going to be a difference in what the steady state rate of accepted spent fuel range was going to be?**
**MR. SHULTIS: Objection, vague, assumes**
page 178
**facts not in evidence.**
**THE WITNESS: As best as I could remember, again our objectives were to try to reach a steady state rate, you know, along the lines that we talked about to preclude for need for utilities to add storage, which, you know, was still estimated to be around 3,000 metric tons per year. And that's still supported by the spent fuel generation column on both waste acceptance schedules. There's still around 3,000 metric tons per year in the early years of repository operation.**