No. 04-0084, No. 04-0083
(Judge Bruggink)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

DOMINION RESOURCES, INC., and
VIRGINIA ELECTRIC & POWER COMPANY
and
DOMINION RESOURCES, INC., and
DOMINION NUCLEAR CONNECTICUT, INC.,

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

---

# DEFENDANT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

---

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

HAROLD D. LESTER, JR.
Assistant Director

LISA L. DONAHUE
Trial Attorney
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
1100 L Street, NW
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
Tel: (202) 353-9498
Fax: (202) 307-2503

Attorneys for Defendant

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., SW
Washington, D.C. 20585

ALAN LO RE
Senior Trial Counsel

ANDREW P. AVERBACH
CHRISTOPHER J. CARNEY
SCOTT SLATER
Trial Attorneys
Civil Division
Department of Justice
1100 L Street, NW
Washington, D.C. 20530

March 24, 2008

TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES . . . . . . . . . . v

SUMMARY OF ARGUMENT . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . 6

I. THE ORIGINAL PROVISIONS OF THE NUCLEAR WASTE POLICY ACT . . . . . . . . . . 6

II. THE DEPARTMENT OF ENERGY'S PROMULGATION OF THE STANDARD CONTRACT THROUGH NOTICE AND COMMENT RULEMAKING IN THE FEDERAL REGISTER . . . . . . . . . . 7

A. The Proposed Rule . . . . . . . . . . 7

B. Public Comments . . . . . . . . . . 8

C. The Final Rule . . . . . . . . . . 10

III. DOMINION'S EXECUTION OF STANDARD CONTRACTS . . . . . . . . . . 12

IV. ISSUANCE OF THE MISSION PLAN AND ITS AMENDMENT . . . . . . . . . . 13

V. THE 1987 AMENDMENTS TO THE NUCLEAR WASTE POLICY ACT . . . 14

VI. DOE'S ISSUANCE OF ANNUAL CAPACITY REPORTS . . . . . . . . . . 16

A. The 1987 Through 1990 Annual Capacity Reports . . . . . . . . . . 16

B. The 1991 Annual Capacity Report . . . . . . . . . . 16

C. The 1992 Through 1995 Annual Capacity Reports . . . . . . . . . . 18

VII. PROGRAM DOCUMENTS REFLECT PLANNED ACCEPTANCE AT AN MRS FACILITY . . . . . . . . . . 19

A. Program Reassessment And 1991 Draft Mission Plan Amendment . . . . 19

TABLE OF CONTENTS (cont'd)

PAGE

B. Preliminary Estimates Of The Total-System Life Cycle Cost For The Restructured Program . . . . . 20

VIII. INDUSTRY SUBMISSION OF DELIVERY COMMITMENT SCHEDULES . . . . . 21

DISCUSSION . . . . . 23

I. PLAINTIFFS BEAR THE BURDEN OF ESTABLISHING ALL ELEMENTS OF THEIR CLAIM, INCLUDING LIABILITY, CAUSATION, FORESEEABILITY, AND REASONABLE CERTAINTY . . . 23

A. Plaintiffs Bear The Burden Of Establishing That Their Costs Are Attributable To DOE's Delay . . . . . 23

B. Plaintiffs Should Be Required To Construct A Reasonable Non-Breach Scenario Against Which Its Damages Can Be Measured . . . . . . 27

C. Regardless Of Whether The Court Employs A "But For" Or "Substantial Casual Factor" Analysis, Plaintiffs Must Show That Their Costs Would Not Have Incurred Absent The Alleged Breach . . . . 29

II. PLAINTIFFS CANNOT PROVE THAT DOE'S DELAY IN PERFORMANCE CAUSED THEM TO INCUR THE DAMAGES THEY SEEK . . . . . 33

A. Plaintiffs Have Improperly Defined DOE's Obligations Under The Standard Contract And, Thus, Have Failed To Provide A Basis For Comparison To The Actual World . . . . . 33

1. The NWPA Does Not Mandate A Rate Of Acceptance . . . . . . . 34

2. The Standard Contract Contains No Language Imposing, And Is Inconsistent With, The Rate Requirement That Plaintiffs Propose . . . . . 36

3. The Documents Upon Which Plaintiffs Rely Do Not Evidence DOE's Intent To Be Bound To Any Rate Of Acceptance, Let Alone The One Plaintiffs Advocate . . . . . 39

TABLE OF CONTENTS (cont'd)

PAGE


4. The Court Need Not Impose A Rate Of Acceptance Upon The Standard Contract . . . . . 43

a. The Parties Reached An Agreement Concerning The Manner In Which Rate Is To Be Calculated . . . . . 43

b. Plaintiffs' Arguments Would Render The Contract Too Indefinite To Enforce . . . . . 46

c. The Rate That Plaintiffs Advocate Does Not Satisfy Their Own Criteria . . . . . 48

5. The Rate Of Acceptance Should Be Determined In Accordance With The APR/ACR Process Mandated By The Standard Contract, In Which Plaintiffs Willingly Participated . . . . . 49

B. Plaintiffs' Claim For Damages Includes Many Expenditures That Were Not Caused By DOE's Delay In Accepting Spent Fuel . . . . . 54

1. Plaintiffs Cannot Establish That The Construction Of The North Anna ISFSI Was Caused By DOE's Delay . . . . . 55

2. Plaintiffs Cannot Establish That The Loading Of The First Ten Casks Included In The Claim At The Surry Facility Was Caused By DOE's Delay . . . . . 59

3. Plaintiffs Cannot Establish That DOE's Delay Necessitated The Cask Crane Upgrades at Millstone Units 2 and 3 . . . . . 60

4. DNC Cannot Recover Pre-Acquisition Costs Incurred at Millstone, As A Matter Of Law . . . . . 62

5. DNC Cannot Establish That The Full Core Reserve Offload License Amendment At Millstone Unit Three Was Caused By DOE's Delay . . . . . 63

6. Dominion Has Avoided The Costs Associated With Loading Fuel To DOE Within The Claim Period, And Should Not Recover For Such Costs . . . . . 65

TABLE OF CONTENTS (cont'd)

PAGE

7. Dominion Cannot Establish That The Cask Loading Modifications, Or Routine Repairs Performed At Its Sites Were Caused By DOE's Delay . . . . . 68

8. Dominion Cannot Establish The Recoverability of Certain Internal Labor Costs . . . . . 69

9. Dominion Cannot Establish The Recoverability Of Certain Overheads . . . . . 71

10. Plaintiffs Are Not Entitled To Recover AFUDC, As A Matter Of Law . . . . . 72

11. Plaintiffs Have Not Establish The Recoverability Of Certain Unsupported Costs . . . . . 74

CONCLUSION . . . . . 75

# TABLE OF AUTHORITIES

CASES PAGE(S)


AES Tech. Sys., Inc. v. Coherent Radiation,
583 F.2d 933 (7th Cir. 1978) . . . . . . . . . . 69

Abbott Labs. v. Brennan,
952 F.2d 1346 (Fed. Cir. 1992) . . . . . . . . . . 31

Addison Express L.L.C. v. Medway Air Ambulance, Inc.,
2006 WL 1489385 (N.D. Tex. May 19, 2006) . . . . . . . . . . 32

Affiliated Foods, Inc. v. Puerto Rico Marine Mgmt., Inc.,
645 F. Supp. 838 (D.P.R. 1986) . . . . . . . . . . 26

Alaska Pulp Corp. v. United States,
59 Fed. Cl. 400 (2004) . . . . . . . . . . 23

Aviation Contractor Employees, Inc. v. United States,
945 F.2d 1568 (Fed. Cir. 1991) . . . . . . . . . . 48

Bel Pre Health Care Center, Inc. v. United States,
24 Ct Cl 495 (1991 . . . . . . . . . . 46

Bluebonnet Savs Bank. F.S.B. v. United States,
67 Fed. Cl. 231 (2005) . . . . . . . . . . 28

Bluebonnet Savs. Bank, F.S.B. v. United States,
339 F.3d 1341 (Fed. Cir. 2003) . . . . . . . . . . *passim*

Boeing Co., ASBCA No. 18,916,
74-2 B.C.A. ¶ 10,976 (1974) . . . . . . . . . . 38

Boyajian v. United States,
423 F.2d 1231 (Ct. Cl. 1970) . . . . . . . . . . 24

Branhill Realty Co. v. Montgomery Ward & Co.,
60 F.2d 922 (2d Cir. 1932) . . . . . . . . . . 42

Campbell v. United States,
661 F.2d 209 (Ct. Cl. 1981) . . . . . . . . . . 37

TABLE OF AUTHORITIES cont'd

CASES PAGE(S)

Canal Electric Co. v. United States,
65 Fed. Cl. 650 (2005) . . . . . 54

Castle v. United States,
301 F.3d 1328 (Fed. Cir. 2002) . . . . . 54

City of Tacoma, Dep't of Public Utilities v. United States,
31 F.3d 1130 (Fed. Cir. 1994) . . . . . 48

Coast Fed. Bank, FSB v. United States,
48 Fed. Cl. 402 (2000) . . . . . 28

Columbia First Bank v. United States,
60 Fed. Cl. 97 (2004) . . . . . 31

Commercial Metals Co. v. United States,
176 Ct Cl 343 (1966) . . . . . 42

Commonwealth Edison v. United States,
56 Fed. Cl. 652 (Fed. Cl. 2002) . . . . . 54

Consolidated Gas Supply Co. v. Federal Energy Regulatory Comm'n,
745 F.2d 281 (4th Cir. 1984) . . . . . 39

Consumers Energy Co. v. United States,
57 Fed. Cl. 278 (2003) . . . . . 54

Coyle's Pest Control, Inc. v. Cuomo,
154 F.3d 1302 (Fed. Cir. 1998) . . . . . 48

David Nassif Assocs. v. United States,
557 F.2d 249 (Ct. Cl. 1977) . . . . . *passim*

David Nassif Assocs. v. United States,
644 F.2d 4 (Ct. Cl. 1981) . . . . . *passim*

TABLE OF AUTHORITIES cont'd

CASES PAGE(S)

Department of Energy v. Westland,
565 F.2d 685 (CCPA 1977) . . . . . . . . 36

England v. Contel Advanced Sys.,Inc.,
384 F.3d 1372 (Fed. Cir. 2004) . . . . . . . . 72

Fleet Nat'l Bank v. Anchor Media Television, Inc.,
45 F.3d 546 (1st Cir. 1995) . . . . . . . . 26

Gevyn Constr. Corp. v United States,
827 F.2d 752 (Fed. Cir. 1987) . . . . . . . . 74

Glendale Fed. Bank, FSB v. United States,
239 F.3d 1374 (Fed. Cir. 2001) . . . . . . . . 27, 28

Granite Mgt. Corp. v. United States,
74 Fed. Cl. 155 (2006) . . . . . . . . 28

Hughes Communications Galaxy v. United States,
271 F.3d 1060 (Fed. Cir. 2001) . . . . . . . . 59

Indiana Michigan Power Co. v. United States,
88 F.3d 1272 (D.C. Cir. 1996) . . . . . . . . 34, 36

Indiana Michigan Power Co. v. United States,
422 F.3d 1369 (Fed. Cir. 2005) . . . . . . . . *passim*

J.D. Hedin Constr. Co. v. United States,
456 F.2d 1315 (Ct. Cl. 1972) . . . . . . . . 30

Julius Goldman's Egg City v. United States,
697 F.2d 1051 (Fed. Cir. 1983) . . . . . . . . 35, 51

Krauss v. Greenbarg,
137 F.2d 569 (3d Cir. 1943) . . . . . . . . 31

TABLE OF AUTHORITIES cont'd

CASES PAGE(S)

Krofft Entertainment, Inc. v. CBS Songs,
653 F. Supp. 1530 (S.D.N.Y. 1987) . . . . . 31

LTV Aerospace Corp.,
ASBCA No. 17,131, 76-1 B.C.A. ¶ 11,840 (1976) . . . . . 37

La Van v. United States,
56 Fed. Cl. 580 (2003) . . . . . 54

Lisbon Contrs. Inc. v. United States,
828 F.2d 759 (Fed. Cir. 1987) . . . . . 29

Marshall v. United States,
164 F. Supp. 221 (Ct. Cl. 1958) . . . . . 73

Massengill v. Guardian Mgt. Co.,
19 F.3d 196 (5th Cir. 1994) . . . . . 47

Mays v. Trump Indiana, Inc.,
255 F.3d 351 (7th Cir. 2001) . . . . . 46

Menne v. Celotex Corp.,
861 F.2d 1453 (10th Cir. 1988) . . . . . 30

Modern Sys. Tech. Corp. v. United States,
979 F.2d 200 (Fed. Cir. 1992) . . . . . 46

National By-Products, Inc. v. United States,
405 F.2d 1256 (Ct. Cl. 1969) . . . . . 41

Nebraska Public Power District v. United States,
73 Fed. Cl. 650 (2006) . . . . . 3

Nebraska Public Power District v. United States,
74 Fed. Cl. 762 (2006) . . . . . 3

Nebraska Public Power District v. United States,
Misc. Docket No. 843, 2007 WL 779291 (Fed. Cir. Mar. 1, 2007) . . . . . 3

TABLE OF AUTHORITIES cont'd

CASES PAGE(S)

Neeley v. Bankers Trust Co. of Tex.,
757 F.2d 621 (5th Cir. 1985) . . . . . . . . . . 46

Northern States Power Co. v. United States,
78 Fed. Cl. 449 (2007) . . . . . . . . . . 53

Northern States Power Co. v. United States Dept. of Energy,
128 F.3d 754 (D.C. Cir. 1997) . . . . . . . . . . 2

PSEG Nuclear, L.L.C. v. United States,
465 F.3d 1343 (Fed. Cir. 2006) . . . . . . . . . . 28

Pacific Gas & Elec. v. United States ,
70 Fed. Cl. 766 (2006) . . . . . . . . . . 53

Pacific Gas & Electric Co. v. United States ("PG&E"),
73 Fed. Cl. 333 (2006) . . . . . . . . . . *passim*

Point Productions A.G. v. Sony Music Entertainment, Inc.,
215 F. Supp. 2d 336 (S.D.N.Y. 2002) . . . . . . . . . . 31

Ridge Runner Forestry v. Veneman,
28 F.3d 1058 (Fed. Cir. 2002) . . . . . . . . . . 46

Rochester Gas and Electric Corporation v. United States,
65 Fed. Cl. 431 (2005) . . . . . . . . . . 63

Rumsfeld v. Applied Cos.,
325 F.3d 1328 (Fed. Cir. 2003) . . . . . . . . . . 33

Sacramento Municipal Utility District v. United States,
70 Fed. Cl. 332 (2006) . . . . . . . . . . 58, 71

San Carlos Irr. & Drainage Dist. v. United States,
111 F.3d 1557 (Fed. Cir. 1989) . . . . . . . . . . 25, 58

San Carlos Irrig. & Drainage Dist. v. United States,
877 F.2d 957 (Fed. Cir. 1989) . . . . . . . . . . 23

TABLE OF AUTHORITIES cont'd

CASES PAGE(S)

Selman v. United States,
204 Ct. Cl. 675,498 F.2d 1354 (1974) . . . . . 35

Shann v. Dunk,
84 F.3d 73 (2d Cir. 1996) . . . . . 46

Smith v. United States,
58 Fed. Cl. 374 (2003) . . . . . 54

Southern Nuclear Operating Co. v. United States,
No. 98-614C (Fed. Cl. Apr. 7, 2004) . . . . . 54

System Fuels, Inc. v. United States,
78 Fed. Cl. 769 (2007) . . . . . 54

System Fuels, Inc. v. United States,
79 Fed. Cl. 37 (2007) . . . . . 73

TEG-Paradigm Environmental, Inc. v. United States,
465 F.3d 1329 (Fed. Cir. 2006) . . . . . 37

Tennessee Valley Auth. v. United States,
69 Fed. Cl. 515 (2006) . . . . . *passim*

Transamerica Equip. Leasing Corp. v. Union Bank,
426 F.2d 273 (9th Cir. 1970) . . . . . 46

Tyler House Apartments, Ltd. v. United States,
38 Fed. Cl. 1 (1997) . . . . . 54

United States Steel Corp. v. United States,
618 F. Supp. 496 (CIT 1985) . . . . . 36

Vermont Yankee Nuclear Power Corporation v. United States,
73 Fed. Cl. 236 (2006) . . . . . 63

White v. Delta Constr. Int'l, Inc.,
285 F.3d 1040 (Fed. Cir. 2002) . . . . . 24

TABLE OF AUTHORITIES cont'd

CASES PAGE(S)

Willems Indus., Inc. v. United States,
155 Ct. Cl. 360, 295 F.2d 822 (1961) . . . . . . . . . . 25

Wilner v. United States,
23 Cl. Ct. 241 (1991) . . . . . . . . . . 69

Wilson v. Marquette Elecs., Inc.,
630 F.2d 575 (8th Cir. 1980) . . . . . . . . . . 69

STATUTES

10 C.F.R. § 961 . . . . . . . . . . *passim*

42 U.S.C. §§ 10132, 10134, 10135 . . . . . . . . . . 6

42 U.S.C. § 10139 . . . . . . . . . . 3

42 U.S.C. § 10161 . . . . . . . . . . 6, 14

42 U.S.C. § 10162(b) . . . . . . . . . . 15

42 U.S.C. § 10168(d)(1) . . . . . . . . . . *passim*

42 U.S.C. § 10172(a) . . . . . . . . . . 15

42 U.S.C. § 10221 . . . . . . . . . . 13

42 U.S.C. § 10222(a)(1) . . . . . . . . . . *passim*

42 U.S.C. § 10242(a) . . . . . . . . . . 15

28 U.S.C. § 2516(a) . . . . . . . . . . 73

31 U.S.C. § 3727 . . . . . . . . . . 62

TABLE OF AUTHORITIES cont'd

MISCELLANEOUS PAGE(S)

5A Corbin on Contracts §§ 992 at 6-7 (1964) .......... 31

11 Corbin on Contracts § 53.3 (rev. ed. 2005) .......... 29

Keeton et al., Prosser and Keeton On The Law Of Torts, 266-68 (5th ed. 1984) .......... 30

McCormack, Handbook on the Law of Damages § 73 at 261 (1935) .......... 31

Restatement (Second) of Contracts § 204 (1981) .......... 43

Restatement (Second) of Contracts§ 211(b) .......... 49

Restatement (Second) of Contracts § 347 .......... 66

Restatement (Third) of Torts (Proposed Final Draft) § 26 (2006) .......... 32

S. Rep. No. 100-152, at 1 (Sept. 1, 1987) .......... 14

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| DOMINION RESOURCES, INC., and<br>VIRGINIA ELECTRIC & POWER COMPANY,<br><br>Plaintiffs,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 04-0084<br>(Judge Bruggink) |

| | | |
|---|---|---|
| DOMINION RESOURCES, INC., and<br>DOMINION NUCLEAR CONNECTICUT, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 04-0083<br>(Judge Bruggink) |

DEFENDANT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

Pursuant to the Court's pretrial orders dated August 2, 2006, as amended, defendant, the United States, respectfully submits the following memorandum of contentions of fact and law.

SUMMARY OF ARGUMENT

This case involves a damages claim by plaintiffs, Dominion Resources, Inc., Virginia Electric And Power Company ("VEPCO"), and Dominion Nuclear Connecticut ("DNC") (collectively, "Dominion"), for roughly $175 million in costs that they allegedly have incurred through June 30, 2006, associated with the storage of spent nuclear fuel ("SNF"). Plaintiffs'

claim includes costs for constructing a dry storage facility at VEPCO's North Anna plant to house SNF, constructing a dry storage facility at DNC's Millstone plant to house SNF from Millstone Unit 2, constructing a third storage pad for the existing dry storage facility at VEPCO's Surry plant, performing a rack addition to the spent fuel pool for Unit 3 of DNC's Millstone plant,[1] and performing a study designing to research the possibility of transferring SNF from the Millstone Unit Two spent fuel pool to the Millstone Unit Three spent fuel pool. Included in these large project categories are upgrades and modifications performed at plaintiffs' sites, labor costs, overhead costs, interest charges, and other costs associated with miscellaneous projects performed by the plaintiffs during the claim period. Plaintiffs contend that the Government is liable for all of these costs because the need for additional storage was caused by the Government's failure to begin accepting SNF from commercial nuclear reactors on January 31, 1998, pursuant to separate versions of the "Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste" ("Standard Contract") between the Department of Energy ("DOE"), and VEPCO or between DOE and DNC.[2]

---

[1] The costs associated with this project were not incurred by DNC, but by Northeast Utilities, the prior owners of the Millstone plant. DNC purports to recover these costs "on behalf" of Northeast Utilities, but as explained in our Motion For Partial Summary Judgement On Pre-Acquisition Costs, filed on March 17, 2008, such costs are not recoverable as a matter of law.

[2] The Government has been specifically enjoined, via a writ of mandamus issued by the United States Court of Appeals for the District of Columbia Circuit, from relying upon the "Unavoidable Delays" clause of the Standard Contract to excuse its delayed performance. <u>See</u> <u>Northern States Power Co. v. United States Dept. of Energy</u>, 128 F.3d 754, 760 (D.C. Cir. 1997). That provision states that "[n]either the Government nor Purchaser shall be liable under this contract for damages caused by <u>failure to perform</u> its obligations hereunder, if such failure arises out of causes beyond the control and without the fault or negligence of the party failing to perform." 10 C.F.R. § 961.11, Art. IX.A (emphasis added).

(continued...)

At trial, plaintiffs bear the burden of proving that their damages were foreseeable, were caused by DOE's partial breach, and are reasonably certain. This legal burden is real, and plaintiffs must do more at trial than simply identify costs that they have incurred in connection with the storage of SNF. Plaintiffs have largely eschewed this burden and, instead, have put the cart before the horse by characterizing all of their claimed costs as "mitigation" expenses and attempting to place the burden on the Government to disprove their reasonableness. However, we do not assert that plaintiffs acted unreasonably in the actual world to manage their spent fuel storage. Rather, the expenses that plaintiffs claim in this case are not recoverable because, for the most part, they would have been incurred irrespective of the Government's delay in performance.

---

[2](...continued)

The D.C. Circuit has eliminated one of the central provisions of the Standard Contract that governs the parties' liability in the event of delays in SNF acceptance. With this clause, DOE would have had the ability to present an absolute defense to liability in this case. Without it, DOE now faces billions of dollars in damages claims. The writ of mandamus wholly changes the nature of the Standard Contract, essentially and inappropriately creating a contract (one without an "Unavoidable Delays" clause) between the parties to which DOE never agreed. We have consistently argued that the D.C. Circuit overstepped its jurisdiction and authority in issuing this writ of mandamus (given that the judicial review provision of the NWPA, 42 U.S.C. § 10139, does not permit the D.C. Circuit to review contract administration matters). Recently, in Nebraska Public Power District v. United States, 73 Fed. Cl. 650, 673 (2006) (Allegra, J.), this Court determined that the writ of mandamus was void because, in issuing the writ, the D.C. Circuit "operated in excess of its jurisdiction and, specifically, without an appropriate waiver of sovereign immunity." This Court subsequently certified its decision for interlocutory appeal to the United States Court of Appeals for the Federal Circuit, Nebraska Public Power District v. United States, 74 Fed. Cl. 762 (2006), and, on March 1, 2007, the Federal Circuit issued an order granting Nebraska Public Power's petition for permission to appeal. Nebraska Public Power District v. United States, Misc. Docket No. 843, 2007 WL 779291 (Fed. Cir. Mar. 1, 2007). The appeal has been fully briefed, and oral argument took place on December 3, 2007. The Government reserves the right to challenge any determination of liability with respect to the Standard Contract if the writ of mandamus is lifted or otherwise deemed inapplicable.

We acknowledge that the Government's delay in beginning the acceptance of SNF by 1998 pursuant to the Standard Contract has required the plaintiffs here to incur costs that they otherwise would not have incurred. Had DOE begun accepting fuel in 1998 in accordance with the terms of the Standard Contract, plaintiffs would not have been required to spend more than $75 million of the amount they now claim as damages. However, plaintiffs cannot show that the remaining expenditures were caused by the Government's alleged breach. These expenditures, which range from construction of dry fuel storage facilities at VEPCO's North Anna plant to charges for portions of overhead pools that did not increase as a result of DOE's delay in accepting spent fuel, were not incurred to mitigate the effects of the Government's breach. Rather, they were incurred as part of plaintiffs' regular business operation and/or would have been incurred irrespective of any breach by DOE. To compensate plaintiffs for these non-incremental expenditures would place them in a better position than they would have occupied had DOE begun accepting spent fuel in 1998.

Ascertainment of whether the costs at issue in this case are incremental to DOE's delay will necessarily require consideration of what DOE's actual obligations regarding spent fuel acceptance after January 31, 1998 were and the actions that plaintiffs would have to have undertaken had DOE timely accepted fuel in accordance with those obligations. Identification of a rate of acceptance is a critical component of this determination. Without a showing of the precise rate at which DOE was obligated to accept SNF, plaintiffs cannot meet their burden to create a plausible world in which DOE begins to accept SNF from the industry in 1998. The Court must then compare those necessary activities and costs against those that plaintiffs are seeking in this case. This does not mean that the Court must ascertain the activities in which

plaintiffs would have engaged and the costs that plaintiffs would have incurred had DOE accepted as much fuel as plaintiffs would have liked, or even as much as DOE planned as it began developing a permanent repository for Yucca Mountain in the 1980s. What the Court must consider as a basis for comparison are the activities and costs that would have been necessary if DOE had accepted fuel at a rate that was required by the Standard Contract.

Identification of a rate of acceptance is a critical component of the dispute. Contrary to plaintiffs' repeated assertions (and as evidenced by the lack of reference in their pre-trial brief to any provision of the Standard Contract containing the rate that they advocate), the Standard Contract did not require DOE to accept fuel at a rate that would preclude the need for utilities to make expenditures upon additional storage after January 31, 1998. This rate is equivalent to (or, at a minimum, would impose a greater obligation upon DOE than) the rate that all the utilities, including plaintiffs, wanted to be included in the Standard Contract and, in fact, requested be included in the Standard Contract, but that DOE unequivocally refused to include in the Standard Contract. Plaintiffs executed the Standard Contract with full knowledge of what that contract required (and did not require). Plaintiffs' argument that the Court should impose what they claim is a "reasonable" rate of acceptance (the so-called "3,000 MTU rate") is an attempt to obtain through litigation what they could not obtain through contract negotiation.

However, no matter which rate of acceptance is applied, the Court still must determine whether the expenses for which plaintiffs seek recovery were incremental to DOE's failure to accept spent fuel beginning in 1998. Unless plaintiffs can prove that they would not have incurred these expenses had DOE timely commenced performance and that these expenses were foreseeable and have been proven with reasonable certainty, they cannot be awarded as damages.

## STATEMENT OF FACTS

### I. THE ORIGINAL PROVISIONS OF THE NUCLEAR WASTE POLICY ACT

On January 7, 1983, Congress enacted the Nuclear Waste Policy Act of 1982 ("NWPA"), Pub. L. 97-425, 96 Stat. 2201 (codified at 42 U.S.C. §§ 10101-10270 (1982)). The NWPA defines a specific process by which the Secretary of Energy, the President of the United States, and the United States Congress would determine a site for a repository for the permanent deep geologic disposal of SNF. See 42 U.S.C. §§ 10132, 10134, 10135. Congress also included in the NWPA provisions allowing the Secretary to study the possibility of creating Monitored Retrievable Storage ("MRS") facilities, with Congress finding that "long-term storage of high-level radioactive waste or spent nuclear fuel in monitored retrievable storage facilities is an option for providing safe and reliable management of such waste or spent fuel." 42 U.S.C. § 10161(a)(1), (b)(1) (1982).

In addition, the NWPA authorized the Secretary to enter into contracts with the owners and generators of SNF of domestic origin for "the acceptance of title, subsequent transportation, and disposal of such [SNF]." 42 U.S.C. § 10222(a)(1) (1982). The contracts had to "provide for payment to the Secretary of fees . . . sufficient to offset expenditures" described elsewhere in the statute. Id.

## II. THE DEPARTMENT OF ENERGY'S PROMULGATION OF THE STANDARD CONTRACT THROUGH NOTICE AND COMMENT RULEMAKING IN THE FEDERAL REGISTER

### A. The Proposed Rule

On February 4, 1983, the Department of Energy ("DOE"), in furtherance of its obligations under the NWPA, published a notice of proposed rulemaking in the Federal Register, proposing terms for the Standard Contract. See 48 Fed. Reg. 5458 (Feb. 4, 1983). The proposed Standard Contract provided a mechanism for determining the order in which, and the rate at which, the contract holders' SNF would be accepted. As for the order of SNF acceptance, the Standard Contract proposed that DOE would issue an "acceptance priority ranking" ("APR") of SNF and/or HLW, through which SNF and/or HLW would receive acceptance priority based generally upon its age. Id. at 5464 (Art. VI.B.3). Although the proposed Standard Contract did not identify a specific rate by which DOE would accept contract holders' SNF, it provided for DOE's issuance of documents for planning purposes to assist in the eventual definitization of the specific rate and order of SNF acceptance and disposal. Id. at 5463 (Art. V.B.5 & Art. V.B.6). The proposed contract further provided that, following DOE's issuance of planning documents, rates of SNF acceptance, as well as the specific order of SNF acceptance from particular contract holders, would be defined through the contract holders' submission, and DOE's approval, of Delivery Commitment Schedules ("DCSs") beginning in 1992. Id. at 5462. The proposed Standard Contract also provided for the contract holders' submission of Final Delivery Schedules ("FDSs"), which would take the annual allocation defined in an approved DCS and refine it to reflect as closely as possible the month(s) and day(s) upon which SNF acceptance would occur. Id. at 5463 (Art. IV.C). The term "DOE facility" in the proposed Standard Contract referred to a

permanent repository for disposal of the SNF and/or HLW. Id. at 5462 (Art. I.11). The proposed rule provided for written comments to be submitted by March 7, 1983. Id. at 5458.

B. Public Comments

DOE received numerous comments in response to the proposed rule.[3] A number of the comments recognized that the Standard Contract did not establish a specific rate at which DOE must accept SNF, and sought to have such a rate included. The Edison Electric Institute ("EEI") together with the Utility Nuclear Waste Management Group ("UNWMG"), utility trade organizations to which Dominion belonged at the time, requested as follows:

> The contract should include a recognition that DOE will design its facilities with the capacity to receive SNF/HLW at a rate commensurate with the amount of SNF/HLW then being generated together with the accumulated backlog of SNF/HLW. We believe that DOE should be able to take delivery of SNF/HLW equal to that year's generation plus a reasonable share of the backlog. While the contract may not be the appropriate place to commit DOE to a specific numerical receiving rate, DOE should recognize, at least qualitatively, the need to have adequate annual receiving capacity to handle industry needs.

DX 5.34, Attachment A at 2 (ARC0010334). Specifically, EEI and UNWMG suggested the inclusion of the following language, intended to add an obligation upon DOE beyond that imposed by the proposed rule:

> WHEREAS, DOE recognizes that its ability to take delivery of spent nuclear fuel and/or high-level radioactive waste must be commensurate with the amount of such fuel and waste then being

---

[3] The evidence will show that utilities and their representatives had significant involvement with and input into the NWPA and the Standard Contract and affirmatively requested – and received – certain terms for inclusion in the final Standard Contract, including the term concerning exchanges of approved DCSs. See Pacific Gas & Electric Co. v. United States ("PG&E"), 73 Fed. Cl. 333, 346-48 (2006), appeal pending, No. 2007-5046 (Fed. Cir. docketed Jan. 24, 2007).

> generated together with the amount of such fuel and waste previously generated, and consistent with its obligation to take title to such fuel and waste as expeditiously as practicable upon the request of the owner or generator of such fuel and waste.

Id. at ARC0010335 (emphasis added).

Other utilities submitted similar comments seeking firm commitments regarding the rate of SNF acceptance. For example, VEPCO supported EEI's comments, and Tennessee Valley Authority ("TVA") submitted a comment, stating that "a commitment to do no more than start accepting deliveries by 1998 is empty and meaningless without setting forth some reasonable minimum rate of acceptance which corresponds to the purposes of the Act." DX 5.63 at 5 (ARC0010537). Although TVA recognized that, "under the priority ranking system in the draft contract, it would be difficult at the time contracts are executed to give each Purchaser assurances of delivery acceptance at any specific rate," it suggested that "[t]his could, however, be done on an industry wide basis." Id. TVA suggested that DOE add a contract provision to provide that "DOE shall start accepting delivery of SNF or HLW not later than January 31, 1998, at not less than the annual rate [at which] SNF and/or HLW is then being produced from civilian nuclear power plants covered by contracts . . . ." Id. DOE also received comments seeking a commitment for DOE to accept SNF at the rates set forth in the Mission Plan that DOE was to prepare in accordance with statutory requirements for ultimate submission to Congress, for its review and consideration. For example, Florida Power & Light Company, expressly stated that DOE should create a mandatory obligation that would require DOE to accept SNF and HLW at the rates identified in the Mission Plan, once that plan was approved by Congress. DX 5.43 at ARC001 0439.

In addition to providing comments concerning the rate of acceptance and the need to alter the prioritization of acceptance rights, EEI and UNWMG also suggested that "[t]he definition of 'DOE Facility' (Article I.11) should be broadened to include destinations other than the repository," and explicitly requested that the possibility of using a Monitored Retrievable Storage ("MRS") facility be accommodated within the language of the Standard Contract. DX 5.34 at ARC0010336. Id. at ARC0010337.

C. The Final Rule

On April 18, 1983, DOE issued the Standard Contract as a final rule. The final rule, as promulgated, made certain modifications to the Standard Contract as set forth in the proposed rule. Although the proposed rule provided that "services provided to the Purchaser by DOE under this contract are related to disposal of SNF," 48 Fed. Reg. at 5462, that "disposal" was defined as emplacement in a permanent repository, id., and that such "disposal" services would begin by January 31, 1998, id., the final Standard Contract eliminated any requirement for DOE to begin SNF "disposal" in a permanent repository by January 31, 1998. Instead, the final Standard Contract only required DOE to begin SNF acceptance by January 31, 1998, after the commencement of "facility" operations. 10 C.F.R. § 961.11, Art. II. The "facility" to which the final Standard Contract refers is either a permanent repository to be constructed pursuant to the NWPA or such other facility to which SNF might be shipped by DOE prior to its transportation to a permanent repository. Id. § 961.11, Art. I.10. As the preamble to the final rule expressly recognized, and as the utilities had requested, the final Standard Contract did not obligate DOE to have an operational permanent repository by January 31, 1998, but permitted DOE to begin SNF acceptance at an MRS facility. 48 Fed. Reg. 16590, 16591 (Apr. 18, 1983).

Critically, DOE did not adopt the suggestion of EEI, UNWMG, and many of the utilities to incorporate into the contract a requirement that DOE accept SNF at a rate equal to the annual generation rate plus some additional amount to reduce the accumulated backlog. Dominion will contend that such a rate of acceptance would serve to eliminate the need to build additional at-reactor storage. However, the Government will show at trial that DOE determined it could not obligate itself to satisfy such a commitment because the number of uncertainties concerning the development of the program, the development of the contemplated disposal facilities, and the potential capabilities for accepting SNF that could be developed by 1998. See PG&E, 73 Fed. Cl. at 349 (finding that DOE expressly did not obligate itself to accept SNF at a particular rate of acceptance because of uncertainties surrounding the waste acceptance program 15 years in the future). Accordingly, DOE specifically declined to create any commitment to accept SNF beginning in 1998 at a specific minimum rate or based upon any mandatory minimum criteria. Instead, the Standard Contract provided that the acceptance rate would be developed in 1991, via promulgation of an Annual Priority Ranking ("APR") and Annual Capacity Report ("ACR"). See 10 C.F.R. § 961.11, Art. IV, Sec. B.5.

The evidence will further show that VEPCO realized in the time frame during which it signed the contract, that DOE had refused to obligate itself to accept fuel at the rate Dominion now advocates. The utilities acknowledged that DOE had rejected their requests regarding the inclusion of a qualitative description of the acceptance rate in both internal memoranda and correspondence with DOE throughout the 1980s. VEPCO, specifically, continued to circulate internal memoranda and participate in industry activities that acknowledged DOE's refusal to incorporate the utilities' preferred acceptance rate into the Standard Contract. Other utilities, like

TVA and Yankee Atomic also noted that their requests regarding the acceptance rate term had been rejected by DOE.

The final version of the Standard Contract maintained the oldest-fuel first ("OFF") allocation method, pursuant to which DOE was to grant allocations of acceptance rights to utilities in accordance with the sequence in which those utilities permanently discharged fuel from their reactors. The final version of the contract did not provide a priority for reactors that would need allocations to continue operating. See 10 C.F.R. § 961.11, Art. V, Sec. B.5; id., Art. VI, Sec. B.1. Finally, the Standard Contract contained an integration clause, which precluded reliance upon any representation, promise, or condition not expressly incorporated into the contract. 10 C.F.R. § 961.11, Art. XXII.[4]

## III. DOMINION'S EXECUTION OF STANDARD CONTRACTS

On June 15, 1983, VEPCO entered into the Standard Contract with DOE. The contract that VEPCO executed covered the SNF generated at the North Anna and Surry plants. The then owner of the Millstone plant, Northeast Utilities Service Company ("Northeast Utilities"), also executed Standard Contracts, covering each of the Units at the Millstone plant. Each Standard Contract contained the same terms and conditions as the final rule promulgated by DOE on April 14, 1983.

Those responsible for executing the Standard Contract upon behalf of VEPCO were fully aware of what the contract provided – and did not provide – about the rate of acceptance. Three VEPCO employees- William Benthall, Marvin Smith, and Brian Wakeman- attended and

[4] The Standard Contract also included a "Disputes" clause, which provided a mandatory administrative mechanism for the resolution of disputes arising under the contract. 10 C.F.R. § 961.11, Art. XVI.A.

participated in industry group meetings at which comments upon and proposed amendments to the Standard Contract were discussed. For example, on February 10, 1983, a VEPCO representative attended an EEI meeting with industry representatives that was specifically convened to prepare comments on the DOE disposal contract. It was this meeting that spawned EEI's request to include a "whereas" clause setting forth DOE's obligation to accept fuel at a rate that exceeded the industry generation rate and commenced working off the backlog. Additionally, VEPCO held internal meetings concerning the Standard Contract for which Mr. Wakeman prepared agendas outlining the issues to be discussed, including DOE's refusal to obligate itself to accept fuel at a the utilities' preferred rate.

## IV. ISSUANCE OF THE MISSION PLAN AND ITS AMENDMENT

In June 1985, DOE issued and submitted to Congress the Mission Plan, in accordance with the requirements of 42 U.S.C. § 10221 (1982), which was to "provide an informational basis sufficient to permit informed decisions to be made in carrying out the repository program and the research, development, and demonstration programs required under this chapter." 42 U.S.C. § 10221 (1982). In the 1985 Mission Plan, DOE projected for informational purposes that an initial permanent repository would begin operations in 1998 and that a second permanent repository would commence operations in 2006. DX 52 at HQR0031129-30. The schedules contained in the Mission Plan projected annual SNF generation rates from utilities nationwide of approximately 3,000 MTU in 1998 and increasing by 2007 to over 4,000 MTU per year. Id.[5] The Mission Plan noted that these schedules were "only an approximation of how the system may operate and is subject to considerable variation. The DOE will further define and specify

[5] Today, utilities discharge approximately 2,000 MTU of SNF per year.

the system acceptance parameters as the program progresses." Id. at HQR0031133. The Mission Plan further advised that "[i]n 1991, the DOE will begin to publish firm waste-acceptance schedules for individual reactors, including shipment allocations." Id. (emphasis added).

In the 1987 Mission Plan Amendment, submitted to Congress in June 1987, DOE recommended deferral of the date contemplated for operation of the first repository from 1998 to 2003, but specifically noted that it could nonetheless begin waste acceptance in 1998 at an MRS facility.[6] DX 60 at HQR0031634. In the 1987 Mission Plan Amendment, DOE published a rate of acceptance for planning purposes, but reiterated the importance of the Annual Capacity Report that would be issued in 1991 – namely, that it would be used in the DCS process. Id. at HQR0031687.

## V. THE 1987 AMENDMENTS TO THE NUCLEAR WASTE POLICY ACT

On December 22, 1987, after DOE submitted the 1987 Mission Plan Amendment, Congress amended the NWPA "to redirect the program for the management and disposal of spent nuclear fuel and high-level radioactive waste under the [NWPA]." S. Rep. No. 100-152, at 1 (Sept. 1, 1987). The Senate Committee on Energy and Natural Resources reported, in considering legislation to amend the NWPA, that "[t]he schedules included in the NWPA have proven to be overly ambitious" and that "[t]his has been largely due to the need to provide additional time for completion of necessary technical work and additional time for public participation." Id. at 5. The committee reported that, "[i]n the four and a half years since passage of the NWPA, it has become clear that the program laid out in the Act will take longer to

[6] The ability to start accepting waste in 1998 at an MRS facility was dependent upon congressional authorization. See 42 U.S.C. § 10161(b)-(c) (1982).

complete than was anticipated and that completion will be at much greater cost." Id. It further reported that, "[i]n addition to cost and schedule considerations, a number of other circumstances have changed since passage of the NWPA," including that, "as we approach major decision points in the nuclear waste program, there will be great potential for political opposition . . . ." Id.

The 1987 amendments to the NWPA directed DOE to characterize a single site, at Yucca Mountain in Nevada, for development of a permanent repository and to terminate activities at all other sites. 42 U.S.C. § 10172(a). The 1987 amendments also authorized the Secretary to site, construct, and operate one, but only one, MRS facility. 42 U.S.C. § 10162(b). However, the 1987 amendments created two so-called "linkages" between the MRS and the repository. Specifically, the amendments provided that "construction of [the MRS] facility may not begin until the Commission has issued a license for the construction of a repository under section 115(d)." 42 U.S.C. § 10168(d)(1). In addition, the amendments provided that "the quantity of [SNF] at the site of such facility at any one time may not exceed 10,000 metric tons of heavy metal until a repository under this Act first accepts [SNF]." Id. § 10168(d)(3).[7]

---

[7] The 1987 amendments to the NWPA also established the Office of the Nuclear Waste Negotiator. 42 U.S.C. § 10242(a). That office was to seek to enter into negotiations with states and Indian tribes to "attempt to reach a proposed agreement" with them through which a state or Indian tribe "would agree to host a repository or [MRS] facility with such State or reservation." Id. § 10243(a). The authorization for that office expired in January 1995, id. § 10250, without any agreements with any states or Indian tribes.

## VI. DOE'S ISSUANCE OF ANNUAL CAPACITY REPORTS

### A. The 1987 Through 1990 Annual Capacity Reports

Beginning in 1987, in compliance with the NWPA and the language of the Standard Contract, DOE issued an "Annual Capacity Report." Each of these ACRs expressly stated that the rates published in the ACRs were for "planning purposes only," and were "not contractually binding." DX 59 at HQR0012713.[8] Further, each of the ACRs from 1987 through 1990 reinforced the finality of the 1991 ACR rate, as expressed in the Standard Contract. As explained in the 1987 ACR:

> Beginning in 1991, the ACR acceptance ranking will be converted into an Annual Priority Ranking for receipt of SNF/HLW. In 1992, based on this priority ranking, the Purchasers will submit to DOE for approval, Delivery Commitment Schedules identifying the SNF/HLW that Purchasers propose to deliver to the DOE waste management system (WMS). Once approved, these schedules will become the basis for Final Delivery Schedules to be submitted by the Purchasers not less than 12 months before the date of DOE's anticipated acceptance of title to the SNF/HLW and subsequent transport to a DOE facility.

DX 59 at HQR0012713.

### B. The 1991 Annual Capacity Report

In December 1991, DOE issued its "Annual Capacity Report" for that year, DOE-RW-331P. The 1991 ACR was significant because it was the last ACR that would be issued before the contract holders were to begin submitting DCSs beginning January 1, 1992. See 10 C.F.R. § 961.11, Art. V.B.1. In that regard, the 1991 ACR provided that the purchasers, "submit Delivery Commitment Schedules (DCS) to DOE identifying the range of SNF that the Purchasers

---

[8] Consistent with the understanding that the 1987 ACR rate was not a final, contractually binding rate, Dominion never used this rate to make spent fuel management decisions at Dominion.

propose to deliver to the Federal Waste Management System (FWMS)," using the "allocations for each delivery year [as] presented in Tables A.1 through A.10 in Appendix A," to complete the DCS. DX 78 at HQR-002-0804 and 09. As dictated by the Standard Contract, the 1991 ACR specified the rate of acceptance for the first 10 years of the DOE program, beginning in 1998. Specifically, the 1991 ACR specified the following acceptance rate:

TABLE 2.1

Projected Waste Acceptance Rates for Spent Nuclear Fuel

| Year | | SNF (MTU) |
|---|---|---|
| 1998 | | 400 |
| 1999 | | 600 |
| 2000 | | 900 |
| 2001 | | 900 |
| 2002 | | 900 |
| 2003 | | 900 |
| 2004 | | 900 |
| 2005 | | 900 |
| 2006 | | 900 |
| 2007 | | 900 |
| 2008 | | 900 |
| | TOTAL | 8,200 |

DX 78 at HQR-002-0807. This rate was created with the knowledge that no permanent repository would be available by January 31, 1998, but that acceptance of SNF would begin at an MRS facility. Id. at HQR-002-0806. The rates were "consistent with the 10,000 MTU storage capacity limit contained in the NWPA for an MRS facility before a repository starts operation." Id. DOE noted, however, that the schedule assumed that the schedule linkages between the MRS construction and repository construction authorization would be eliminated. Id.

C. The 1992 Through 1995 Annual Capacity Reports

The 1992 ACR, which was issued in May 1993, contained the same acceptance rates as the 1991 ACR. DX 93 at HQR-001-2324. The 1992 ACR also provided that, "[d]uring the first ten years following projected commencement of the Civilian Radioactive Waste Management System (CRWMS) operation, the total quantity of SNF that could be accepted is projected to be 8,200 MTU." Id. at HQR-001-2319. It stated that "[t]his is consistent with the storage capacity licensing conditions imposed on an MRS facility by the NWPA." Id.

In 1995, DOE issued a combined APR and ACR, to "establish[] the order in which the Department allocates the projected acceptance capacity for commercial [SNF]" and to "appl[y] projected nominal acceptance rates for the system to the priority ranking in the APR, resulting in individual allocations for the owners and generators expressed in metric tons of uranium (MTU)." PX 102 at DOM00048144. The 1995 ACR contained substantially similar SNF acceptance rates as the 1991 and 1992 ACRs, identifying a projected nominal waste acceptance rate of 8,200 for the first 10 years of SNF acceptance. Id. at DOM00048147. The 1995 ACR also contained the following statement:

> The ACR (see Appendix B) applies a 10-year projected nominal waste acceptance rate to the APR, resulting in individual capacity allocations. In the previous ACR, the projected nominal acceptance rate was based on the assumption of SNF acceptance beginning in 1998 at a Monitored Retrievable Storage facility prior to repository operations. Due to the uncertainty associated with the date of commencement of operation of the waste management system, the annual nominal waste acceptance rates are presented by year(s) of operation of the system rather than by specific calendar year(s). The projected nominal acceptance rates also reflect the capacity limit imposed by the Act on such a storage facility prior to repository operations. These projected nominal waste acceptance rates are presented in Table 1. The Department will continue to process DCS submittals on an annual basis.

Id. at DOM00048146-7 (emphasis added). The 1995 ACR further provided that the capacity allocations listed in the ACR "form the basis for the Purchasers' submittal" of DCSs. Id. at DOM00048144.

## VII. PROGRAM DOCUMENTS REFLECT PLANNED ACCEPTANCE AT AN MRS FACILITY

### A. Program Reassessment And 1991 Draft Mission Plan Amendment

In November 1989, after the passage of the 1987 Amendment to the NWPA, the Secretary of Energy submitted a report to Congress regarding DOE's reassessment of the program. In this report, DOE stated that it would be unable to begin operations at a permanent repository until 2010, it planned "to work with Congress to modify the current linkages between the repository and the MRS facility and to embark on an aggressive program to develop an integrated MRS facility for spent fuel." DX 65 at DB0001451. DOE further advised that, "if the linkages [were] modified, it [was] likely that waste acceptance at an MRS facility could begin by 1998 or soon thereafter." Id.

In September 1991, DOE issued another Draft Mission Plan amendment, which provided further details upon the "action plan" set forth in the Secretary's 1989 Reassessment. DX 76 at HQR0030799. In accordance with the 1989 Reassessment, the 1991 Draft Mission Plan Amendment reaffirmed DOE's plans to begin performance in 1998 at an MRS. Id. at HQR-003-0825. The schedule set forth in the 1991 Mission Plan Amendment showed acceptance by DOE up to the 10,000 MTU limit, beginning in 1998 at the MRS, until the repository began operations in 2010. Id. at HQR0031000 to 01.

B. Preliminary Estimates Of The Total-System Life Cycle Cost For The Restructured Program

DOE's anticipation of performance at an MRS also was reflected in the cost analyses that DOE performed around the time of the issuance of the 1991 ACR to support the adequacy of fees collected for the Nuclear Waste Fund. The fee paid by utilities, 1 mil per kilowatt hour, was established by Congress in enacting the NWPA. 42 U.S.C. § 10222(a)(2). Pursuant to the NWPA, DOE is required annually to assess whether the fees collected pursuant to statute are adequate to fund all of the efforts necessary to implement the NWPA. 42 U.S.C. § 10222(a)(4). The Secretary is to advise Congress if the fee is found to be inadequate. Id. To determine whether the fee is adequate, DOE first prepares a Total System Life Cycle Cost ("TSLCC") report, in which it projects the total cost of the program. This total system cost projection is based upon the projected number of years that the program is estimated to operate, projected transportation requirements, projected interest rates and other factors. The then-current program plans, including acceptance rate projections, type and location of receiving facilities, and scope of the transportation program, are the basis for the total cost estimate.

In its Preliminary Estimates of the Total-System Life Cycle Cost For The Restructured Program: An Addendum to the May 1989 Analysis of the Total Life Cycle Cost for the Civilian Radioactive Waste Management Program, December 1990 ("1990 PETSLCC"), DOE utilized a schedule that was explicitly based upon acceptance starting at an MRS. DX 71. The first ten years are identical to the 1991 ACR schedule, with the exception of the second year of acceptance, where the 1990 PETSLCC contemplates that 400 MTU rather than 600 MTU of SNF would be accepted. Id. This schedule also shows what DOE anticipated the transition from a repository to an MRS would look like. Id. In year 11 and year 12 of acceptance, 900 MTU

would be accepted at a permanent repository. In years 13 through 17, 1,800 MTU would be accepted at a permanent repository. In year 18 (2015) the system would accept 3,000 MTU at a permanent repository. Id.

## VIII. INDUSTRY SUBMISSION OF DELIVERY COMMITMENT SCHEDULES

By letter dated March 4, 1992, the DOE contracting officer issued a letter to VEPCO, and other utilities, along with the instructions for the submission of DCSs. DX 85. The contracting officer stated that "[t]he allocations in the 1991 Annual Capacity Report (ACR) should be the basis for the DCS submittals." Id. The accompanying instructions provided that purchasers could "begin submitting to the Department of Energy (DOE) Delivery Commitment Schedules (DCS) that identify all spent nuclear fuel (SNF) the Purchasers plan to deliver to DOE beginning 63 months thereafter." Id. The instructions stated that "[t]he DCS provides the Purchasers with the opportunity to inform DOE of their plans for utilizing their allocations of projected Federal waste management system (FWMS) acceptance capacity." Id. They further provided that, "[f]or each allocation listed in the 1991 ACR (or subsequent ACRs, as appropriate), a Purchaser must submit at least one DCS for that allocation at least 63 months prior to the date that the allocation occurs (e.g., if a Purchaser has an allocation in 1998, a DCS must be submitted for that allocation by September 30, 1992)." Id. The instructions also required that the utilities list upon the DCSs the method of delivery to DOE (truck, barge, or rail) and fuel handling crane capacities.

As the evidence will show, the DCS instructions were developed with the full participation of the nuclear industry. Recognizing the need to submit DCSs to claim allocations, many utilities submitted timely DCSs that were approved by DOE. For example, Wisconsin Electric Power Company ("WEPCO") submitted DCSs for all of its allocations in the first ten

years of acceptance in 1992. Eight other utilities also submitted DCSs for all of their allocations in the first ten years of contract performance after 1998. Moreover, every utility with an allocation in 1998 and 1999, with the exception of one utility, submitted a DCS for that allocation. All of those DCSs were approved by DOE. All but two utilities with allocations in 2000 submitted DCSs that were approved by DOE.

The rate identified in the 1991 ACR did not provide VEPCO with fuel acceptance allocations for 1998, the first year scheduled for DOE performance. In fact, North Anna did not receive any allocations until Year 7, 2004. However, VEPCO did not express objection to the rate that DOE had promulgated in the 1991 ACR. On September 10, 1993, VEPCO submitted its first delivery commitment schedule for acceptance of 8.17 metric tons of uranium in 1999 from its Surry plant. The amount of uranium specified in this initial DCS comported with the annual allocation with which VEPCO was provided in the 1991 ACR. The company indicated in the DCSs that the Surry plant had a maximum lifting capacity of 125 tons and proposed that the cask provided by DOE be suitable for transport by barge (rather than rail or truck). In submitting the DCS, VEPCO did not express any objection to the allocation it received. DOE approved the DCS by letter dated December 6, 1993. PX 86. VEPCO submitted additional DCSs for acceptance of fuel at its Surry facility, all of which were based upon the rates and allocations set forth in the most recently issued ACR and APR, and none of which was accompanied by an objection to the acceptance allocation.

On or about March 31, 2001, Dominion acquired Millstone from the Connecticut Light and Power Company and Western Massachusetts Electric Company, subsidiaries of Northeast Utilities. Complaint ¶ 7. Prior to the acquisition of that facility, Northeast Utilities, like VEPCO, had submitted DCSs in accordance with the rate of acceptance and allocations set forth

in the applicable APR and ACR for delivery acceptances at Units One and Two of the Millstone plant.

## DISCUSSION

### I. PLAINTIFFS BEAR THE BURDEN OF ESTABLISHING ALL ELEMENTS OF THEIR CLAIM, INCLUDING LIABILITY, CAUSATION, FORESEEABILITY, AND REASONABLE CERTAINTY

#### A. Plaintiffs Bear The Burden Of Establishing That Their Costs Are Attributable To DOE's Delay

"To recover for breach of contract, a party must allege and establish: (1) a valid contract between the parties, (2) an obligation or duty arising out of the contract, (3) a breach of that duty, and (4) damages caused by the breach." San Carlos Irrig. & Drainage Dist. v. United States, 877 F.2d 957, 959 (Fed. Cir. 1989). Plaintiffs seek to recover damages based on their "expectation interest" in the Standard Contracts. See Pl. Mem. Cont. Fact & Law at 17 (citing Restatement (Second) of Contracts § 347)). That is to say, plaintiffs seek to recover expenses that they claim would not have been incurred had the Government begun removing fuel from their reactor sites beginning sometime after January 31, 1998. The mere fact of DOE's partial breach of the Standard Contract does not "perforce" make all of a utility's costs "to store its SNF recompensable." Indiana Michigan Power Co. v. United States, 422 F.3d 1369, 1376 (Fed. Cir. 2005). Dominion still must prove foreseeability, causation, and the amount of its damages to a reasonable certainty, id. at 1373, 1376, and it must prove each of these three elements "by a preponderance of the evidence." Alaska Pulp Corp. v. United States, 59 Fed. Cl. 400, 413-14 (2004).

The fundamental goal in awarding expectation damages is to "place the injured party in as a good a position as it would have been had the breaching party fully performed." Indiana

Michigan, 422 F.3d at 1373. "[T]he non-breaching party should not be placed in a better position through the award of damages than if there had been no breach." Bluebonnet Savs. Bank, F.S.B. v. United States, 339 F.3d 1341, 1344-45 (Fed. Cir. 2003) (citing White v. Delta Constr. Int'l, Inc., 285 F.3d 1040, 1043 (Fed. Cir. 2002)) ("[T]he non-breaching party 'should on no account get more than would have accrued if the contract had been performed.'"); Pacific Gas & Electric Co. v. United States, 73 Fed. Cl. 333, 385 (2006), appeal pending, No. 2007-5046 (Fed. Cir. docketed Jan. 24, 2007) (same).

Although plaintiffs appear to acknowledge these fundamental precepts of contract law in their brief, they simultaneously disregard their own burden of proof. Plaintiffs disclaim any responsibility for showing that the damages they seek to recover from the Government reflect costs they would not have incurred absent DOE's breach and contend that, in establishing its damages, "a plaintiff does not use a but-for world to estimate his damages . . . but, rather must establish his actual costs in the real world." Pl. Mem. Cont. Fact & Law at 18. In so doing, plaintiffs characterize the damages they seek as "incidental losses" and "mitigation" damages, contending that they need only show that they incurred the expenses claimed. Such a conclusion should fail because it wholly eliminates plaintiffs' obligation to prove causation.

Plaintiffs will attempt to prove their case by simply offering up evidence of their out-of-pocket costs, a strategy that is contrary to fundamental principles of contract law and remedies. "[R]ecoverable damages cannot be proved by a naked claim for a return of costs even where they are verified. The costs must be tied in to fault on the defendant's part." Boyajian v. United States, 423 F.2d 1231, 1239 (Ct. Cl. 1970) (emphasis added). In Boyajian, the Court of Claims rejected efforts by the plaintiff to prove its damages by presenting "a schedule, supported by an accountant's testimony," of incurred costs as "not in and of itself acceptable 'proof'" of

causation. Simply put, Dominion must do more than merely present a schedule of costs that it claims to have incurred in mitigating its losses. It must prove that these costs were directly caused by DOE's breach.

More specific to the spent nuclear fuel context, the Federal Circuit's holding in Indiana Michigan dictates the appropriate framework for the resolution of the issues presented in this case. In Indiana Michigan, the Federal Circuit defined the scope of a spent nuclear fuel plaintiff's burden with respect to damages. In that case, as in this one, the plaintiff sought damages for its efforts to expand its storage capabilities and, specifically, the costs that it incurred for a rerack and expansion of its spent nuclear fuel pool. 422 F.3d at 1372. Critically, in Indiana Michigan, the Federal Circuit upheld the trial court's decision not to award any damages, based in part upon its finding that the utility could not show that its actions were caused by DOE's breach and that these actions would have taken place even in the absence of a partial breach. Id. at 1376.

Indeed, characterizing the costs that they incurred as "mitigation damages" puts the cart before the horse. As a threshold matter, plaintiffs must prove, as a means of demonstrating that the costs that they incurred were "caused" by the partial breach, that they would not have incurred these so-called mitigation costs absent any delay. See San Carlos Irr. & Drainage Dist. v. United States, 111 F.3d 1557, 1563 (Fed. Cir. 1989) ("A plaintiff must show that but for the breach, the damages alleged would not have been suffered."); Willems Indus., Inc. v. United States, 155 Ct. Cl. 360, 295 F.2d 822, 831 (1961) ("[T]he measure of damages to be applied in the particular case is irrelevant until the claimant has established the fact of losses that were the natural and proximate result of the breach of contract. Were this not true, the doctrine of mitigation of damages would lose much of its significance.").

As the United States Court of Appeals for the First Circuit recognized in rejecting a position similar to that taken by plaintiffs, the fact that an entity characterizes its damages as "mitigation damages" does not somehow eliminate the causation requirement that the entity prove, "as an element of its case, the extent to which it was damaged by the . . . breach." Fleet Nat'l Bank v. Anchor Media Television, Inc., 45 F.3d 546, 560-62 (1st Cir. 1995) (emphasis in original). The First Circuit specifically found that characterizing claimed costs as mitigation damages prior to connecting them to the breach inappropriately assumes causation:

> The doctrine [of mitigation] thus presupposes, as a threshold matter, the existence of a causal nexus between the damages sought and the breach or tort, looking at whether and to what extent an intervening cause (i.e., a plaintiff's own negligence) may have contributed to these damages. Here, the question is not whether and to what extent Anchor's own conduct contributed to its damages; it is, rather, the threshold question of whether the damages Anchor sought were caused by the conduct of which Anchor complained. Accordingly, the doctrine of mitigation of damages is completely inapposite.

Id. (emphasis in original); see also Affiliated Foods, Inc. v. Puerto Rico Marine Mgmt., Inc., 645 F. Supp. 838, 839-40 (D.P.R. 1986) ("[I]t is a mistake to think that by merely placing the 'mitigation' label on any expense incurred an injured party is entitled to recover it. Plaintiff cannot escape the burden of proving that the losses sought to be avoided were caused, or would have been caused, by defendants' breaches.").

As such, the label that plaintiffs have chosen to attach to their claimed damages is of no moment. Even the most eminently reasonable expenditure is not recoverable in a breach of contract action if it was not caused by the defendant's breach. Plaintiffs' characterization of their claim as one for "mitigation damages" does not change their burden, nor does it eliminate the requirement, established by the Federal Circuit in Indiana Michigan, that the damages it seeks be

costs that would not have been incurred absent a breach. 422 F.3d at 1376. Only after plaintiffs have established that their expenses are directly attributable to DOE's breach does the burden shift to the Government to show that plaintiffs' mitigation efforts were not reasonable. As the evidence will show, many of those costs for which plaintiffs seek compensation are ones that plaintiffs would have needed to incur even if DOE commenced accepting fuel in 1998 at the rate established by the mechanism in the Standard Contract and are, therefore, not appropriately claimed as damages.

B. Plaintiffs Should Be Required To Construct A Reasonable Non-Breach Scenario Against Which Its Damages Can Be Measured

Requiring plaintiffs to depict an accurate non-breach scenario is crucial to the Court's ability to evaluate whether certain items claimed as damages are costs that would have been incurred even if DOE had begun accepting spent fuel in 1998. This Court's decision in Pacific Gas & Electric Co. v. United States, 73 Fed. Cl. 333 (2006), appeal pending, No. 2007-5046 (Fed. Cir. docketed Jan. 24, 2007), recognizes the general principle that, when seeking expectancy damages, a plaintiff must establish a plausible non-breach world against which to measure causation. Specifically, the Court stated that "[p]laintiff bears the burden of 'establishing what might have been' with reasonable certainty had defendant performed the Standard Contract." Id. at 386 (quoting Glendale Fed. Bank, FSB v. United States 239 F.3d 1374, 1380 (Fed. Cir. 2001)); see id. at 406 ("[t]o derive the proper amount for the damages award, the cost resulting from the breach must be reduced by the costs, if any, that the plaintiff[] would have experienced absent a breach" (quoting Bluebonnet, 339 F.3d at 1345)). The Court further clarified that PG&E's alleged expectancy damages could only be measured by reference to a world where DOE performed and that, without reference to the performance world, the

measure of plaintiff's damages would be "irrelevant." Id. at 375 n.38; see PSEG Nuclear, L.L.C. v. United States, 465 F.3d 1343, 1351 (Fed. Cir. 2006) ("Any issues related to the types of damages permitted under the contract, if any, and the extent of those damages can be resolved by solely resolving the DOE's contractual obligations." (emphasis added)).

The principle upon which the Court relied in PG&E is not unique to SNF cases or to cases involving the type of costs that plaintiffs seek here. As a matter of well-established contract law, the failure of a plaintiff to prove that certain costs would not have been incurred in the non-breach world precludes a finding that the incurrence of costs was "caused" by the breach. See, e.g., Granite Mgt. Corp. v. United States, 74 Fed. Cl. 155, 169 (2006) (plaintiffs bear burden of propounding realistic "but for" scenario); Bluebonnet Savs Bank. F.S.B. v. United States, 67 Fed. Cl. 231, 237-38 (2005), vacated on other grounds, 339 F.3d 1341 (Fed. Cir. 2003); Coast Fed. Bank, FSB v. United States, 48 Fed. Cl. 402, 403 n.25 (2000), rev'd on other grounds, 309 F.3d 1353 (Fed. Cir. 2002), vacated, 320 F.3d 1338 (Fed. Cir. 2003); see also Glendale Fed. Bank, FSB v. United States, 239 F.3d 1374, 1380 (Fed. Cir. 2001) (plaintiffs bear burden of demonstrating "what might have been"). Requiring a plaintiff to demonstrate a non-breach world is simply another way of stating that a party cannot recover as damages from the Government any costs that it would have incurred in the absence of a breach. See Bluebonnet Savs. Bank, 339 F.3d at 1345; see also Indiana Michigan, 422 F.3d at 1376. Without establishing a "but for" world in which no partial breach occurred, plaintiffs leave the Court with no mechanism by which to determine whether its claimed costs were incremental to the delay in fuel acceptance, or whether they would have been incurred regardless of any delay.

In fact, plaintiffs' own claim for damage in this case is premised on their representation that the damages they seek are for activities that would not have been undertaken had DOE

performed. Logically, for a plaintiff to represent that it would not have taken certain actions absent a breach, it must know what actions it would have taken. For this reason, plaintiffs' reliance upon Lisbon Contrs. Inc. v. United States, 828 F.2d 759 (Fed. Cir. 1987), is misplaced. Plaintiffs bear the burden of demonstrating what the world would have looked like in the absence of DOE's delay. To the extent that the world they paint fails to take into account major expenditures that they have avoided in the actual world, they have failed to sustain their burden of proof.

Courts routinely must resolve what would have happened had a breaching party performed: "[t]he position that one would have occupied if history had been different is purely hypothetical. And yet that is the problem that the trial court . . . [is] required to solve . . . The working rules of law by which court[s] are directed are never capable of exact and perfect application." 11 A. Corbin, Corbin on Contracts § 53.3 (rev. ed. 2005) (emphasis added) (cited in PG&E, 73 Fed. Cl. at 397). Yet, absent consideration of such a world, plaintiffs will be placed in a better position than had the contract been performed. See PG&E, 73 Fed. Cl. at 397.

C. Regardless Of Whether The Court Employs A "But For" Or "Substantial Casual Factor" Analysis, Plaintiffs Must Show That Their Costs Would Not Have Incurred Absent The Alleged Breach

Plaintiffs assert that the Court should employ a "substantial causal factor" test rather than a traditional "but for" analysis. See, e.g., Plfs. Memo. Cont. Fact & Law at 18. However, plaintiffs do not elaborate upon what they perceive to be the fundamental difference between these two tests. Implicit in plaintiffs' arguments, though, is the notion that, somehow, the "substantial causal factor" standard sets a lower threshold for them to meet and that this test obviates the need to paint a plausible picture of the actions that they would and would not have

undertaken had DOE timely commenced accepting fuel. This argument does not accurately reflect plaintiffs' burden.

In Indiana Michigan, the Federal Circuit, in discussing the standard for proving damages, identified the requirement that the plaintiff utility show that "the breach is a substantial causal factor in the damages." However, it did not relieve the plaintiff from its obligation to show that its costs were directly attributable to DOE's partial breach, as opposed to an independent "business judgment." Indiana Michigan, 422 F.3d at 1373, 1376. In fact, the Federal Circuit affirmed the trial court's finding that the utility had failed to meet its burden of proof because the utility would have made the same business judgment to rerack its spent fuel pool even had DOE timely commenced performance. As Indiana Michigan illustrates, merely labeling the inquiry as the "substantial causal factor" test does not mean that a plaintiff can recover as damages costs that it would have incurred in the absence of a breach.

In fact, plaintiffs' endorsement of a "substantial factor" test of causation only serves to obscure the causation issue. The traditional causation standard in breach of contract cases in the Federal Circuit requires the plaintiff to prove that the claimed damage "was attributable solely to, and was therefore directly caused by, the [breach]." J.D. Hedin Constr. Co. v. United States, 456 F.2d 1315, 1330 (Ct. Cl. 1972). The "substantial factor" test, by contrast, originated in tort law to analyze concurrent cause cases. See Keeton et al., Prosser and Keeton On The Law Of Torts, 266-68 (5th ed. 1984). However, even in tort cases, the substantial factor test has not "replaced the need for each liable defendant to be a but-for and substantial contributor to the indivisible injury," Menne v. Celotex Corp., 861 F.2d 1453, 1461 (10th Cir. 1988), and courts have made clear that, when the claimed damages could have resulted from multiple factors, the plaintiff "must establish that the breach alone would have been sufficient" to cause the claimed damage

and that it would not have occurred "but for" the breach. Point Productions A.G. v. Sony Music Entertainment, Inc. 215 F. Supp. 2d 336, 341 (S.D.N.Y. 2002); see Columbia First Bank v. United States, 60 Fed. Cl. 97, 105 (2004) (under the substantial factor test, plaintiff required to show that the breach "directly and primarily" caused the alleged loss); Krauss v. Greenbarg, 137 F.2d 569, 572 (3d Cir. 1943) (defining substantial factor to mean the "predominating" factor).[9]

The Federal Circuit has recognized that the "substantial factor" test and the "but for" test "generally yield identical results." Abbott Labs. v. Brennan, 952 F.2d 1346, 1352-53 (Fed. Cir. 1992). Indeed, in Abbott the Federal Circuit observed that, if anything, the "substantial factor" test is more rigorous than the "but for" test and further explained that, with the exception of a few particular classes of tort cases, "no case has been found where the defendant's act could be called a substantial factor when the event would have occurred without it . . ." Id. (citing Prosser & Keeton, The Law of Torts 268)).[10] A recent district court decision explains why, as applied to

---

[9] A concurrent causation issue was addressed in Krofft Entertainment, Inc. v. CBS Songs, 653 F. Supp. 1530 (S.D.N.Y. 1987). There, Krofft claimed that CBS breached a licensing agreement which caused Krofft to be unable to obtain financing to produce a Broadway play. CBS maintained that there could be no causation if it established that, even if it had not breached the license agreement, Krofft would still have been unable to obtain financing. The district court agreed. In addressing the law of causation, the district court cited McCormack, Handbook on the Law of Damages § 73 at 261 (1935), for the proposition that in a breach of contract case a breaching party's act or omission ordinarily can only be considered a "substantial factor" in causing the damage "where the damage would not have occurred 'but for' the alleged wrongful act or omission . . . ." Id. at 1534. Similarly, the court cited 5A Corbin on Contracts §§ 992 at 6-7, and 997 at 21 (1964), for the proposition that "[i]t must be shown that but for the breach" the damages would not have been incurred. Id. "Corbin concludes that a plaintiff cannot charge the other party with losses and disappointments that would have occurred in the absence of any breach by the other party, since such losses were 'not caused by the other party's breach of duty.' Id. § 992 at 6." Id.

[10] Recently, the drafters of the Restatement (Third) of Torts have announced their intention to abandon the "substantial factor" test in tort cases because of its widespread misapplication by courts. They specifically concluded that "some courts have accepted the
(continued...)

a breach of contract claim, the "substantial factor" test can be more exacting than a simple "but for" inquiry. See Addison Express L.L.C. v. Medway Air Ambulance, Inc., 2006 WL 1489385 (N.D. Tex. May 19, 2006). In that case, the court recognized that, "to be a substantial factor of causation, conduct must do more than 'furnish a condition' that makes an injury possible." Id. at * 5 (citations omitted). The court found that, although the plaintiff's injury might not have occurred "but for" the defendant's conduct, the resultant injury was too attenuated from that conduct to be deemed a "substantial factor." Id.

As this discussion makes clear, the label attached to the standard of causation does not change what the Federal Circuit held in Indiana Michigan – a case that involves the same type of damage claims that are at issue in this case, for breach of the same contract that is at issue in this case. To establish causation in this context, Indiana Michigan requires plaintiffs to show that, at a minimum, had DOE begun accepting fuel in 1998, plaintiffs would not have incurred the costs they now seek as damages. Imposition of this requirement is necessary to ensure that plaintiffs are restored to the position they would have occupied in the absence of DOE's delay in performance, and are not reimbursed for costs that they otherwise would have been required to incur.

---

[10](...continued)
proposition that, although the plaintiff cannot show the defendant's tortious conduct was a but-for cause of harm by a preponderance of the evidence, the plaintiff may still prevail by showing that the tortious conduct was a substantial factor in causing the harm," but that this "proposition is inconsistent with the substantial-factor standard adopted in Restatement Second of Torts § 431, Comment a." Restatement (Third) of Torts (Proposed Final Draft) § 26 cmt. j (2006). As the drafters recognized, "[t]he [causation] element that must be established by whatever standard of proof is the but-for or necessary-condition standard of this Section." Id. Accordingly, the proposed final draft of section 26 of the Restatement (Third) of Torts provides the following test for causation, in place of the "substantial factor" test: "Conduct is a factual cause of harm when the harm would not have occurred absent the conduct."

## II. PLAINTIFFS CANNOT PROVE THAT DOE'S DELAY IN PERFORMANCE CAUSED THEM TO INCUR THE DAMAGES THEY SEEK

### A. Plaintiffs Have Improperly Defined DOE's Obligations Under The Standard Contract And, Thus, Have Failed To Provide A Basis For Comparison To The Actual World

"Because the purpose of a damages award is to put the non-breaching party 'in as good a position as [it] would have been in had the breaching party fully performed,' the logical starting point for a damages analysis is an understanding of the breaching party's obligations under the contract." Rumsfeld v. Applied Cos., 325 F.3d 1328, 1336 (Fed. Cir. 2003) (brackets in original); see PG&E, 73 Fed. Cl. at 375 n.38 (damages can be determined "[o]nly by determining the scope of plaintiff's performance obligation"). Although plaintiffs contend that the NWPA and the Standard Contract required DOE to accept fuel at a rate that would eliminate the need for additional expenditures upon spent fuel storage after 1998 and therefore ask the Court to identify a "reasonable" rate that satisfies this test, there is no basis in either the NWPA or the Standard Contract for such a test. In fact, the 3,000 MTU rate that plaintiffs have identified, and upon which they have based their damages claim, does not even satisfy this test. By arguing that DOE was obligated to perform at the rate that they deem to be reasonable, plaintiffs are asking the Court to rewrite a contract using terms to which the parties not only never agreed, but that were expressly rejected during the course of the parties' negotiations. No such terms are a part of the parties' contract.[11]

[11] As described in the next section, the parties' dispute over the rate of acceptance required by the Standard Contract is more than theoretical. Many of the expenditures for which recovery is sought in this lawsuit are recoverable only if plaintiffs can establish that DOE was obligated to accept fuel at the rate they advocate. These expenditures would have been necessary even if DOE had begun accepting fuel in 1998 at the rate established pursuant to the mechanism in the Standard Contract. Moreover, as plaintiffs themselves will acknowledge, every

(continued...)

1. The NWPA Does Not Mandate A Rate Of Acceptance

Plaintiffs go to great length to argue that the "objectives" of the NWPA support imposition of the rate of acceptance that they advocate. However, they fail to point to a single provision of that legislation that sets forth that requirement. The reason for this omission is simple: the NWPA is devoid of any requirement that DOE begin acceptance at any particular level. PG&E, 73 Fed. Cl. at 389 (citing 42 U.S.C. § 10131(b)) ( [T]he plain language of the NWPA clearly states the Act's "purposes," none of which is to eliminate the need for additional at-reactor storage at utilities after January 31, 1998.")

Plaintiffs will assert that the NWPA requires DOE to accept fuel "as expeditiously as practicable," which they interpreted to mean that DOE was obligated to accept fuel at a rate that would ramp up to 3,000 MTU within a "reasonable period time." However, nowhere in the Act does it indicate that the phrase "as expeditiously as practicable" identifies any rate. Moreover, the Act, by its terms, only imposes this requirement after repository operations have commenced. 42 U.S.C. § 10222(a)(5)(a). The NWPA did not require DOE to have an operating repository by January 31, 1998. See Indiana Michigan, 88 F.3d 1272, 1276 (D.C. Cir. 1996). Instead, it permitted DOE to begin acceptance at a "facility," which could be either a repository or an interim storage facility. As a result, the "expeditiously as practicable" language in the NWPA is irrelevant until DOE accepts spent fuel at a repository.

The only specific deadline or obligation imposed by the NWPA that is relevant to the case is the requirement, set forth in Section 302(a) of the NWPA, 42 U.S.C. § 10222(a)(5)(B),

[11](...continued)
modification of the ramp-up rate to 3,000 MTUs potentially affects plaintiffs' spent fuel management decisions. Therefore, each ramp-up rate must be modeled separately for plaintiffs to establish the non-breach world and meet their burden in this case.

that any contracts between the Secretary of Energy and generators and title holders of spent nuclear fuel provide that DOE dispose of SNF "beginning not later than January 31, 1998." Although plaintiffs now contend that inclusion of a contractual acceptance rate that does not preclude the need for additional at-reactor storage costs after January 31, 1998, would be inconsistent with the NWPA, plaintiffs did not challenge the Standard Contract as being inconsistent with the terms of the NWPA when it was signed. Plaintiffs' pre-litigation actions are completely inconsistent with their current arguments regarding their expectations as to the terms of the NWPA. See Julius Goldman's Egg City v. United States, 697 F.2d 1051, 1058 (Fed. Cir. 1983) ("A principle of contract interpretation is that the contract must be interpreted in accordance with the parties' understanding as shown by their conduct before the controversy."), cert. denied, 464 U.S. 814 (1983).

Plaintiffs include in their pre-trial brief, and apparently intend to designate at trial, the prior testimony of various DOE witnesses concerning their understanding of the scope of the NWPA. Reliance upon these statements is inappropriate. First, some, if not all, of these statements have been taken out of context. A careful look at the full content of this testimony evidences that, when DOE deposition witnesses discuss a 3,000 MTU acceptance rate, they characterize it merely as a "goal," or a rate that DOE's acceptance will "eventually" meet – not as a contractual obligation. In any event, ample evidence will refute Dominion's proposed statutory and contract interpretation. Second, even if this testimony were to support plaintiffs' arguments concerning the 3,000 MTU rate, the Court should not rely upon such statements. Even the opinions of individuals who actually participated in the legislative process are irrelevant to a proper interpretation of the requirements of a statute. See, e.g., Selman v. United States, 204 Ct. Cl. 675, 685 n.6, 498 F.2d 1354, 1359 n.6 (1974) (affidavit of a United States Senator concerning

particular legislation was "without evidentiary value" because "no member of a legislature, outside of the legislature, is empowered to speak with authority for that body"); accord Department of Energy v. Westland, 565 F.2d 685, 690-91 (CCPA 1977); United States Steel Corp. v. United States, 618 F. Supp. 496, 500 n.5 (CIT 1985). The opinions of DOE personnel are similarly inadmissible. PG& E, 73 Fed. Cl. at 390 ("The court therefore declines to afford any weight to 'after-the-fact' statements made by DOE officials about the intent of Congress in passing the NWPA.").[12]

2. The Standard Contract Contains No Language Imposing, And Is Inconsistent With, The Rate Requirement That Plaintiffs Propose

At trial, plaintiffs will never cite to any language in the Standard Contract that requires DOE to accept SNF at a rate designed to preclude utility at-reactor storage after 1998. The reason is that the Standard Contract does not impose such an obligation. Standing alone, this fact

---

[12] Plaintiffs refer in their brief to their obligation to pay fees as a quid pro quo, apparently rooted in the NWPA, for the acceptance rate that they advocate. Plfs' Mem. Cont. Fact & Law at 30. However, the portion of the NWPA that established the fee amount says nothing about DOE having any obligation to preclude additional at-reactor storage in exchange for a fee, and merely requires that contracts for spent fuel acceptance call for the commencement of performance or before January 31, 1998. See 42 U.S.C. § 10222(a)(2) & (3); see also Indiana Michigan Power Co. v. Department of Energy, 88 F.3d 1272, 1276 (D.C. Cir. 1996) (recognizing a "quid pro quo," pursuant to which the utilities paid for a guarantee that DOE would begin disposing of SNF by a day certain," but not mentioning the rate at which DOE is required to accept fuel.). Indeed, the stated purposes of the NWPA, set forth at 42 U.S.C. § 10131(b), indicate that the Act was designed to ensure the public health and safety rather than the economic interests of the utilities.

Plaintiffs also assert, through citations to various fee adequacy studies, that DOE has assessed the adequacy of the fees charged the utilities under the Standard Contract upon the basis of a 3,000 MTU steady-state rate of acceptance. However, as we will demonstrate at trial, the purpose of these analyses was to determine the cost for the entire waste acceptance program (which was designed to store spent fuel for 10,000 years) rather than the cost associated with a particular rate of acceptance during the first few years of performance. It is simply incorrect to assume that, as plaintiffs apparently do by relying upon a quid, pro, quo argument, that the utilities were "paying" for a particular rate of acceptance.

should foreclose any argument that such a requirement – which would impose billions of dollars upon the United States – is consistent with the parties' intent.

Although analysis of the unambiguous terms of the contract should end the inquiry, plaintiffs' arguments do not fail only because of the lack of contractual language supporting such a requirement. Where a contract includes an integration clause, "it is a fair bet that the parties agreed to no more than they said." Campbell v. United States, 661 F.2d 209, 218 (Ct. Cl. 1981). Here, the Standard Contract's integration clause provides that "[a]ny representation, promise, or condition not incorporated in this contract shall not be binding on either party. No course of dealing or usage of trade or course of performance shall be relevant to explain or supplement any provision contained in this contract." 10 C.F.R. § 961.1, Art. XXII. It is for precisely this reason that, in PG&E, this Court found that "[t]he existence of the integration clause in the Standard Contract . . . militates strongly against modifying or supplementing it by adding a specific acceptance rate term." PG&E, 73 Fed. Cl. at 385.

In construing the terms of a contract, it is appropriate to consider evidence that the parties understood its plain language. See, e.g., TEG-Paradigm Environmental, Inc. v. United States, 465 F.3d 1329 (Fed. Cir. 2006) (relying upon pre-award discussions between Government and bidders, in which the plaintiff participated, to confirm that the plaintiff's understanding of the contract comported with its plain language). In fact, because the Standard Contract was promulgated through notice-and-comment rulemaking in which both plaintiffs participated, there is a substantial administrative record containing industry comments and requests regarding the originally proposed contract terms that can assist in interpreting the Standard Contract. See, e.g., LTV Aerospace Corp., ASBCA No. 17,131, 76-1 BCA ¶ 11,840 (1976) (analyzing regulatory administrative history in interpreting contract clause developed through notice-and-comment

rulemaking); Boeing Co., ASBCA No. 18,916, 74-2 BCA ¶ 10.976 (1974) (same). This record conclusively demonstrates that DOE unequivocally rejected a rate that was equivalent to, or more restrictive than, the rate that plaintiffs now seek to import and confirms that plaintiffs fully understood the clear implications of this rejection.

As described above, in response to DOE's February 4, 1983 proposed rule, which contained no rate of acceptance, utility groups of which plaintiffs were members specifically requested that DOE add a two-part minimum acceptance rate obligation in the Standard Contract that would contractually obligate DOE to accept SNF at a rate "[1] commensurate with the amount of [SNF] then being generated together with [2] the accumulated backlog of [SNF]."[13] DX 5.34 at ARC 001 0334. The evidence will show that, despite this request – and others – to include specific obligations in the Standard Contract, DOE elected not to obligate itself to satisfy any particular rate of acceptance or qualitative test in the contract. See PG&E, 73 Fed. Cl. at 348 (acknowledging that "DOE did not adopt the suggestion of EEI and many of the utilities . . . to incorporate into the Standard Contract a firm commitment from DOE regarding the rate of DOE's acceptance of SNF from utilities"). As Robert Morgan, at the time the Director of DOE's Office of Civilian Radioactive Waste Management, is expected to testify (and has repeatedly testified), uncertainties surrounding the waste acceptance program that was to commence 15 years in the future would have made it "unconscionable" for DOE to commit to any particular rate of acceptance.[14] Instead of including a rate of acceptance or qualitative test in the contract,

[13] As described above, the rate that plaintiffs advocate is equivalent to, if not more restrictive than, the rate proposed by EEI and UNWMG.

[14] The parties recognized as much in the body of the Standard Contract and specifically agreed that its terms "had been developed in the light of uncertainties necessarily attendant upon (continued...)

DOE included a provision that obligated DOE to begin issuing an APR and ACR as the date for commencement drew closer. Plaintiffs thus understood, as evidenced by their active involvement in the notice-and-comment process, "that the ACR/APR and DCS/FDS scheme was the process under the express terms of the Standard Contract by which a firm acceptance rate and delivery schedule[] would be determined." PG&E, 73 Fed. Cl. at 399.

Moreover, the evidence will show that, even after the promulgation and execution of the Standard Contract, representatives of EEI and UNWMG, continued to request that DOE add to the Standard Contract an obligation concerning the rate of acceptance and that DOE did not accept any industry request for a minimum receiving rate for SNF. Despite the repeated rejection of its request for inclusion of a rate into the Standard Contract, EEI continued to press the matter. Even as late as December 1992, EEI continued to advocate that contract holders request the inclusion of a rate of acceptance in the Standard Contract These repeated requests, and DOE's rejection of the requests, is unequivocal evidence that the terms were not included in the contract. Consolidated Gas Supply Co. v. Federal Energy Regulatory Comm'n, 745 F.2d 281, 289 (4th Cir. 1984) (unilateral statements of position before an integrated contract is entered do not become part of contract when party arguing for their inclusion was unable to secure adoption of statements in contract).

3. The Documents Upon Which Plaintiffs Rely Do Not Evidence DOE's Intent To Be Bound To Any Rate Of Acceptance, Let Alone The One Plaintiffs Advocate

In a series of bullet points beginning on page 38 of their pretrial brief, plaintiffs assert that certain documents manifest DOE's understanding that it was required, under the terms of the

[14](...continued)
long-term contracts." 10 C.F.R. § 961.11, Art. XV.

Standard Contract, to accept spent fuel at least at the rate that they advocate. However, none of the documents or the statements upon which plaintiffs rely demonstrate an understanding of DOE's obligations under the Standard Contract.

First, plaintiffs will not produce any document that proves that the contractually obligated annual acceptance rate is 3,000 MTUs. Moreover, the majority, if not all, of the documents that plaintiffs cite post-date the execution of the Standard Contract. Similarly, the statements that Mr. Morgan made in December 1983 as part of the Proceedings of the 1983 Civilian Radioactive Waste Management Information Meeting were made after the Standard Contract was signed and, therefore, cannot be evidence of any "meeting of the minds." See, e.g., PG&E, 73 Fed. Cl. at 383 n.41 ("[D]espite plaintiff's statement that 'the parties understood from the time of contracting . . . that a reasonable acceptance rate should accomplish [the two part obligation," not one of the numerous citations provided by plaintiff in support of this statement is contemporaneous with or antecedent to the execution of the Standard Contract between the parties on June 30, 1983"). Moreover, plaintiffs only refer to part of Mr. Morgan's December 1983 statement. They do not quote in their pretrial brief other portions of Mr. Morgan's statement, in which he explained that, based upon uncertainties associated with the SNF acceptance program, the repository schedule that he hoped to create might be "extremely optimistic." PX 37 at SN069599-600. Mr. Morgan also indicated that DOE needed an "alternative" or "parallel" plan to begin receiving waste by January 31, 1998, and that an MRS could serve as that alternative. Id. at SN069600. Consistent with the Standard Contract's mechanism for setting the rate of acceptance, Mr. Morgan noted that, as DOE "develop[ed] better schedules, [it would] present those schedules to the states and to the public." Id. Any notion that Mr. Morgan ever understood or suggested that DOE was somehow obligated to meet Dominion's proposed requirements is simply unfounded.

Further, the documents upon which plaintiffs rely do not reflect DOE's understanding of its obligations under the Standard Contract. "Before a representation can be contractually binding, it must be in the form of a promise or undertaking . . . and not a mere statement of intention, opinion, or prediction." National By-Products, Inc. v. United States, 405 F.2d 1256, 1263 (Ct. Cl. 1969). In National By-Products, the Court rejected a plaintiff's effort to collect damages for the Government's failure to satisfy hopes and goals that were never made contractual obligations:

> Under these principles, for a government representation that a right-bank levee would be built to be binding as a contractual obligation, it must have been in the form of an undertaking rather than a mere prediction or statement of opinion or intention. . . . If . . . the Government's statement was subject to two reasonable interpretations, one that it was an undertaking, the other that it was a prediction, and the parties chose opposite ones, then there is no contract covering that representation, unless one side either knew or should have known the meaning attached to it by the other. The Government prevails, in other words, if we find that the parties arrived at a contract which provided for no right-bank levee, or that they reached no mutual agreement at all on this issue.

Id. at 1264 (emphasis added).

The Court in National By-Products determined that, although the Government's representative had represented during contract negotiations "that in its then view the right-bank dike would eventually come into being," such "a representation, without more, would not indicate the Government's commitment to build it, or its guarantee that it would be built." Id. at 1270. "Rather, the representation would simply mirror the Government's current belief, opinion or prediction, even its fervent hope that this would occur." Id. at 1270; see id. at 1269 ("we attribute the Corps' activity in later acting as a catalyst for local action to provide right-bank protection to its public-minded concern with the problem . . . and not to any feeling of

contractual liability" (emphasis in original)). Accordingly, the Court found that the plaintiff had not established "any contractual obligation on the part of the Government to build, or have built, a right-bank levee" upon which a damages award could be based. Id. at 1272; see also Commercial Metals Co. v. United States, 176 Ct. Cl. 343, 349 (1966) ("[T]he Railroad's historical practice – which has not been incorporated in any written pronouncement for the information of the public – could not modify the plain language of the sales contract between the plaintiff and the Railroad . . . ."); Branhill Realty Co. v. Montgomery Ward & Co., 60 F.2d 922, 923 (2d Cir. 1932) (although parties discussed lessee's use of leased premises as chain store, lessee "did not bind itself so to do" in the contract, so that lessee "might, at its option, use them either for a chain store or for any lawful purpose").

In this case, even plaintiffs' own descriptions of the documents upon which they rely demonstrate that the statements that DOE officials made merely reflected their plans for the waste management system, rather than DOE's obligations under the Standard Contract. See, e.g., Pl. Mem. Cont. Facts & Law at 34-35 (describing how DOE's Draft Mission Plan reflected how it "planned to implement the program") (emphasis added); id. at 36 (relying upon the Robert Morgan's statements in December 1983 concerning the "basic strategy . . . outlined in the mission plan." (emphasis added)). Beyond the fact (which plaintiffs do not address) that consideration of statements made by DOE officials as a means of interpreting the Standard Contract would directly contravene the contract's integration clause, these statements are not probative of DOE's understanding of what was required under the Standard Contract. Rather, the documents to which plaintiffs cite consistently indicate that they are merely plans or strategies, that they are not contractually binding, and that it is the ACR process contained in the Standard Contract that will be the means through which a firm delivery schedule is to be reached.

As this Court explained in examining the litany of documents that the radioactive waste management program has generated during the last 20 years and upon which plaintiffs now rely, "the court's role is not to enforce and impose on DOE an obligation to carry out a strategy as it was envisioned at that time in the absence of a contractual understanding." See PG&E, 73 Fed. Cl. at 391. Simply stated, "examples of predictions, hopes, goals, or aspirations . . . do not amount to binding promises that can be enforced by the court through the award of contract damages." Id. at 393.

4. The Court Need Not Impose A Rate Of Acceptance Upon The Standard Contract

a. The Parties Reached An Agreement Concerning The Manner In Which Rate Is To Be Calculated

Despite the unrefuted evidence that DOE specifically considered – and rejected – the requests of various interested parties, including plaintiffs, that DOE obligate itself contractually to satisfy qualitative acceptance rate standards, plaintiffs contend that the Court should determine a "reasonable" acceptance rate based upon those proposed standards because the acceptance rate is an "omitted" term. This argument is misguided.

We agree that, in appropriate circumstances, if a term of a contract "which is essential to a determination of [the parties'] rights and duties" has been omitted from a contract, "a term which is reasonable in the circumstances may be supplied by the court." Restatement (Second) of Contracts § 204 (1981). However, an "omission" occurs where "[t]he parties to an agreement . . . entirely fail to foresee the situation which later arises and gives rise to a dispute" or whether they "have expectations but fail to manifest them either because the expectation rests on an assumption which is unconscious or only partly conscious, or because the situation seems to be unimportant or unlikely, or because discussion of it might be unpleasant or might produce delay

or impasse." Id. § 204 cmt. b. "Sometimes it is said that the search is for the term the parties would have agreed to if the question had been brought to their attention" when negotiating the contract. Id. § 204 cmt. d.

In this case, none of these circumstances described in Restatement (Second) of Contracts § 204 is present. As this Court found in PG&E, the acceptance rate was a contentious and important issue carefully considered by all parties involved in the nuclear industry. PG&E, 73 Fed. Cl. at 339. As a result, it cannot plausibly be argued that the parties failed to foresee the situation that later arose and gave rise to the dispute, or that any other of the circumstances identified in Restatement for imposing a reasonable term are applicable. Simply stated, the parties squarely considered, and reached resolution upon, the method by which the rate of acceptance would be reached. To insert a "reasonable" term would render superfluous the terms upon which the parties did agree.

Plaintiffs' reliance upon the Court of Claims' decision in David Nassif Assocs. v. United States, 557 F.2d 249 (Ct. Cl. 1977), is, for this reason, misplaced. In David Nassif, a construction contract failed to specify the size of a contractually-required cafeteria, or even the manner in which the size would be determined. See David Nassif Assocs. v. United States, 644 F.2d 4, 5 (Ct. Cl. 1981). During contract negotiations, "the parties never discussed the matter of the cafeteria's size" and, "[e]ven more than that, it was quite literally an issue to which neither party ever gave any thought." David Nassif, 557 F.2d at 258 n.5 (emphasis in original). The Court observed that, "[n]ormally, the task of supplying a missing, but essential, term (for an agreement otherwise sufficiently specific to be enforceable) is the function of the court." Id. at 258. That, however, was because, "by mutual oversight, the matter of the cafeteria size was never focused upon, either in the negotiations or in the subsequent lease agreement itself." David

Nassif, 644 F.2d at 5. Accordingly, the Court assumed the task of determining the size of the cafeteria "that the parties would have agreed upon at the time of their initial lease negotiations . . . ." Id. at 7.

Nassif is distinguishable because, in that case, the parties never considered the issue that the Court was required to insert. By contrast, and as the Court explained in PG&E, in this case, "DOE specifically chose not to obligate itself to a firm acceptance rate, and [] all parties to the Standard Contract recognized that choice, even if they had hoped a rate would be specifically provided for." PG&E, 73 Fed. Cl. at 382. Based upon the request of the utilities, DOE placed into the final version of the Standard Contract the contractual mechanism by which acceptance allocations would be determined – namely, the 1991 ACR/APR. It simply cannot be said that the parties, through "oversight," did not think about the rate during contract formation. To the contrary, the Court's imposition of its own rate would create a contract that the parties did not create themselves.

In this regard, plaintiffs' concession on page 30 of their pre-brief that "Congress chose not to implement the NWPA by exercising its regulatory and taxing powers, but rather required that its provisions be implemented by contract," is significant. At bottom, the parties' dispute centers upon, and jurisdiction before this Court is grounded upon, the existence of a contract. As long as this is the case, any arguments about what is "reasonable" must focus not upon not what is a reasonable legislative solution to the problem of spent fuel storage, but upon what is required in light of the plain terms of the Standard Contract and the express rejection of the utilities' request to include an acceptance rate in the Standard Contract.

b. Plaintiffs' Arguments Would Render The Contract Too Indefinite To Enforce

In Nassif, the Court of Claims expressly limited the trial court's ability to supply its own term to those agreements that are "otherwise sufficiently specific to be enforceable." Nassif, 557 F.2d at 258. A court cannot make contracts for the parties. To be valid and enforceable, "a contract must have . . . sufficient definiteness so as to 'provide a basis for determining the existence of a breach and for giving an appropriate remedy.'" Ridge Runner Forestry v. Veneman, 28 F.3d 1058, 1061 (Fed. Cir. 2002) (citations omitted). If an agreement is missing one or more essential terms, an agreement to agree upon those terms is unenforceable because it lacks mutuality of intent and sufficient definiteness to determine the rights and liabilities of the parties. See Modern Sys. Tech. Corp. v. United States, 979 F.2d 200, 204 (Fed. Cir. 1992); Bel Pre Health Care Center, Inc. v. United States, 24 Cl. Ct. 495, 496 (1991) ("[I]f an essential term, such as the quantity term, has been omitted then there can be no basis for deciding whether the agreement has been broken; the definiteness necessary for enforceability is lacking"), aff'd, 980 F.2d 745 (Fed. Cir. 1992) (table); Transamerica Equip. Leasing Corp. v. Union Bank, 426 F.2d 273, 274 (9th Cir. 1970) ("Where an agreement is not sufficiently definite to enable a court to give it an exact meaning or where an essential element is reserved for future agreement of both parties, a legal obligation cannot result. ").

"Courts refuse to enforce agreements that contain indefinite promises or terms they deem essential because judicial clarification of the uncertainty entails great danger of creating intentions and expectations that the parties themselves never entertained." Neeley v. Bankers Trust Co. of Tex., 757 F.2d 621, 628-29 (5th Cir. 1985); see Mays v. Trump Indiana, Inc., 255 F.3d 351, 357-58 (7th Cir. 2001); Shann v. Dunk, 84 F.3d 73, 81 (2d Cir. 1996) ("We believe the

issue of Shann's liability for the deferred payments was of such importance that, if the district court finds the parties failed to agree on it, the court would be required to void the contract for absence of an essential term.").

Obviously, as indicated in the Court of Claims' decision in Nassif, certain terms of a contract that are "essential" to it in some respects may, in certain circumstances, be identified by the Court, which must consider what "the parties would have agreed upon at the time of their initial . . . negotiations . . . ." Nassif, 644 F.2d at 7. However, at a certain point, the missing term becomes so essential to the formation of the contract that the Court, if it supplies the missing term itself, creates a contract to which the parties had never agreed.

In this case, to the extent that plaintiffs truly believe that the Court should abandon the only contractual mechanism for determining acceptance rate obligations and simply impose its own rate based upon its own selected standards, its arguments would empower the Court to create the central term of the parties' contract. The enormous variance in the effect of the acceptance schedule term upon the parties' rights, obligations, and damages cannot be said to be minor and, in fact, is one of the most essential terms of the Standard Contract. To the extent that the Court disagrees with the our demonstration that the schedule provisions of the Standard Contract and the approved DCSs identify the parties' obligations in this case, the Court cannot merely impose its own view of a reasonable schedule term. A rejection of our position would effectively render the Standard Contract too indefinite to enforce. See Massengill v. Guardian Mgt. Co., 19 F.3d 196, 202 (5th Cir. 1994) ("When a writing does not show the parties' agreement on a minor contract term, the reviewing court may supply a reasonable interpretation. . . . But essential contract terms may not be supplied by a court. 'If any essential term is left unresolved, there is simply no contract and no obligation on the parties.'" (emphasis

added; citation omitted; applying Mississippi law)); see also Coyle's Pest Control, Inc. v. Cuomo, 154 F.3d 1302, 1306 (Fed. Cir. 1998) (refusing to read "reasonable" term into contract, court found contract unenforceable as indefinite quantity contract because it lacked minimum quantity term).[15]

c. The Rate That Plaintiffs Advocate Does Not Satisfy Their Own Criteria

Plaintiffs will assert that the Court should accept 3,000 MTU rate of acceptance (as outlined in the 2004 APR/ACR) because it is "reasonable." Presumably, they have selected this number because it comports with many of the planning documents that DOE generated in the early phases of the waste management program and, thus, appears to cloak their theory with legitimacy. However, plaintiffs never account for the fact that this rate, although undeniably higher than a 900 MTU rate during the first ten years of the program, does not achieve the goal of eliminating the need for expenditures upon additional at-reactor storage after 1998. This infirmity is evidenced by the fact that the 3,000 MTU rate that plaintiffs propose does not exceed the industry-wide generation rate until the fifth year of the program. Plaintiffs themselves acknowledge the need, at the 3,000 MTU rate, to load fuel into dry casks for storage onto the Surry ISFSI after 1998. Moreover, even at the plaintiffs' proposed 3,000 MTU rate, in the best case scenario, VEPCO fails to maintain full core reserve ("FCR") at its North Anna facility and

[15] It is true that the a contract term which allows for future negotiation "impliedly places an obligation on the parties to negotiate in good faith," Aviation Contractor Employees, Inc. v. United States, 945 F.2d 1568, 1572 (Fed. Cir. 1991), and that, where the contract and applicable regulations provide guidelines for negotiations of future agreements, the Court may "determine whether or not the government negotiated according to the contract." City of Tacoma, Dep't of Public Utilities v. United States, 31 F.3d 1130, 1132 (Fed. Cir. 1994). However, that review does not provide the Court with the ability to create a contract for the parties where the "missing" terms are so essential to the central purpose of the contract that the absence of the terms renders the contract too indefinite to enforce.

would need additional fuel storage for that site. Simply stated, the rate that plaintiffs propose not only is not contained in the Standard Contract, but does not even satisfy the qualitative test that they have proposed because it requires them to make substantial expenditures to store fuel after January 31, 1998. Thus, even if plaintiffs' request that the Court insert a "reasonable" rate of acceptance into the Standard Contract were appropriate, it is evident that they have failed to provide such a rate and have, therefore, failed to sustain the burden of proving a plausible non-breach scenario.[16]

5. The Rate Of Acceptance Should Be Determined In Accordance With The APR/ACR Process Mandated By The Standard Contract, In Which Plaintiffs Willingly Participated

Although plaintiffs ask the Court to impose into the Standard Contract an obligation for DOE to accept 3,000 MTUs of SNF every year soon after 1998, to do so, the Court would have to ignore the actual language of the Standard Contract. That language, instead of creating an obligation to accept 3,000 MTU per year, contains a scheduling provision that ultimately allows DOE to select the appropriate SNF acceptance rate, subject only to a review for abuse of discretion by the Energy Board of Contract Appeals ("EBCA"). Pursuant to this scheduling mechanism, DOE issued the 1991 ACR and requested DCSs from utilities, many of which it then

[16] Truly eliminating, upon an industry-wide basis, the need for expenditures upon additional at-reactor storage after January 31, 1998, would have required either the commencement of fuel acceptance prior to 1998 (which is not required by the Standard Contract) or acceptance at a rate that is far higher than the rate that even plaintiffs advocate. In apparent recognition of the fact that the rate that they champion does not satisfy the understanding that they claim to have, plaintiffs refer to the 3,000 MTU rate as being the "most" reasonable rate. Ostensibly, a rate is "reasonable" from plaintiffs' perspective if neither VEPCO nor DNC would be required to make expenditures upon at-reactor storage after January 31, 1998, even if that rate would not prevent other utilities from having to make such expenditures. Given that the Standard Contract was executed by all members of the industry, this interpretation cannot possibly be correct. See Restatement (Second) of Contracts§ 211(b) (requiring standardized contracts to be interpreted uniformly amongst all contract holders).

approved, thereby defining the schedule of performance beginning in 1998. If the Court disregards these provisions and the actions of the parties in accordance with these provisions, the Court is left with no method by which to assess damages arising from DOE's delay, as the Court recognized in PG&E:

> If the court were to insert a firm acceptance rate obligation of 3,000 MTU/year in the Standard Contract, or if it were the understanding of the parties that the Standard Contract continued a firm acceptance rate obligation that the court should somehow enforce, then the ACR provision would be rendered "inexplicable, inoperative . . . , insignificant, meaningless, [or] superfluous." If there existed a firm acceptance rate obligation, there would be no need to "project[ ]" the "annual receiving capacity for the DOE facility" and update such projections annually.

PG&E, 73 Fed. Cl. at 387 (citations omitted).

Instead of agreeing to a specific minimum acceptance rate or creating standards that would obligate DOE to satisfy a minimum rate, the Standard Contract recognizes the uncertainties inherent in the development of the waste management program and, accordingly, creates a contractual mechanism for the development of a specific acceptance schedule that establishes, in essence, a two-phase process. First, the Standard Contract's schedule terms seek to obtain the agreement of the parties to a specific schedule for the acceptance of an individual contract holder's SNF and HLW. Pursuant to the terms of the Standard Contract, DOE was to issue, beginning not later than July 1, 1987, "an annual capacity report for planning purposes," identifying "projected annual receiving capacity" at any DOE facilities and annual acceptance ranking for acceptance of contract holders' SNF and/or HLW for the first 10 years "following the projected commencement of operation of the initial DOE facility." 10 C.F.R. § 961.11, Art. IV.B.5(b). Subsequently, beginning on April 1, 1991, DOE was to issue "an annual acceptance

priority ranking" for receipt of the contract holders' SNF, "based on the age of SNF and/or HLW as calculated from [its] date of discharge." Id., Art. IV.B.5(a).

Second, the contract holder, "[a]fter DOE has issued its proposed acceptance priority ranking" on April 1, 1991, and no earlier than January 1, 1992, would submit a delivery commitment schedule ("DCS") identifying "all SNF and/or HLW the [contract holder] wishes to deliver to DOE beginning sixty-three (63) months thereafter," for DOE's approval or disapproval. 10 C.F.R. § 961.11, Art. V.B.1 (emphasis added). If DOE approves the DCS, the parties have effectively agreed and defined the amount of SNF that DOE will accept from that contract holder 63 months later. Id. If DOE disapproves the first DCS submission, the contract holder is entitled to make a second DCS submission, again for DOE's approval or disapproval. Id. If DOE approves the second DCS submission, the parties have, as stated above, effectively defined the amount of SNF that DOE will accept from that contract holder 63 months later.[17] Id.

DOE and the utilities acted in accordance with these provisions to develop the schedule for waste acceptance beginning in 1998. As we will establish at trial, the rates of SNF acceptance identified in the 1991 ACR were predicated upon the requirements of the 1987 NWPA amendments, which precluded DOE from accepting more than 10,000 MTUs of SNF for storage at an MRS prior to the operation of a Federal repository. 42 U.S.C. § 10168(d)(1). When developing the 1991 ACR, and anticipating operation of a repository in 2010, DOE

[17] If DOE disapproves the second submission, DOE responds with its own proposed schedule, which the contract holder may accept or, alternatively, may attempt to negotiate with DOE. 10 C.F.R. § 961.11, Art. V.B.2. The contract holder may then submit its dispute to the contracting officer for a decision, the contracting officer issues a decision on the schedule, and the contracting officer's final decision upon the DCS "shall be final and conclusive" until, within 90 days, the contract holder appeals to the Energy Board of Contract Appeals. Id., Art. XVI.A.

divided the 10,000 MTU acceptance limitation across the 12-year period from 1998 (when it anticipated that MRS operations would begin) to 2010.

DOE then drafted, with the assistance of the utilities, the instructions for the submission of DCSs. After the instructions were issued, numerous utilities, including plaintiffs, submitted DCSs that were based upon the rates contained in the 1991 ACR, which were in turn approved by DOE. In full compliance with this procedure, plaintiffs timely submitted DCSs for DOE approval, never once objecting to the amount or order of allocations that they received. In fact, on numerous occasions, plaintiffs engaged in detailed correspondence with the contracting officer in an effort to ensure that there was no miscommunication about when, where, and how DOE would accept spent fuel from plaintiffs. The facts that plaintiffs had an open line of communication with DOE, did not object to the rates promulgated during the ACR/APR process, and were active and willing participants in that process is proof positive that the rate contained in the 1991 ACR was well within the parameters of plaintiffs' understanding of DOE's obligations under the Standard Contract. See Julius Goldman's Egg City v. United States, 697 F.2d 1051, 1058 (Fed. Cir. 1983), cert. denied, 464 U.S. 814 (1983). For this reason, plaintiffs' attempt to impose a higher rate should be rejected.

Plaintiffs argue in their pre-trial brief that the rates contained in the 1991 ACR reflect a minimalist interpretation of DOE's obligations under the Standard Contract or, alternately, were prohibited by the 1987 NWPA Amendments Act because they violated the statutory "linkage" that prevented construction the MRS facility prior to the issuance of a license for the construction of a repository. See 42 U.S.C. § 10168(d)(1). Yet, the evidence will show that, when it

promulgated the 1991 ACR, DOE was aware that a repository would not be ready by 1998[18] and, instead, was making a good-faith effort to secure performance at an MRS. Far from seeking to manipulate its obligations under the Standard Contract, DOE promulgated the rates contained in the 1991 ACR as part of its plan to begin performance in 1998 at as great a rate as existing law would permit.[19] As the evidence will demonstrate, and as DOE publicly explained, DOE believed that the best strategy for finding a party to host an MRS would be to leave the linkages in place, thereby alleviating concern from a potential host that the MRS would become a de facto repository. Once a repository host was located, DOE intended to seek congressional authorization to lift the construction linkage, a change in law that DOE believed would be easier to obtain after an MRS host had been located. This change in the law is just one of several ways that the performance world would have differed from the world that exists today. However, it does not make DOE's plan "illegal" or demonstrate that the agency somehow acted in bad faith. Even plaintiffs will agree that DOE issued its ACR rates based upon what it believed it could accomplish, and not in bad faith.

---

[18] Neither the NWPA nor the Standard Contract require DOE to have a repository available by 1998. See Indiana Michigan v. DOE, 88 F.3d 1272, 1275 (D.C. Cir. 1996) (NWPA does not tie repository to 1998 date); 10 C.F.R. § 961.11, Art. I.10 (defining"facility" as either a permanent repository or such other facility to which SNF might be shipped by DOE prior to its transportation to a permanent repository).

[19] In their pretrial brief, plaintiffs imply that a rate meets DOE's obligation, as long as it eventually ramps up to 3000 MTUs. Plfs. Mem. Cont. Facts & Law 5. At trial, we will show that the acceptance rate to which DOE obligated itself for the first ten years of the program, together with the planning documents that DOE issued at the same time for subsequent years, meets the "ramp-up" test put forth by plaintiffs.

B. Plaintiffs' Claim For Damages Includes Many Expenditures That Were Not Caused By DOE's Delay In Accepting Spent Fuel

In their pre-trial brief, plaintiffs have identified separate areas of disagreement between the parties about which expenditures are attributable to, and which losses plaintiffs have avoided as a result of, the Government's failure to accept spent fuel on or before January 31, 1998. For the most part, we agree with plaintiffs' identification of the issues that require the Court's resolution. We set forth our position with respect to the issues below.[20]

---

[20] When plaintiffs filed their complaints over four years ago, they included a takings claim. Plaintiffs have not identified a separate category of damages under a takings theory, nor have they produced any evidence of a takings in their Initial Disclosures, through the course of discovery, or in their pretrial brief. Because the only right that plaintiffs possess to the disposal of SNF derives solely from the Standard Contract, they may not maintain a takings claim based upon the failure to perform under that contract. Castle v. United States, 301 F.3d 1328, 1342 (Fed. Cir. 2002); Smith v. United States, 58 Fed. Cl. 374, 389 (2003); La Van v. United States, 56 Fed. Cl. 580 (2003); Commonwealth Edison Co. v. United States, 56 Fed. Cl. 652 (2002). Moreover, to date, no court in a spent fuel case has awarded damages on a takings theory. Northern States Power Co. v. United States, 78 Fed. Cl. 449, 472 (2007) (rejecting takings claim where plaintiff failed to demonstrate that it had been deprived of any contract rights or that it suffered any loss of property independent of its contract rights); System Fuels, Inc. v. United States, 78 Fed. Cl. 769, 809 (2007) (rejecting takings claim because "[p]laintiffs contracted to pay the Government to dispose of spent nuclear fuel. Accordingly, the allocation of costs associated with the failure of this commercial agreement must be adjudicated under contract law"); Pacific Gas & Elec. v. United States, 70 Fed. Cl. 766, 778 (2006) (dismissing takings claim, as "plaintiff [did] not have a takings claim absent the rights and obligations granted to the parties by the Standard Contract"); Canal Electric Co. v. United States, 65 Fed. Cl. 650, 656 (2005) (rejecting both physical invasion and regulatory takings claims in SNF case, and noting that "[p]laintiff has not shown that it is entitled to damages under a theory independent of the rights accorded Canal Electric under the Standard Contract"); Southern Nuclear Operating Co. v. United States, No. 98-614C, slip op. at 5 (Fed. Cl. Apr. 7, 2004) (unpublished opinion) (dismissing Standard Contract holders' takings claim because it "is grounded on the SNF contracts that [two of the plaintiffs] executed with the United States."); Consumers Energy Co. v. United States, 57 Fed. Cl. 278, 280-81 (2003) (dismissing illegal exaction claim because the sole basis for the Government's obligation to accept, transport, and dispose of SNF derives from the Standard Contract); Tyler House Apartments, Ltd. v. United States, 38 Fed. Cl. 1, 10 (1997) (citing J.J. Henry Co. v. United States, 188 Ct. Cl. 39, 46, 411 F.2d 1246, 1249 (1969)).

1. Plaintiffs Cannot Establish That The Construction Of The North Anna ISFSI Was Caused By DOE's Delay

The evidence will show that, when VEPCO planned to construct the ISFSI at its North Anna facility in the mid-1990s, it did so with the understanding that, even if DOE began the acceptance of SNF in 1998, VEPCO would still need additional storage capacity at its North Anna facility. In the course of its spent fuel planning in the actual world, VEPCO produced a document, which clearly and reasonably set forth its spent fuel storage options, and determined that the construction of an ISFSI was the most prudent course. As the Court will see, this careful and complete analysis is consistent with how nuclear utilities conduct spent fuel planning, and is in marked contrast to the manner in which plaintiffs have constructed their non-breach world in this case.

Rather than present a non-breach world that is consistent with VEPCO's contemporaneous planning in the real world, plaintiffs contend that, had the DOE begun accepting SNF in 1998 at the 900 MTU rate, VEPCO would have ignored an extensive, projected loss of full core reserve at its North Anna facility and would have planned to utilize spent fuel shipping allocations from the Surry and Millstone plants to meet North Anna's needs. In support of this contention, Dominion provided a "Causation Model," prepared in response to a Notice of Deposition served by the Government pursuant to RCFC 30(b)(6), that impossibly manipulates Dominion's allocations, as provided by DOE in the 1991 APR. Plaintiffs' modeling assumptions concerning the use of shipment allocations are severely flawed and, for the most part, impossible. First, VEPCO could not possibly have planned on using Millstone shipment allocations to maintain FCR at North Anna, because Dominion did not purchase the Millstone plant until <u>eight years after</u> the decision to construct the North Anna ISFSI was made. Secondly, in 1993 when

planning for its future spent fuel management, VEPCO made the independent business decision not to use Surry shipment allocations at North Anna. As the evidence will establish at trial, the 900 MTU causation model was created entirely with hindsight, in an effort to maximize claimed damages at the 900 MTU rate. As a result, the model does not adequately reflect the decision-making procedures that nuclear utilities, including VEPCO, undertake in the real world to conduct spent fuel management planning.

By contrast, the Government's expert, Dr. Jonathan Neuberger, will explain to the Court why the assumptions plaintiffs use in their models are inadequate and will present an independently prepared model to the Court. Dr. Neuberger's model employs assumptions that that are consistent with VEPCO's contemporaneous spent fuel planning as conducted in 1993. Based on this model, Dr. Neuberger has concluded -- as VEPCO itself concluded in 1993 -- that even if DOE had performed in 1998, VEPCO would have needed additional spent fuel storage and that the construction of an ISFSI was its most prudent option. Dr. Neuberger will further explain prudent decision-making in the face of uncertainty, and how businesses in risk-averse industries like the nuclear utility industry approach decision-making.

In addition, the Government's technical expert, Mr. Joseph Grillo, who has extensive experience in nuclear power plant operations, will explain how utilities make decisions from a technical perspective. He, too, will explain that maintaining FCR is a top priority for nuclear utilities, and that large expenditures are frequently justified to manage the risk associated with a potential loss of FCR. Mr. Grillo will further explain the lead time required for spent fuel management planning, and the reasons why spent fuel planning decisions and expenditures are often made far in advance of actual need. What plaintiffs now belittle as a mere "insurance policy" is precisely the type of long-range planning in which prudent nuclear utilities engage.

As the Court will see, uncertainties in the nuclear utility environment, coupled with the high risk associated with making poor spent fuel management decisions, show that Dominion's portrayal of its spent fuel management decisions in the non-breach world are implausible, unreasonable, and clearly motivated by litigation. Through the testimony of Dominion personnel, the spent fuel management planning documents that Dominion generated, and the analysis and explanations of our experts, the Government will show that plaintiffs would have constructed the North Anna ISFSI even if DOE had begun the acceptance of SNF in 1998 at the 900 MTU rate.

Even at the 3,000 MTU rate of acceptance, Dominion cannot meet its burden to establish that it would not have constructed the ISFSI at its North Anna facility. Dominion's 3,000 MTU "Causation Model," suffers from the same inadequacies as the model prepared in response to the Government's Notice of Deposition pursuant to RCFC 30(b)(6), and does not reflect actual spent fuel management planning decisions.[21] Indeed, plaintiffs' own spent fuel planning studies, performed by the same person who will sponsor plaintiffs' causation models, contemplate the construction of an ISFSI at North Anna if DOE had accepted SNF at the 3,000 MTU rate. Like the 900 MTU causation mode, the 3,000 MTU model perfectly manipulates spent fuel shipping allocations to create a best-case scenario for North Anna's spent fuel storage. Even with a perfect manipulation of spent fuel shipment allocations -- a modeling assumption that VEPCO

[21] Dominion also may present its "Alternative Causation Model," a model produced in February 2008, at trial. This model is intended to reflect the effect of DOE's spent fuel acceptance at the 1987 ACR rate upon Dominion spent fuel storage. Like Dominion's other "causation" models, this alternative model suffers from inadequate assumptions, based only upon hindsight for the purposes of litigation. At this rate, and with perfect manipulation of spent fuel allocations, Dominion appears to maintain FCR at its North Anna facility. However, as the evidence will show, Dominion never used this rate in the actual world as a basis for its spent fuel planning.

specifically chose not to use in its real world planning -- VEPCO loses FCR at its North Anna plant for two years, much longer than any prior, temporary loss of FCR at VEPCO. Dominion personnel will agree that nuclear utilities routinely develop contingency plans for the storage of spent fuel. The evidence will show that Dominion's reliance on this best case scenario is a strategy that is contrary to Dominion's stated spent fuel planning policies.

Dominion, recognizing the difficulty posed by its 3,000 MTU model, asserts for the first time in its pretrial brief that it could employ the following spent fuel management options to maintain FCR at North Anna: a temporary rack, exchanges, or a 20 percent increase in their shipment allocations. Plfs. Mem. Cont. Fact & Law 48-49.[22] Putting aside for the moment whether such alternative options were available to VEPCO, to the extent Dominion would have

---

[22] Dominion suggests that VEPCO may have been able to use the Exchanges provision of the Standard Contract to purchase spent fuel shipment allocations from other utilities, and potentially advance its place in the queue. Although exchanges of approved DCSs are permitted under the Standard Contract, such exchanges are expressly subject to DOE's approval, "in its sole discretion." 10 C.F.R. § 961.11, Art. V.E. Consequently, VEPCO's approved DCSs would form the basis for any exchange of acceptance allocations. Further, the fact that DOE has the discretion to disapprove exchange requests renders VEPCO's exchanges claim speculative. See San Carlos Irrigation & Drainage Dist. v. United States, 111 F.3d 1557, 1563 (Fed. Cir. 1997). The Court in Sacramento Municipal Utility District v. United States, 70 Fed. Cl. 332, 375 n.40 (2006), recently rejected an identical claim that an SNF plaintiff would have been able to advance its place in the DOE acceptance queue through the use of exchanges, concluding that such a claim was "highly speculative."

Pursuant to Article V.B.2 of the Standard Contract, purchasers have the right, subject to DOE approval, to adjust the quantities of SNF identified in an approved DCS by plus or minus 20 percent. As with exchanges of approved DCSs, DOE's unilateral right to approve any proposed adjustment, through its right to disapprove an FDS in which the adjustment is identified, makes Dominion's reliance upon this provision for purposes of establishing damages inherently speculative. Further, Dominion's reference to this provision fails to take into account the potential effect their use of this provision would have on other purchasers' place in the DOE acceptance queue.

employed the use of a temporary rack or seek to exchange approved DCSs, such options are not free of charge. The procurement of any spent fuel management option would have been costly, and would have required advance planning. Even if the Court were to agree that Dominion would employ an alternative storage option in the non-breach world, at most, VEPCO would only be entitled to recover the cost of the construction of the ISFSI at North Anna, less the cost of whatever spent fuel management option Dominion would have employed in the non-breach world. See Hughes Communications Galaxy v. United States, 271 F.3d 1060, 1066-68 (Fed. Cir. 2001) (limiting a plaintiffs' damage award to "only increased costs," rather than all incurred costs). To do otherwise would impermissibly put Dominion in a better position. Bluebonnet, 339 F.3d at 1344-45.

It is worth repeating in this circumstance that, for Dominion to prove that DOE's delay caused it to construct the North Anna ISFSI, Dominion bears the burden to recreate the world in which DOE has not breached. It is not enough merely to suggest possible storage options without proving the cost of those options. To the extent that plaintiffs put forth a damages model that fails to take into account the expenditures they would have incurred to pursue these options, they have failed to establish the extent of their damages to a reasonable certainty. Without making such a showing, Dominion cannot recover the costs associated with the North Anna ISFSI at any rate of acceptance.

2. Plaintiffs Cannot Establish That The Loading Of The First Ten Casks Included In The Claim At The Surry Facility Was Caused By DOE's Delay

Included in VEPCO's claim is the cost associated with loading fuel from their Surry facility into dry storage casks for placement on Surry's ISFSI Pad II. Whether the cost of loading the first ten casks included in plaintiffs' claim (through July 2003) at the Surry facility is

traceable to the delay in the Government's performance depends exclusively upon what was required of DOE pursuant to the Standard Contract. As the evidence will show, and our experts will explain, had the Government performed at the rate contained in the 1991 ACR (the 900 MTU rate), Dominion still would have been required to load these ten casks to the second ISFSI pad at Surry.[23] Resolution of whether plaintiffs are entitled to recover the costs associated with the loading of these casks requires a determination of a rate of acceptance under the Standard Contract. If the Court adopts the 900 MTU rate, plaintiffs will have failed to show that the costs associated with these cask loadings would not have been incurred irrespective of DOE's delay in performance.

3. Plaintiffs Cannot Establish That DOE's Delay Necessitated The Cask Crane Upgrades at Millstone Units 2 and 3

The evidence will show that Dominion elected to upgrade the cask cranes at Millstone Units Two and Three not to accommodate the movement of SNF to dry storage, but to remedy a long-standing safety violation, to eliminate the need to undertake expensive load drop analyses and mitigation measures that would have been required even had DOE commenced acceptance of SNF in 1998, and to avoid public intervention. As Mr. Grillo will explain, a "single-failure proof" crane can maintain control of a suspended load even in the event of a component failure. Recognizing the importance of controlling heavy loads suspended above or near SNF or safety-related equipment at nuclear power plants, in 1980 the NRC published NUREG-0612. This regulatory guideline provides plant operators only two options for the movement of loads weighing approximately 1,700 pounds or more. First, the operator can upgrade its crane to

[23] In its original 3,000 MTU rate model, Dominion asserts that it would not have been required to load these ten casks. We do not dispute that assertion.

single-failure proof. In the alternative, the operator can perform a complex analysis of the consequences of dropping a heavy load and implement appropriate mitigation measures. Taking no action to address the consequences of a potential load drop is not an option under NUREG-0612.

As the evidence will demonstrate, in October 2001, Dominion discovered that Millstone's former operators had never complied with NUREG-0612. That is, Northeast Utilities had not single-failure proofed the Unit Two and Three cask cranes, nor had they performed any load drop analyses. Moreover, the load path for the Unit Two crane traversed certain safety-related equipment, including a pipe trench housing a service water line running to the plant's emergency diesel generators. For years, the Unit Two crane transported heavy loads in an unanalyzed condition, exposing Millstone to the threat of shutdown in the event of a dropped load.

Dominion's decision to remedy this historical lack of compliance had nothing to do with DOE's partial breach of the Standard Contract. As the Court will hear from Dominion witnesses and Mr. Grillo, a load drop analysis was required for any of the cask types handled at Millstone Unit Two, and no such analyses had ever been performed. Dominion, therefore, elected to upgrade its Unit Two and Three cranes to prevent itself from having to perform these analyses and to implement necessary mitigation measures, to eliminate the need for corresponding license amendments, and to improve the cranes' safety. Under NUREG-0612, Dominion had only two options: spend several million dollars upgrading its cranes, resulting in an improved physical plant; or, spend several million dollars preparing and defending load drop analyses, after which its facilities would remain unimproved. Even had DOE performed beginning in 1998, Dominion would have faced one or the other of these choices. Ultimately, Dominion determined that the most prudent course was to single-failure proof its cranes, eliminating altogether any future need

to postulate drop events.[24] Mr. Grillo will also testify that, regardless of the rate of acceptance, it would have been prudent for DNC to upgrade their cranes.

Dominion had yet another motivation for upgrading the Millstone cask cranes, and this too was unrelated to DOE's performance. Throughout its history, Millstone's operators have battled aggressive public opposition to the plant's existence. Indeed, the stated objective of one of its opponents is to bring about the facility's demise. Analyses such as those pertaining to load drops under NUREG-0612 are subject to vigorous public scrutiny, objection, and intervention. By contrast, upgrading a qualified crane to single-failure proof provides no opportunity for public intervention. At trial, we will show that Dominion's desire to avoid costly, time-consuming intervention by public groups further contributed to its decision to upgrade the Unit Two and Three cask cranes. Because Dominion would have incurred the costs associated with these parallel projects even had DOE arrived at Millstone to begin removing SNF in 1998, the amounts claimed are not recoverable as a matter of law.

4. DNC Cannot Recover Pre-Acquisition Costs Incurred at Millstone, As A Matter Of Law

As discussed more fully in our motion for partial summary judgment on pre-acquisition claims, filed on March 17, 2008, Dominion cannot recover damages for $12,066,611 in expenditures made by the former owners of Millstone before Dominion ever acquired the facility. Such recovery is barred by the Assignment of Claims Act, 31 U.S.C. § 3727, which voids purported assignments against the Government of claims that would-be assignors failed to pursue, or elected not to pursue, in court. Further, neither the NWPA nor the Standard Contract

[24] In the course of upgrading to single-failure proof, Dominion elected also to upgrade the weight capacity of its Unit 2 crane from 100 to 125 tons.

authorizes the assignment of pre-acquisition claims against the Government. The lack of such a legislative exception to the Assignment of Claims Act demonstrates Congress's intent to adhere to traditional principles of privity of contract and sovereign immunity with regard to pre-acquisition claims accruing under the Standard Contract. As this Court is aware, these principles dictate that an acquiring entity cannot recover against the United States costs incurred by a former owner prior to the point at which the purchaser contracted with the Government.

Dominion's reliance upon two recent SNF cases, Rochester Gas and Electric Corporation v. United States, 65 Fed. Cl. 431 (2005), and Vermont Yankee Nuclear Power Corporation v. United States, 73 Fed. Cl. 236 (2006), to overcome the Assignment of Claims Act is unavailing. The primary issue for the Court's consideration in these cases, the permissibility of a "partial assignment" of the Standard Contract, is not present here. Moreover, to the extent that the Court in Rochester Gas and Vermont Yankee permitted the assignment of pre-acquisition claims, we respectfully submit that the Court erred in its reasoning on the subject.

5. DNC Cannot Establish That The Full Core Reserve Offload License Amendment At Millstone Unit Three Was Caused By DOE's Delay[25]

The evidence will show that Dominion sought and obtained from the NRC permission to perform additional complete offloads of the Millstone Unit Three reactor core in order to eliminate a restriction in its operating license that otherwise threatened the facility with early shutdown, and this action had nothing to do with DOE's partial breach of the Standard Contract.

---

[25]The costs associated with the Millstone Unit Three Full Core Offload Amendment were incurred by Millstone's prior owner, Northeast Utilities. As described in the Defendant's Motion For Partial Summary Judgment On Pre-Acquisition Costs, filed on March 17, 2008, the Government seeks to preclude DNC's recovery of any costs incurred by Millstone's prior owners. To the extent that DNC is permitted to recover such costs, the costs associated with the Full Core Offload Amendment were not caused by DOE's delay and are not recoverable.

As originally licensed, Unit Three was restricted to only six full core offloads over the life of the plant. The evidence will show that since the time of Unit Three's initial licensing, industry practice changed so as to favor the performance of routine full core offloads, which allowed for greater efficiency in refueling operations. In order to realize these operational efficiencies, Millstone needed to obtain a license amendment permitting it to perform full core offloads as part of the plant's normal evolution. This project was completed and paid for by Dominion's predecessors well before Dominion's acquisition of Millstone. Had they and/or Dominion continued to perform routine full core offloads without the amendment, Unit 3 would have reached its original offload limit long before the plant's life expired.

In its pretrial brief, Dominion concedes that "eliminating a full core offload restriction, by itself, would be unrelated to the government's breach." Plfs. Mem. Cont. Fact & Law 53. To avoid such a result, Dominion attempts to bootstrap its claim for $427,909 in costs associated with the Unit Three license amendment to a wholly separate project undertaken at a later date, the installation of racks in the Unit Three spent fuel pool, which Dominion claims is incremental to DOE's partial breach of the Standard Contract. Dominion's sole contention in this regard is that one component of the former project, a heat load analysis, also was required as part of the later project. The Court should reject Dominion's effort to saddle the Government with non-incremental expenses stemming from the Unit Three license amendment.

The evidence will demonstrate that the heat load analysis undertaken by Dominion's predecessors was necessary to obtain the license amendment, regardless of whether a similar analysis was necessary for a subsequent project. As a result, the costs associated with the heat load analysis that supported the license amendment request would have been incurred even had

DOE commenced performance under the Standard Contract in 1998, rendering these costs unrecoverable as a matter of law.

6. Dominion Has Avoided The Costs Associated With Loading Fuel To DOE Within The Claim Period, And Should Not Recover For Such Costs

The Standard Contract explicitly provides that utility plaintiffs are legally responsible for assuming the costs associated with loading their SNF into casks provided by the DOE when DOE arrives to accept such fuel. 10 C.F.R. § 961.11, Art. III.A.2(a). There is no dispute that loading fuel into the casks that DOE provides pursuant to the Standard Contract will require a substantial amount of labor by nuclear power plant operators. Our experts will testify that, had DOE performed at the 900 MTU rate using the rail casks that VEPCO specifically requested, VEPCO would have been required to load 26 casks through 2006.[26] Similarly, had DOE performed at the 900 MTU rate using the truck casks that DNC's predecessors specifically requested,[27] DNC would have been required to load 144 casks through 2006.[28] Our experts have calculated the labor cost associated with these loadings, based upon the labor costs that plaintiffs have employed in this case to compute their own cost to load fuel to dry storage casks. In addition to these labor costs, plaintiffs would have incurred mobilization costs and fuel characterization costs associated with loading fuel to DOE, which are similarly not recoverable. These amounts, which reflect a series of conservative assumptions, represent a cost that plaintiffs have avoided

---

[26] At the 3,000 MTU rate, VEPCO would be required to load 65 casks through 2006.

[27] In 2001, after DNC's acquisition of the Millstone site, DNC requested that the DOE bring a large rail cask for pick-up of SNF. Had DOE performed at the 900 MTU rate using the rail casks that DNC requested, DNC would have been required to load 24 casks through 2006. Had DOE performed at the 3,000 MTU rate, DNC would have been required to load 64 large casks through 2006.

[28] At the 3,000 MTU rate, DNC would be required to load 408 truck casks through 2006.

having to expend as a result of DOE's breach and should be deducted from any award of damages. Restatement (Second) of Contracts § 347(d).

Plaintiffs contend that, because the cask loading costs are dependent upon the type of cask that DOE provides, this offset is too speculative to compute. This argument is of no avail for two reasons. It is true that DOE has not identified the exact technology that it would have used to load fuel into casks for transport to an MRS. However, as part of his analysis, Mr. Grillo will identify and compare the type of casks that were licensed for transport of SNF by the Nuclear Regulatory Commission during the claim period. The dimensions and loading requirements for each of these casks are well-documented, and not at all speculative. Based upon this information, and information received from plaintiffs' documentation, our experts are able to determine that the actions plaintiffs took to load SNF into dry storage casks in the actual world would be substantially similar in time, effort and cost as the actions that would have been necessary to load fuel into any cask provided by DOE in the non-breach world.

Second, the Government's calculation of Dominion's DOE loading costs represents the most conservative calculation of the expenditures that would be required to support loading to DOE. The Government's experts have quantified the costs associated with DOE loading by using the type of cask that plaintiffs specifically requested during the claim period- a large cask for VEPCO and a truck cask for DNC. There is simply no reason to believe that the company would have requested a cask that did not minimize its expenditures. In fact, as VEPCO's personnel will readily admit, the use of a large cask is more economical for its facilities than a truck cask, because truck casks cannot carry as much fuel as rail casks and are therefore more expensive to load on a per-fuel-assembly basis. The use of casks other than the ones that DNC requested would have required the company to make additional expenditures upon plant

modifications. In fact, although DOE might conceivably have provided a heavy rail cask for the loading of fuel at the Millstone facility, Mr. Grillo and Mr. Johnson will testify that the use of these casks would have required plant modifications, which would have required additional expenditures. Thus, although the cost of loading casks to DOE may be difficult to predict to the very last dollar, it can safely be said that the costs that our experts have calculated do not exceed the costs that Dominion would have been required to expend if DOE had begun acceptance of fuel in 1998.

Plaintiffs also contend that an offset for DOE loading costs is inappropriate because they will incur costs to transfer fuel to DOE in the future. This argument is unavailing. Plaintiffs have dictated the terms of this litigation by choosing to sue for a partial breach of the Standard Contract. The only issue before the Court is the calculation of the difference between the amounts that plaintiffs have actually spent on fuel storage through June 30, 2006, and the amount they would have had to spend (including any costs they have actually avoided) had DOE timely commenced performance. If, as plaintiffs contend, they will incur costs in the future to load casks to DOE, that expenditure can be included in the calculation of damages in future litigation. However, if the Court does not award an offset at this time, there is no mechanism that guarantees the right of the Government to recover an offset in the future for costs that plaintiffs have unquestionably avoided. In fact, it is entirely likely that, at some point, in the future the loading cost adjustment will outstrip the incremental costs that plaintiffs claim as damages. In that situation, plaintiffs will have every incentive to decide <u>not</u> to bring a subsequent lawsuit – leaving the Government with no ability to require plaintiffs properly to account for the costs they have avoided. Simply put, the Government's ability to require plaintiffs to account for its costs

avoided should not be tied to plaintiffs' unilateral decision as to whether it should bring future lawsuits.

7. Dominion Cannot Establish That The Cask Loading Modifications, Or Routine Repairs Performed At Its Sites Were Caused By DOE's Delay

The evidence will show that certain modifications performed by DNC at Millstone Unit Two and by VEPCO at its North Anna facility would have been required even if DOE had begun performance in 1998.[29] As described in the previous section, the Standard Contract obligates nuclear utility plaintiffs to conduct the activities and assume any costs associated with those activities to load their SNF to a cask provided by DOE. In the actual world, DNC performed plant modifications to support the loading of SNF into casks for storage on its ISFSI. VEPCO made similar modifications to its North Anna facility. As the evidence will show, and Mr. Grillo will explain, these same modifications would have been required to load fuel into a dry storage cask provided by DOE.

Plaintiffs assert that the costs associated with these modifications are too speculative, but this argument is unavailing for the reasons set forth in the preceding section of this memorandum. If DOE had brought any licensed transport cask to Dominion's sites for spent fuel pick-up, the modifications identified as not caused by DOE's delay would have been required to

[29] In its pretrial memorandum, Dominion focuses entirely on the Millstone Unit Two modifications. See Plfs. Mem. Cont. Fact & Law at 51. However, certain modifications associated with the construction of the North Anna ISFSI, performed to facilitate the loading of fuel into dry storage casks, are similarly unrecoverable. Because the cost to perform each of these modifications were charged to the cost of the ISFSI, they are not recoverable as part of that larger project. However, even if this Court were to determine that DOE's delay caused VEPCO to construct the North Anna ISFSI, the costs associated with the North Anna spent fuel loading modifications were not caused by DOE's delay.

load fuel into the DOE provided casks. Therefore, our experts need not know the precise cask that DOE would have provided to determine damages.

In addition, included in plaintiffs' claim are other costs that were charged to dry fuel storage projects, but are not related to DOE's delay, such as the costs associated with the purchase of Nozzleless Handling Tools at the North Anna and Surry facilities and the repairs made to the Surry Cask Transporter. As the evidence will show, and as Mr. Grillo will explain, neither of these activities are in any way related to the DOE's delay in performing its duties pursuant to the Standard Contract. In fact, the Surry Cask Transporter was used to move casks that had been loaded to the Surry ISFSI, but that plaintiffs themselves have not included in their claim. The nozzleless handling tools were necessary to move spent fuel assemblies that had malfunctioned in the North Anna and Surry pools. This malfunction was not caused by DOE, and the use of the tool was required to move the assemblies in the normal course of Dominion's spent fuel operations. As such, these items are unrelated to DOE's delay and are not recoverable.

8. Dominion Cannot Establish The Recoverability of Certain Internal Labor Costs

Plaintiffs should not be able to recover work performed by salaried employees at no additional cost to the company. See Wilner v. United States, 23 Cl. Ct. 241, 258, 262-63 (1991) (allowing recovery for hours that would not have been worked "but for" the delay); Wilson v. Marquette Elecs., Inc., 630 F.2d 575, 586 (8th Cir. 1980) (rejecting claim that $40,000 in "lost time" for employee labor was recoverable because no showing that company lost any money because of time employee was forced to spend upon project); AES Tech. Sys., Inc. v. Coherent Radiation, 583 F.2d 933, 943 (7th Cir. 1978) (plaintiff not entitled to damages where breach did not "prohibit . . . employees from working on other projects"). It is for this reason that our

accounting expert, Mr. Larry Johnson, CPA, will opine that the work of the employees who collectively averaged working less than two hours per week on breach-related projects was not caused by DOE's delay. Compensating plaintiffs for the cost of these hours would pay them for labor costs that would have been incurred in the absence of any breach by DOE, and would place them in a better position than they would have occupied even had DOE commenced performance in 1998.[30]

Plaintiffs assert that the company has been damaged because, by working on breach-related projects, its employees forewent other opportunities. However, plaintiffs have not identified a single foregone opportunity occasioned by the largely de minimis amounts of work performed by the employees in question. In addition, plaintiffs cannot identify any evidence that they would have employed fewer of these employees – whether upon an employee-by-employee basis or on a position-by-position basis – as a result of the alleged breach. Plaintiffs bear the burden of proving that the amounts that they expended are traceable to the breach, and there is no evidentiary basis for simply assuming that either VEPCO or DNC has been injured merely because some of their salaried employees were required to expend a few extra (non-overtime) hours a week working on breach-related projects.

---

[30] Plaintiffs' claim includes internal labor charges that represent time spent by their employees working on projects that we acknowledge are attributable to DOE's delay in accepting spent fuel. Included in the claim are the efforts of Dominion employees who worked overtime to perform breach-related activities, who were paid by the hour to perform these activities, or who spent more than half of their time in any one calendar year working on these activities. We do not dispute the inclusion of these charges as damages.

9. Dominion Cannot Establish The Recoverability Of Certain Overheads

Dominion's damage claim also includes multiple components of overheads that were allocated to breach-related activities. We do not dispute, and our accounting expert will not challenge, the legitimacy of these allocations from an accounting perspective. However, Dominion has not provided and will not provide any evidence that the cost pools from which these overhead charges were calculated were in any way affected by DOE's delay in performance.

In its pretrial memorandum, Dominion implies that, if the Court does not allow it to recover its overhead costs in this litigation, Dominion's other projects will become "more expensive." Plf.'s Mem. Facts & Law at 61. This assertion confuses cost accounting with the calculation of damages and demonstrates Dominion's fundamental misunderstanding of the two concepts. A more accurate description of these overhead costs, and what the evidence will show, is that imagined as a pie, in which the size of the pools from which the overhead charges were calculated stayed essentially the same. The only effect that plaintiffs' performance of breach-related activities had upon these pies was to change the size of each of the slices – that is, the amount of the overhead pool allocated to each individual project with a separate code in plaintiffs' accounting system. This Court has rejected similar claimed overhead costs where the plaintiff failed to show any relationship to the dry storage project or that such costs were incremental to the Government's delay in SNF acceptance. See Tennessee Valley Auth. v. United States, 69 Fed. Cl. 515, 542 (2006) (rejecting claimed "capital support" overhead expenses reflecting management allocations where plaintiff failed to show any relationship between the claimed cost to the dry storage project); Sacramento Mun. Util. Dist. v. United

States, 70 Fed. Cl. 332, 377 (2006) (rejecting claimed overhead where plaintiff failed to meet burden of proving that costs were incremental to DOE's delay in SNF acceptance), appeal pending, No. 2007-5052 (Fed. Cir. docketed Feb. 6, 2007) ("SMUD").[31]

Dominion will assert, in conclusory fashion, that the use of resources represented by their overhead costs "deprived Dominion of their use on other projects." Plf.'s Mem. Facts & Law at 61. However, Dominion will be unable to present any evidence in support of such an assertion. At a minimum, the amounts of any increases in overhead costs attributable to the breach cannot be proven with reasonable certainty. For these reasons, the overhead charges they have included in their claim are not recoverable.

10. Plaintiffs Are Not Entitled To Recover AFUDC, As A Matter Of Law

As explained more fully in the Government's Motion For Partial Summary Judgment On AFUDC, filed on March 17, 2008, Allowance For Funds Used During Construction ("AFUDC") is an accounting mechanism, established by regulation, that utilities, including plaintiffs, use to account for the time value of money associated with capital expenditures. As we have acknowledged with respect to plaintiffs' overhead calculations, we do not dispute that, for purposes of internal cost accounting, plaintiffs are entitled to record AFUDC. However, the mere fact that AFUDC is permitted by regulation does not change the fact that it is, at bottom, designed to permit plaintiffs an opportunity to obtain compensation for the loss of the time value of money expended upon construction projects. This allowance is precisely the sort of interest that is not recoverable against the Federal Government absent a waiver of sovereign immunity,

---

[31] The Federal Circuit heard oral argument of the appeal in SMUD on February 4, 2008.

and no accounting regulation alters that conclusion. See 28 U.S.C. § 2516(a) (1976); England v. Contel Advanced Sys.,Inc., 384 F.3d 1372, 1379 (Fed. Cir. 2004).

Plaintiffs rely upon this Court's decision in Tennessee Valley Authority v. United States, 69 Fed. Cl. 515, 541-42 (2006), to support their argument that AFUDC is recoverable as damages. As an initial matter, in TVA, the Court awarded AFUDC costs based upon the erroneous premise that "a contractor may recover interest actually paid on funds borrowed" even in the absence of a waiver of sovereign immunity. TVA, 69 Fed. Cl. at 541 (citing Wickham Contracting Co. v. United States, 12 F.3d 1574, 1582-83 (1994)). This ruling conflicts squarely with governing precedent and has not been followed in other spent fuel cases. See System Fuels, Inc. v. United States, 79 Fed. Cl. 37, 70 (2007), appeal pending, nos. 2008-5029, 2008-5035 (Fed. Cir. docketed Jan. 9, 2008).[32] "[L]ike interest on substantive claims against the government, '[i]nterest on bank loans made because of financial stringency resulting from a breach by the Government of a contract between it and the borrower is not recoverable.'" England, 384 F.3d at 1379 (Fed. Cir. 2004) (quoting J.D. Hedin Constr. Co. v. United States, 456 F.2d 1315, 1330 (Ct. Cl. 1972)); see Marshall v. United States, 164 F. Supp. 221, 224 (Ct. Cl. 1958) ("[I]nterest on borrowed money is not recoverable in suits against the Government unless it is called for in the contract itself or in the governing statute."). Such costs may be recoverable, if ever, only to the extent that a statute or contract clause, like the "Changes" clause in procurement contracts, expressly authorizes it. See Bell v. United States, 404 F.2d 975, 984 (Ct.

---

[32] In TVA, the Court deemed this requirement satisfied, ostensibly because the utility owner was a public quasi-governmental corporation that had no equity and therefore was required to fund all capital projects through cash flows or debt. TVA, 69 Fed. Cl. at 42. No such circumstances, of course, exist in this case.

Cl. 1968). No such clause is contained in the Standard Contract. For this reason alone, the Court's conclusion in TVA should not be followed.

Moreover, even if it were the case, as plaintiffs contend, that "interest as a claim" is recoverable against the United States without a waiver of sovereign immunity, this would only be the case where the cost for which plaintiffs seek recovery can be "be directly traced to a specific loan or a necessity for increased borrowing must be shown to have been required by extra work or delay caused by the Government." Gevyn Constr. Corp. v United States, 827 F.2d 752, 754 (Fed. Cir. 1987) (emphasis added). Plaintiffs will not and cannot make any such showing, and their request to be compensated for having recorded AFUDC in connection with the projects undertaken in this case should, therefore, be denied.

11. Plaintiffs Have Not Establish The Recoverability Of Certain Unsupported Costs

In addition to the costs included in Dominion's claim that the Government disputes on the basis of a failure to prove causation, the Government also disputes some of the charges included in Dominion's claim that are unsupported. These unsupported charges are in the form of invoices or other claimed costs for which the Government has not received adequate documentation from Dominion.[33] Throughout the course of discovery, the Government and Dominion have diligently participated in a process, akin to an audit, through which the Government has been able to verify and support the majority of the charges included in Dominion's claim. However, there remains a limited number of charges that are not verifiable

[33]. Similarly, plaintiffs have included in their claim $ 4,881 in engineering labor costs associated with the Surry facility that appear to have been incurred for a project completely unrelated to the storage of spent fuel. Obviously, such engineering costs are not recoverable.

based upon the information that Dominion has provided. In its pretrial brief, Dominion implies that it should receive a dispensation from supporting this comparatively small amount in unsupported charges, because it has cooperated with the Government's investigation of its claim. While we appreciate Dominion's cooperation, it is not automatically entitled to recover for all charges in its claim, regardless of the level of support provided. When trial has concluded, if Dominion is still unable to present support for such unsupported charges, compensation for those costs must be denied.

## CONCLUSION

For the reasons outlined above, the Government respectfully requests that the Court require plaintiffs to satisfy their burden of proof and allow plaintiffs to recover only those costs that they prove are foreseeable, certain and directly caused by the Government's breach, and are otherwise recoverable as a matter of law.

Respectfully submitted,

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/Harold D. Lester, Jr.
HAROLD D. LESTER, JR.
Assistant Director

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

ALAN LO RE
Senior Trial Counsel

ANDREW P. AVERBACH
CHRISTOPHER J. CARNEY
SCOTT SLATER
Trial Attorneys
Civil Division
Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530

s/Lisa L. Donahue by s/Scott Slater
LISA L. DONAHUE
Trial Attorney
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
1100 L Street, N.W.
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
Tel: (202) 353-9498
Fax: (202) 307-2503

March 24, 2008

Attorneys for Defendant

CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 24th day of March, 2008, a copy of the foregoing "DEFENDANT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Scott Slater