# Lake Barrett

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
-----------------x
YANKEE ATOMIC ELECTRIC COMPANY; : Case Nos. 98-126C.
CONNECTICUT YANKEE ATOMIC POWER : 98-154C. 98-474C.
COMPANY; MAINE YANKEE ATOMIC : 98-483C. 98-484C.
POWER COMPANY; FLORIDA POWER & : 98-485C. 98-486C.
LIGHT COMPANY; NORTHERN STATES : 98-488C. 98-614C.
POWER COMPANY; DUKE POWER, a : 98-621C, 99-447C,
Division of DUKE ENERGY CORP.; : 00-440C. 00-695C,
INDIANA MICHIGAN POWER COMPANY: : 00-703C, 01-115C.
SACRAMENTO MUNICIPAL UTILITY : 01-116C, 01-249C
-----------------X

(Caption continued on the next page)

Deposition of LAKE H. BARRETT
Washington, D. C.
Monday, April 22, 2002
9:31 a.m.

Job No.: 11792-4
Pages 1 through 272, Volume 1
Reported by: Diane Gomez, RPR



DISTRICT; SOUTHERN NUCLEAR :
OPERATING COMPANY, et al.; :
COMMONWEALTH EDISON COMPANY; :
BOSTON EDISON COMPANY; GPU :
NUCLEAR, INCORPORATED; WISCONSIN :
ELECTRIC POWER COMPANY; POWER :
AUTHORITY OF THE STATE OF NEW :
YORK; OMAHA PUBLIC POWER DISTRICT;:
NEBRASKA PUBLIC POWER DISTRICT; :
and TENNESSEE VALLEY AUTHORITY, :
Plaintiffs :
v. :
THE UNITED STATES, :
Defendant :
-----------------X



Deposition of LAKE H. BARRETT, held at the offices of:

ARNOLD & PORTER
555 12th Street, Northwest
Washington, D. C. 20004
(202) 942-5000

Pursuant to agreement, before Diane Gomez, Registered Professional Reporter and Notary Public in and for the District of Columbia.



APPEARANCES

ON BEHALF OF PLAINTIFFS FLORIDA POWER & LIGHT COMPANY, NORTHERN STATES POWER COMPANY, DUKE POWER, INDIANA MICHIGAN POWER COMPANY, BOSTON EDISON COMPANY, GPU NUCLEAR, INC., POWER AUTHORITY OF THE STATE OF NEW YORK, OMAHA PUBLIC POWER DISTRICT, and NEBRASKA PUBLIC POWER DISTRICT:
DEVON E. HEWITT, ESQUIRE
SHAW PITTMAN LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) 847-5097

ON BEHALF OF PLAINTIFF SACRAMENTO MUNICIPAL UTILITY DISTRICT:
JEFFREY L. HANDWERKER, ESQUIRE
HOWARD CAYNE, ESQUIRE
RONALD A. SCHECHTER, ESQUIRE
ARNOLD & PORTER
555 12th Street, Northwest
Washington, D. C. 20004-1206
(202) 942-5000

13

Q Did you review any documents in preparation for today's deposition?
MR. CRAWFORD: Objection.
**A No.**
Q Not a single document?
**A No. We just talked.**
Q What other activities did you engage in in preparation for today's deposition?
**A None.**
Q Can you describe for me your educational background?
**A B.S. degree in mechanical engineering, University of Connecticut, '67; M.S., mechanical engineering/nuclear, '72. Did business courses '72, '73, '74.**
Q In connection with your preparation for today's deposition did you read the transcripts of any other depositions taken in any of the other spent nuclear fuel cases?
**A No.**
Q Are you familiar with the testimony of any witness in any other of the spent nuclear fuel cases?

14

**A No.**
Q Have you spoken with any of the witnesses in any of the spent nuclear fuel cases concerning their testimony?
**A Meaning deposition stuff?**
Q Yes.
**A All I know is what they have done it on, days, but of content, no. Or of questions, no.**
Q I'm sorry, I didn't understand your answer, all I know is that they have done it on, days?
**A They have been here certain days, you know, Zabransky and others. I know their schedules, but I don't know the content of their discussions nor the questions nor their answers.**
Q So you never had a conversation, for example, with Mr. Zabransky concerning any aspect of his testimony in the spent nuclear fuel cases?
MR. CRAWFORD: Objection. Asked and answered.
Q Correct?
**A No. Just, I know when he's done it. That's all I know. I don't know the substance.**

15

Q And would the same -- the same would go for any other person within the Department of Energy who's been deposed in the spent nuclear fuel cases, correct?
**A Correct.**
Q And the same would go for any outside contractor to the Department of Energy who has been deposed in the spent nuclear fuel cases, correct?
**A I have not talked to any of them.**
Q I assume you're aware, Mr. Barrett, that the United States Court of Appeals for the District of Columbia has issued a Writ of Mandamus against the Department of Energy in connection with the spent nuclear fuel cases?
MR. CRAWFORD: Objection.
**A I know they've issued court papers regarding this.**
Q Are you aware that a Writ of Mandamus had been issued?
MR. CRAWFORD: Objection, form.
**A If it's called a Writ of Mandamus or court form I don't know. I know the courts have spoken.**
Q And are you familiar with the contents of

16

the orders issued by the court?
MR. CRAWFORD: Objection. Foundation.
**A In a very general sense.**
Q Can you explain to me your general understanding of the order?
**A The D.C. Circuit Court of Appeals said we have an obligation --**
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion.
**A And there's things in Court of Claims, which is what this is. That's pretty much the general sense I have.**
Q Do you know what obligation the D.C. Circuit said the Department of Energy has?
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion.
**A Not really. Because that's a confusing thing to me.**
Q What's confusing to you, sir?
**A When the court stated, you know, obligation and some of the wording in those court orders, I do not personally understand them.**

Q Correct?
MR. CRAWFORD: Objection, asked and answered. Objection, argumentative.
**A That's true.**
Q And, similarly, it was not your opinion in 1986, that a repository could not be operational by 1998, correct?
MR. CRAWFORD: Objection, form. Objection. vague.
**A You're asking what I thought --**
MR. CRAWFORD: Objection, foundation, too. Go ahead.
**A Are you asking what I thought in 1986, or are you asking what I think looking back over history?**
Q I'm asking that you put yourself in the shoes of Lake Barrett in 1986.
MR. CRAWFORD: Objection, foundation.
**A Okay. We went to '86. Before we were -- your line of questioning was going to mid-'84. You want to go to '86 now?**
Q Yes, sir.
**A In '86 I was working for the Department of**



**Energy, okay, so I had different knowledge. So the question is in 1986 did I think something. Now tell me what that something was again.**
Q In 1986 was it your opinion that a repository could not be operational -- a repository for the disposal and storage of spent nuclear fuel could not be operational by 1998?
**A I don't recall what I thought in 1986. Because in 1986 I was at the Department of Energy in a systems job probably, and the colleagues down the hall were working the repository. I did not. I don't recall what the repository schedule was in 19 -- what I personally thought in 1986.**
Q When did you join the Department of Energy?
**A Summer of '85 or spring of '85.**
Q What was your position between the summer of '84 and the spring of '85?
**A I was the branch chief of the engineering branch in the office -- the Division of Waste Management in the Office of Nuclear Materials Safety and Safeguards of the Nuclear Regulatory Commission.**
Q Please describe for me your



responsibilities in that position.
**A I was responsible for engineering for uranium mill tailings, low-level waste disposal sites and high-level waste disposal sites for the Nuclear Regulatory Commission is what my duties were.**
Q Did you work with issues relating to the disposal of spent nuclear fuel in that position?
**A Yes.**
Q And can you describe for me your work on those issues?
**A It was the engineering aspects of repository reviews for all media, including the development of branch technical positions and regulatory guidance and the regulations for high-level waste is what you asked about.**
Q I asked about spent nuclear fuel.
**A Well, okay, spent nuclear fuel and high-level waste.**
Q Using the term "spent nuclear fuel" to cover both?
**A Right.**
Q Did you work with officials at the



Department of Energy in this position?
**A Yes.**
Q And which offices did you work?
**A With the office that I'm presently in.**
Q Do you recall which individuals at the Department of Energy you worked with during this period?
**A Specific names, Ben Rusche is the only name that comes to mind, who was the director who I worked for years ago in the seventies.**
Q When did you work for him in the seventies?
**A Mid-seventies is the best I can recall.**
Q Was that Electric Boat?
**A No, at the Nuclear Regulatory Commission. So it would have been like '75, '76. He was the director of the Office of Reactor Regulation in the mid-seventies in the Nuclear Regulatory Commission, and he was the first confirmed director of the Office of Civilian Radioactive Waste Management. So he was one I know I talked to, but I did not talk much to the DOE people when I served at NMSS between -- that short period from mid-'84 to mid-'85.**

41

Q How long did you work for Mr. Rusche? Was it approximately a year?
A At the Nuclear Regulatory Commission?
Q Yes.
A I don't remember, a couple of years.
Q And did you report directly to him?
A No. He was twice removed. He was my boss's boss. Maybe my boss's boss's boss. I can't remember the structure.
Q Did you ever meet with him or work with him directly during the period '75, '76?
A Repeat the question.
Q Did you ever work directly with him during that period?
A Directly with him. I was in contact with him on various issues that we mutually worked upon. I mean, I did not report to him. I mean, he was my boss's boss or something.
Q Did you believe that he was competent in his field of expertise?
A Very.
Q Why do you say very?

42

A Because he was a very knowledgeable individual in my opinion.
Q In what field was he knowledgeable?
A In nuclear matters.
Q Such as?
A Regulatory safety, which is what we did.
Q Did you ever speak with him in the period following the period during which you worked with him and the summer of 1984?
A Yes. In spring of '79 we worked together. I didn't work for him at Three Mile Island. He was brought in as a temporary manager for Metropolitan Edison, and I worked for the Nuclear Regulatory Commission. So we were -- we worked on the stabilization of Three Mile Island Unit 2 for several months.
Q So he was in private industry at that point?
A Correct.
Q Did you continue during that period to find him competent in nuclear matters?
A Yes.

43

Q Did you continue to describe him as very competent?
A Yes.
Q When did you next deal with him?
A Pardon?
Q When did you next deal with Mr. -- how do you say his name?
A Rusche.
Q Rusche.
A Well, he became my -- when I came to the Department of Energy in the spring of '85 he was my boss's boss.
Q How did it come to be that you left the NRC and went to the Department of Energy in 1985?
A Somebody told me that a fellow named Roger Hilley who worked for Ben Rusche wanted someone like myself there, and we had a phone call and asked me to come down and talk and one thing led to another and I transferred.
Q Do you recall who had that initial communication with you?
A No.

44

Q Did you speak with Mr. Rusche before you took your position?
A I don't remember. Probably did but I just don't remember.
Q What was your initial position at the Department of Energy?
A Division director, systems and transportation or something to that effect.
Q And what did that position involve?
A I was responsible for the development of the transportation systems to move spent fuel and high-level waste to the DOE facilities from their current locations was the primary job, and also for the systems engineering for the entire program.
Q Entire program you're referring to what?
A The civilian and all the different sites that we were looking at, the systems engineering requirements documents and the systems engineering structure for all of the civilian radioactive waste management program.
Q To whom did you report when you held this position?

A **Roger Hilley.**
Q And he reported to Mr. Rusche?
A **Correct.**
Q Are you familiar with the acronym MRS?
A **Yes.**
Q What does that stand for?
A **Monitored retrievable storage facility.**
Q Were you involved with monitored retrievable storage facilities during this period?
A **Secondarily, yes. Insofar as in the -- that was the facility that the transportation --**
MR. CRAWFORD: Objection. Let me object here and -- the objection is to vagueness. What period are you referring to?
MR. CAYNE: First I'm going to object for the record to counsel continuing to cut off the witness while he's in the process of answering a question. And I believe the witness has answered my question.
MR. CRAWFORD: Then I didn't cut him off.
Q For how long did you hold this position?
A **I don't recall.**



Q Two or three years?
A **Probably.**
Q Were you involved in issues relating to the siting and development of a repository during this period?
A **In a general sense. I did not have direct line responsibility for repository development. That was another group.**
Q But you said in a general sense. What did you mean?
A **I would hear in staff meetings in various work we did together the general state of where the repository programs were, but I had no direct, you know, responsibility in that area.**
Q You were a division director, correct?
A **Correct. In the storage and something, whatever Hilley's organization title was. Which was not the repository. That was a completely different office did the repository. We were storage and transportation systems I think was the name of our office.**
Q Were you involved in issues relating to the



rate at which spent nuclear fuel would be accepted for disposal during your time as director of this division?
A **Probably. I don't -- probably.**
Q You don't recall?
A **I don't recall detailed discussions regarding the acceptance rates. I know that we had acceptance rates in various documents for the repository and for the proposed MRS, which was not authorized at that time, for planning purposes.**
Q Were you an advocate of the MRS during this period?
MR. CRAWFORD: Objection, vague.
A **Advocate. I would say that I thought an MRS was -- we were proposing an MRS to Congress, and yes, I was an advocate. I thought that would have made a much better system if we had it.**
Q Why were you of that view?
A **Because -- one of the reasons was we were striving to meet the '98 removal date to the best of our ability, and an MRS circa early -- let's see in the late eighties the MRS we proposed to do it because**



**the repository date was post -- somewhere in that period it was post-1998. So, yeah, it was post-1998 in the mid-eighties. So the MRS was our primary means to remove fuel by 1998.**
Q You referred to the '98 removal date a moment ago. Do you recall that?
A **Yes.**
Q What were you referring to when you referred to the '98 removal date?
A **The statute said that -- had a January 1998 target date in it for removal of the fuel. We were trying to meet that to the best of our ability.**
Q And what was it that you were trying to accomplish by January 1998?
A **To accept fuel into the federal disposal system, which we were proposing to include an MRS in that mid -- I'm trying to get the years straight. Yeah, mid-eighties. '86 we made a proposal.**
Q How much fuel were you attempting to accept at that point?
A **I don't recall the numbers, but I would have to go back and look in the records. I don't**

49

recall specific receipt rates.
Q Were you attempting to accept more than a single spent nuclear fuel assembly?
A **Yes.**
Q Was it ever the intent of your office to be able to accept a single spent fuel assembly by January 31st, 1998?
MR. CRAWFORD: Objection, vague. Objection to the extent it might call for a legal conclusion.
A **From a systems perspective it was our intention to build a system that would take more than one fuel assembly.**
Q From a systems perspective was it ever your intention to build a system that would take only -- be able to take only a single fuel assembly by January 31st, 1998?
A **That was never our intention, to do just one fuel assembly.**
Q Was it ever the intention of your office at any time subsequent to the period in which you held the position -- was it director of --
A **Division director.**

50

Q Was it ever the position of your office subsequent to that time that the goal would be to be in a position to accept a single spent fuel assembly by January 31st, 1998?
MR. CRAWFORD: Objection, vague. Objection, foundation, and objection to the extent it calls for a legal conclusion.
A **It was never our plans to take one fuel assembly to my recollection.**
Q Do you recall ever having any discussions internally whether the acceptance of a single fuel assembly would satisfy the department's obligations under the contract, the standard contract?
A **I never recall any discussions from a systems perspective about the contract, so, no, I don't recall ever having a discussion.**
Q What do you mean from a systems perspective?
A **We were -- our job was to develop the systems to receive the material, and we never, to my recollection, we never discussed about a system that would receive one fuel assembly. Okay. We always**

51

**talked about more.**
Q From a systems perspective was it ever your intention to design a system that could only accept 900 MTUs of spent nuclear fuel per year?
MR. CRAWFORD: Objection, vague. Objection, foundation. Objection to the extent it calls for a legal conclusion.
A **Repeat the question.**
Q From a systems perspective was it ever your intention to design a system that could only accept 900 MTUs of spent nuclear fuel per year?
A **There's different things happened as a function of time, okay. What time are you referring to?**
Q In 1986.
A **In '86, no.**
Q In 1986 how many MTUs per year did you attempt to design a system to accept?
A **I don't recall a specific number, but it was -- I don't recall a specific number. It's in the records.**
Q Would 3,000 refresh your recollection?

52

A **That's probably about right.**
Q And how did you come to the 3,000 number?
MR. CRAWFORD: Objection, foundation.
A **I'd have to go back and look at records, which I have not done. It is the evolution of the design receipt rates for the first repository, second repository, the MRS in the system. My recollection is the MRS was to receive 3,000 tons a year circa that time prior to the amendments act, which was in excess of the generation rate of around 2,000.**
Q That was important, wasn't it, that it be in excess of the generation rate?
MR. CRAWFORD: Objection, vague.
A **Well, important? Yes, in my opinion it was significant that you design a system to remove the backlog of materials that were accumulating under the intent of the act.**
Q And why was that significant in your view?
A **Because the concept of a Nuclear Waste Policy Act was to -- for the federal government to take the materials from the high-level waste and spent fuel sites into federal custody.**

65

was in QA, so I personally, the QA office was, very little impact. I had no personal involvement in the linkages then.
Q But in your position you did attend, did you not, staff meetings in which the linkages were discussed, correct?
A Probably did. I just don't recall the specifics. But I'm sure there was general discussion about many things that happened in the amendments act.
Q Well, based on your general recollection of the discussions in which you personally participated, Mr. Barrett, how did the linkages imposed by the '87 act affect the administration of the program?
MR. CRAWFORD: Objection, foundation. Objection, speculation.
A Given that the MRS was basically linked and disapproved as we had proposed it and we had only one site, there was a lot of discussion about how we could best design the program to be successful, and which success included doing all we could do to meet the '98 date.
Q And, again, when you say meet the '98 date,

66

you're referring to what?
A To be able to move fuel into the federal system with a target of January '98.
Q And in your view did the '87 act have the effect of reducing the take rate?
MR. CRAWFORD: Objection, foundation.
A Yes, it did. Because the only way at the time for '98 would have been -- to receive the material in '98 was with an MRS, and the MRS could only be achieved in 1998 through a volunteer site, through congressional approval of a volunteer site. And that there were linkages in the statute, and that's when the discussion started about the change to the 900, which was caused by the statutory linkages.
Q So is it your testimony that it was the statutory linkages imposed by the '87 legislation that reduced the annual acceptance rate from 3,000 MTUs to 900 MTUs?
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion. Objection, foundation.
A The linkages imposed by law complicated the receipt rates and work was done, and the specifics of

67

it I don't recall, regarding how we could best operate the program with those congressionally mandated linkages.
Q But I'm not sure if you answered my question. Did those linkages have the effect of reducing the take rate, which I understand you to have testified was 3,000 prior to the '87 amendments, to the 900 level that subsequently followed?
MR. CRAWFORD: Objection to the foundation. Objection to the extent it mischaracterizes prior testimony. Objection to the extent it calls for a legal conclusion.
A We still -- my recollection is we still kept the 3,000 ton receipt design, but we had to reconcile the fact that we would hit the limits, and it was -- my recollection is I just don't remember what we did and how we did balance those.
Q What did you mean, Mr. Barrett, when you just referred to the 3,000 MTU receipt design?
A You would have to look at the document -- the systems documents circa '87, '88. I believe they still had 3,000 ton receipt for a volunteer MRS but

68

acknowledge the fact that that would have to be addressed as related to linkages.
Q So if I understand correctly based on your -- well, let me step back a second.
The word "design," what are you referring to when you say receipt design. What design are you referring to?
A The MRS, which would be the first ability to receive materials, was the receipt rate design was 3,000 tons per year is my recollection. I would have to check that. I haven't gone over any old documents. Was 3,000. So the designing of the transportation system, the design of the hot cells and receiving facilities was a nominal 3,000 ton capability per year.
Q When you use the word "nominal," what do you mean?
A That the normal operational rate of receipt was designed 3,000 tons per year of the MRS.
Q A few moments ago you answered a question and you stated we had to reconcile the fact that we would hit the limits. Do you recall that?

69

A **Uh-huh.**
Q What did you mean when you stated "we would hit the limits"?
A **The linkages in the amendments act were such that you could not operate at 3,000 tons per year very long before you hit the statutory limits, and we had to look at -- my recollection is that we had to look at how that all would work. For example, you would not want the system to operate at a high rate and then stop to reconcile that.**
Q Why is it that you could not operate at the 3,000 ton per year very long before you hit the statutory limits?
A **The statute had linkages that said you could not receive more than certain tonnages for certain events. I don't recall the details of what they were, but there was a 10,000 ton limit and there was something else that you couldn't do. And that was tied to the repository.**
Q How many years would it take after licensing of the repository for the repository to be built?

70

MR. CRAWFORD: Objection to foundation. Objection to the extent it calls for speculation.
A **Repeat the question again, please.**
Q Based on your projections, after licensing of a repository how many years do you project that it would take the repository to become operational?
MR. CRAWFORD: Same objection.
A **When you say after licensing, you mean upon receipt of a construction authorization?**
Q Yes.
A **Depends on the design of the facility.**
Q With respect to the facility that you had under design in the 1987 time frame, how many years after receiving construction authorization would the repository become operational?
MR. CRAWFORD: Objection, vague. Objection, foundation.
A **I don't recall the repository construction schedule circa '88/'89. I just don't recall it.**
Q Would five years be a good approximation?
MR. CRAWFORD: Objection to the vagueness of it and objection to the foundation. Objection to

71

the extent it calls for speculation.
A **Five years probably was what was in the records then.**
Q And with respect to the repository under design today, how many years do you project that it will take for that repository to become operational after receipt of the necessary construction authorization?
MR. CRAWFORD: Objection to the foundation.
A **It depends upon what the design configuration is of the repository, and also the degree of preparatory work that we're allowed to do prior to the construction authorization.**
Q Do you have current projections with respect to the repository under consideration by the department today?
MR. CRAWFORD: Objection, vague.
A **Today's proposal and plan is if we see budgets and if things go according to -- as we would wish them to, if we change to a modular construction approach, it is possible to be receiving material in basically a two to three-year period.**

72

Q After receiving construction authorization?
A **Correct.**
Q And your best recollection of that period from the 1987 time frame would have been five years back then, correct?
MR. CRAWFORD: Objection to the extent it mischaracterizes prior testimony.
A **As it related to the plans of a repository at that time, five years was probably right.**
Q Had the MRS that you proposed to Congress in 1987 been approved, how long would the construction of that facility have taken from start to receipt of spent nuclear fuel?
MR. CRAWFORD: Objection, vague.
A **I don't recall that.**
Q I'm trying to refresh your recollection. Would two years be a good estimate of that time frame?
MR. CRAWFORD: Objection, vague.
A **I'd have to go -- MRS schedules are 15 years old in my brain. I don't remember what the MRS schedules were at all.**
Q The MRS would have taken less time than the

MR. CRAWFORD: Objection to the foundation. Objection, assumes facts not in evidence.

**A Please restate that question.**

Q As a matter of design and systems engineering, would it have been possible for a repository to accept spent nuclear fuel at a beginning rate in excess of 400 MTUs?

**A Yes.**

Q And as a matter of design and system engineering would it have been possible for a repository to begin the acceptance of spent nuclear fuel at an annual MTU rate of 1,800?

MR. CRAWFORD: Objection, vague.

**A When you use the word "possible" versus practicable there's a difference. You ask possible, the answer is yes. With time and money you can do almost anything.**

Q Do you believe it would not have been practicable?

**A It would have been hard to go from zero to 1800 in my opinion. Possible, yes.**

Q Well, the ramp-up rate you referred to was



five years, correct?

MR. CRAWFORD: Objection, vague.

**A Yes, but not starting at 1800 the first year.**

Q Would it have been practicable for the ramp-up rate to occur in a period of less than five years?

MR. CRAWFORD: Objection, vague. Objection, foundation.

**A You could.**

Q For example, would it be practicable for the ramp-up rate to take place within a period of three years?

MR. CRAWFORD: Objection, vague. Objection to the foundation. Objection to the extent it calls for speculation.

**A These are all degrees of more difficult and less difficult practicalities.**

Q You used the word "practicable" and that's simply what I'm asking you. Would it have been practicable for the ramp-up rate to have occurred within a three-year period, the ramp-up to have



occurred within a three-year period?

MR. CRAWFORD: Objection. Same objections.

**A It's possible. These are different degrees of practicality on how quickly you ramp up under what circumstances. I don't remember -- I don't recall what the rates were circa '87. Given the national mood and concerns about things nuclear, it's not very practicable today I believe to ramp up in less than three years to 3,000. Not to say it could not be done.**

Q Putting aside issues of national mood and concerns, as a matter of systems engineering and design would it have been practicable to have the ramp-up occur within a three-year period?

MR. CRAWFORD: Objection, vague. Objection to the foundation. Objection to the extent it calls for speculation.

**A I don't know. I would have to look at all the economics, the cash flow, the preparations for institutional aspects of transportation. You know, I don't know if it would be practicable or not.**

Q So sitting here today you can only state,



am I correct, that it might have been practicable for the ramp-up to have occurred within three years, correct?

MR. CRAWFORD: Objection to the extent it mischaracterizes his prior testimony. Objection, asked and answered. Objection, vague. Objection, foundation. Objection, to the extent it assumes facts not in evidence.

**A It's possible.**

Q Are you aware, Mr. Barrett, whether the fees that the utilities were required to pay under the standard contract were developed or determined based on a particular acceptance rate and ramp-up schedule?

MR. CRAWFORD: Objection, lack of foundation. Objection to the extent it calls for speculation.

**A It's my understanding the monies paid by the utilities were a function of the kilowatt hours of nuclear energy delivered, not on the system design that we're doing.**

Q You don't believe the fees had any relation to the system design?

A Not to my recollection.
Q For how long did you hold your position in quality assurance?
A I don't know, a year or so.
Q What position did you next take on?
A I don't remember my official titles. I became responsible for programmatic aspects of the repository. I became responsible for programmatic aspects of the MRS facility. And I was responsible for business development contracts for awhile.
Q And when did you take on those responsibilities?
MR. CRAWFORD: Objection. Asked and answered.
A I don't know, '88, '89, until I was sent by Admiral Watkins to defense programs in the spring of '90.
Q And what were your duties when you were responsible for the programmatic aspects of the repository?
A Project manager of Yucca Mountain project at the time reported to me.



Q Were you required to appear before Congress during this period?
A Not that I recall. I might have but I don't remember it.
Q Were you involved in the development of acceptance rates during this period?
A Not to the degree that I remember. I might have been.
Q Wouldn't you have been if you were responsible for the programmatic aspects of the repository?
MR. CRAWFORD: Objection, argumentative.
A I don't -- you know, I was responsible for the programmatic aspects. If we ever did anything regarding acceptance rates at that time, I don't recall doing anything.
Q Do you recall if you were involved in the establishment or analysis of acceptance rates prior to your next position in 1990?
A I don't recall anything. I might have.
Q We'll go through some documents later to refresh your recollection, but I just -- a lot of



documents actually.
A Whatever.
Q I just want to know what you recall.
MR. CRAWFORD: Objection. Form.
A 14 years ago. I don't remember specific documents at this time.
Q What was the position you took in 1990?
MR. CRAWFORD: Objection, form. Objection, vague.
A I was detailed initially and then transferred to the Office of Defense Programs. I was the -- what was my title? I don't know. I was director of the Rocky Flats program office.
Q And what responsibilities did that position involve?
A It was the restart of the Rocky Flats nuclear weapons production plant after the FBI raid.
Q Did you have continuing responsibilities for or involvement with the spent nuclear fuel program during this period?
A None whatsoever.
Q For how long did you hold this position?



A Until January of '93.
Q And in January 1993 what position did you take?
A Admiral Watkins made me acting director of RW.
Q And RW stands for?
A Offices of Civilian Radioactive Waste Management.
Q And what were your duties in that position?
MR. CRAWFORD: Objection, vague. Objection, lack of foundation.
A The duties of the director of the Office of Radioactive Waste Management.
Q You ran the program at that point, correct?
A That's correct.
Q And have you basically held that position either as acting director, director, or deputy director through today?
MR. CRAWFORD: Objection, vague.
A I was never the director. I was either the acting director or the deputy director.
Q And today you are the deputy director,

113

A Probably.
Q And in 1987 did you personally read the amendments to the Nuclear Waste Policy Act?
A I'm sure -- well, did I sit down and actually read it? I mean, I dealt with it a lot, but yes, I'm sure I read most of it at one time or another.
Q In 1985 when you took on your position at DOE did you read the standard contract?
A No, actually I didn't.
Q Have you ever read the standard contract subsequently?
A Cover to cover, no.
Q Have you read portions of it?
A Yes.
Q What portions have you read?
MR. CRAWFORD: Objection, vague.
A I don't know. I would have to go -- you know -- the '98 date, the section. I mean I -- I don't know. I would have to look.
Q Do you think you read at least three-quarters of the contract?

114

MR. CRAWFORD: Objection. Asked and answered. Objection, vague.
A I doubt I've read --
MR. CRAWFORD: Objection, foundation.
A I doubt I've read three quarters of that contract.
Q Do you think you read at least half of that contract?
MR. CRAWFORD: Objection, asked and answered. Objection, vague. Objection, burdensome.
A I don't know.
Q Is it possible you did?
MR. CRAWFORD: Objection, asked and answered. Objection, vague, burdensome.
A I just don't know how much of it I read.
Q So it is possible that you have not read half of the provisions of the standard contract, correct, sir?
MR. CRAWFORD: Objection, argumentative. Objection, asked and answered. Objection, vague, burdensome.
A Possible.

115

Q Is it possible that you've read less than a quarter of the provisions, sir?
MR. CRAWFORD: Objection, argumentative, burdensome. Objection, asked and answered.
A I don't know.
Q So it is possible that you, in your years at the Department of Energy or before, have read personally less than 25 percent of the provisions of the standard contract, correct?
MR. CRAWFORD: Objection, argumentative. Objection, foundation. Objection, asked and answered.
A I probably read more than a quarter of it.
Q Are you certain?
MR. CRAWFORD: Objection, argumentative.
Q Are you certain?
MR. CRAWFORD: Objection, argumentative.
A No, I'm not certain.
Q I would like to return to paragraph three on the top of page seven. Have you had a chance to read that?
A Yes.
Q Can you explain that objective to me?

116

A That was an objective, okay, to receive waste in 1998 and along with the acceptance schedule it's -- in accordance with the acceptance schedule provided in the standard contract, okay. So that was the goal.
Q And you're comfortable with that goal?
MR. CRAWFORD: Objection.
A It wasn't mine. It wasn't my goal.
Q But you understand that was a goal of the program?
A Yeah.
Q In 1985, correct?
A That's correct.
Q And what acceptance schedule did the standard disposal contract provide for?
MR. CRAWFORD: Objection, foundation. Objection to the extent it calls for speculation.
A I think the contract references other documents that references things, and I don't specifically know.
Q So is it your testimony that it provided for a schedule but you don't sitting here today know

117

what that schedule is?
MR. CRAWFORD: Objection. Argumentative.
A **The receipt rate of January -- excuse me, the receipt date of January 31, 1998, clearly was always a goal. Okay. Regarding the acceptance rate of so many tons year one, year two, year three, okay, you know, that has changed over time. My focus has always been to create a siting process that got us a site to allow us to have the -- a reasonable receipt rate going toward the steady state 3,000 tons per year, and that's where my focus has always been, not on contract details. Okay. I am not a lawyer, I'm an engineer, okay, so I have not gone into the contract in any great detail at all.**
**Okay, now regarding your question here about the acceptance schedule in the contract, actually I don't recall seeing a metric ton per year in the contract.**
Q Let me step back a second, Mr. Barrett. You just referred to a reasonable receipt rate going toward the steady state 3,000 tons per year.
A **Right.**

118

Q "That's where my focus has always been." Do you recall that testimony?
A **That's what I just said I think.**
Q Does that continue to be your focus to this very day, sir?
A **Yes.**
Q And does that continue to be the focus of the Department of Energy's spent nuclear fuel program?
MR. CRAWFORD: Objection to the form. Objection to the foundation. Objection, vague.
A **We are still trying to perform under the Nuclear Waste Policy Act to receive the waste into the federal system as soon as we can under the constraints of the law. So, yes, that remains my goal and the organization's goal.**
Q Again, just so the record is clear, your goal and the organization's goal is to achieve a reasonable receipt rate going towards the steady state of 3,000 tons per year, correct?
MR. CRAWFORD: Objection to the extent it mischaracterizes prior testimony. Objection, foundation. Objection, vague.

119

A **That has been our goal to do that.**
Q And it continues to be your goal today, correct?
A **Correct.**
Q And it was your goal in 1985, correct?
A **Correct.**
Q And it was the goal of the department in 1982 when the standard contracts were signed, correct?
MR. CRAWFORD: Objection, vague. Objection, calls for speculation. Objection to the extent it mischaracterizes his prior testimony.
A **I wasn't there in '82 so I don't know about '82, but in '85 and today it has always been our intent to try to do what we can from a technical point of view to receive the materials at a reasonable rate.**
Q And the reasonable rate is the rate that would ramp up -- is a rate that would ramp up towards 3,000 MTUs per year, correct?
MR. CRAWFORD: Objection, vague. And foundation.
Q I believe your counsel cut you off. What was your answer, sir?

120

A **That has been our intent.**
Q Let's go back to paragraph three, page seven. You referred to January 31st, 1998, as being a goal. Was it something more, wasn't it a contractual commitment and a statutory command?
MR. CRAWFORD: Objection, argumentative. Objection, best evidence. Objection to the extent it calls for a legal conclusion.
A **As an engineer, okay, and as a program administrator, okay, and dependent on what the contract said or what courts said, we were always trying to achieve that goal.**
Q And why did you establish that goal for yourself?
A **Because --**
Q And your department?
A **It was set in the law, okay, that our goal was to try to create a facility and to create a system that would meet that goal of January 31st, 1998, to start to receive fuel. And it has always been an important objective and goal.**
Q To start to receive fuel on January 31st,

1998, at a ramp-up level that would -- in a reasonable amount of time and at a 3,000 per year MTU acceptance rate, correct?

MR. CRAWFORD: Objection to the form. Objection to the mischaracterization of prior testimony. Objection to the extent it assumes facts not in evidence.

**A It was a systems goal to receive the material at a reasonable rate, okay, of which the 3,000, ramp up to 3,000 tons was a reasonable rate. It was never a -- in my opinion it was never a legal requirement to do 3,000 tons per year.**

Q You base the goal on the statute, correct? That's what you've testified to, correct?

**A Yes.**

Q Back to paragraph three --

**A Excuse me. Let me go back to that. When you say the statute does not say 3,000, okay, that was a judgment part. It is the receipt in January 31, 1998, is in the statute. The rate to my knowledge is not in the statute.**

Q So why did you set the 3,000 MTU goal?



**A That was a --**

MR. CRAWFORD: Objection to the fact that that question assumes facts not in evidence.

**A That was in our judgment a reasonable rate, steady state rate to move up to under the circumstances we were in.**

Q Paragraph three. I'm not certain I understand your testimony. I'm still unclear what you're referring to with respect to the acceptance schedule. You see that language, acceptance schedule in paragraph three?

**A You asked me to interpret this paragraph three which I never wrote.**

MR. CRAWFORD: He's asking you whether you see that.

**A Do I see it? I see that line.**

Q And what do you understand that to be referring to? What acceptance schedule did the standard disposal contract provide for?

MR. CRAWFORD: Objection to the foundation of the question and objection, best evidence.

**A I don't know because I do not recall an**



**acceptance schedule in the contract itself. So I would have -- I don't know what this means.**

MR. CAYNE: It's 12:30. Let's break for a one-hour lunch.

(A luncheon recess is taken.)



AFTERNOON SESSION

BY MR. CAYNE:

Q Good afternoon, Mr. Barrett. Who are the individuals that report directly to you in your position as deputy director?

**A Now?**

Q Yes.

**A Dr. Russell Dyer, project manager Yucca Mountain project; Sandra Waisley who is the acting director of the U.S.A. subprogram administration; and Mr. Jeffrey Williams who is the acting director of office of waste acceptance and transportation international or technology -- technology and QA director. Mr. Ron Murthey, and Mr. Ronald Milner who is the chief operating officer.**

Q Do you work with Mr. David Zabransky?

**A Yes.**

Q And what position does he hold?

**A I think he is now the acting director of transportation and waste acceptance.**

Q And in that capacity to whom does he report?

MR. CRAWFORD: Objection. Lack of foundation.
Q You see B, the waste receipt rate?
A Uh-huh.
Q Are you familiar with the basis for the 3,000 MTU per year receipt rate in 1985?
MR. CRAWFORD: Objection, asked and answered. Objection, foundation.
**A I'm familiar with it. It was established before my arrival or personal participation in establishing that number. It seemed like a reasonable number to me then as it does today.**
Q Has there ever been a time since you've been at the Department of Energy that a 3,000 MTU per year rate did not seem reasonable?
MR. CRAWFORD: Objection, vague. Objection, asked and answered. Objection, lack of foundation.
**A As this is used in this case, as an assumption for an operating facility rate and capacity, it was a reasonable number.**
Q In C, do I understand this correctly that



after two years the MRS would have been operating at full -- at the full acceptance rate?
MR. CRAWFORD: Objection, vague.
**A That's what it says. I never thought it was that fast, but that's what it says.**
Q Do you have any basis to disagree with the statement in C?
**A I think going from zero to 3,000 in a two-year period is extremely challenging and questionable to go that fast.**
Q Do you believe that the individuals in the Office of Civilian Radioactive Waste Management program were careless in establishing this two-year ramp-up period?
MR. CRAWFORD: Objection, foundation. Objection, speculation.
**A I don't believe they were careless at all. I believe that's overaggressive in my judgment based on what history has shown us how difficult nuclear facility creation implementation is.**
Q Would you believe it to be overly aggressive in 1985?



MR. CRAWFORD: Objection, foundation.
**A I don't think I ever really tuned in on it.**
Q Did you ever have discussions with anyone in your office concerning the reasonableness of the two-year ramp-up period?
**A Not that I recall.**
Q Who would have made the final decision in your office to authorize the two-year ramp-up period?
MR. CRAWFORD: Objection, vague. Objection, foundation.
**A That would have been Roger Hilley who is responsible for that office.**
Q Do you believe he was a competent individual?
**A Yes, I do.**
Q Do you believe he had good professional judgment?
MR. CRAWFORD: Objection, foundation.
**A As a senior manager, yes.**
Q Did you find him to be overly aggressive in his administration of the program?
MR. CRAWFORD: Objection, foundation.



Objection, vague.
**A No.**
Q Can you turn your attention to page 26. You see page 26 consists of a chart. Would you take a moment to refresh your recollection concerning its contents.
**A Okay.**
Q Are you familiar with this chart?
**A Vaguely.**
Q Have you seen the column labeled Spent Fuel, the fourth column to the right?
**A There's four, four, four, four, nine, 18?**
Q Right.
**A Yeah.**
Q Are you familiar with the basis for the projection that the ramp-up would go from 400 to 900 at the third year?
**A I'm sorry, repeat the question.**
Q Are you familiar with the basis, technical or otherwise, for the determination that the acceptance rate would ramp up from 400 to 900 between the third and the fourth year of the acceptance of the

answered.
A **I have no idea how many meetings.**
Q A handful?
MR. CRAWFORD: Objection. Asked and answered. Objection, foundation.
A **Don't know.**
Q Could it have been as many as five?
MR. CRAWFORD: Objection, asked and answered. Argumentative. Foundation.
A **Don't know.**
Q You don't know whether it was as many as five?
A **Could have been.**
MR. CRAWFORD: Objection, argumentative.
Q Over what period of time did these meetings occur?
MR. CRAWFORD: Objection, argumentative. Objection, foundation and asked and answered.
A **In the post-'94 budget decision when the MRS volunteer was unlikely to go forward.**
Q Do you know whether there were any contacts made by any member of your office to Secretary Hodel



in 1994 concerning the contents of Secretary Hodel's letter of September 7th, 1984?
A **I don't know of any.**
Q Do you recall whether during any of the meetings you attended in which Exhibit 3 was discussed whether any member of your office, the Office of Civilian Radioactive Waste Management Program, whether any member of your office expressed the view that there were misstatements of fact or law in Secretary Hodel's letter?
MR. CRAWFORD: Objection. Asked and answered. Objection, foundation.
A **Repeat how you phrased that.**
Q Do you recall whether during any of the meetings you attended in 1994 in which Exhibit 3 was discussed, whether any member of your office took the position that there were -- that the letter of Secretary Hodel dated September 7th, 1984, contained any misstatements of fact or law?
MR. CRAWFORD: Same objection.
A **Don't know.**
Q No recollection?



A **Don't recall.**
Q Page 97, Exhibit 2, the same paragraph we've been referencing. Can you tell me what the reference is in the fourth line to a firm schedule?
A **Fourth line of which paragraph? Oh, I see. Okay.**
MR. CRAWFORD: Objection, foundation. Objection to the extent it calls for speculation.
A **I don't know what more to say than what it says here. I don't know what they were talking about.**
Q What is your understanding of the term "firm schedule" as it is used in this document?
A **Firm or just the word "schedule" beginning in '98, which is repeating back what the statute says. So adding the word "firm" in front of "schedule" is meaningless to me, but maybe it meant something to the writer.**
Q Do you recall whether that term was discussed by any members of your staff in the 1994 time period?
A **I have no recollection of the word "firm" being used in front of any schedule in this program**



**ever.**
Q Would you turn to page 99 of Exhibit 2. Take a look at the third full paragraph on page 99 that starts, "the owners and generators." Do you see that?
A **Uh-huh.**
Q Take a moment to read that.
A **Okay.**
Q Are you familiar with the position stated there?
A **Yes.**
Q What is your familiarity with that position?
A **That the act requires the utilities to store the waste until January 31, 1998.**
Q And after January 31, 1998, whose obligation is waste storage?
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion. Objection to the foundation.
A **My interpretation is it's silent about that.**

Q Is this consistent with your understanding?
MR. CRAWFORD: Objection, asked and answered.
**A I go back to the act. The act says that the utilities are responsible for storage until the department takes the waste, and it gave a date of January 31, 1998, to start. It was always the tenant that, even when we started, if we started as advertised -- I mean, there would be some storage going on afterwards anyway. So the utility is responsible for safe storage of the waste.**
Q You refer to some storage. What storage were you referring to?
**A Some utilities are still going to have to do storage of the waste while we were operating. It may not have had allocations. There are many different things.**
**(Deposition Exhibit Barrett 4 was marked for identification and was retained by counsel.)**
Q Mr. Barrett, the court reporter has handed you a document marked for identification as Exhibit 4. Do you have that in front of you?



**A Yes, I do.**
Q And this document is a draft of the Civilian Radioactive Waste Management Program Mission Plan as of December 20th, 1983. Do you see that?
**A Yes.**
Q I would like to refer your attention to the third paragraph under Introduction.
MR. CRAWFORD: What page are we on?
MR. CAYNE: Page 1-1.
**A Okay.**
Q Please let me know after you've read that.
**A Okay. I read it.**
Q Do you agree with the statement made in Exhibit 4 that the waste acceptance schedule will initially preclude the need for additional at-reactor storage after January 31st, 1998, and ultimately remove from at-reactor storage all waste that is more than five years old?
MR. CRAWFORD: Objection, vague. Objection, foundation.
**A I don't know. I would have look in here and see what it did.**



Q Well, would the mission plan as it stood in 1985, based on your knowledge of it, preclude the need -- had it been implemented as it stood in 1985, would that have precluded the need for additional at-reactor storage after January 31st, 1998?
MR. CRAWFORD: Objection, vague. Objection, foundation.
**A Not necessarily.**
Q Might it have?
**A Might have; might not have, too.**
Q How would you make that determination?
MR. CRAWFORD: Objection, vague. Objection, foundation. Objection to the extent it calls for speculation.
**A You would have to look to see what utilities could go when under the oldest-fuel-first allocation and all that. So it becomes very complicated to figure out if someone would have to do additional storage or not.**
Q Did anyone in your office ever make, attempt to make that determination on a utility-by-utility basis?



MR. CRAWFORD: Objection, foundation. Objection, vague.
**A Not to my knowledge.**
Q You made a reference to oldest-fuel-first allocation. To what were you referring?
**A It's my understanding that under the framework of the act that the allocations for service are provided to the contract holders on an oldest-fuel-first basis.**
Q Were there also certain exceptions to that under the act or contract?
MR. CRAWFORD: Objection, compound.
**A What do you mean by exemptions?**
Q Exceptions --
**A What do you mean by that?**
Q For example, for shut-down reactors.
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion. Objection, compound.
**A The framework -- now, I don't know if it's in the statute or if it's in the contract -- is we have the ability to approve, I'll use the words hardship cases to allow people to have an earlier or**

less than 2.5 years for its licensing review." Do you see that statement?
A Yes, I do.
Q. Are you familiar with the basis for that conclusion, that it would require less than 2.5 years to complete that process?
A In this document, no.
Q Are you familiar outside of this document with the amount of time it would have taken the NRC to complete this process?
MR. CRAWFORD: Objection, vague.
A I'm familiar with the NRC processes to approve and, you know -- facility under 10 CFR Part 72 which is what this is.
Q And do you believe that a projection of that process would take less than 2.5 years to be an appropriate projection?
A It's around two and a half years, 30 some months I've testified to, which is about two and a half years. Two and a half to three years.
Q You've testified to today? Is that what you're referring to?



A In the last five years.
Q Before Congress? Have you testified anywhere in the last five years other than before Congress?
A What do you mean by testify?
Q You just referred to testimony you gave in the last five years, correct?
A Oh, Congress. Yes, I've testified before Congress regarding storage approval times in the last five years.
Q And you testified that the period in which -- the period that it would take to license an MRS facility would approximate 2.5 years, correct?
A It could be done that fast.
Q You testified to Congress that that was an appropriate projection of the required time, correct?
A I believe so. I would have to go back and look.
(Deposition Exhibit Barrett 5 was marked for identification and was retained by counsel.)
Q The court reporter, Mr. Barrett, has handed you a document marked for identification as Exhibit 5.



The first page states Annual Capacity Report Briefing for OCRWM Executive Committee, November, there's no date, 1986. Do you have that before you?
A Yes, I do.
Q Were you a member in November 1986 of the OCRWM executive committee?
A I don't think so.
Q In November 1986 you were a division director, correct?
A Correct.
Q And you don't believe that in that capacity you would have been a member of the executive committee?
A No, I was not then.
Q Have you taken a moment to leaf through this document?
A Okay.
Q I would like to turn your attention, on the left-hand side it says HQ 0002904.
A 290 --
MR. CRAWFORD: Wait a minute. Oh, I got you.



A Positions by decision group, current status?
Q Yes. You see under Decisions Group it has aggregate acceptance, the first entry, system study or technical basis under review confirms 3,000 MTU per year?
A I see it.
Q That's consistent with your testimony today, correct, that --
MR. CRAWFORD: Objection.
MR. CAYNE: Could I finish, counsel.
MR. CRAWFORD: Sorry.
Q That's consistent with your testimony today that in 1986 your office was projecting a 3,000 MTU per year acceptance rate, correct?
MR. CRAWFORD: Objection, vague.
A Seems consistent.
Q Do you know what the, or are you familiar with the system study that is being referred to in this entry?
A Not the specific one.
Q Do you have a general understanding of the

system study being referred to here?
MR. CRAWFORD: Objection. Asked and answered.
**A There were various studies done in the eighties and also in the very early nineties on system performance rate, you know, what the costs were, schedules were, plausibility of them.**
Q And these system studies looked at system issues, correct?
**A Yes.**
Q And am I correct that each one of these studies to which you've just referred confirmed an acceptance rate, an aggregate acceptance rate of 3,000 MTU per year?
MR. CRAWFORD: Well, objection, vague.
**A I think it's overstated to say it confirmed it. It showed that, you know, at 2,000 it does this, at 3,000 it does that, 4,000 it does something different. I don't know if they actually reached an absolute confirmation that 3,000 was the exact number, but generally they supported the system rate of 3,000 was a reasonable rate.**



Q So it's your understanding or your knowledge that each of the various system studies to which you just referred that were undertaken in the -- from the mid-1980s to I think you said the mid-1990s, supported an acceptance rate of 3,000 MTU per year, correct?
MR. CRAWFORD: Objection, vague. Objection, assumes facts not in evidence. Objection, mischaracterizes prior testimony.
**A Yes.**
Q I'll ask you to turn to page HQ 0002909 of this same exhibit.
**A Okay.**
Q Do you see under the second entry, allocation of acceptance under consequences of decisions, it says "allocation required to plan maximum storage at some sites." Do you see that statement?
**A I see it.**
Q Do you understand that statement?
**A No.**
Q Do you understand that statement to refer



to the need of the utilities to have significant advanced knowledge of the allocation rankings in order to store the fuel in the most efficient manner?
MR. CRAWFORD: Objection, speculation. Objection to the extent it assumes facts not in evidence. Objection to the foundation.
**A Could be. I don't know.**
Q Do you have any knowledge of the considerations that utilities undertake in attempting to maximize their storage capacity, their existing storage capacity?
**A Yes.**
Q And what considerations are necessary to be undertaken by a utility to do that?
**A Safety considerations, economic considerations, future site use and decommissioning schedules, all sorts of issues a utility needs to consider to make decisions about how best to store the fuel.**
Q And is one of the issues they need knowledge about the priority queue?
**A The likely --**



MR. CRAWFORD: Objection, foundation.
**A The likely removal time for the Department of Energy is an important part of that consideration.**
Q So the failure to provide the utility with that information could cost the utility to store fuel in a less than optimal manner, correct?
MR. CRAWFORD: Objection, speculation. Objection, foundation. Objection to the extent it assumes facts not in evidence.
**A The removal date would be the important thing to the utility planner regarding where you are in your allocation as a subset. The most important part is the when will the federal facility be capable to receive material. So the allocation to me is a secondary issue compared to the rate of development of receiving facility, which is the primary consideration.**
Q You said the most important part. The most important part to what?
**A For a utility deciding what they should do with their storage. The most important -- one of the more important aspects of a utility decision will be**

**when will the federal government start taking waste and at what rate from their facility. The most important part of what the federal removal rate would be is not your allocation so much as is when does the federal system start.**

Q So a utility would need to know when the federal system would start in order to most efficiently utilize its available storage space for spent nuclear fuel, correct?

A **It's an important consideration.**

MR. CRAWFORD: Howard, since we're moving to another document, can we take a break?

MR. CAYNE: Oh, sure.

(There is a recess from the record.)

(Deposition Exhibit Barrett 6 was marked for identification and was retained by counsel.)

Q Mr. Barrett, the court reporter has handed you a document marked as Exhibit 6, which is the June 1987, annual capacity report. Do you have that before you?

A **Yes, I do.**

Q Did you play any role in the preparation or



issuance of this report?

A **None.**

Q Did you ever see this report prior to its issuance?

A **No.**

Q Have you ever had occasion to look at this report before today?

A **Yeah, I've seen it.**

Q In what circumstances have you had occasion to look at this report?

A **There was a big stack of stuff somebody gave me one time.**

Q When would this have been?

A **Somewhere in the early nineties. There's a newer one than this one. No. This was in a stack of stuff. I never read it.**

Q Do you recall for what purpose you were given this document in the early nineties?

A **No.**

Q But you examined a portion of its contents at that time?

MR. CRAWFORD: Objection, asked and



answered.

A **I'm not sure I ever even opened it. Because there was a newer one.**

Q I'd like to step back. Do you recall with respect to the last document I asked you if you were a member of the executive committee of the OCRWM.

A **Yes.**

Q And you answered in the negative?

A **Because I was -- I was not and then I was.**

Q Who would have been members of that committee in November 1986 to your knowledge?

MR. CRAWFORD: Objection, foundation.

A **Roger Hilley, the depository people. I think Keith Klein was still here then, Ed Kay, Sam Rousso ran admin, and I don't know who else. Wasn't many.**

Q Excuse me?

A **It wasn't very many people.**

Q Who's on it today?

A **It doesn't exist today.**

Q When did it go out of existence?

A **'89, somewhere in there.**



Q You were a member of the committee prior to the time it went out of existence?

A **At the very end I was a member of it.**

Q When did you join, '89?

A **'88, '89, somewhere in there when I was QA director or one or the other jobs. I don't remember. But I was officially a member of it, and I think it had one meeting and then it kind of went away.**

Q Who were the other members of the committee at the time you joined?

A **I don't remember.**

Q You don't recall any of the other members at the time you joined?

A **I guess it would have been Ed Kay who was the acting director. Sam Rousso probably would have been there. After that I just don't remember.**

Q Would you turn to page Roman little v, captioned Summary of Exhibit 6. Are you there?

A **Roman numeral v.**

Q On the bottom. You see that?

A **It says Section 1.**

Q It's the fourth page of the document?

241

Energy recommended it, but go ahead.
Q And it was this linkage that caused the ultimate failure of the MRS proposal, correct?
MR. CRAWFORD: Objection to the extent it calls for speculation. Objection to the foundation.
A No.
Q It hindered the continuation of the MRS proposal, correct?
MR. CRAWFORD: Objection. Same objections.
A No. I don't think so. Let me rephrase it. I don't think so.
Q I thought you testified this morning that the congressional enactment in 1987 was a large reason why the MRS proposal never was implemented. Is that not correct?
A That is correct.
Q And you indicated that this is similar to one of the linkages Congress enacted, this being the linkage referred to on page 58 of Exhibit 8?
A No.
Q I'm sorry. No, you did not say --
A I'm answering your question no.

242

Q Okay. I misheard you then. I thought you testified that this linkage was similar to what Congress enacted?
A Yes.
Q You did testify to that?
A Yes.
Q And did this linkage have an effect on the ability to proceed with the MRS proposal?
A In a minor way.
Q And what was that?
A It limited the usefulness, but it was almost immaterial in the change in '94.
Q Was there another linkage that had a more adverse effect on the program?
A Not a linkage.
Q What resulted in the failure to proceed with the MRS program?
A Failure to --
MR. CRAWFORD: Objection, asked and answered.
A Failure to give the grants to the Indian tribes who wanted to pursue a proposal.

243

Q Had Congress enacted the grants that you just referred to in 1984, when would an MRS facility have been able to commence operations?
MR. CRAWFORD: Objection to the extent it calls for speculation.
A There were no grants in '84.
Q In '94?
A Now rephrase your question.
Q With respect to the grants that you referenced a few moments ago that Congress failed to enact in 1994, I'm asking you to assume that those grants had in fact been authorized. Had those grants been authorized in 1994, when could an MRS have commenced operations?
MR. CRAWFORD: Objection to the extent it calls for speculation.
A It was still possible to do it in '98, and that was my testimony in the spring of '93.
Q Your testimony to Congress?
A Yes.
Q And did that testimony give consideration to the linkages in the 1987 legislation?

244

A I believe it did.
Q And taking into account the linkages imposed by the '87 legislation, it's your testimony that if Congress had enacted -- authorized the grants in 1994 the MRS would have, could have commenced operations by January 31st, 1998, correct?
MR. CRAWFORD: Objection to the foundation.
A I go back here on these things. I think what had to happen was I think they had to change the linkages in the proposal, which is what the plan was with the Mescaleros and the Goshoots, was that they would propose the change to the linkages. So I think the linkages had to be modified for performance in '98. The plan was to do that in the proposal to Congress because it would take Congress to act on it. So the linkages may have had to change. I would have to go back and look at what the linkages were which I don't recall now.
Q So your best recollection is that the 1994 proposal to which you referred would have required two things, that certain grants be authorized and that the linkages enacted in 1987 be amended or repealed?

245

A Yes. And that was the -- that was the plan. In calendar '93, in the FY '94 budget proposal, that the Indian nations would present a proposal that would change the linkages and be able to operate in 1998. And the denial of Congress to develop those proposals led to -- and there was no chance of modifying the linkages nor getting the site in any practical sense was -- led to the inability or the unlikelihood of meeting the '98 date.
Q But it was your view, am I correct, in 1993 that had Congress acted differently, had Congress authorized the grants, had Congress repealed the linkages, then the MRS facility could have commenced operations on or before January 31st, 1998, correct?
A Correct. That's my recollection.
MR. CRAWFORD: Let's take a break.
MR. CAYNE: Sure.
(There is a recess from the record.)
(Deposition Exhibit Barrett 9 was marked for identification and was retained by counsel.)
Q Mr. Barrett, going back to our previous line of discussion, do you recall that you testified

246

that the linkages to which we were referring would have had very little effect on the ultimate failure of the MRS proposal? Do you recall that?
A Yes.
MR. CRAWFORD: Objection.
Q To the extent you've refreshed your recollection on that proposal and the implications of the linkages, would you want to amend in any way that answer?
A Refresh me on the two linkages.
Q Well, the linkage that I was referring to was the linkage that was proposed in the DOE report.
A I never knew DOE ever proposed a linkage, but the linkage -- the linkages in my mind are the ones in Congress. There's two of them.
Q I will hand them to you, sir.
A And then we'll come back and clear this -- well, we'll come back to this since your question is on those linkages, though.
(Deposition Exhibits Barrett 10 and Barrett 11 were marked for identification and were retained by counsel.)

247

Q Mr. Barrett, you've been handed two additional exhibits marked for identification as Exhibit 10, which is a copy of Section 10165 of Title 42 and Exhibit 11, which is a copy of Section 10168 also Title 42. Do you have those two before you?
A Yes.
Q And I understand you're reviewing these copies of the statutes now to refresh your recollection on the linkages about which you've testified?
A Correct.
MR. CRAWFORD: It might help if you would direct him to some part of it.
A On ten?
Q Yes.
A The linkage is B, the secretary may not select the site under subsection A until the secretary recommends a repository.
Q Okay.
A That in a -- and the reason I said that the failure of the grants was the primary reason why we would not do it was the proposal to Congress would be

248

the Indian nation in that case proposing to be the site, volunteering to be the site which would negate the secretary selecting a site. So the lack of a volunteer, you know, agreed to by Congress was more important than this limitation B.
Q Could I also ask you to look at section little d of Exhibit 11.
A Yeah, I was doing ten and then we'll do -- so that's ten.
And the concept in the proposal would be to modify this linkage as well. If the --
Q This linkage being sub (d)?
A Sub (d), correct.
Q Of 11?
A D of 11, would be to modify these as well, at least -- (d)(1) would be that they would propose to change the one that they could start construction prior to construction authorization for the repository but (d)(2) would remain.
Q What about (d)(3)?
A (D)(3) would remain.
Q With the 10,000 limit?

249

A Right. And (d)(4) would remain. And they were not limiting as to starting in '98. But (d)(1) of Exhibit 11 would be modified by the proposal as would B of Exhibit 10. This was in a proposal to Congress by the Native American nations that would volunteer. But there was never any indication to my recollection that they would change the mass limits of Exhibit 11 (d)(2), (3) and (4). That was the premise that we were working on circa '93 for the proposal.
So I answered the primary reason for the ability to meet the '98 date in early '93 was a proposal to modify those two linkages. So in my mind in my original answer was the lack of -- the congressional refusal to go forward with those proposals was the primary reason that the MRS was not available in 1998. Not the linkages per se. Because if we had a volunteer, in my judgment, those linkages would have been modified by Congress if it was acceptable to the volunteer host.
Q But without modifying linkages that you've identified, the proposal could not have gone forward, correct?

250

A Without -- these linkages prevent us from going forward without a volunteer to change the linkage.
Q And linkage (d)(1) in Exhibit 11 is similar, is it not, to the linkage proposed by the Department of Energy in the last Exhibit 9 that we were referring to a few moments ago?
MR. CRAWFORD: Objection, vague. Objection, foundation, and objection to assumes facts not in evidence.
A The proposal from the Department of Energy that's in one of these things here which I guess would have been 9. You tell me where it was because that's where we started.
Q I'm sorry. Exhibit 8.
MR. CRAWFORD: The last paragraph or last section.
A 58?
Q Yes.
A I was unaware, and I don't know if this is really true or not, that he did this, although it says it here, that the Department of Energy proposed that.

251

The working hypothesis that I had in '93, because I was not intimately involved in the policy aspects in the eighties, was that this was imposed by Congress, which it was.
Q This being?
A The linkage that you could not -- that the MRS could not start receiving fuel. This was congressionally imposed. There's no number of volumes in here in the DOE -- I didn't know DOE had proposed anything to Congress regarding linkages. I was aware that they had dialogues about a concern that the MRS be -- appear to be a replacement for the repository and that there needed to be ties. I did not know the department went so far as to make a congressional recommendation.
Q You believe that they made that recommendation to make it even clearer that the MRS was not a replacement for the repository?
MR. CRAWFORD: Objection to the foundation. Objection to speculation.
A I don't know. I don't know what those who did this at that time did or didn't do. I was not in

252

a policy role in the 1980s.
Q So prior to today you were not aware, Mr. Barrett, that the Department of Energy had made any proposals to Congress with respect to the linkages we have been discussing, correct?
A That's correct.
Q And sitting here today you do not know why the Department of Energy made the proposal with respect to the linkage, the proposed linkage referenced on page 58 of Exhibit 8, correct?
A I do not know.
Q So my question is correct, yes?
MR. CRAWFORD: Objection. Asked and answered.
A State your question again.
Q I just want the record to be clear, sir.
A Well, state your question again. Let's see if I can try to give a yes or no.
Q And sitting here today you do not know why the Department of Energy made the proposal with reference to the linkage, the proposed linkage referenced on page 58 of Exhibit 8, correct?

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
-----------------x
YANKEE ATOMIC ELECTRIC COMPANY; : Case Nos. 98-126C,
CONNECTICUT YANKEE ATOMIC POWER : 98-154C, 98-474C,
COMPANY; MAINE YANKEE ATOMIC : 98-483C, 98-484C,
POWER COMPANY; FLORIDA POWER & : 98-485C, 98-486C,
LIGHT COMPANY; NORTHERN STATES : 98-488C, 98-614C,
POWER COMPANY; DUKE POWER, a : 98-621C, 99-447C,
Division of DUKE ENERGY CORP.; : 00-440C, 00-695C,
INDIANA MICHIGAN POWER COMPANY; : 00-703C, 01-115C,
SACRAMENTO MUNICIPAL UTILITY : 01-116C, 01-249C
-----------------X
(Caption continued on next page)

Continued Deposition of LAKE H. BARRETT
Washington, D. C.
Tuesday, April 23, 2002
9:36 a.m.

Job No.: 11792-5
Pages 273 through 526, Volume 2
Reported by: Diane Gomez, RPR



DISTRICT; SOUTHERN NUCLEAR :
OPERATING COMPANY, et al.; :
COMMONWEALTH EDISON COMPANY; :
BOSTON EDISON COMPANY; GPU :
NUCLEAR, INCORPORATED; WISCONSIN :
ELECTRIC POWER COMPANY; POWER :
AUTHORITY OF THE STATE OF NEW :
YORK; OMAHA PUBLIC POWER DISTRICT;:
NEBRASKA PUBLIC POWER DISTRICT; :
and TENNESSEE VALLEY AUTHORITY, :
Plaintiffs :
v. :
THE UNITED STATES, :
Defendant :
-----------------X



Continued Deposition of LAKE H. BARRETT, held at the offices of:

ARNOLD & PORTER
555 12th Street, Northwest
Washington, D. C. 20004
(202) 942-5000

Pursuant to agreement, before Diane Gomez, Registered Professional Reporter and Notary Public in and for the District of Columbia.



APPEARANCES
ON BEHALF OF PLAINTIFFS FLORIDA POWER & LIGHT COMPANY, NORTHERN STATES POWER COMPANY, DUKE POWER, INDIANA MICHIGAN POWER COMPANY, BOSTON EDISON COMPANY, GPU NUCLEAR, INC., POWER AUTHORITY OF THE STATE OF NEW YORK, OMAHA PUBLIC POWER DISTRICT, and NEBRASKA PUBLIC POWER DISTRICT:
DEVON E. HEWITT, ESQUIRE
SHAW PITTMAN LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) 893-0527

ON BEHALF OF PLAINTIFF SACRAMENTO MUNICIPAL UTILITY DISTRICT:
JEFFREY L. HANDWERKER, ESQUIRE
HOWARD CAYNE, ESQUIRE
RONALD A. SCHECHTER, ESQUIRE
ARNOLD & PORTER
555 12th Street, Northwest
Washington, D. C. 20004-1206
(202) 942-5000

THE WITNESS: Can we take a break?
MR. CAYNE: Certainly.
THE WITNESS: About 60 seconds.
(There is a recess from the record.)
**A Before we start with the next question, I would like to revisit something.**
Q Mr. Barrett, before you speak, let me ask you, since we broke a few moments ago, have you spoken with your counsel concerning your testimony that you just provided?
MR. CRAWFORD: Yeah.
**A Yes.**
Q Please proceed.
**A Okay. My concern here, I'll give you -- you asked a question; I'll give you an answer. You will restate the questions -- my answers, excuse me, slightly differently. You will introduce words that I did not use. And then you ask me to say yes or no to that. Okay. I don't like your recharacterizing my answer differently than I did. And it puts me in a position I don't want to say yes to something that's slightly different. Now, you may be close but they're**



**different. They're yours, not mine. I did not use the word "danger" in that previous series; you did. Okay. But you're recasting them all slightly different, and I think, that's my perception, setting up a record and putting words in this that I don't necessarily agree to. It's going to take a long time if we're going to go on every single phrase that you recast them because you don't like the way I answered it. That's a problem. All right? So I don't know how to work it out but...**
Q I appreciate the lecture, Mr. Barrett. Let me explain to you this is the process of examination in a judicial proceeding. I ask you the questions. The issue is not whether you like or enjoy the question. Your job here today is to provide the best, most honest, most direct answer. If you think I misstated something, you point it out to me. If you don't like the terms I use, you make that clear in your answer. Okay, sir? I am attempting to determine factual issues to be used in the trial of this proceeding, and I have to ask the questions the way I deem best. You have to give me your most direct and



honest questions. Do you understand the process, sir?
**A I understand the process.**
Q Thank you, sir.
I would like to turn your attention to page two of the same exhibit.
**A Page two or page two of the attachment?**
Q Page two of the attachment. Can you take a look at the first paragraph on the top of page two.
**A Yes.**
Q Take a moment to read it.
MR. CAYNE: Let me state that Steve Cohn, C-o-h-n, counsel for Sacramento Municipal Utility District has entered the deposition room.
**A So you want me to read the paragraph on top of page two?**
Q Yes. Have you had a chance to read it?
**A Yes.**
Q Do you agree with the statement contained in that paragraph?
MR. CRAWFORD: Objection, vague.
**A The points one, two, and three?**
Q Let's go through it. It states that "the



commission recognized the perceived concern that an unlinked MRS facility might be recorded as a de facto repository." Do you see that?
**A I see that.**
Q Did you share that concern at the time of this memorandum?
**A I had no opinion. That was a statement from the commission.**
Q But did you as an individual, sir, as the director or acting director of RW have a concern that an MRS unlinked to a permanent repository might in fact be regarded as a de facto repository?
**A I wasn't the director or the acting director.**
Q In the capacity that you held at this time did you have that concern?
**A I knew that was -- it was a policy issue in the United States Congress.**
Q Did you have a view on that issue of any type?
MR. CRAWFORD: Objection. Asked and answered.

401

**A There was an issue that I knew existed. It was immaterial what I personally felt one way or the other.**
Q Fine. But my question, Mr. Barrett, is whether you personally had a view on that question, not whether or not your view was material to anything.
**A I wished that Congress didn't have such a strong view about it, but that's what they had and that's the way it was.**
Q Why did you wish that Congress did not have such a strong view about it?
**A Because it really restricted our ability to take material into federal responsibility.**
Q You're referring to the linkages imposed by the 1987 amendments to the Nuclear Waste Policy Act of 1982, correct?
**A Correct. That's what this says.**
Q And that was your view?
**A Yes.**
Q Do you understand the statement "and notwithstanding their finding that there is no technical basis for the linkages between the MRS and

402

the repository," do you know what that statement means?
**A I don't know what it means.**
Q You have no idea whatsoever?
**A I can surmise what it means.**
Q Well, what is your professional surmise, sir?
MR. CRAWFORD: Well, objection to the form.
Q Please answer the question, Mr. Barrett.
**A All right. There is no technical reason for linkage other than the perception of the host of the storage facility that it is unfair for it to be there because it will stay for a long time and it may stay there forever, therefore they wanted, from a policy matter, a statutory linkage that prevented it from happening.**
Q Does that mean that there was no technical basis for the provisions of the 1987 amendments to the Nuclear Waste Policy Act that imposed the linkages between the construction and operation of a permanent repository and the construction and operation of an MRS facility?

403

**A Yes.**
MR. CRAWFORD: Objection. Foundation.
Q What is the term "technical basis," what do you understand that term to refer to?
**A That there's no scientific nor -- there's no technical or scientific reason that there needs to be a linkage.**
Q So to be blunt, the linkages involve pure politics. Is that what you're saying?
MR. CRAWFORD: Objection. That's not what he's saying.
**A Pure policy.**
Q Pure policy?
**A Policy.**
MR. CAYNE: And I object to counsel for the government advising the witness as to what he has said or hasn't said or how he should testify. That is totally improper.
MR. CRAWFORD: It's proper for me to say when you're mischaracterizing what he said.
MR. CAYNE: It's totally improper, counsel.
MR. CRAWFORD: No, it's not.

404

Q I would like to direct your attention to the next section on page two, "DOE generally agrees with the commission's conclusions." Do you see that?
**A Yes.**
Q The paragraph has a statement, "The commission found that while no single factor could favor an MRS over the no-MRS option, cumulatively" --
**A Excuse me. Are you reading here?**
Q Under "DOE generally agrees with the commission's conclusions" on page two of the exhibit.
**A Halfway down or --**
Q Oh, about five lines down. Do you see that?
**A Right. Start again.**
Q "The commission found that while no single factor would favor an MRS over the no-MRS option, cumulatively the advantages of an MRS would justify the building of an MRS if, one, there were no linkages of between the MRS and the repository." Do you see that?
**A Yes.**
Q Do you agree with that statement?

409

**wasn't scheduled until after 1998, which would preclude a '98 fuel receipt.**
Q The repository operation wasn't scheduled in 1989 to commence until the year 2010, correct?
**A It says construction authorization.**
Q Well, I just asked you about operation.
**A That's correct.**
Q The operations of the repository were not intended to commence until 2010, correct?
**A That's correct.**
Q And as it was then planned with a 2010 operation date, when was it anticipated that the repository -- the construction of the repository would be authorized?
**A I don't recall, but I think it was something like 2005.**
Q Somewhere between 2005 or somewhere between 2005 and 2007?
**A Somewhere in there. I don't -- 2005 plus or minus a couple of years.**
Q So based on the testimony you just provided, sir, am I correct that, returning your

410

attention to Exhibit 16, that the MRS facility referenced in the bottom of page two of the attachment to that exhibit, the MRS facility that is referred to there under the law that was in existence at that time could not begin operations until, at the earliest, sometime between the period 2005 and 2007, correct?
MR. CRAWFORD: Objection to the form of the question.
Q Correct, Mr. Barrett?
**A Without any changes to the law, that is correct.**
Q It is correct that the repository -- that the MRS facility could not become operational until sometime in the time frame 2005 and 2007?
**A Under the statute currently in place, without a change.**
Q And the statute currently in place was existing federal law, correct?
**A The statute also provided for a volunteer process that could change the linkages.**
Q And the volunteer process itself would require the enactment of additional federal

411

legislation, correct, Mr. Barrett?
**A Correct.**
Q And what is the nature of the additional federal legislation that would have been necessary in order to authorize a volunteer -- the siting of an MRS facility at a location owned by a volunteer?
**A It would require proposal from the volunteer to the Congress with their proposal that could change the linkages.**
Q And it would take federal law, an act of the United States Congress to both approve the linkages and to authorize the construction and operation of a facility on the location owned by the volunteer, correct?
**A Basically, yes.**
Q Let me rephrase my last question. And it would take federal law, an act of the United States Congress to either modify or eliminate -- to both modify or eliminate the linkages and to authorize the construction, operation of a facility on the location owned by the volunteer, correct?
**A Close.**

412

Q What is -- why only close, sir? And let's try to get it right.
**A It's my recollection the facility was authorized by the amendment, so it didn't need to be reauthorized. So it was -- the MRS was already authorized by Congress. It didn't need to be reauthorized. There's something else in your statement that was close but not quite.**
Q The Congress would have been required to either modify, substantially modify or eliminate the linkages, correct?
**A And you used "or." The last time you used an "and."**
Q Okay. Or?
**A If you say it with "or" and "authorize," I agree.**
Q And the volunteer would have to be approved, the siting of the facility at the location of the volunteer, and by volunteer you're referring to a volunteer state or Indian tribe, correct?
**A Correct.**
Q And the location of the volunteer state or

413

Indian tribe would also specifically have to be approved by affirmative federal legislation, correct?

A **I don't know if the actual site had to. They had to change the linkages. They had to change the linkages. I'm not sure they actually had to approve the site.**

Q You used the term "authorize." What did you mean by authorize?

A **If you read the -- my recollection is if you read the amendments act of '87, they specifically authorize the construction of an MRS that did not exist in the '82 act. But then they put a limitation in the linkages that basically prevented us from ever building. But actually the construction was authorized in the amendments act. You can read it as a matter of record I believe.**

Q Now, I believe you testified that an MRS would have been authorized or was authorized under the '87 legislation provided that the statutorily mandated links were satisfied, correct?

A **That's my understanding.**

Q And I'm referring to the links to the

414

repository, you understand that?

A Yes.

Q But did the '87 legislation authorize the construction and operation of an MRS facility that was not compliant with each of the links established by the 1987 amendments to the Nuclear Waste Policy Act of 1982?

MR. CRAWFORD: Objection, best evidence.

A **I think the way you phrased that the answer is no.**

Q Did you not understand the question?

A **Your phraseology had a double negative in it, so I think the answer was no.**

Q Let me try to ask the question again, because we want the record clear. Did the 1987 legislation authorize the construction and operation of an MRS facility that was not compliant with each of the links established by the 1987 amendment to the NWPA?

A No.

MR. CRAWFORD: Objection. Best evidence.

Q So you agree with me that such an MRS was

415

not lawful in 1989, correct?

MR. CRAWFORD: Objection. Asked and answered.

A **The answer is yes.**

Q And in fact --

A **I do.**

Q And, in fact, such an MRS never became lawful under the laws of the United States, correct?

A Yes.

Q Turn your attention to page four of Exhibit 16, please. The second full paragraph, Mr. Barrett. Are you there?

A Yes.

MR. CRAWFORD: What page?

MR. CAYNE: Page four of the attachment to Exhibit 16.

MR. CRAWFORD: Which paragraph are we on?

MR. CAYNE: The second full paragraph.

Q It starts, in conclusion number four, "The commission found that an MRS link as provided in the current law would not be justified, especially in light of uncertainties in completion time for the

416

repository." Do you agree with that statement or did you agree with that statement in 1989?

MR. CRAWFORD: Objection. Relevance.

A **I don't recall what I felt in '89, but I basically agree with that.**

Q And then it proceeds. "As a result of that conclusion the commission does not recommend a linked MRS as required by the current law." Do you now or did you then agree with that recommendation?

A **Basically, yes.**

Q Turn your attention to page five of the same document, the final paragraph. Towards the middle of the paragraph. And you can take your time again to read any part of this page or any part of this entire document that will assist you in responding to my inquiry. The part of the paragraph I'd like to focus your attention on is towards the middle. It states, "The capacity limit would be reached within a few short years, assuming any sort of reasonable acceptance rate for the waste management system." Do you see that statement?

A Yes.

**consternation about what constitutes an emergency. So neither of those in my recollection did I consider practical. And we didn't pursue them.**

Q What did you mean by the last statement, "The MRS review commission recommendations are viewed as an interim solution to a problem that requires long-range planning and thought"?

A **That their recommendations didn't make any sense but we were being nice about it.**

**(Deposition Exhibit Barrett 17 was marked for identification and was retained by counsel.)**

Q The court reporter has handed you, Mr. Barrett, a document marked for identification as Exhibit 17, which is encaptioned Nuclear Waste. Is there a need for federal interim storage by the U.S. monitored retrievable storage review commission? November '89, bearing Bates numbers PA-172230 through PA-172270. Do you have that document before you?

A **Yes.**

Q And let me tell you that this document is an excerpt from the entire -- of the entire report issued by the U.S. monitored retrievable storage



review commission.

Did you ever have an opportunity to review this document in the course of the performance of your duties as an official at the Department of Energy?

A **I believe so.**

Q Let me turn your attention to page bearing Bates number PA-172244.

A **Okay.**

Q I'd like to ask you to read the passage, the paragraph that begins at the very bottom of the left-hand column of that page starting, "However, the schedule linkage." Do you see that?

A **Yes.**

Q Could you read that paragraph up to including number five.

A **I've read that.**

Q Okay. Let me ask you to focus your attention to the first statement of that section, specifically, "However, the schedule linkage presently in the NWPAA (MRS construction may not begin until the Nuclear Regulatory Commission issues a license with a construction of a repository) would make it impossible



for an MRS to be operational more than three years before the repository." Do you see that statement?

A **Yes.**

Q Do you agree with that statement?

MR. CRAWFORD: Objection. Asked and answered.

A **In general, yes.**

Q Do you agree with it as stated here to be accurate and correct?

A **It's a judgment call.**

MR. CRAWFORD: Same objection.

A **I don't disagree with it -- I don't disagree with that statement.**

**(Deposition Exhibit Barrett 18 was marked for identification and was retained by counsel.)**

Q Mr. Barrett, the court reporter has handed you a document marked for identification as Exhibit 18. Do you have that before you?

A **Yes.**

Q This document is the report to Congress on reassessment of the civilian radioactive waste management program dated November 1989 issued by the



U.S. Department of Energy, Office of Civilian Radioactive Waste Management bearing Bates numbers PA-163156 through PA-163188. Did you have any role in the preparation of this report?

A **I think so.**

Q What was your role, Mr. Barrett?

A **I don't specifically remember the details. I remember we did this. This was part of Admiral Watkins', you know, review of this. So I know I was involved in it. I don't remember what my title was then. I was one of the acting office directors. Not the entire program office but one of them.**

Q Do you know whether you would have been a drafter or a reviewer of this document?

A **I did not draft it. I was a reviewer. I was a participant in its generation and development.**

Q In your position would you have been required to approve of or sign off on this document prior to its final issuance?

A **I don't remember if I signed this or not.**

Q You might have?

A **I might have. I wasn't the final, because**

I was not -- November '89. I was still there but I was not the act -- Sam Ruosso would have been the director, so Sam would have signed this.

Q But would it be a fair statement that it is likely that you would have been the person who would have had to sign off on this document prior to its final issuance?

MR. CRAWFORD: Objection to foundation.

A Sam ran things administratively loser than I do. I don't know if I would have signed this or not. I mean, under my regime I would have to sign it. I don't know if I signed it, but I was a participant in it.

Q You might have signed it?

A I might have signed it. But I might not have.

Q I would like to turn your attention to page -- you see page ten?

A Yes.

Q In connection with your participation in the preparation of this report, would you have reviewed and analyzed the content of this referenced



schedule for restructure program, Figure 1?

A I would have been involved in it. So, yeah, I would have reviewed it probably, yes.

Q And would you have been in agreement with its contents before this report was issued?

A Organizationally I would have been. I'm not sure what my personal opinion was versus the organization's. I just don't recall. I don't recall I had a big disagreement or anything with it.

Q So you believe that as an organizational matter you would have signed off on the contents of Figure 1, correct?

A I would have supported it, yes.

Q Let's just walk through -- first, can you explain to me what this Figure 1 represents?

A In '89 we reviewed the program, where it was in light of the amendments act, in light of the MRS commission report, and basically restructured the program to a degree around the new repository date which now went to 2010 whereas before it had been 2003. We reviewed that and this was the new, the new revised adjusted program based on those events.



That's my recollection of what it was.

Q How did the MRS commission report that we just reviewed affect your analysis with respect to your review of Figure 1 on page ten?

MR. CRAWFORD: Well, let me just -- I'll object to the foundation of that and to the form of the question about the statement made by counsel that we just reviewed the MRS commission report. I mean, you certainly asked the witness questions about it.

MR. CAYNE: I object to counsel's testimony and speaking objections. They're improper.

Q Could you please respond to the question, Mr. Barrett.

MR. CRAWFORD: I was speaking to you.

A Repeat the question, please.

Q Certainly. How did the report issued by the MRS commission affect your analysis of what appears in Exhibit 18 as Figure 1?

MR. CRAWFORD: Objection, foundation. Objection, vague.

A What the primary premise in this Figure 1 is is a volunteer MRS that would have a proposal to



Congress which would change the linkages which would allow us to receive waste in 1998. It does not have in it the user-funded facility. It does not have in it the emergency facility that they recommended.

Q You said it would have a proposal to Congress.

A Right.

Q A proposal to Congress would not be sufficient to allow the overall process referenced in Figure 1 to go forward, correct?

A A proposal from a volunteer site where the proposer agreed to the linkages, where the linkages were invented to protect the MRS site would surely have been approved by Congress in my opinion. So if we had a volunteer site, I thought it would be very easy -- Congress would readily approve the change in the linkages if it was satisfactory to the volunteer.

Q So you are confident that federal legislation would have been enacted and signed by the President approving any volunteer that came along that was willing to allow the siting of an MRS facility on its property?