IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - - -x

YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C)(Wilson, J.) :
NORTHERN STATES POWER COMPANY :
(98-484C)(Wiese,J.) :
DUKE POWER, A Division of :
DUKE ENERGY CORP. :
(98-485C)(Sypolt,J.) :
INDIANA MICHIGAN POWER COMPANY :
(98-486C)(Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C)(Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY, :
et al. :
(98-488C)(Yock, S.J.) :
COMMONWEALTH EDISON COMPANY :
(98-621C)(Hewitt, J.) :
BOSTON EDISON COMPANY :
(99-447C)(Allegra, J.) :
GPU NUCLEAR, INCORPORATED :

(00-440C)(Bush, J.) :
WISCONSIN ELECTRIC POWER COMPANY :
(00-697C)(Merow, S.J.) :
POWER AUTHORITY OF THE STATE OF NEW YORK :
(00-703C)(Damich, J.) :
OMAHA PUBLIC POWER DISTRICT :
(01-115C)(Bush, J.) :
NEBRASKA PUBLIC POWER DISTRICT :
(01-116C)(Sypolt, J.) :
TENNESSEE VALLEY AUTHORITY :
(01-249C)(Bruggink, J.) :
Plaintiffs, :
v. :Discovery
THE UNITED STATES, :Judge:
Defendant. :(Judge
---------------------xSypolt)

McLean, Virginia
Wednesday, April 10, 2002

Continued deposition of ALAN BROWNSTEIN, a witness, recalled for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness being previously duly sworn by CATHERINE S. BOYD, a Notary Public in and for the Commonwealth of Virginia, taken at the offices of Shaw Pittman,



LLP, 1650 Tysons Boulevard, McLean, Virginia 22102-4859, at 9:26 a.m., Wednesday, April 10, 2002, and the proceedings being taken down by Stenotype by CATHERINE S. BOYD and transcribed under her direction.



APPEARANCES:

On behalf of the Plaintiffs Florida Power & Light Company, Northern States Power Company, Duke Power, Indiana Michigan Power Company, Boston Edison Company, GPU Nuclear, Incorporated, Power Authority of the State of New York, Omaha Public Power District, Nebraska Public Power District:
ALEX D. TOMASZCZUK, ESQ.
DANIEL S. HERZFELD, ESQ.
Shaw Pittman, LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) (770-7901)

On behalf of Plaintiff Sacramento Municipal Utility District:
DAVID S. NESLIN, ESQ.
Arnold & Porter
370 Seventeenth Street, Suite 4500
Denver, Colorado 80202-1370
(303) 863-2301



APPEARANCES: (Continued)
On behalf of Plaintiffs Southern Nuclear Operating Company, Alabama Power Company, Georgia Power Company:
JEFFREY L. HANDWERKER, ESQ.
Arnold & Porter
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
(202) 942-6101

On behalf of Plaintiff Wisconsin Electric Power Company:
DONALD J. CARNEY, ESQ.
Perkins Coie, LLP
607 Fourteenth Street, N.W.
Washington, D.C. 20005-2011
(202) 434-1675

On behalf of Plaintiff Commonwealth Edison Company:
NORMAN M. HIRSCH, ESQ.
Jenner & Block, LLC
One IBM Plaza
Chicago, Illinois 60611-7603
(312) 222-9350

Page 291

based could have caused perturbations really to the utilities, some to us.
That's an example.
Q. Since you raised the subject, exchanges are mentioned here as the fourth issue to be addressed in the APR?
A. Right.
Q. And the first sentence under the issue says purchasers have the right to exchange approved DCSs subject to DOE approval?
A. Correct.
Q. Did you agree with that statement?
A. Yes, I did.
MR. BANES: Objection. Calls for a legal conclusion.
THE WITNESS: Sorry. Yes, I do.
BY MR. TOMASZCZUK:
Q. Going back to the first page, the draft briefing paper goes on to state this option, and I presume that's the option of delaying the APR and DCS process, was rejected because of the purchasers' perceived need not to support any action that could be viewed as acquiescing on the 1998 date?
A. Correct.

Page 292

Q. And is that statement consistent with your understanding of the rejection of this option?
A. Yes, it is.
Q. The purchasers were concerned that they not take any action that could be viewed as extending the 1998 date in the contract?
A. Yes.
Q. Do you know why?
MR. BANES: Objection -- lack of foundation.
Calls for speculation.
BY MR. TOMASZCZUK:
Q. Let me go back. Did you have any discussions with utility representatives concerning this issue?
A. I did.
Q. And you understood the utility representatives to advise you that they were not willing to take actions that could be perceived as acquiescing on an extension of the January 31, 1998 date?
A. We referred to the ACR issue resolution process yesterday, and these were basically staff-to-staff technical discussions.

Page 293

We discussed many issues associated with the contract, some of which are listed in this paper.
When we had those discussions with the technical people, as I recall it, they understood, you know, a host of implementation problems, and as I recall it, were sympathetic to the need to try to resolve those, you know, before we moved on.
They went back, as I understand it, after our meetings to their respective management and to their legal counsel, and came back and said something to the order of while we understand, we have been advised not to proceed down that course.
This is many years ago, but that's how I recall the, the events.
Q. And did any of those utility personnel explain that to you or tell you anything further about that?
A. My only recollection is for whatever the reason that I remember, they came back and said there was a group or an individual, I don't recall, that Jay Silberg, they had reviewed the issue with Jay Silberg, and he had advised them

Page 294

in part because of, you know, legal concerns, not to do that, again, to the best of my recollection.
Q. Okay.
(There was a pause in the proceedings.)
BY MR. TOMASZCZUK:
Q. There is a reference here at the bottom of page 1 to an option for dealing with the waste acceptance rate issue as I understand it?
A. Correct.
Q. And it refers to the need or desire to allow the purchasers to cooperatively avoid out-of-pool storage requirements based on RW-859 data?
A. Correct.
Q. Do you see that?
A. Yes, I do.
Q. Was it DOE's intention at the time to structure the program such that purchasers would avoid out-of-pool storage requirements based on RW-859 data?
MR. BANES: Objection -- vague.
THE WITNESS: In my mind, there's a

fundamental difference between goals and objectives and policy and contractual commitments.
There was no contractual commitment to do any such thing.
Was there a goal to try to avoid additional storage? Sure, but that's separate and apart from contractual commitment.
BY MR. TOMASZCZUK:
Q. So at least in that context, you understood a distinction between contractual commitments and other things?
MR. BANES: Objection. Mischaracterizes prior testimony.
THE WITNESS: Every time I use, whether today or yesterday, every time I use the word goal or objectives, to me, that's separate, distinct and apart from a contractual commitment.
MR. TOMASZCZUK: All right. Ms. Reporter, would you mark as Brownstein Exhibit 26 a memorandum dated April 15th, 1991?
And the subject is approval for issuance of a comment draft of the annual Acceptance Priority Ranking.



It has on it the Bates numbers HQR-001-1538 through 1539.
(Brownstein Exhibit No. 26 was marked for identification.)
THE WITNESS: Okay.
BY MR. TOMASZCZUK:
Q. Have you seen the document before today?
A. I have.
Q. Did you draft it?
A. To the best of my recollection, I did, or played a major role in doing so.
Q. All right. Your name appears in handwriting in the upper right-hand corner?
A. That's my name, not my handwriting, but yes.
Q. And this was a memorandum sent through the deputy director of OCRWM to the director, correct?
A. Correct.
Q. And at that time, Mr. Milner was acting as the deputy director?
A. I don't believe that's accurate, no.
Q. But Mr. Milner signed the memo on the



second page of it?
A. Yes, that's correct.
Q. And he sent it through RW-2, the deputy director's office?
A. That's correct.
Q. And who would that have been at the time, do you know?
A. We can clearly go back to the charts if I had to.
Q. Can you tell from that initial there next to RW-2 who that might be?
(The witness reviewed the document.)
THE WITNESS: I really can't.
BY MR. TOMASZCZUK:
Q. Okay. Can you tell who approved the action?
A. Yes.
Q. As set forth in the memorandum?
A. Yes, I can.
Q. And who is that?
A. That signature there is J.B., stands for John Bartlett, and a guess, that, that mark may have been Frank Peters.
Q. Okay. And the subject of the memo is the front office approval if you will for



issuance of a draft of the APR?
A. Well, for a comment draft of the Acceptance Priority Ranking report, yes.
Q. Do you see in the second paragraph under the heading discussion?
A. Yes.
Q. Can you read the first sentence for me?
A. The publication?
Q. Um-hm.
MR. BANES: You're not limited to that.
THE WITNESS: "The publication of the APR begins the contractually binding waste acceptance process."
BY MR. TOMASZCZUK:
Q. Did you write that?
A. I did, or am responsible for it, yes.
Q. Is it a true statement?
MR. BANES: Objection -- vague, and calls for a legal conclusion.
THE WITNESS: It is, it is accurate in the context that I have testified earlier today and yesterday of how I interpret contractually binding.

Page 387

Energy's plans for nuclear waste at Yucca Mountain?
A. What time period are you referring to?
Q. March 14th of this year.
A. No.
Q. Did you ever discuss that testimony with Mr. Barrett?
A. Not that I recall.
Q. Do you know whether Mr. Barrett testified on the Hill on March 14th?
A. I believe he did.
Q. And what do you know about that subject?
A. I wasn't involved in the preparation of that testimony, and I don't believe I actually reviewed, reviewed that testimony.
I wasn't involved in that one at all.
(There was a pause in the proceedings.)
BY MR. TOMASZCZUK:
Q. Give me just a second, okay?
A. Sure.
(There was a pause in the proceedings.)
MR. TOMASZCZUK: Mr. Brownstein, at

Page 388

at this time, I don't have any further questions for you.
I would like to thank you for your time and your cooperation. I very much appreciate it.
I know it has been a long day and a half, and I need to adjourn the deposition because there are some documents which we believe still have not been produced that may bear upon your testimony, so I reserve the right to call you back if and when those documents are produced, and that includes but are not limited to documents on a privilege log that the government has provided to us, but at this time, I have no further questions, and I adjourn subject to those conditions.
THE WITNESS: Okay.
MR. BANES: We reserve the right to, we reserve the right to object to reopening, so with that, I'm going to ask a few questions.
EXAMINATION BY COUNSEL FOR DEFENDANT
BY MR. BANES:
Q. So Mr. Brownstein, let's see here if you could just get out Exhibit 1.
It's the contract. It's in there

Page 389

somewhere.
(There was a pause in the proceedings.)
THE WITNESS: Okay.
BY MR. BANES:
Q. Let's see. Turn to page, there is a Bates stamp number the bottom. It says ADM-001, and then I'm going to use that last four digits if you could turn to page 660 for a moment in Exhibit 1?
A. Okay.
Q. Mr. Tomaszczuk was asking you several questions about the Delivery Commitment Schedules and how they related to the contract.
Do you remember that testimony?
A. Yes.
Q. Turn to paragraph or Article V.B that's located down there on this page 660.
A. Okay.
Q. Was this the paragraph you were talking about earlier that was the basis for Delivery Commitment Schedule instructions?
A. Yes.
Q. Now turning to where it says beginning January 1st, 1992, purchaser shall submit to DOE

Page 390

the Delivery Commitment Schedules or schedule which shall identify all SNF or HLW the purchaser wishes to deliver beginning 63 months thereafter.
Now can you tell me, could you just explain for me how you interpreted that paragraph and how it translated into the Delivery Commitment Schedule instructions?
MR. TOMASZCZUK: Objection. It's compound, calls for a legal conclusion.
(The witness reviewed the document.)
THE WITNESS: I combined that paragraph with Appendix C of the contract.
BY MR. BANES:
Q. Okay. And did you believe that the delivery -- let's take a look at the Delivery Commitment Schedule. Pull that out for a minute. That was Exhibit 34.
A. Yes.
Q. Did you believe that those, Exhibit 34 was consistent with the provisions of the contract regarding Delivery Commitment Schedules?
A. We used the Appendix C as a basis for that, yes.

Page 391

Q. Okay. Now with respect to when a purchaser would submit a Delivery Commitment Schedule, let's say a purchaser wanted to, pursuant to this paragraph B on the contract, Article V.B., if a purchaser wanted to deliver SNF beginning in say 1998, when would they have to submit a Delivery Commitment Schedule?
A. It's clear in our mind you would have to subtract 63 months from that date.
Q. Okay. Now if they didn't want to, if a purchaser did not want to deliver any SNF in 1998, would they have to submit a DCS 63 months prior to that?
A. No. It states that purchaser shall identify all SNF and/or HLW the purchaser wishes, emphasize wishes, to deliver to DOE beginning 63 months thereafter.
Q. So but was this, was the submission of a DCS a prerequisite, pursuant to the contract in your opinion, was submission of a DCS a prerequisite to acceptance of a purchaser's spent nuclear fuel?
A. In my mind, it was.
Q. And was that pursuant to this, was it a prerequisite 63 months prior to the date they

Page 392

wished delivery to occur?
MR. TOMASZCZUK: Objection to the form.
I don't know what "this" is.
BY MR. BANES:
Q. Was it, was such a, was such acceptance of spent nuclear fuel a prerequisite, or was submission of a DCS 63 months prior, in your opinion, a prerequisite to DOE's acceptance pursuant to the contract to such spent nuclear fuel?
A. Yes.
Q. All right. Now if a, if a utility decided not to submit a DCS -- well, strike that.
If a utility -- let's see. Prior to, I think you testified earlier prior to acceptance of spent nuclear fuel, who in your opinion was responsible for this, for storage of the spent nuclear fuel?
A. I think it is in my mind, and based on several documents, it is clear that the utilities remained responsible until DOE accepted it.
Q. In the documents you prepared, did you

Page 393

convey that to the purchasers?
A. I did.
Q. All right. Now let's take a look at --
(There was a pause in the proceedings.)
BY MR. BANES:
Q. Okay. With respect to, with respect to the rates, acceptance rates contained in each of these documents we have looked at, I think that you testified earlier that they were subject to a whole host of assumptions, is that correct?
A. Yes.
Q. Now so let's take a look at Exhibit 6 and go to Table 2 dash 1 or 2.1 on page 7.
(There was a pause in the proceedings.)
THE WITNESS: Okay.
BY MR. BANES:
Q. Now on page 7 of this document, there is a, there is what purports to be called illustrative waste acceptance schedule.
And then at the top there, it says the waste acceptance schedule, or excuse me -- this

Page 394

schedule is only an approximation, approximation of how the system may operate and is subject to uncertainties that are recognized in the mission plan.
Why did you include that language in this Annual Capacity Report?
A. We knew that there were, you know, at different times in the program, you know, whether there were legal restrictions, we certainly knew that there were challenges, and we wanted to make it clear to the utilities and everyone understood that we were at the early stages, and these were our best projections at the time, and we tried to be clear over the years of why, and, and that they were subject to change.
Q. In your opinion, with respect to Table 2 dash 1, would it be appropriate to read 2.1 in this 1987 Annual Capacity Report without reading the entire document?
A. Well, I believe it's always inappropriate to pull out any excerpt from a document.
A document's prepared. All words have meaning, and should be read in the context of

Page 395

the document.
Q. And is that because in other portions of the document, the assumptions upon which the rates on page 7 are based are described?
MR. TOMASZCZUK: Objection -- leading.
THE WITNESS: In each of the ACRs, and we reviewed several of them here, there were a number of caveats concerning the waste acceptance schedule.
They were in different places in different, different documents as the document evolved, but they were there.
We didn't put them in the same place in the same time.
They were always there somewhere.
BY MR. BANES:
Q. Let's see. Mr. Tomaszczuk showed you Exhibit 2, which was the 1985 mission plan.
Before we get to that, let me ask you a couple of questions.
Did the, in your opinion, did the Nuclear Waste Policy Act require the Department of Energy to accept spent nuclear fuel at any particular rate from the purchasers?
MR. TOMASZCZUK: Objection -- lack of

Page 39

foundation.
THE WITNESS: There was no rate in the Nuclear Waste Policy Act.
BY MR. BANES:
Q. Okay. And with respect to the standard contract, which is located at Exhibit 1 --
A. Yes, I have that.
Q. Did the standard contract require the Department of Energy to accept spent nuclear fuel from the purchasers at any particular rate of acceptance?
A. There was no rate in the standard disposal contract.
Q. Now going back to the mission plan, which is Exhibit 2, to your knowledge, was the mission plan or any portion thereof ever incorporated into the contract?
A. No.
Q. All right. Now Mr. Brownstein, Mr. Tomaszczuk was asking you about the 1991 APR, which is Exhibit 30. He was referring to page --
A. Wait a second.
Q. I'm sorry. Did you find it?

Page 397

A. No -- Number 30?
Q. Exhibit 30.
MR. HANDWERTER: The ACR.
BY MR. BANES:
Q. Was that the ACR? Excuse me. The ACR is the one I want to talk to you about.
A. I'm sorry. I don't have these things in order.
Okay.
Q. Page 4 for a second of the document under 2.0, waste acceptance projections?
A. Yes.
Q. Mr. Tomaszczuk was asking you whether the rates reflected in Table 2 dash one or 2.1 -- excuse me -- assumed the existence of an MRS facility or a DOE facility.
Do you recall that question?
MR. TOMASZCZUK: Object to the form.
THE WITNESS: Yes.
BY MR. BANES:
Q. All right. And do you recall that you responded to that yes, it did assume the existence of a DOE facility for acceptance of spent nuclear fuel?
A. Yes, an MRS facility, yes.

Page 39

Q. Now with respect to every, in every document that you, that contained a rate that you worked on, did, did all of those projected rates assume the existence of some type of repository, either repository or MRS, prior to the acceptance of spent nuclear fuel?
MR. TOMASZCZUK: I'm going to object to the form of the question.
I don't understand it.
THE WITNESS: I can still answer?
BY MR. BANES:
Q. Sure, if you understand it, you can.
A. I made the statement in all the documents, as I have testified -- I'm looking at page 4 -- that assumed the commencement of facility operations.
Q. Okay.
A. And I defined facility as either an MRS or a geologic repository.
Q. So in any document in which you would have incorporated a rate, is it fair to say that you would have assumed the, an operational facility being either an MRS or a repository?
A. Yes.
(There was a pause in the

Page 399

proceedings.)
MR. BANES: Okay, sir. Just a second here.
(There was a pause in the proceedings.)
BY MR. BANES:
Q. Okay. Turn to Exhibit 26 for a minute, sir?
A. I really need to organize this. If these are going to be the subjects of questions, I have to get them in some order.
Twenty-six, I've got it.
Q. Okay. Okay. All right. Turn to Exhibit 26.
Let's go back to that paragraph you were discussing with Mr. Tomaszczuk. It starts the publication of the ACR, APR.
If you would just read that entire paragraph for me?
You don't have to read it outloud. You can read it to yourself.
A. Thank you.
(The witness reviewed the document.)
THE WITNESS: Okay.
BY MR. BANES:

Page 400

Q. All right. Now in the statement there, I think Mr. Tomaszczuk asked you what you meant by the publication of the APR begins the contractually binding waste acceptance process.
Does the remainder of that paragraph refresh your recollection what, why that word begins is there?
A. Well, in my mind, the contract laid out a process, as I have testified, beginning with the ACR, ACR following with the APR, to be followed by the DCS to be followed by the FDS.
That's what I was referring to.
Q. Okay. And all right. So as far as this contractually binding waste acceptance process, were you referring to all of that process, or just the APR?
A. No. Begin the process, the APR was the sort of the second step, well, the first step in the process leading to the FDSs, which is the last step leading to the, to the actual acceptance.
Q. And with respect to the process, while it hasn't been marked as an exhibit, Mr. Tomaszczuk showed you the what has been kind of referred to as the Starship Enterprise chart?

Page 401

A. Yes.
Q. Did that, did that chart lay out what this process, this process was supposed to be from the beginning of the contract all the way to acceptance and delivery?
A. That was, that was its intent.
Q. And looking at this, we just I guess won't mark it, but --
MR. TOMASZCZUK: I'm going to come around.
THE WITNESS: If we're going to do it, could we move it closer?
This is not the easiest thing in the world to read.
Can you see it from here?
(A discussion was held off the record.)
BY MR. BANES:
Q. All right. Now I wanted to ask a little bit about the mechanics of the chart?
A. You understand I haven't seen this in, I haven't looked at this in years.
Q. Can you tell where the Annual Priority Ranking first appears, or that let's start with the Annual Capacity Report.

Page 402

Where is that?
A. That's right there.
Q. Let the record reflect that the witness is pointing to a box that has the number 060 in the upper left-hand corner.
And on the far left of the chart, towards the far left of the chart, now there is a dark line here.
A. Right.
Q. What is that dark, what is that dark line supposed to represent? Annual Capacity Report and Annual Priority Ranking?
A. The dark line under the legend indicates the optimum path.
The whole chart is divided basically into two parts which is, which is the first part is if everything went right, this is, this is how the process would go.
And then there were, there were other possibilities, other things that could go, other things that could happen, and what I had asked the contractor to do was to lay out all those other things that could happen and contingencies, and that's what they tried to do here.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - - - - -x

YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C)(Wilson, J.) :
NORTHERN STATES POWER COMPANY :
(98-484C)(Wiese,J.) :
DUKE POWER, A Division of :
DUKE ENERGY CORP. :
(98-485C)(Sypolt,J.) :
INDIANA MICHIGAN POWER COMPANY :
(98-486C)(Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C)(Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY, :
et al. :
(98-488C)(Yock, S.J.) :
COMMONWEALTH EDISON COMPANY :
(98-621C)(Hewitt, J.) :
BOSTON EDISON COMPANY :
(99-447C)(Allegra, J.) :
GPU NUCLEAR, INCORPORATED :

Page 468

(00-440C)(Bush, J.) :
WISCONSIN ELECTRIC POWER COMPANY :
(00-697C)(Merow, S.J.) :
POWER AUTHORITY OF THE STATE OF NEW YORK :
(00-703C)(Damich, J.) :
OMAHA PUBLIC POWER DISTRICT :
(01-115C)(Bush, J.) :
NEBRASKA PUBLIC POWER DISTRICT :
(01-116C)(Sypolt, J.) :
TENNESSEE VALLEY AUTHORITY :
(01-249C)(Bruggink, J.) :
Plaintiffs, :
:Discovery
v.
THE UNITED STATES, :Judge:
Defendant. :(Judge
-------------------xSypolt)
McLean, Virginia
Thursday, April 11, 2002

Continued deposition of ALAN BROWNSTEIN, a witness, recalled for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness being previously duly sworn by CATHERINE S. BOYD, a Notary Public in and for the Commonwealth of Virginia, taken at the offices of Shaw Pittman,

Page 469

LLP, 1650 Tysons Boulevard, McLean, Virginia 22102-4859, at 9:38 a.m., Thursday, April 11, 2002, and the proceedings being taken down by Stenotype by CATHERINE S. BOYD and transcribed under her direction.

Page 470

APPEARANCES:

On behalf of the Plaintiffs Florida Power & Light Company, Northern States Power Company, Duke Power, Indiana Michigan Power Company, Boston Edison Company, GPU Nuclear, Incorporated, Power Authority of the State of New York, Omaha Public Power District, Nebraska Public Power District:
ALEX D. TOMASZCZUK, ESQ.
DANIEL S. HERZFELD, ESQ.
Shaw Pittman, LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) 770-7901)

On behalf of Plaintiff Sacramento Municipal Utility District:
DAVID S. NESLIN, ESQ.
Arnold & Porter
370 Seventeenth Street, Suite 4500
Denver, Colorado 80202-1370
(303) 863-2301

Page 471

APPEARANCES: (Continued)
On behalf of Plaintiffs Southern Nuclear Operating Company, Alabama Power, Georgia Power:
JEFFREY L. HANDWERKER, ESQ.
Arnold & Porter
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
(202) 942-6101

On behalf of Plaintiff Wisconsin Electric Power Company:
DONALD J. CARNEY, ESQ.
Perkins Coie, LLP
607 Fourteenth Street, N.W.
Washington, D.C. 20005-2011
(202) 434-1675

On behalf of Plaintiff Commonwealth Edison Company:
NORMAN M. HIRSCH, ESQ.
Jenner & Block, LLC
One IBM Plaza
Chicago, Illinois 60611-7603
(312) 222-9350

Page 548

proceedings.)
BY MR. BANES:
Q. Okay. Let's see here. Turning back to Exhibit 43, Mr. Brownstein --
MR. HIRSCH: Which one is 43?
MR. BANES: I think that's one of the, one of these vugraphs.
MR. HIRSCH: Off the record.
(There was a pause in the proceedings.)
BY MR. BANES:
Q. Okay. Now let's see if you could open to Exhibit 43, page 262 -- I just asked him to hold Exhibit 42, page 43 exhibit, or page 262 open for a moment.
And then let's see. I have got now Brownstein Exhibit 36.
Now yesterday we were talking about the, with Mr. Tomaszczuk, we were talking about at what point we are in, the DOE and the purchasers are in the process of the standard contract for setting a rate?
A. Right.
Q. Do you recall that testimony now?
A. Yes, I do.

Page 549

Q. And I think you testified that the, that the point of the process that we're in is in the, in the DCS?
We're still in the DCS process, is that correct.
A. Yes.
Q. Now the utilities and the utilities and the -- to, to your recollection, have you, the utilities and DOE ever agreed upon a mutually acceptable schedule?
MR. HIRSCH: Objection -- vague. Calls for a legal conclusion.
THE WITNESS: Some utilities have submitted the DCSs, and we have approved them.
BY MR. BANES:
Q. Okay. And for those that you haven't approved, what's the process for after disapproval occurs?
MR. HIRSCH: Objection -- vague, no foundation.
Calls for a legal conclusion.
THE WITNESS: I don't know how to identify these boxes.
This exhibit shows the path. If -- once we have completed our review, which is

Page 550

indicated in the box.
BY MR. BANES:
Q. The number in the upper left-hand corner?
A. 005; if we disapprove it and it goes to box 025, then it lays out a series of steps.
We, we disapprove it. We notice the utility of that disapproval, and then the utility is supposed to revise their DCS and submit it to us.
We then go through another review process, and again, we then have two options.
We can approve the DCS, or we can disapprove it.
If we disapprove it again, there is, appears to be two links.
We notify purchaser, and the purchaser -- or we can then propose a DCS to the purchaser. That's a little different than the first one, and I believe that's consistent with the contract.
Do you want me to continue on with the steps?
Q. Sure.
MR. HIRSCH: I'm going to make the

Page 551

same objection I made to the previous question.
THE WITNESS: There is another review process.
Once again, you can end up with an, with approved DCS or, or we could then disapprove what the purchaser proposed, which leads into negotiations between DOE and the purchasers.
BY MR. BANES:
Q. Okay. Now let's go to, let's go to the contract for a minute, Exhibit 1.
A. Okay.
Q. All right. And turn to page 660 of the Exhibit 1.
A. Okay.
Q. And is the process you have just described located, contained somewhere in the contract here?
MR. HIRSCH: Objection -- vague. Calls for a legal conclusion.
THE WITNESS: Yes.
BY MR. BANES:
Q. And where is that?
MR. HIRSCH: Same objection.
THE WITNESS: Under Article V.B.1 and



Alderson Reporting Company, Inc.
1111 14th Street, N.W. Suite 400 1-800-FOR-DEPO Washington, DC 20005

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - - x

YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
MAINE YANKEE ATOMIC POWER COMPANY :
(98-474C)(Merow, S.J.) :
Plaintiffs, :
v. :
THE UNITED STATES, :
Defendant. :

- - - - - - - - - - - - - - - - - - - - x

Washington, D.C.
Thursday, May 23, 2002

Deposition of ALAN BROWNSTEIN, a witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to agreement, the witness being duly sworn by JAN A. WILLIAMS, a Notary Public in and for the District of Columbia, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., 20005-3305, at 8:40 a.m., Thursday, May 23, 2002, the proceedings being taken down by Stenotype by JAN A. WILLIAMS, RPR, and transcribed under her direction.

Page 150

Q. Okay. Can I ask, do you know an answer to my question without telling me the answer?
MR. CRAWFORD: He's asking you if you know an answer to his question.
THE WITNESS: I'm going to ask it to be repeated so I can answer you accurately.
MR. STOUCK: Let's have it read back.
THE REPORTER: "Question: Have you reviewed, Mr. Brownstein, any briefs or legal filings by the government in this litigation?"
MR. CRAWFORD: The pending question is different than that.
BY MR. STOUCK:
Q. Right. Your counsel has instructed you not to answer that question. I'm just asking in your mind, without telling me the answer, do you know an answer to that question?
A. Yes.
Q. Do you know the position that the Department of Justice has taken in these cases, I'm talking now about the Yankee cases, about the significance under the standard contract of delivery commitment schedules? Do you know the Department of Justice's position?
MR. CRAWFORD: Objection, vague,

Page 151

overbroad, and to the extent it calls for a legal conclusion.
THE WITNESS: I think I do.
BY MR. STOUCK:
Q. Okay. What is your understanding of the Department of Justice's position with respect to the significance under the standard contract of delivery commitment schedules?
MR. CRAWFORD: Same objection or objections. And let me add one, foundation.
THE WITNESS: I think Justice believes that the extent of damages or breach is determined by approved DCSs.
BY MR. STOUCK:
Q. Okay. Is that the same thing as saying that -- is it your understanding that the Department of Justice has taken the position in this litigation that the Department of Energy has no obligation to accept any spent fuel that is not described in an approved delivery commitment schedule? Do you know whether the Department of Justice has taken that position?
MR. CRAWFORD: I'm going to object, vague, foundation, to the extent it calls for speculation, to the extent it calls for a legal conclusion, and

Page 152

overbroad.
THE WITNESS: I really don't know.
BY MR. STOUCK:
Q. You don't know one way or the other?
A. No.
Q. Okay. Well, do you believe that the Department of Energy -- or do you know whether the Department of -- let me ask it this way, without regard to whatever position the Department of Justice has taken, do you know whether the Department of Energy has an obligation under the standard contracts to accept spent fuel that is not described in an approved delivery commitment schedule?
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion and foundation since he's not a 30(b)(6) witness.
THE WITNESS: That's an issue in question. I always viewed that both parties had to do the steps required in the contract. The DCSs are -- there's another step in the process which is the final delivery commitment schedules.
So you're asking about DCSs. Where I'm going to ask you for clarification is you're asking me about what happens if there's an approved DCS but there never is an approved FDS.

Page 153

BY MR. STOUCK:
Q. I believe you testified that is the situation we're in, correct?
A. Yes.
Q. There are no approved final delivery commitment schedules that I'm aware of. Are you aware of any?
A. There are not to my knowledge.
Q. Okay. So do you know whether -- well, I don't know if that clarifies the question. But my question is, with respect to spent fuel, commercial spent fuel, utility spent fuel that's out in the world somewhere in the United States that is not described in a delivery commitment schedule that has been submitted by a utility and approved by the Department of Energy, okay, you agree there is such spent fuel out there?
A. Yes.
Q. Okay. With respect to that spent fuel that's not described in a delivery commitment schedule that has been submitted to the Department of Energy and approved by the Department of Energy, do you know whether or not DOE is obligated under the standard contract to accept that spent fuel for disposal at some point in time? The question does

not involve a time frame of when they are obligated to accept it, just whether they are obligated to accept it?
MR. CRAWFORD: Objection to the foundation; objection to the extent it calls for a legal conclusion.
THE WITNESS: I'm going to try to ask a clarification.
BY MR. STOUCK:
Q. Sure.
A. Are you saying -- let me try this again. Are you saying, if there is an approved DCS, irrespective of anything else, do we have an obligation, does the department have an obligation to accept that fuel? Is that what you're asking me?
Q. Actually the question I just asked was about all of the fuel that's not described and approved.
A. Okay.
Q. The fuel that's not described in an approved DCS, do you have an obligation under the contract as DOE to accept that spent fuel for disposal?
MR. CRAWFORD: Same objections.
THE WITNESS: I really don't know because



that's a situation that we never looked at. You know, the expectation is that both sides would complete the contractual requirements for both the delivery commitment schedules and then final delivery schedules, you know, as we did the dance to the waste acceptance -- you know, to actual waste acceptance. I don't recall ever addressing the question of what happens if, you know, a utility did not do that. So the answer is I don't know.
BY MR. STOUCK:
Q. So would it be fair based on that answer to say that, during your tenure at RW, when you had responsibility for these waste acceptance matters which as we've said or I have said many times I think is from 1985 to March of '95, during that time you did not have any understanding one way or the other about whether or not DOE was obligated under the standard contract to accept spent fuel that was not described in an approved delivery commitment schedule; is that right? I thought you said you never thought about it.
A. Yeah. As I recall my assumption was that both sides would do it. What happens if somebody did not do it? I don't -- I don't believe we ever really had that discussion.



Q. So you had no understanding one way or the other about that subject during the time you were responsible for these matters; is that a fair statement?
A. I just want to take time and think about the question.
Q. Okay. I did not mean to rush you.
MR. CRAWFORD: Same objections as to the original question.
THE WITNESS: We never -- if we had a discussion about that, we never took that to its logical conclusion. In other words, we always said, you know, we needed to do this, whether it's publishing the ACR, APR, and the DCSs, and the utilities had these responsibilities in order to do it.
And we may have made some statements in these documents indicating that the utilities, you know, needed to do it or are required to do it, I don't know the exact words. But I don't recall a discussion where we said, well, if a utility did not do this, how would you balance them not meeting a specific term of that contract with the ultimate responsibility, irregardless of time, if they paid their fees, that we would have to accept their waste.



You know, that's a much broader question. Does that help?
BY MR. STOUCK:
Q. That does help. I think what that means is you did not have any understanding one way or the other on this question during the time you were working on these matters; is that right?
MR. CRAWFORD: Objection.
THE WITNESS: I think, if you boil it all down, that would be fair. I mean that's a complex situation.
MR. STOUCK: Can we go off the record.
(Discussion off the record.)
MR. STOUCK: Can you mark this?
(Brownstein Exhibit No. 82 was marked for identification.)
BY MR. STOUCK:
Q. Mr. Brownstein, I must ask you, while you were off the record you had a conversation with your counsel?
A. Yes.
Q. Anything else you want to tell me about our recent exchange?
A. No.
Q. Okay. Do you know what this is?

didn't have a facility, with respect to the first caveat; with respect to the second, what would happen if they had an approved DCS but took no action to submit an FDS, we never really addressed that, I never really addressed that.

You know, every stage -- you know, whether it was the APR or the DCSs, I know in correspondence we urged -- we told the utilities this was consistent with the contract, but we never said -- well, we never did the what-if questions.

BY MR. STOUCK:

Q. So you didn't have any understanding one way or the other about my question which is you have the DCS, but you don't have anything subsequent, you just never thought about it, never focused on it; is that fair?

MR. CRAWFORD: Same objections.

THE WITNESS: I did not think we had a binding obligation with respect to my first caveat which is because the commencement of facility operations. We never really addressed the second caveat situation, where we had that and it stopped.

BY MR. STOUCK:

Q. You never formed that understanding?

A. No.



Q. You agree with my statement, never formed an understanding?

A. Yes.

Q. And you expected that utilities, you expected them in the course of the processes discussed in the standard contract, that at some point in time utilities would submit final delivery schedules, that's the way you thought about it?

A. I had every reason to expect that utilities, you know, participated, if you will, in both the ACR, in the development of the APR, and in responding to our instructions on the DCS.

Q. Okay. So you did expect that there would be FDSs for all spent fuel described in a DCS?

A. I did.

Q. And do you know whether it would be possible for DOE to accept spent fuel from a utility if that utility had submitted a DCS to DOE, proper DCS, completely filled out, but had not submitted an FDS? And, just to amplify my question, is there enough information specified in the DCS to allow DOE to accept spent fuel for disposal even if DOE does not subsequently get the additional information specified in the FDS?

MR. CRAWFORD: Objection, compound, vague,



and to the foundation and to the extent it calls for a legal conclusion.

THE WITNESS: Not necessarily. Let me try to give you an example. And frankly I would have to go back and review, it's been a long time, whether it's a real example or not. But let's say a utility owned a couple reactors and say one -- a couple examples, one was a PWR and one was a BWR or one facility could accommodate rail and one facility can only do truck.

In the DCS they may put a range of fuel down that encompassed both situations. Under that situation we would not necessarily have enough information whether to show up with the right type of cask, whether it be a BWR, PWR, or a rail or a truck cask. So that's not -- that's why I said not necessarily.

BY MR. STOUCK:

Q. Okay. So there are circumstances such as the examples you just gave me where, in the absence of the additional information set forth in the FDS, DOE would not be in a position to accept spent fuel just on the basis of the information set forth in a DCS with respect to the same fuel?

MR. CRAWFORD: Objection, asked and



answered.

THE WITNESS: If that was the only information we have, that could be a problem.

BY MR. STOUCK:

Q. Well, would it be a problem in at least some circumstances, maybe not all, but at least some?

MR. CRAWFORD: Same objection.

THE WITNESS: I would expect it would be a problem especially in the initial years, whenever those initial years were, as we were -- we would be -- we would be ordering casks, for example, we would understand -- the vision was that we would understand what casks of what type we would need and what year.

And we would begin to order that, you know, in an efficient manner from the manufacturers. It wouldn't be a -- we viewed it not as a prudent use of nuclear waste fund dollars to take a look at what we would need over ten years and order that on day one.

So, in the initial years, we may have a limited number of truck and rail casks and those orders would, in fact, be based in part on information that was exchanged in both the DCS and the FDS. That's the basis for how I'm giving you the

# CHRISTOPHER KOUTS

**Pacific Gas & Electric Company v U.S No. 04-74C June 13, 2006**

**Heritage Reporting Corporation**

**Page 2286 to Page 2632**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*HERITAGE REPORTING CORPORATION*
*1220 L Street, N.W.*
*Suite 600*
*Washington, DC 20005*
*Phone: 202-628-4888*
*FAX: 202-371-0935*

Page 2286

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

-----------------------------x

PACIFIC GAS & ELECTRIC COMPANY : No. 04-74C

Plaintiff. :

vs. :

THE UNITED STATES,

Defendant. :

-----------------------------x

Courtroom 5
National Courts Building
717 Madison Place NW
Washington, D.C.

Tuesday, June 13, 2006

VOLUME 7

The parties met, pursuant to the notice of the Judge at 9:03 a.m.

BEFORE THE HONORABLE EMILY C. HEWITT

Page 2287

APPEARANCES

ON BEHALF OF PLAINTIFF:
JERRY STOUCK, ESQ.
ROBERT L SHAPIRO, ESQ
DAVID CALLET, ESQ
ERIC ROWE, ESQ.
Greenberg Traurig LLP
800 Connecticut Avenue Northwest, Suite 500
Washington D.C. 20006
(202) 331-3100

ON BEHALF OF THE DEFENDANT:
JOHN EKMAN, ESQ
ALAN LO RE, ESQ.
HEIDE HERRMANN ESQ.
SCOTT R DAMELIN, ESQ
SHARON A SNYDER, ESQ
JOSHUA E. GARDNER, ESQ.
MARIAN SULLIVAN, ESQ
U.S. Department of Justice
1100 L Street Northwest
Washington, D C 20036
(202) 514-2000

Page 2288

APPEARANCES (Continued).

ALSO PRESENT: DAVID ZABRANSKY
JANE TAYLOR
GABRIELLE BUTLER

***Index appears at end of transcript***

Page 2289

PROCEEDINGS

-----

THE COURT: We continue with the Plaintiff's case, the last witness, Dr. Cornell. Before we turn to that, are there any housekeeping matters at this time?

MR. EKMAN: Your Honor, the government just wanted to inform the Court that the deposition of Mr. David Duke is scheduled for today at 2:00 by telephone.

THE COURT: All right. And how does that impact the schedule in court? Do you have other persons who are working with that?

MR. EKMAN: Indeed, we do.

THE COURT: Thank you. Plaintiff can call its next witness.

MR. STOUCK: Thank you, Your Honor. Plaintiff calls Professor Brad Cornell.

THE COURT: Mr. Cornell, good morning, sir. When you arrive at the witness chair to my left, before you sit down, if you would indicate that you're ready to take the oath by raising your right hand?

Whereupon--

BRADFORD CORNELL

Page 2582

MR. LO RE: Certainly, Your Honor.
THE COURT: Mr. Christopher Kouts?
THE WITNESS: Yes.
THE COURT: Good afternoon, sir.
THE WITNESS: Good afternoon.
THE COURT: When you arrive at the witness chair, before you sit down and when you're ready to take the oath, please indicate by raising your right hand.
Whereupon–
CHRISTOPHER KOUTS
a witness, called for examination, having been duly sworn, was examined and testified as follows:
THE COURT: Thank you, sir. Please state your full name for the record.
THE WITNESS: Christopher Alexander Kouts.
THE COURT: Mr. Lo Re to examine on direct examination.
DIRECT EXAMINATION
BY MR. LO RE:
Q. Good afternoon, Mr. Kouts.
A. Good afternoon.
THE COURT: Please pour yourself a glass of water, if you'd like.

Page 2583

THE WITNESS: Okay. Thank you.
BY MR. LO RE:
Q. Mr. Kouts, where are you currently employed?
A. I am currently employed with the Office of Civilian Radioactive Waste Management within the U.S. Department of Energy.
Q. What is your title there, sir?
A. I am director of the Office of Waste Management.
Q. And how long have you been in that position?
A. I've been in that position since we reorganized recently, for approximately a month.
Q. Prior to that, what was your title?
A. I was director of the Office of Systems Analysis and Strategy Development.
Q. How long were you in that position?
A. On an acting basis, since October 2002, and on a permanent basis, I believe July of 2003.
Q. Now, what did your responsibilities include when you were in your previous position?

Page 2584

A. They're essentially the same as they are now. I am responsible for the waste acceptance component of the waste management system, which includes management of the standard contracts with utilities and all the activities associated with that, such as testifying in court on certain issues.
The other pieces of my responsibilities include systems analysis for the program, making sure that the various components of the program, the repository, the transportation component, and the waste acceptance component, work effectively and efficiently.
In addition to that, I'm primary coordinator for other DOE programs within the Department, the Office of Environmental Management, that manages most of the defense waste that the country has and also the Naval Nuclear Propulsion Program, which is responsible for providing essentially nuclear power to our nuclear fleet, plus other activities, including safeguards on security policy and other activities as assigned.
Q. And I think you touched on this in

Page 2585

your prior answer, but can you describe for the Court how your responsibilities relate to the execution of the standard contract for the acceptance of spent nuclear fuel and high-level waste?
A. Yes. When the Department chooses a date for the, that it intends – or year, if you will, that it intends to receive spent fuel from utilities for the purposes of disposal, the process associated with the contract, the delivery commitment schedules, and the final commitment schedules, that would all be managed in my office.
I have several staff who support me in that area. Mr. Zabransky, who's here in court, is a contracting officer, Mr. Pollog also, who will be testifying later. And in that process, any contractual aspects associated with that would be managed through my office.
Q. And to whom do you report at the Department of Energy, sir?
A. I report to the principal deputy director of the program, Mr. Paul Goalen.
Q. And to whom does Mr. Goalen report?
A. Mr. Goalen reports to the recently

Page 2586

named director of the program, Ward Sproat.
Q. And to whom does Mr. Sproat as the director of OCRWM report?
A. He reports to the Undersecretary and the Secretary of Energy and the Deputy Secretary, I should say.
Q. Mr. Kouts, when did you first join – I'm going to refer shorthand, for the Office of Civilian Radioactive Waste Management, as OCRWM, if that's okay?
A. Sure.
Q. When did you first join OCRWM?
A. I joined in June 1985.
Q. And can you briefly go through your various jobs that you had with OCRWM?
A. I'll endeavor to be brief. My first assignment when I joined the program was to develop the monitored retrievable storage proposal that was a requirement of Section 141 of the Nuclear Waste Policy Act. I worked on that for several years, until that was submitted in 1987. At which point, I worked on integration activities and then was subsequently appointed to be head of our transportation program.

Page 2587

After that, in that position about three years, I was appointed to a division that – actually, no, I worked for the director's office on contingency planning and strategic planning for a period of time. Then I moved into a division that dealt with interactions, primary interactions with the Nuclear Regulatory Commission and regulatory affairs for the program.
From there, I went to a position that supported the director of the program at that time for all his activities associated with development of testimony, policy papers, and so forth, director of division of the planning division for a few years. Then I accepted a different division, which was responsible for developing an interim storage design, a topical safety analysis report that was to be submitted to the Nuclear Regulatory Commission.
And that was in anticipation that the Department would receive interim storage authority from Congress which was being considered at that time. After that position –
THE COURT: I'm sorry. What time

Page 2588

frame was that in?
THE WITNESS: That was in the mid-90s, from about '95 to about '97.
THE COURT: Thank you.
THE WITNESS: At that point in time, I then accepted a position working essentially for the director's office and for the director of Yucca Mountain project as a liaison, as a technical and policy liaison, and I was responsible essentially for making sure that policy products that were produced and technical products that were produced by the project at that point were acceptable to the Department.
The first was the liability assessment, which was a Congressional deliverable, which we submitted in 1998, and then subsequent to that, I worked on, for several years, until its completion, the site recommendation for Yucca Mountain.
That specific activity required me to be the primary interface with the Secretary's office and the Undersecretary's office in that regard. I was the point person for the program and dealt with virtually all the issues that

Page 2589

occurred up until the point of the Secretary's recommendation.
After the Secretary recommended it to the President on February 14th, then the Secretary and the President subsequently recommended the site to the Congress. I was involved in preparing the Secretary and the Undersecretary for hearings, which were called by Congress. In addition to that –
THE COURT: February 14th of what year.
THE WITNESS: I'm sorry, 2002. The way the Nuclear Waste Policy Act is set up, once the site was recommended, the governor of Nevada had an opportunity to disapprove the site, if he disagreed with it, which he subsequently did.
As a result, there were a series of hearings by Congress to consider the state's veto. And, again, I supported the Secretary and the Undersecretary in those activities up until the point of the President signing the joint resolution of Congress in July of 2002, which essentially affirmed the site selection.
Subsequent to that, shortly

Page 2590

thereafter, I was appointed an acting, excuse me, an acting position to the Office of Systems Analysis.

BY MR. LO RE:

Q. And that's the position we talked about at the beginning of your testimony?

A. That's correct.

Q. Mr. Kouts, could you provide the Court with your educational background after high school?

A. I have a Bachelor's and a Master's degree in engineering, and I'm also a licensed professional engineer.

Q. And where is your degree from, sir?

A. George Washington University.

Q. Are you familiar with the term "M&O contractor"?

A. Yes, I am.

Q. And what does that mean?

A. It means management and operating contractor.

Q. And do the M&O contractors play any role with respect to the way OCRWM establishes the standard contract, executes the standard contract?

Page 2591

A. They serve as the primary support contractor for the program's contractual activities, and I say contractual in the manner -- they're a prime contractor, and the reason we have an M&O contractor is that there was a great deal of criticism at the time in the early years of this program that we had many different contractors and we couldn't manage them all. So as a result, we went to more of a mission oriented management and operating contractor concept, so most of our money is spent through that for the various activities of the program, including the repository, transportation, and some in the waste acceptance area.

Q. Is there one M&O contractor under the standard contract?

A. Yes, there's one M&O contractor that we have.

Q. And who is that, what entity is that?

A. It's Bechtel SAIC Corporation.

Q. You touched on this, I think, a moment ago, but can you describe what Bechtel's responsibilities are as the M&O contractor?

Page 2592

A. On an annual basis, we give them an annual plan, a task plan, and they conduct activities under that task plan for the next fiscal year. In addition, if there is additional work that we need done in any one year, we give a technical direction letter, which then they perform that work and provide deliverables to us.

Q. Now, in the jobs that you've described that you've had with OCRWM, how have you used M&O contractors and their subcontractors?

A. We ask them specifically in my area to do, for instance, in a systems area, we'll ask them to do systems analyses and have them conduct those analyses for us, and then we'll review their deliverables after they finish their work.

Q. Now, you mentioned deliverables a moment ago. In what form are the deliverables from the M&O contractors?

A. They're typically in the form of paper reports that are provided under Bechtel stationery.

Q. And how does DOE regard those forms, those written, that written work product?

Page 2593

A. They are deliverables in the view of the contractor, essentially on that specific activity.

Q. Now, is there a process by which DOE makes a determination to adopt a position by a contractor?

A. If the Department chooses to accept the views of the contractor and chooses to make a statement about it publicly, it will issue a Departmental document or something under the Departmental letterhead in order for that to become a Departmental position.

Q. Now, is there a particular process that DOE goes through to put its imprimatur on a document?

A. Yes. A document has to go through a clearance process and will have to be accepted by the federal employees within the program, and at that point in time, when it's accepted, it can become a DOE document.

Q. Now, is there somebody within OCRWM who is responsible for setting policy with respect to a document?

A. The primary policy officer within the program is the director of the program.

Page 2594

Q. Now, Mr. Kouts, while we were talking about your various jobs, you mentioned the MRS. I want to go back to that and spend a little time with that.

A. Okay.

Q. Can you describe what you did with respect, or what you have done with respect to the development of the MRS under the standard contract?

A. As I indicated earlier, my first position in the program was to help develop the monitored retrievable storage proposal to Congress that was required by Section 141 of that Act. There are a variety of requirements for the report or the proposal that Congress wanted in relation to that facility.

And part of that was the need for and feasibility of such a facility. In addition to that, we did an environmental assessment, environmental evaluation, and we also provided a program plan. I was responsible, as a staff person back in June of 1985, for the needs and feasibility analysis of the MRS.

Q. Now, when you started working on the MRS project, how did DOE foresee the use of an

Page 2595

MRS, if you know?

A. Yes, I do remember. The vision of the director at that time, Mr. Ben Rusche, was that the, it takes some explaining, but I'll do it briefly, that a geologic repository for the disposal of high-level radioactive waste was going to be a very difficult, a difficult animal to accomplish.

So his view was that the MRS, the monitored retrievable storage facility should be more than just a storage facility. It should be an integral component of the system and should actually do the packaging of the materials for the repository. The idea was to have the MRS centrally located, where the vast majority of fuel from reactors would be sent to it.

The fuel would then be repackaged at that time. We were thinking of consolidating fuel rods, taking the fuel assemblies apart, consolidating them and putting them into disposal ready containers, which would go to whatever repository was selected.

At that time, at that point in time, we were looking at three different repository

Page 2596

sites. We were looking at the basalt site in Hanford, Washington. We were looking at the Yucca Mountain site in Nevada, on the Nevada test site. And we were also looking at a bedded salt deposit in Deaf Smith County, Texas.

So the idea was, whichever of those repositories was selected, that the MRS would do the packaging, acceptance of the fuel from the reactors, from primarily the eastern reactors, and then that would be packaged. And then in disposal ready containers or canisters, those would be transported to the repository. And then the repository would then put those underground and for permanent isolation.

Q. Now, Mr. Kouts, I'd like to show you an exhibit. This is PX-82.

MR. LO RE: If I may approach, Your Honor?

THE COURT: Yes.

MR. LO RE: This is, as counsel points out, this is an excerpt of PX-82, which I believe is in evidence, Your Honor.

BY MR. LO RE:

Q. And just one housekeeping note,

Page 2597

Mr. Kouts, we are going to be providing you with hard copy exhibits. What we're looking at, our technical staff will also have the document on the screen for you to look at, whatever you prefer.

A. Okay.

Q. This document is entitled, "The mission plan for the Civilian Radioactive Waste Management Program." It's dated June 1985. Mr. Kouts, are you familiar with this document?

A. Yes, I am.

Q. And what is it?

A. This was a requirement of the Nuclear Waste Policy Act, that the program develop a mission plan in terms of its concept of how it was going to implement the Nuclear Waste Policy Act and also generate the general schedules that we were going to be implementing.

Q. And you said that you came on to the program just around this time, is that right?

A. That's correct.

Q. And did you take any action with respect to this exhibit, this document?

A. Well, this, yes, this document became the primer for the program for several years,

Page 2598

and familiarity with it was absolutely essential to understanding where the program was going.

Q. Now, I'd like to turn to the page that's Bates-numbered, and I'll refer to that uppermost Bates number to be clear, that's Bates-numbered, ends in 5305, and it's under the heading, "IV, assumptions about geologic repositories." Do you see that? I'm sorry, it's page five – I'm sorry, page 25 of the document.

And I'm afraid, I think that the copy you're looking at – I lied. I think the copy you're looking at doesn't have Bates numbers, so we're going to go with page 25 of the document.

Let's look at that heading IV and everything below it. It says, "Assumptions about geologic repositories," and all the bullets below. Again, the heading here was, "Assumptions about geologic repositories."

What was the significance of this clause, sir?

A. This was the planning basis for the program. At that time, we were basically planning and implementing to geologic

Page 2599

repositories and specifics about them.

Q. And under C, under repository start-up dates for the authorized system?

A. Yes.

Q. Do you see that? Now, there is no reference here to the MRS. Do you know why that is?

A. At this point in time, this was the only – the only thing that the program had authorized were repositories. Therefore, that's why this is referred to as the authorized system. If you go back to the Nuclear Waste Policy Act, the first repository was authorized, therefore, and the second repository was implied.

So the thoughts were that you were only allowed to build geologic repositories at this point in time.

Q. Now, if you look under 2.7, which is just below there, it says, the heading is, "Waste Acceptance Schedule." Do you see that?

A. Uh-huh.

Q. The first sentence says, "The DOE is committed to accept waste from the signatories of the standard disposal contracts on a firm

Page 2600

schedule that begins no later than January 31, 1998." Do you see that?

A. Yes, I do.

Q. And what was your understanding of that sentence?

A. It kind of speaks for itself. The Department was committed to accepting spent fuel under the contract no later than January 31,1998.

Q. Now, there are two schedules we're going to talk about that are set out below there, there's table 2-2 and table 2-3. Do you see that?

A. Yes, I do.

Q. How did those schedules relate to your understanding of DOE's obligations under the standard contract?

A. Well, essentially, it was the planning basis, at that time, as to the amount of acceptance that we were going to be taking in any one year at one facility.

Q. And how did they relate to your contractual obligation, if you know?

A. Well, there's, in terms of a contractual obligation, there are no

Page 2601

requirements for the amount of spent fuel, as far as I'm aware, that the Department needs to take. The Department understands it needs to take all this fuel that the utility generate, but the rate at which the Department does that is subject to the Department's interpretation of what it can do and what it can't do.

Q. Now, there's a reference below here to, the last paragraph in this sentence, "on the basis of the integrated system approach described in the improved performance plan," do you see that?

A. Yes, I do.

Q. It says, and in that Section 2.3, "The DOE has identified many possible waste acceptance schedules," then it goes on. What is that reference there, the improved performance plan, what is your understanding of that?

A. The improved performance plan basically refers to a system that not only has repositories in it, but also a monitored retrievable storage facility.

Q. Now, talk about 2-2 and 2-3, let's start with 2-3, which is the improved

Page 2602

performance system, and that's page 27 of this document. Now, what was your understanding of the status of the authorization, Congressional authorization for this schedule at this time, 1985?
A. As I mentioned earlier, in 1985, the only authorized facility we had was the repository, was really the first repository, and therefore, the acceptance at that, at an MRS was, again, would have to be approved by Congress, in terms of the facility would have to be authorized.
Q. Now, there's a reference here both to a first repository, and that comes online in 2000, I guess it's 1998, and then there's a reference to a second repository coming online later, do you see that?
A. Yes, I do.
Q. What was the status, if you know, of the authorization of the second repository at this time?
A. I don't believe the second repository was authorized. The Act clearly indicated that it was Congress' intent that there should be multiple repositories because, essentially,

Page 2603

they placed a 70,000-ton limit on the first repository until the second repository was in operation.
Q. Now, if you look in the upper left-hand corner of this document, it says, "pre-1998," do you see that, this very top line? And then it says, "MRS acceptance," do you see that?
A. Yes, I do.
Q. Very hard to read, I apologize. What is your understanding of what was to happen under this contract, vis-a-vis the MRS, and when?
A. The early planning for the MRS had it operational in the 1996 time frame, so what that line, that pre-1998 line reflects is the amount of spent fuel that would be received at the MRS prior to the time that the repository was operational.
Q. And how did that pre-1998 performance comport with your understanding of DOE's obligation under both the Nuclear Waste Policy Act and the standard contract?
A. It was over and above that level of performance required, as I read it.

Page 2604

Q. Now, you'll see that on the right-hand side, there is a column that says, "spent fuel backlog," on this chart?
A. Yes, I do.
Q. And, again, this is a bit of an eye test, but if you look at – first of all, what is your understanding of what the spent fuel backlog is?
A. That was an estimate at the time of the amount of spent fuel that would have been discharged from reactors up until that specific year.
Q. And so looking at that first entry, it looks like 39,900, do you see that?
A. Mine says 37,000, but that's –
Q. Okay. I'm sorry. I misread it. It's 39, 37,9. Looking at that and looking at this chart, when does the backlog begin to get reduced on a steady state basis?
A. Well, it seems to go up to a peak of 38,600 in the – and it's kind of hard to read across, but I'll do my best. In the year 2005 and then subsequent to that, it's drawn down.
Q. Now, one other, hopefully, your eyes can bear with me.

Page 2605

A. Actually, excuse me, I think it's 2006.
Q. Thank you. Hopefully, your eyes can bear with me for one more question on this chart. If we look at the MRS acceptance column, and that's four columns in, when do you reach the 3,000 rate?
A. You reach it in 1998. You're essentially accepting 3,000 metric tons at the MRS in 1998.
Q. Okay. Now, let's flip back to table 2-2 for a moment, and this refers on the heading as, "Waste Acceptance Schedule Authorized System." Do you see that?
A. Yes, I do.
Q. Okay. And what was the significance of that to you?
A. Again, this was the only system that the program perceived that it was authorized from Congress at this time.
Q. And, again, this has the first repository coming online in 1998, correct?
A. That's correct.
Q. No MRS?
A. That's correct.

Page 2606

Q. And then there's a second repository coming online, when is that?
A. It looks like 2006.
Q. Okay. Let's just look at that first repository for a moment. You'll see beginning in 1998 that – and it's under the column, "Spent Fuel." Do you see that?
A. Yes.
Q. What is the amount of fuel that's being accepted in 1998 on this second, on this table 2-2?
A. 400 metric tons.
Q. Now, when does the rate of 3,000, when is that achieved on this chart?
A. On this chart, it's in the sixth year of operation, which would be in 2003.
Q. Now, what is the steady state rate for the first repository here?
A. The steady state rate, as far as I can tell, is 3,000 metric tons.
Q. Okay. Now, let's bring on the second repository. That comes online, I think you said in 2006, is that right?
A. Let me say that it's 3,000 tons of spent fuel, if you will, commercial spent fuel,

Page 2607

and then there's high-level waste, which are essentially defense materials, which are in addition to that, so the acceptance rate of the total rate is 3,400, the commercial spent fuel rate is 3,000.
Q. Thank you for the clarification. And actually, before we talk about the second repository, I want to ask you something else that I missed.
A. Sure.
Q. And that is, do you know why the repository doesn't begin accepting spent nuclear fuel at a rate of 3,000 MTU per year in 1998?
A. As I remember, the intent there was to walk before you can run, and the idea was that the facility needed to ramp-up in a reasonable sense, so that you build up to your maximum capacity. You don't have – although you may have capability on day one, you only operate in order to get your procedures straight. And it's just good sense to start up a nuclear facility, essentially, at a relatively lower rate, just as nuclear power plants would be done. They start off at low power, then

Page 2608

they build up to higher power. This is a reflection of just an engineering, if you will, concept, that you would slowly ramp-up with the repository to its maximum capability here in year six.
Q. To your knowledge, has that mind-set of walking before you run, or concept, has that changed during your tenure at OCRWM?
A. No, that's been pretty consistent. There have been different concepts about how much, how long the ramp-up should take, but that general concept has been fairly consistent throughout my involvement in the program.
Q. Now, let's talk about that second repository on table 2-2, comes online, I believe it's 2006, and I'm looking at the column, left column that says, "Spent Fuel," under the second repository. When does that repository reach its steady state rate?
A. It looks like that reaches its steady state rate in its seventh year of operation.
Q. And what is that steady state rate?
A. 3,000 metric tons.
Q. And so once the second repository comes on, once the second repository is

Page 2609

accepting at a steady state rate, what is the acceptance rate, according to this chart, between the two repositories?
A. For commercial spent fuel?
Q. For commercial spent fuel, yes.
A. It would be 6,000 metric tons per year at the maximum rate.
Q. Now, let's look at that backlog column on this chart, which is the one on the far right. Looking at this chart – and I think it might be a little easier to read, maybe not.
A. Mine's harder to read.
Q. Can you tell when the backlog begins to get reduced on this chart, which is 2-2, table 2-2?
A. It looks like it reaches a peak of 51,900 in the year 2006 and then goes down after that year, starting in 2007, I believe. Let me just read, take one more look at that.
Q. Sure.
A. Yeah, it's 2006 that it reaches a peak, and after that, it goes down.
Q. And, again, performance begins on this chart in what year?
A. In this chart, it's 1998.

Page 2610

Q. Okay.
THE COURT: Is 51,900 the peak, 51,900?
THE WITNESS: That's what it appears to me, yes.
THE COURT: We're on 2-2, right?
THE WITNESS. Correct.
THE COURT: And that's the –
THE WITNESS: That's the point –
THE COURT: That's the ninth item down that chart?
MR. LO RE: Your Honor, if this is helpful, I think that DX-81 –
THE COURT: Okay.
MR. LO RE: Or, actually, excuse me, PX-81 is a better, a more legible copy.
THE COURT. I'm just going to suggest to you we need to check when we get to that, that 2005, it could be the year we just need to check.
MR. LO RE: Okay. That's fine.
THE COURT: And the same is true on table 2000 – 2-3?
THE WITNESS: You're right. It might be 2005. I'm sorry.

Page 2611

THE COURT: We just need – it's around there, but I think it may be a higher year.
MR. LO RE: Your Honor, if it's okay, maybe we could do it now, if I could just show the witness what I think is a clearer version?
THE COURT: Sure, sure.
BY MR. LO RE:
Q. I'm going to hand you –
MR. LO RE: If I may approach, Your Honor?
THE COURT. Yes, that's fine.
MR. LO RE: Thank you. This is PX-81, and no need, I don't think we need to move this into evidence because it is, it is a duplicate, and unless the Court prefers, whatever the Court prefers.
THE COURT: Well, I'm going to move this in. PX-81 is admitted.
MR. LO RE: Thank you.
THE COURT: Is that – okay, because –
MR. LO RE: It might be easier for everybody after the fact.
THE COURT: Yes.

Page 2612

(Plaintiff Exhibit Number 81 was received in evidence.)
THE WITNESS: It's 2005, that's correct.
BY MR. LO RE:
Q. So just so we're clear, 2005 in table 2-2?
A. That's correct.
Q. Is when the backlog begins to be reduced?
THE COURT: And then look at table 2-3 also and see if.
THE WITNESS: Okay.
THE COURT: I think that's the same.
THE WITNESS: All right. That's also 2005.
BY MR. LO RE:
Q. And then just while we're looking at a clearer copy, when does that second repository come online, what year is that? Is it easier to read on this? And, again, I'm sorry. This is, now, I'm talking about 2-2, when the second repository comes online.
A. It would be year 2006.
Q. And then just to close the loop on

Page 2613

that, if we're looking at table 2-3, what year does the second repository come online?
A. Also 2006.
Q. Okay. Thank you. Now, Mr. Kouts, I'd like you to turn to page 28 of this document, the second full paragraph starting with the word "included."
A. Yes.
Q. "Included in tables 2-2 and 2-3 are possible acceptance schedules for defense high-level waste." And then below, it says, "These schedules are for illustrative purposes only at this time. The amount of defense waste to be disposed of in the repository and the actual acceptance rates have not yet been determined by DOE." What does that mean, if you know?
A. That's essentially indicating that this was an estimate and that it was not in any way a commitment, that it was the amount of materials we were going to be taking, there was a lot of uncertainty at this point in the program of the amount of waste and where we were headed and so forth.
Q. At the bottom of the last page, the

Page 2614

very, very last paragraph, it says, "The representative waste acceptance schedule for the improved performance system," do you see that?

A. Yes, I do.

Q. And then it rolls over to the next paragraph, last paragraph of the bullets, starting with, "it should be emphasized."

A. Yes.

Q. Okay. And could you read that into the record, please?

A. "It should be emphasized that this schedule is only an approximation of how the system may operate and is subject to considerable variation. The DOE will further define and specify the system acceptance parameters as the program progresses."

Q. And what was your understanding of that phrase, sir?

A. Essentially, exactly what it indicates, is that at this point in the program, we were uncertain about what the system would look like, the size of it, the amount of fuel and the materials we were going to be accepting, and we wanted to put everyone

Page 2615

on notice that this was our best guess at that time.

Q. Now, if you look at the paragraph, two paragraphs below, there's a paragraph starting with, "the DOE"?

A. Yes.

Q. And halfway down, maybe three-quarters of the way down, it says, "under the terms." Do you see that sentence?

A. Yes, I do.

Q. Could you read that into the record, please?

A. "Under the terms of the contracts for disposal services that had been signed between the DOE and the utilities, an annual capacity report with projected annual receiving capacities and rankings will be issued by the DOE beginning in 1987."

Q. Could you go on, please, next sentence?

A. "In 1991, the DOE will begin to publish firm waste acceptance schedules for individual reactors, including shipment allocations."

Q. And, Mr. Kouts, what was your

Page 2616

understanding of those two sentences?

A. My understanding was that in terms of implementing the contract and making commitments for the Department, in terms of what it would receive in spent fuel or acceptance of spent fuel from utilities, that we were going to be following the process identified in the standard contract, and we would start the delivery commitment schedule process in 1991 in anticipation of 1998 waste receipt from utilities.

Q. Thank you. Mr. Kouts, I'd like to show you another document. This is DX-107.

MR. LO RE: If I may approach, Your Honor?

THE COURT: You may.

BY MR. LO RE:

Q. This document is dated March 1987 and is entitled, "Monitored Retrievable Storage Submission to Congress." Mr. Kouts, are you familiar with this document?

A. Yes, I am.

Q. What is it, sir?

A. It's volume I of the proposal that the Department submitted to Congress in fulfillment

Page 2617

of the requirements of Section 141 of the Nuclear Waste Policy Act to submit a proposal on monitored retrievable storage to the Congress.

Q. Were you involved in the development of this proposal, sir?

A. Yes, I was.

Q. How was that?

A. Essentially, I was actively involved with this volume of the second volume, which was the needs and feasibility analysis and the environmental assessment of the sites and also in the program planning, that was volume III of this.

Q. Now, Mr. Kouts, I'd like to turn to -- I hope you have Bates numbers on this one -- what is marked as the Bates number 311. This is the executive overview, and if you would turn now to the second page of this executive overview, now looking at the paragraph that starts with, the first full paragraph that starts, "The DOE's proposal"?

A. Yes.

Q. It says, "The DOE's proposal was ready for submittal to Congress in February 1986, but