# CONDENSED TRANSCRIPT

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

YANKEE ATOMIC ELECTRIC COMPANY
CONNECTICUT YANKEE ATOMIC POWER COMPANY
MAINE YANKEE ATOMIC POWER COMPANY
FLORIDA POWER & LIGHT COMPANY
NORTHERN STATES POWER COMPANY
DUKE POWER, A Division of DUKE ENERGY CORP.
INDIANA MICHIGAN POWER COMPANY
SACRAMENTO MUNICIPAL UTILITY DISTRICT
SOUTHERN NUCLEAR OPERATING COMPANY, et al.
COMMONWEALTH EDISON COMPANY
BOSTON EDISON COMPANY
GPU NUCLEAR, INCORPORATED WISCONSIN
ELECTRIC POWER COMPANY
POWER AUTHORITY OF THE STATE OF NEW YORK
OMAHA PUBLIC POWER DISTRICT
NEBRASKA PUBLIC POWER DISTRICT
TENNESSEE VALLEY AUTHORITY,

Plaintiffs,

vs. Case Nos. 98-126C, 98-154C, 98-474C
98-483C, 98-484C, 98-485C
98-486C, 98-488C, 98-614C
UNITED STATES, 98-621C, 99-447C, 00-440C
00-697C, 00-703C, 01-115C
01-116C, 01-249C

DEFENDANT.

---

VOLUME II
DEPOSITION OF ROBERT M. ROSSELLI
Taken on behalf of Sacrament Municipal Utility District
April 16, 2002

\- - -

BE IT REMEMBERED THAT, pursuant to the Washington Rules of Civil Procedure, the deposition of Robert M. Rosselli was taken before Marta M. Rice, a Certified Shorthand Reporter, and a Notary Public for the State of Washington, on April 16, 2002, commencing at the hour of 9:07 a.m., the proceedings being reported at the Hampton Inn, 486 West Bradley, Richland, Washington.


## NAEGELI REPORTING CORPORATION

Portland, OR (503) 227-1544
Spokane, WA (509) 838-6000
Seattle, WA (206) 622-3376
Coeur d'Alene, ID (208) 667-1163

National: (800) 528-3335
www.naegelireporting.com
Fax: (503) 227-7123

Corporate Office: 2020 US Bancorp Tower, 111 S.W. Fifth Avenue, Portland, OR 97204

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
YANKEE ATOMIC ELECTRIC COMPANY
CONNECTICUT YANKEE ATOMIC POWER COMPANY
MAINE YANKEE ATOMIC POWER COMPANY
FLORIDA POWER & LIGHT COMPANY
NORTHERN STATES POWER COMPANY
DUKE POWER, A Division of DUKE ENERGY CORP.
INDIANA MICHIGAN POWER COMPANY
SACRAMENTO MUNICIPAL UTILITY DISTRICT
SOUTHERN NUCLEAR OPERATING COMPANY, et al.
COMMONWEALTH EDISON COMPANY
BOSTON EDISON COMPANY
GPU NUCLEAR, INCORPORATED WISCONSIN
ELECTRIC POWER COMPANY
POWER AUTHORITY OF THE STATE OF NEW YORK
OMAHA PUBLIC POWER DISTRICT
NEBRASKA PUBLIC POWER DISTRICT
TENNESSEE VALLEY AUTHORITY,
Plaintiffs,
vs. Case Nos. 98-126C, 98-154C, 98-474C
98-483C, 98-484C, 98-485C
98-486C, 98-488C, 98-614C
UNITED STATES, 98-621C, 99-447C, 00-440C
00-697C, 00-703C, 01-115C
01-116C, 01-249C
DEFENDANT.

VOLUME II
DEPOSITION OF ROBERT M. ROSSELLI
Taken on behalf of Sacrament Municipal Utility District
April 16, 2002
---

BE IT REMEMBERED THAT, pursuant to the Washington Rules of Civil Procedure, the deposition of Robert M. Rosselli was taken before Marta M. Rice, a Certified Shorthand Reporter, and a Notary Public for the State of Washington, on April 16, 2002, commencing at the hour of 9:07 a.m., the proceedings being reported at the Hampton Inn, 486 West Bradley, Richland, Washington.



APPEARANCES

ARNOLD & PORTER
BY: DAVID S. NESLIN
370 Seventeenth Street
Denver Colorado 80202-1370
303-863-2301
E-mail: David_Neslin@aporter.com
Appearing on behalf of Sacramento Municipal Utility

SHAW PITTMAN
BY; DANIEL S. HERZFELD
1650 Tysons Boulevard
McLean, Virginia 22102-4859
703-770-7612
E-mail: Daniel.herzfeld@shawpittman.com
Appearing on behalf of Florida Power & Light Company, Northern States Power Company, Duke Power, Indiana Michigan Power Company, Boston Edison Company, GPU Nuclear Inc., Power Authority of the state of New York, Omaha Public Power District, and Nebraska Public Power District

BALCH & BINGHAM



BY: K. C. HAIRSTON
1710 Sixth Avenue North
Birmingham, Alabama 35203
205-251-8100
E-mail: Kchairston@balch.com
Appearing on behalf of Alabama Power, Georgia Power, and Southern Nuclear

JENNER & BLOCK
BY: DONALD R. CASSLING
One IBM Plaza
Chicago, Illinois 60611-7603
312-222-9350
E-mail: Dcassling@jenner.com
Appearing on behalf of Commonwealth Edison Company

U.S. Department OF JUSTICE
CIVIL DIVISION
BY: HAROLD D. LESTER, JR. and R. ALAN MILLER
1100 L. Street, N.W.
Washington, D.C. 20530
202-307-6288
E-mail: harv.lester@usdoj.gov
alan.miller@usdoj.gov



Also Present:
Peter J. Skalaban, Jr.

RICHLAND, WASHINGTON,
APRIL 16, 2002,
9:07 a.m.

EXAMINATION
BY-MR.NESLIN:

Q. Mr. Rosselli, I remind you that you're still under oath from yesterday. Do you understand?
A. Yes.
Q. And we'll follow the same ground rules that we discussed in the beginning of your deposition yesterday, okay. Do you recall?
A. Yes.
Q. Have you discussed your deposition with anyone since the time that we broke yesterday and this morning?
A. No.
Q. I'd like to clarify one point that we discussed yesterday afternoon with respect to Exhibit 13, the December 20, 1983 draft of the Mission Plan. Mr. Rosselli, am I correct that this draft does reflect the intent of the Department, as you understood it at the time it was issued?
A. The intent of the Department as it

Page 190

relates to its plans to fulfill the requirements of the statute, yes.
Q. It reflects how the Department expected to fulfill it's requirements under the statute?
A. Yes.

(Whereupon, a document entitled Mission Plan for the Civilian Radioactive Waste Management Program, dated April of 1984 was marked Exhibit-24.)

BY MR. NESLIN:

Q. Mr. Rosselli, you've been handed what's been marked Exhibit 24 to your deposition. This document is entitled Mission Plan for the Civilian Radioactive Waste Management Program dated April of 1984. Would you have been responsible for the preparation of this document, sir? And let me clarify that this is not the entire document. It's simply, I believe, the first two chapters of a much lengthier document.
A. Given the fact that the Mission Plan was under my responsibility, I would conclude, yes.
Q. And you were still at OCRWM as of April 1984?
A. Yes, I was.
Q. Would you have reviewed this before it

Page 191

was published in this form?
A. I don't recall.
Q. Sir, as you've testified that you would have been responsible for the preparation of the Mission Plan, apparently a Mission Plan, this April draft, was prepared, was published. Pages 1 and 2 indicate that it was circulated to various parties by the Department. Based upon that, would you believe that you would have reviewed it before it was circulated?
A. The transmittal letter on this thing is dated May 2nd, '84. And I do not recall when I started to actually disengage. If memory serves me correctly, I was here in Richland in the first part of May. And so I don't recall the extent and degree of my actual review of this before it went out.
Q. Do you recall reviewing drafts of the Mission Plan subsequent to December 20th of 1983?
A. Yes, I did. I have reviewed those documents. Those are per all your documents.
Q. And I'm talking about drafts after, that were prepared after Exhibit 13?
A. No, I don't recall that. I just don't recall.

Page 192

Q. Do you recall the process that the Department followed in going from the December 20th, 1983 draft to the April 1984 draft?
A. Specifically, no, I don't recall the exact process.
Q. Do you recall anything about the process?
A. No, I don't.
Q. Do you recall who was involved in attempting to revise the plan?
A. Specifically, no.
Q. I believe you testified yesterday that the Mission Plan work was coordinated by Mr. Head in the operations division?
A. That's correct.
Q. Would Mr. Head have been involved in the preparation of the April 1984 draft?
A. Yes. I can only assume, you know, at this point in time, given the functional responsibilities of that organization and the fact that it fell under my responsibility that, you know, there was a process, and those players were involved from the initial draft to the second draft to the final.
Q. If I could direct you to page 2-1 of

Page 193

the April 1984 draft. If you could look under heading A, Waste Acceptance Schedule. If you could review that portion of the document. Do you see the table 2-1, Mr. Rosselli?
A. Yes.
Q. Do you recall reviewing this table?
A. No, I don't.
Q. At or about March or April of 1984?
A. I don't recall it specifically, no.
Q. Do you know whether this table reflected the Department's intended rate for receiving spent nuclear fuel as of April 1984?
MR. LESTER: Objection. Calls for speculation and a legal conclusion.
MR. NESLIN: You may answer if you can.
THE WITNESS: Yes. I believe that in the earlier version, it showed 1800 as the initial acceptance rate for the first five years. And I believe in further thought and discussion, the department felt that they couldn't start at that higher rate, so they made some adjustments to it and they, sort of, prepped for operation and full scale on a different schedule. And that's what I remember

Page 194

as the terms of why there are changes in the numbers from the previous Mission Plan.
BY MR. NESLIN:
Q. This table reflects the receipt rate of 400 metric tons beginning in 1998, increasing to 900 metric tons in 2001, 1800 metric tons in 2002, and then 3000 metric tons thereafter for the first repository. Correct?
A. Yes.
Q. And a second repository beginning in, I believe, 2005 at 1800 metric tons receipt rate, increasing to 3000 metric ton receipt rate in the year 2010. Correct?
A. Yes.
Q. Did that reflect the Department's expectation as of April 1984, as you recall?
A. Yes.
Q. Mr. Rosselli, was the change to a 400 metric ton receipt rate in 1998, was that because returns repository development was slipping?
A. No. It was much more associated with start-up of a new operation and what was doable relative to the start-up.
Q. Concerns that you could not immediately

Page 195

begin performing at 1800 MTU?
A. Right.
Q. Even if the facility were operating in 1998?
A. Right. It was as they were starting to look at it, you know, the feeling was that starting at 1800 was too big a number for an initial acceptance rate. And they had to start on a smaller scale and work through the procedures that were in place and get comfortable with them before they got to a steady state operation of 3000. It would take them some time to get there, which is a normal start-up situation, by the way, in anything.
Q. Who at the department was involved in making that change? Do you recall?
A. I don't recall that.
Q. Do you recall who at the department had concerns about the Department's ability to begin receiving waste at the rate of 1800 MTU in 1998?
A. I don't recall that.
Q. Do you recall -- if I could direct you back to Exhibit 1. Do you recall whether that reflected input from the geologic repository

Page 196

deployment section?
MR. LESTER: Objection. Asked and answered.
THE WITNESS: I don't recall.
BY MR. NESLIN:
Q. Do you recall whether it reflected input from the storage and systems development?
MR. LESTER: Same objection.
THE WITNESS: I don't recall.
BY MR. NESLIN:
Q. Is there anything that you can think of that you might look at that would refresh your recollection on this issue?
A. Not off the top, no.
Q. Can you think of who else would be knowledgeable about this issue?
MR. LESTER: Objection. Asked and answered.
THE WITNESS: Specifically, no.
(Whereupon, pages of a document from the Justice Department to Mr. Rosselli were marked Exhibit-25.)
BY MR. NESLIN:
Q. Mr. Rosselli, Exhibit 25 is a series of pages, the first page of which bears the

Page 197

# CONDENSED TRANSCRIPT

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

YANKEE ATOMIC ELECTRIC COMPANY,

Plaintiff,

vs. No. 98-126C, 98-145C, 98-474C

UNITED STATES OF AMERICA,

Defendant.

VOLUME III
DEPOSITION OF ROBERT M. ROSSELLI
Taken on behalf of the Plaintiff
April 16, 2002

- - -

BE IT REMEMBERED THAT, pursuant to the Washington Rules of Civil Procedure, the deposition of Robert M. Rosselli was taken before Marta M. Rice, a Certified Shorthand Reporter, and a Notary Public for the State of Washington, on April 16, 2002, commencing at the hour of 10:30 a.m., the proceedings being reported at the Hampton Inn, 486 Bradley Boulevard, Richland, Washington.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

YANKEE ATOMIC ELECTRIC COMPANY,
Plaintiff,
vs No 98-126C, 98-145C, 98-474C
UNITED STATES OF AMERICA,
Defendant.

VOLUME III
DEPOSITION OF ROBERT M. ROSSELLI
Taken on behalf of the Plaintiff
April 16, 2002

---

BE IT REMEMBERED THAT, pursuant to the Washington Rules of Civil Procedure, the deposition of Robert M. Rosselli was taken before Marta M Rice, a Certified Shorthand Reporter, and a Notary Public for the State of Washington, on April 16, 2002, commencing at the hour of 10.30 a m., the proceedings being reported at the Hampton Inn, 486 Bradley Boulevard, Richland, Washington

Page 227

APPEARANCES
SPRIGGS & HOLLINGSWORTH
BY. PETER J. SKALABAN, JR.
1350 I Street, N W.
Washington, D C. 20005-3305
202-898-5821
E-mail pskalaban@spriggs com
Appearing on behalf of Yankee Atomic Company

U S DEPARTMENT OF JUSTICE
CIVIL DIVISION
BY HAROLD D LESTER, JR and R. ALAN MILLER
1100 L Street, N W
Washington, D C 20530
202-616-0383
E-mail harv lester@usdoj.gov
alan miller@usdoj gov
Appearing on behalf of the United States

Page 228

RICHLAND, WASHINGTON,
APRIL 16, 2002,
10.30 a m
ROBERT M. ROSSELLI,
having been first duly sworn, was examined and testified as follows·
EXAMINATION
BY-MR SKALABAN
Q. Hello, Mr. Rosselli My name is Peter Skalaban I represent Yankee Atomic Electric Company, Connecticut Yankee Atomic Power Company, and Maine Yankee Atomic Power Company. This deposition has been noticed in Yankee Atomic Electric Company, Connecticut Yankee Atomic Power Company, and Main Yankee Atomic Power Company versus the United States under the numbers 98-126C, 98-153C and 98-474C Could you state your full name for the record?
A Robert Michael Rosselli
Q Procedurally, how this deposition will work is, I'll be asking you a series of questions, and you will be expected to answer the questions The court reporter is taking everything down, and we will get a written transcript of everything that's said today. Do

Page 229

you understand that?
A Yes, I do
Q Please respond verbally, so that the court reporter can get your answers So if possible, please avoid shaking of the head Is that okay?
A Yes, it is
Q If I ask you a question and you don't understand one of my questions, or you're not sure what I'm asking, will you let me know, so I can rephrase it?
A I will
Q And if I ask you a question and provide an answer and later on in the deposition you realize that answer is incorrect or incomplete, will you let me know, so that we can correct or complete your answer?
A Yes, I will.
Q. Thank you Sir, where were you born?
A Youngstown, Ohio
Q And when were you born?
A May 8, 1944
Q Did you grow up in Youngstown, Ohio?
A No I grew up, basically, in Murray, Ohio which is a southwest suburb of Cleveland

Page 230

Object to the form. Object because it calls for speculation
THE WITNESS: I have no basis to respond to that question
BY MR. SKALABAN
Q Is it reasonable to expect that some utilities under an OFF schedule would not have enough of an allocation to meet their storage needs?
MR LESTER Objection, vague Objection, doesn't define the time period. Objection, calls for speculation And I object to the form.
THE WITNESS I have no basis to respond to that question
BY MR. SKALABAN
Q When you say you have no basis to respond to my last two questions, you just don't have an understanding of the issue?
A I don't know what would happen in 1998 It's total speculation So I have no basis to comment upon that
Q Well, when you were involved in drafting the contract in 1983, did you have any expectations of how that would work in the



future?
A No
Q In terms of OFF and exchanges?
A No We were setting up a mechanism that would provide for the disposal of spent nuclear fuel based on oldest first
Q And that's how you expected it would work in practice?
A Yes. And there was the exchange provision to address, if for some reason a deviation surfaced.
Q And that reason would not be to reallocate the acceptance allocations to each utilities in an efficient way?
MR LESTER: Objection Asked and answered both in this deposition and in the last one Calls for a legal conclusion I object to the form as well
THE WITNESS I do not recall.
BY MR. SKALABAN
Q In your mind if exchanges would allow for the reallocation of spent fuel acceptance allocations in a manner that was efficient and saved utilities money, would that be a desirable outcome?



MR. LESTER: Objection, vague Calls for speculation
THE WITNESS. I don't recall
BY MR. SKALABAN.
Q But even sitting here today, would that be a desirable outcome to increase under efficiency?
MR. LESTER Same objections.
THE WITNESS I don't recall.
BY MR SKALABAN
Q. Again, Mr Rosselli, I'm not asking for your recollection. I'm just asking you for your opinion If exchanges would allow for utilities to realize cost savings by reallocating among themselves, acceptance allocations, would that be desirable?
MR LESTER Objection, vague Calls for speculation
THE WITNESS. You're asking me to comment on something that I don't recall was a consideration at the time of the formation of the contract
BY MR SKALABAN:
Q But sitting here today, you have no opinion on whether that would be desirable or



not?
A No, I don't
Q I'd like to call your attention to paragraph 112 on page 24 of this document That paragraph states, "Under the Yankee Atomic Contract, DOE is required to undertake all reasonable steps necessary for the development, licensing and construction of all transportation casks necessary for use in the spent fuel/HLW program established by the NWPA"
Do you agree with that paragraph, Mr. Rosselli?
MR LESTER Objection, vague Doesn't define the term reasonable Calls for a legal conclusion The standard contract is the best evidence of its contents
THE WITNESS I don't recall
BY MR SKALABAN
Q Do you have any recollection of any discussions, at all, from the January 1983 time period through June of 1983 regarding DOE's provision of the transportation casks necessary for use in the spent fuel program?
MR. LESTER: Objection, vague.
THE WITNESS: I don't recall

MR. LESTER. Objection, vague, compound Calls for speculation
THE WITNESS I have no basis to respond to that
BY MR. SKALABAN:
Q And in the next paragraph it states that, "The movement of spent fuel from a spent fuel pool at an operating plant can be disruptive of the normal electricity generation activities at the plant " Do you see that, sir?
A. Yes, I do
Q Do you have any reason to disagree with that statement?
MR LESTER Objection, calls for speculation
THE WITNESS I have no basis to respond
BY MR. SKALABAN:
Q I'd like to call your attention to Rosselli Exhibit 3 which is the standard contract If you could please take a moment to read -- I'll give you the Bates number of the page It's HQ0016689
A Okay

Page 295

Q If you could take a moment to read Article B
A. Excuse me what article?
Q I'm sorry Article 5, paragraph B, entitled Delivery Commitment schedule and paragraph C, entitled Final Delivery Schedule
A Okay
Q During the time of contract formation, what was your understanding of how Article 5, subparagraph b, Delivery Commitment Schedule would work in operation?
MR LESTER Objection Calls for a legal conclusion and asked and answered in the prior coordinated discovery depositions.
THE WITNESS. In the development of the contract, we were preparing a process, was an enabling process I don't recall giving much thought in terms of how it would actually work, because it was so far out into the future
BY MR SKALABAN
Q. So at the time of contract formation, you hadn't thought through all the details of how the process would work and operation --
MR LESTER. Objection, form.

Page 296

BY MR. SKALABAN.
Q -- down the line?
MR. LESTER. Objection, form. Mischaracterizes his testimony.
THE WITNESS Yes And at the time of, you know, formulation, I mean, there were still a lot of technical and financial questions that had to be resolved So we were putting together based on the contract, on the legislation, the instrument that would define the process in terms of how this would all work when all these things got resolved
MR SKALABAN I'm sorry Could you read back the last answer
(Record read )
BY MR. SKALABAN
Q. Now, I'm sorry, what did you mean by the instrument of the process? I'm not sure if I followed your answer to that?
MR LESTER. Objection, vague
BY MR. SKALABAN:
Q Could you clarify that for me a little bit?
A The contract was the instrument and that contract outlined the process that would be used

Page 297

once all the issues were resolved, and we were starting to implement the contract
Q And so what did you understand that process to be?
MR LESTER Objection, vague
THE WITNESS As outlined right here in the article, that utilities would propose The Department would either accept or reject their proposals If they were rejected, they were given an opportunity to re-propose or revise.
BY MR SKALABAN
Q Now, what did you understand the criteria to be on whether a DCS was acceptable or not?
MR LESTER Objection. Calls for a legal conclusion Asked and answered in the last deposition
THE WITNESS I don't remember
BY MR SKALABAN
Q And did you anticipate that the exact operation of this provision and this process would be flushed out in the future?
MR. LESTER. Objection. Calls for a legal conclusion

Page 298

THE WITNESS I don't recall
BY MR. SKALABAN
Q. Do you have any understanding of what the provision that says, "Purchaser shall have the right to adjust the quantities of SNF and/or HLW plus or minus 20 percent and the delivery schedule up to two months until the submission of the final delivery schedule." Do you have an understanding of what that provision was intended to do?
MR. LESTER Objection. Calls for a legal conclusion
THE WITNESS: I don't recall.
BY MR SKALABAN:
Q Do you have an understanding of what the effect would be if the delivery commitment schedule process was halted or suspended?
MR LESTER. Objection Calls for a legal conclusion
THE WITNESS. I have no basis to respond to that
BY MR SKALABAN
Q So at the time of contract formation, you hadn't thought of the possible effects of that? Of a halting or suspense in the process?



MR LESTER Objection, form. Mischaracterizes his testimony
THE WITNESS I don't recall.
BY MR SKALABAN.
Q Do you have any understanding of what the effect of final delivery commitment schedule was intended to be? A final delivery schedule, what the intent -- I'm sorry. Let me rephrase that, maybe, to be a little clearer.
Article 5, paragraph C, refers to final delivery schedule. Do you have any recollection of what DOE's intent was regarding how that provision would operate?
MR. LESTER: Objection. Calls are a legal conclusion. Vague.
THE WITNESS: This was the instrument that the utilities could propose what they finally would be giving the Department according to their acceptance ranking And it would be the basis upon which future plans would be, you know, made to receive and ultimately dispose of their spent fuel.
MR SKALABAN: I'd actually like to take to break, Mr. Lester, if that's acceptable to you, because I don't think I have



that much longer to go And if I can organize things then --
MR. LESTER. Sure.
(Recess)
MR. SKALABAN: I'd like to mark as Rosselli Exhibit 6 the May 7, 1983 EEI comments
(Whereupon, a document entitled Edison Electric Institute dated March 7, 1983 was marked Exhibit-6)
MR. LESTER I'm sorry. You mean to say March rather than May?
MR. SKALABAN March 7, 1983 EEI comments
BY MR SKALABAN
Q Mr. Rosselli, if you can look at page 7 of these comments. First of all, do you recognize these comments?
A Specific form, I mean, I don't But I do recognize that we got comments from EEI
Q Does this --
MR. LESTER Maybe we could stop the deposition until taping stops
MR SKALABAN. Yeah, off the record



(Off the record)
BY MR SKALABAN
Q Does this appear, Mr Rosselli, to be the comments that you would have received from EEI?
MR LESTER Objection Calls for speculation
THE WITNESS To the best of my recollection, yes
BY MR. SKALABAN.
Q I'd like to call your attention to page 7 in the letter It's YDK-026-103882.
A Got it
Q Do you see in the first full paragraph beginning, "To remedy these shortcomings?"
A Yes
Q EEI states, "We also urge the purchasers be allowed to exchange delivery commitments This will allow the marketplace to deal with particular utility needs." Do you see that, sir?
A. No. "To remedy these shortcomings?"
Q Yeah, it's in that paragraph If you could take a moment, please.
A. Okay.

# Nancy Slater (Thompson)

Page 1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - X

YANKEE ATOMIC ELECTRIC :
COMPANY, :
Plaintiff, : Case No. 98-126C
v. : Senior Judge
: Merow
THE UNITED STATES, :
Defendant. :
: - - - - - - - - - - - - - - - X

Washington, D.C.
Wednesday, April 21, 1999

Deposition of NANCY H. SLATER, a witness herein, called for examination by counsel for Plaintiff in the above-entitled matter, pursuant to agreement, the witness being duly sworn by JAN A. WILLIAMS, a Notary Public in and for the District of Columbia, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., at 10:10 a.m., Wednesday, April 21, 1999, and the proceedings being taken down by Stenotype by JAN A. WILLIAMS, RPR, and transcribed under her direction.

Page 2

APPEARANCES:

On behalf of the Plaintiff:
ROBERT L. SHAPIRO, ESQ.
JERRY STOUCK, ESQ.
PETER J. SKALABAN, JR., ESQ.
Spriggs & Hollingsworth
1350 I Street, N.W.
Washington, D.C. 20005-3305
(202) 898-5854

On behalf of the Defendant:
MARIAN E. SULLIVAN, ESQ.
Trial Attorney
Commercial Litigation Branch
U S. Department of Justice
1100 L Street, N.W
Room 10150
Washington, D.C. 20530
(202) 307-6289

Page 3

CONTENTS


| WITNESS | EXAMINATION BY COUNSEL FOR PLAINTIFF |
|---|---|
| NANCY H. SLATER | |
| By Mr. Shapiro | 4 |
| Afternoon session - 94 | |


EXHIBITS


| SLATER EXHIBIT NO. | PAGE NO. |
|---|---|
| 1 - Letter dated 3/1/99 | 50 |
| 2 - Letter dated 4/28/87 | 82 |
| 3 - Memo dated 6/29/87 | 95 |
| 4 - Letter dated 10/2/87 | 97 |
| 5 - Letter dated 11/10/87 | 99 |
| 6 - Standard Contract Issue Resolution Process | 122 |
| 7 - Preliminary Draft dated 12/19/92 | 152 |
| 8 - Handwritten documents dated 8/29/91 | 161 |
| 9 - Memo dated 6/18/92 | 171 |
| 10 - Preliminary Draft dated 12/22/92 | 175 |
| 11 - Preliminary Draft dated 12/19/92 | 177 |
| 12 - Fax dated 9/1/93 | 181 |
| 13 - Spent Fuel Acceptance Scenarios devoted' to Shutdown Reactors dated 10/89 | 185 |
| 14 - Letter dated 1/26/93 | 191 |
| 15 - Fax dated 6/2/94 | 194 |
| 16 - Memo dated 7/25/94 | 199 |


Page 4

PROCEEDINGS

Whereupon,

NANCY H. SLATER,

was called as a witness by counsel for Plaintiff, and having been duly sworn by the Notary Public, was examined and testified as follows:

EXAMINATION BY COUNSEL
FOR PLAINTIFF
BY MR. SHAPIRO:

Q. Would you state your name for the record, please.
A. Nancy H. Slater.
Q. Ms. Slater, my name is Robert Shapiro, we're here for your deposition. Have you ever had your deposition taken before?
A. No.
Q. Do you have some understanding of what's going to happen today?
A. Yes.
Q. What do you understand is going to happen today?
A. I understand that I'm going to be a factual deponent and that you're interested in asking me questions about my knowledge of the waste acceptance area during the time I was in

Page 29

instance, DOE's obligations under the contracts?
A. Actually I can give you an example of what I would have looked at that might clarify this a little, and that is utilities are entitled to deliver five-year-old fuel. If the requirements document were to say ten-year-old fuel, I would have to call that out as something that needed to be corrected. So that's the kind of thing that you would have looked for, the inconsistencies between the contract and the requirements documents.
Q. Let me go back to that again. Suppose your contracts required you ultimately to take 100,000 MTU and you see that the system is only calling for 70,000. Wouldn't that be an inconsistency?
A. I don't believe that it would be. You understand that the 70,000 MTU is legislatively mandated. So, therefore, you understand that there is no flexibility to change the capacity of the repository willy-nilly.
But, if you've read the legislation, I'm sure you also understand that at one point a second repository was contemplated. So no, I could not do anything about 100,000 MTU limit

Page 30

because I cannot change legislation.
Q. Again so I understand the difference is that you were really looking at things for which there might be some flexibility to change, those were the kinds of things that you were examining, to see if those items were consistent with the contract?
A. Right, or there were some items that might have been inflexible and someone made an error and transposed a number. So we were looking at a lot of things, again with the ultimate goal of assuring that the contract was consistent with program documents, no new requirements imposed indirectly.
Q. But, if there was a legislative limit such as the 70,000 K limit, you weren't going to look at that to see how that would fit in with the contracts?
A. No. And I don't believe that the 70,000 limit is discussed in the contract.
Q. When you were looking at these kinds of requirements, did you ever look at the time frame called for in the contract for starting waste acceptance and how that fit in with the system requirements?

Page 31

A. I'm not sure I understand the specific point you're trying to get at with that question.
Q. Well, you understand the contract called for --
A. January 31, 1998, right.
Q. Called for waste acceptance that began on that date?
A. Right.
Q. Did you ever look at whether or not any of the system requirements called for waste acceptance to start at a later point in time, would you have looked at that kind of issue?
A. I would have looked at that kind of issue. And my recollection at the time I was there is that the documents were consistent with the contract.
Q. The system requirements documents called for waste acceptance to begin by January 31, 1998?
A. I believe so.
Q. Do you recall how the system planned to start taking spent fuel in '98?
A. No, I don't.
Q. The system requirements documents, when

Page 32

you looked at them, in the '91 to '95 period, they didn't call for taking spent fuel by 1998 in a repository, did they?
A. I think the subject of acceptance, transportation, storage, and disposal was in the main addressed independent of date. The same activities have to be performed no matter the date you start them.
Q. Do you recall looking at any discussions in the system requirements documents of taking spent fuel at a location other than the one repository?
A. No.
Q. So the system as we've been talking about, as you've been referring to it, was the system for the one repository?
A. Yes.
Q. And earlier you had mentioned that there was some discussion that the system might include two repositories?
A. No. There was legislation that discussed the second repository.
Q. Let me go back to your background. Prior to 1991, when you joined DOE, what was your prior position?

Page 33

A. I worked for the Edison Electric Institute in two positions. Lastly in the fossil power area, managing two committees, prime movers and chemistry. But prior to that, when I joined the institute, I was program manager for the Utility Nuclear Waste Management Group.
Q. What was your job title when you were working in the fossil fuel area?
A. Program manager.
Q. And how long were you in the fossil fuel area?
A. My recollection is perhaps a little over two years.
Q. How come you left EEI to go to the government?
A. Oh, this will sound like one of those idealistic answers, but truthfully I grew up in the generation that was taught that you do not solve problems from the outside, you solve them from the inside, you have to be part of the solution. And I was on a "mission from God".
Q. What do you mean you were on a "mission from God"?
A. It's a line from the Blues Brothers. I was very committed to the whole concept of

Page 34

disposal.
Q. When you say the issue of disposal, you mean spent fuel disposal?
A. Yes, nuclear waste disposal, whether it's spent fuel or high level waste.
Q. And we've covered the period when you were with the fossil fuel group. When did you start with the nuclear waste group?
A. That would have been in 1991, April -- no, actually sorry about that, April of '86, because I was with EEI for roughly five and a half years.
Q. So roughly '86 to '89 you were in the nuclear waste of EEI and then '89 to '91 the fossil fuel area?
A. Right.
Q. How come you moved in '89 from the nuclear area to the fossil fuel area?
A. Truthfully because I had a manager who was the most obnoxious person I have ever worked for. And it is just as important to me who I work for as what I do.
Q. You had an obnoxious manager in the nuclear area?
A. Nuclear area.

Page 35

Q. Who would that have been?
A. Steven Kraft.
Q. What was Mr. Kraft's position?
A. He would have been the director.
Q. Director of the Utility Nuclear Waste Management Group?
A. Right. There were two program managers, one handled low level waste and I handled spent fuel and high level waste.
Q. I'm not sure how EEI was organized. What was the level above Mr. Kraft?
A. It would have been a vice president.
Q. And who was that?
A. Loring Mills.
Q. During the two years you were with the fossil fuel group, did you have any residual involvement at all in the nuclear side of things?
A. None. I was asked to come back and I refused.
Q. Who asked you to come back?
A. Steve Kraft.
Q. What sort of issues did you work on with the Utility Nuclear Waste Management Group from '86 to '89?
A. As I recall we were routinely involved

Page 36

in assessing the adequacy, both financial and technical, of DOE's program. We would visit the sites. I remember at that time there were three.
We would meet with department personnel to discuss issues that were of interest to us. And we were also involved in an effort that related to the standard contract. And involved identifying issues that might require clarification.
Q. Did this group have any involvement in legislation?
A. Not directly, no.
Q. What about indirectly?
A. Indirectly as you know EEI is a trade association and dealt with -- I'm not sure what it stands for, ANEC which would have been the lobbying arm. And so that's how any legislative connection would have been made. But I have no personal knowledge of that.
Q. Now, if I understand correctly, did this part of EEI, the Utility Nuclear Waste Management Group, what happened to that group?
A. Well, let's see. Ultimately I believe they were absorbed by NEI, but I can't tell you

Page 81

A. Mr. Kraft rarely attended the working group meetings and tended to focus his efforts more on what was going on in the legislative front. And the day-to-day operations for the group were left to me.

Q. You said there was a long list of issues that the utilities looked at that they thought might need some benefit or need some clarification that are in this standard contract. Do you recall any others besides these three?

A. Let's see. The term domestic origin, for example, I do recall that one.

Q. What was the nature of that issue?

A. What does -- what is fuel domestic origin, is it fuel that's mined in this country or is it fuel that's burned in this country. And as you know utilities buy their fuel from a variety of places. And so one of the things that needed to be interpreted and clarified was that it means fuel burned in a reactor in this country.

Q. Did the group reach closure on that issue?

A. Oh, yes, they did. And subsequently,

Page 82

when I came to DOE, I wrote the letter that answered the question yet again for one of the utilities.

Q. Which way did you answer the question?

A. Burned in a U.S. reactor.

Q. Just to rephrase, DOE agreed that, as long as the fuel is burned in a U.S. reactor, it was considered fuel of domestic origin?

A. Domestic origin, right, right.

Q. Do you recall the utility working group looking at the issue of the rate at which DOE would accept spent fuel?

A. Not really. And only in the sense that whatever DOE came up with the utilities obviously wanted more.

(Slater Exhibit No. 2 was marked for identification.)

BY MR. SHAPIRO:

Q. Ms. Slater, if you would take a look at a document that we've had marked, Slater Exhibit 2. Do you recognize this document?

A. Let me look through it.

Yes, I do.

Q. Can you tell us what the document is?

A. You'll remember that I said that there

Page 83

were issues that were identified based on review that both DOE and the utility group believed needed to be resolved. Some of the issues were coincident, some were not.

And this represented the utility group's effort to not only request a clarification but influence the outcome of the clarification because only the contracting officer had the ability to opine on the standard contract.

Q. Now, you'll see in the last page of this document that it's signed by Mr. Kraft. Do you recall, would you have written this document for him?

A. No, I would not.

Q. Were you involved in the creation of this document?

MS. SULLIVAN: Do you need to take time to review the document before you answer any further questions?

THE WITNESS: Yes, I was involved.

BY MR. SHAPIRO:

Q. What was the nature of your involvement?

A. Explaining issues to the individuals

Page 84

who would have been responsible for drafting this response, this request.

Q. Who would have drafted this letter?

A. To the best of my knowledge, it would have been individuals like Jay Silberg at Shaw, Pittman, Potts & Trowbridge and Mike Bauser at Newman, Holtzinger.

Q. So it would have been drafted by outside counsel for the Utility Nuclear Waste Management Group?

A. With some support from perhaps technical contractors if it dealt with technical issues.

Q. I see you looking through the document. Do you want some more time to look through it?

A. No.

Q. Just a moment ago, you said something, and I didn't understand what you said. You had said that utilities had looked at issues and DOE had looked at issues that might need clarification, you said some were coincident and some were not. I guess I'm not sure what you mean.

A. DOE, for example, might not have

Page 105

DOE didn't have any viewpoint?
A. Priority for shutdown reactors was a classic.
Q. Any others?
A. I don't recall specifically. I remember that one in particular because it was so contentious within the industry.
Q. What about issues on which DOE did have a viewpoint, which of those do you recall being worked on?
A. I know we had a viewpoint as DOE on final delivery schedules and what information those FDS's should include. And I know that DOE based that on operational considerations, similar to the safeguards and security operational considerations I explained to you earlier this morning.
Q. Let me make sure I've got the right time frame in mind. We're still talking about the time when you were working for the Utility Nuclear Waste Management Group?
A. Yes.
Q. And during that period do you recall any other issues coming up where DOE was proposing a clarification?

Page 106

A. Not specifically.
Q. What about when you actually started working with Mr. Brownstein over at DOE, this process was still ongoing?
A. It was still ongoing.
Q. And then you sort of reversed roles in some respects and you started working on that process from the DOE side?
A. Yes.
Q. What did you do in this process on the DOE side?
A. For example, on -- I continued to work on developing positions on issues where DOE felt it had an interest, communicating with the utility group.
Q. Which issues do you recall working on once you joined DOE?
A. Delivery commitment schedules, delivery commitment schedule exchanges, final delivery schedules, standardized canisters, oldest fuel first. I don't remember whether domestic origin was one of those issues or not. There were a significant number of issues.
Q. You mentioned delivery commitment schedules. What was the nature of the issue with

Page 107

respect to delivery commitment schedules?
A. Delivery commitment schedule had to be -- the instructions for completing the DCS had to be developed, the DCS itself had to be approved by is it OMB or -- OMB. The DCS's had to be transmitted, actual forms had to be transmitted to the utilities.
Q. What was the issue as part of the ACR resolution process that was trying to be resolved with respect to delivery commitment schedules?
A. One of the issues that I recall, and this was from the utility side, the DCS asks for the discharge date on the fuel. Now, the department would have liked to have had a very specific discharge date because it tells them a lot about the characteristics of the fuel. It lets them plan very accurately.
The utilities didn't want to do that. The utilities wanted to give them a range of discharge dates that might have been for ten years, because they wanted -- they believed they needed to preserve their flexibility to reach into that pool of fuel, pull it out, and give them anything they felt like giving them. And that was the issue. DOE wanted specific

Page 108

discharge date, they wanted broad discharge dates.
Q. Do you recall how that issue got resolved, did it get resolved?
A. By default it did because the DCS's were submitted with a range of discharge dates. And on my side on DOE I recognized that, in the final delivery schedule, I would get the specific discharge dates. So, in fact, it ceased to be an issue.
Q. Do you remember any other issues coming up in this ACR resolution process with respect to delivery commitment schedules?
A. Not that I recall.
Q. What about delivery commitment schedule exchanges, what was the issue there?
A. Do you wish me to address that from the utility side or from the DOE side?
Q. Well, let's start with the utility side.
A. From the utility side, the issue there centered around let's assume that two utilities wanted to make an exchange. Could a utility that had BWR, boiling water reactor, fuel exchange with a utility that had pressurized water reactor

Page 161

address one issue, that you would go to rulemaking to address the entire suite of issues, some of which could take longer to resolve than others. So a timing issue.
Q. The timing issue being that DOE wanted to wait before going further on this issue until other issues were more ripe?
A. Until we completed the effort, the ACR issue resolution process, and been able to go to rulemaking with a more complete set of changes.
(Slater Exhibit No. 8 was marked for identification.)
BY MR. SHAPIRO:
Q. Ms. Slater, you've been handed what we've had marked as Slater Exhibit 8. Do you recognize this document?
A. No. I don't recall this. This is my handwriting. And these appear to be the meeting minutes from a standard contract task force that would have been a utility group task force in August 29, 1991, five days after I joined DOE.
And it looks like it focuses on completing DCS's. And I believe you will note in item 3 that we discussed that range of discharge dates which was one of the issues that was

Page 162

unclear.
Q. You said that Slater Exhibit 8 that you're looking at looks to be minutes of a meeting of utilities. Why would you have attended the meeting if you were already at DOE at that point?
A. You recall that we discussed instructions for completing the DCS form. Prior to formalizing the instructions for completing the DCS form, we would have met with the standard contract task force; the utilities, because we had provided them with a copy of the instructions and asked them to review it, asked them if they had any questions, and agreed to discuss the form with them so that we were not imposing something that was unclear and would not work.
And this meeting appears to have done just that, because, if I am reviewing this correctly, starting at item 4, page 3, paragraph 1, page 3 paragraph 3, page 4 at the top, these are all what appear to be pages of the procedure.
Q. Let me also confirm something that I think you said earlier, that Slater Exhibit 8, the first page of it looks to be a sign-in sheet for a meeting?

Page 163

A. Yes.
Q. And the subsequent pages appear to be your own minutes or notes of that meeting?
A. My notes for suggested changes, because, in fact, if you look, it says page 4 at the top, article VB, spell it out. And what does approval mean, it has to be signed. So this is exactly what this one is. This was to receive the comments that the utilities had on the DCS procedure and the form itself and go back and review them and then incorporate them.
Q. When you say the DCS procedure, you mean the instructions given to --
A. Instructions.
Q. Given to utilities on how to complete the DCS?
A. Right.
Q. On the second page of Slater Exhibit 8, you have it looks like certain items or issues 1, 2, 3, 4. Could you tell me what the second one is talking about?
A. Let me read it for a moment.
Okay. Submission of the first DCS's was timed, it's explicitly mandated in the contract, 63 months prior to the delivery year,

Page 164

and assumes that delivery would commence in 1998, January 31, '98.
If 1998 were not the year when delivery commenced, utilities would have submitted DCS's for 1998. The question was do they get to go back now and revise their DCS's or are they just overcome by events, are they calendar year specific or year one, is it 1998 or year one.
Q. Year one of what?
A. Of any range of dates. So, if it were year one, no one would have to revise anything. If it's 1998, do I make them go back and revise all their DCS's, do I -- if they have to go back and revise their DCS's, can I revise a DCS or would I have to treat it as an exchange in a given year. So there were procedural questions about that, and that's what this issue is discussing.
Q. You say year one, you mean year one of DOE's acceptance of spent fuel under the waste acceptance system?
A. Yes.
Q. The instructions for the delivery commitment schedules, did they require utilities to not request delivery of more spent fuel than

Page 165

was provided for in their allocation in the published annual priority report?

A. Yes, that would have been the basis for rejection of the DCS.

Q. Was there any discussion of that instruction at this meeting?

A. I don't specifically recall that.

Q. You don't specifically recall that instruction being discussed at any such meetings?

A. No, because I know that, when I was on the utility side, we clearly understand that you weren't supposed to go ask for more than you were entitled to.

Q. What was the point then of the delivery commitment scheduling process if everyone was entitled to a certain amount and everyone knew what that amount was and you couldn't ask for more than that amount? Couldn't DOE have just written -- they knew what the delivery commitment schedules were going to be requesting, didn't they? What was the point of the process?

A. Again, because it's not as clear as you think it is, if there were no DCS exchange process, you might perhaps be correct. But, assuming that people could exchange positions in

Page 166

the queue, could exchange BWR fuel for PWR fuel, could exchange ten-year-old fuel for five-year-old fuel, it could make a very great difference to how you manage your acceptance process.

The DCS was supposed to be a heads-up from the utilities about the type of fuel they would be delivering to us. The utilities didn't want to do that. They did not want to commit themselves to a specific discharge date because they were concerned that, if they did that, they would lock themselves in and there would be no opportunity to deliver anything else.

So in the end it wasn't much of a heads-up because they had tremendous ranges. In fact, there was a discussion that they would like to include in that range of discharge dates fuel that had not even been discharged at the time the form was submitted because obviously five years later, if it were four-year-old fuel, now it would be nine-year-old fuel.

So again, you know, the heads-up that it was supposed to be in the end turned out to be not much of a heads-up at all. But by completing the DCS -- you had to have a signed DCS in order

Page 167

to exchange. So, by completing and filing the DCS, you were providing yourself with a future instrument to adjust your position in the queue.

Q. But, other than actually coming up with a formalized signed piece of paper, pretty much anyone looking at the process could have predicted what any given utility's DCS was going to look like?

A. I would say that I could predict looking at the APR who was going to deliver -- this is absent an exchange process. Who was going to deliver and how much they were going to deliver. I couldn't predict what they were going to deliver, the age of it. that was just not possible.

Q. As far as the age, what you're saying is most of the utilities were fairly vague as to indicating how old the fuel was that they intended to deliver anyway?

A. They provided a tremendous range so that they would have the flexibility to pick what they wanted when it came time to deliver. And for us, you know, we wanted to know because there are limits. There's the certificate of compliance for each cask and there are I believe

Page 168

thermal load limits, radiation level limits. And that is dependent on the age and burnup of the fuel.

So, if you're trying to schedule acceptance of fuel, you to a certain extent arrive at the number of casks you need to deliver by the type of fuel you're going to pick up. So we had thought we would get a heads-up on what we would be picking up and that would permit the department to plan out its transportation program. It didn't quite work out that way.

Q. The DCS process would also I guess have allowed a utility to request delivery of less fuel than their allocation?

A. Yes. Let's assume that someone -- I don't believe this was the case. But let's suppose someone was permitted to discharge -- to deliver one fuel assembly in year one. Remember, every time you deliver fuel, you disrupt your operations in order to do that. So the utility would likely ask themselves is it worth it to me to deliver one assembly.

Q. Do you recall, did any utility submit proposed delivery commitment schedules requesting delivery of less than their full allocation?

Page 173

and there.
Q. And the bottom paragraph talks about a marathon session and mentions comments from others, you are mentioned and then the next entity is PNL. Is that Pacific Northwest Labs?
A. Yes.
Q. What would the nature of their involvement have been?
A. PNL was involved in -- as a contractor in originally drafting -- helping to draft the standard contract. Now, precisely what their involvement was I don't know. And in this capacity they may have been consulting for Billy Cole.
Q. So PNL would have been a subcontractor of TRW?
A. I think, I'm not sure.
Q. And then the next entity referred to is M&O Transportation?
A. That's TRW, that's management and operating, their transportation group. And the next organization would be the M&O MRS, monitored retrievable storage design group.
Q. What would the nature of those two organizations have been in the process of

Page 174

finalizing those issues?
A. If there were any design considerations for which we were unaware, because, remember, we were focusing on contractually based issues. If there were design considerations that we needed to consider or that we had overlooked, it would be their opportunity to inform us.
Q. At the top of the memo, there's a cc list with a number of people. These people were all individuals involved in DOE's resolution of these issues?
A. Some directly, some indirectly. Alan Brownstein, of course, was my boss. Jim Clark was M&O, the supervisory level, I don't know how directly he was involved. E.R. Johnson is the managing officer of JAI, and I don't know how directly he would have been involved.
M.C. Klose I don't recall. Ernie Leonard, a staffer to the M&O. Nora McDonald, M&O, data manipulation. Doug Williamson, M&O, nuclear engineering background. And Glen Vawter, I don't have the vaguest idea of why he's on this distribution list, he's M&O.
Q. What do you recall Mr. Vawter's position being with the M&O group?

Page 175

A. I don't recall his position with the M&O.
(Slater Exhibit No. 10 was marked for identification.)
BY MR. SHAPIRO:
Q. Ms. Slater, you've been given what we've had marked as Slater Exhibit 10. Do you recognize it?
A. Yes. I would like to look it over, but it is another OCRWM position on one of the 35 issues, this one dealing with the identity of the amount of waste to be identified on the DCS.
Yes. This is a simple issue, simple. The language at the time in the contract implied that ad infinitum, when it became time to submit on that first opportunity of DCS, that you would have to tell us everything you were ever going to deliver.
So the confusion was do I need to submit ten DCS's, 50 DCS's, do I put it all on one DCS, and what is the amount I'm supposed to submit. This was a simple issue in the sense that what we told them was that the DCS is year specific. It's not to include more than one year.

Page 176

You have a DCS for every year. And the amount you put in the DCS for one year is the amount that you're allocated for that year. So there was confusion about how many DCS's did they have to submit for all ten years, could they submit for all ten years if they wanted to.
The questions from the industry were all over the map. Some people thought they didn't have to, some people thought they did. It was just confusion.
Q. Was part of this issue also the notion that the delivery commitment schedules called for the utility not to request more than their allocation; the utilities' statement of how much spent fuel they would like to deliver, if they had complete flexibility, it was constrained by their allocation?
A. Right, absolutely. That was an implicit assumption. And, when I was in the utility side of the business, it was always understood that the DCS's were not to be completed for more than what you had as an allocation.
Q. And DOE shared that understanding?
A. And DOE shared that understanding.

Page 206

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
---------------X
YANKEE ATOMIC ELECTRIC :
COMPANY, :
Plaintiff, : Case No. 98-126C
v. : Senior Judge
: Merow
THE UNITED STATES, :
Defendant. :
---------------X

Washington, D.C.
Thursday, April 22, 1999

Continued deposition of NANCY H. SLATER, a witness herein, called for examination by counsel for Plaintiff in the above-entitled matter, pursuant to agreement, the witness being previously duly sworn, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., at 2:10 p.m., Thursday, April 22, 1999, and the proceedings being taken down by Stenotype by JAN A. WILLIAMS, RPR, and transcribed under her direction.

Page 207

APPEARANCES:

On behalf of the Plaintiff:
ROBERT L. SHAPIRO, ESQ.
SUSAN SACHS, ESQ.
Spriggs & Hollingsworth
1350 I Street, N.W
Washington, D.C. 20005-3305
(202) 898-5854

On behalf of the Defendant:
MARIAN E. SULLIVAN, ESQ.
Trial Attorney
Commercial Litigation Branch
U.S. Department of Justice
1100 L Street, N.W.
Room 10150
Washington, D.C. 20530
(202) 307-6289

Page 208

CONTENTS


| WITNESS | EXAMINATION BY COUNSEL FOR PLAINTIFF |
|---|---|
| NANCY H. SLATER | |
| By Mr. Shapiro | 209 |


EXHIBITS


| SLATER EXHIBIT NO. | PAGE NO. |
|---|---|
| 17 - Memo dated 8/5/94 | 209 |
| 18 - Memo dated 5/16/90 with attachments | 215 |
| 19 - Letter dated 2/10/95 with attachments | 221 |
| 20 - Memo dated 6/24/93 | 233 |
| 21 - Letter dated 6/24/93 | 249 |
| 22 - Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste dated 6/22/83 | 254 |
| 23 - Acceptance Priority Ranking & Annual Capacity Report dated March 1995 | 275 |
| 24 - Complaint | 306 |


Page 209

PROCEEDINGS

Whereupon,

NANCY H. SLATER,

the witness on the stand at the time of recess, having been previously duly sworn, was further examined and testified as follows:

EXAMINATION BY COUNSEL FOR PLAINTIFF - RESUMED

BY MR. SHAPIRO:

Q. Ms. Slater, we're here for the continuation of your deposition. You understand you're still under oath?

A. Yes.

Q. Do you understand that?

A. Yes, I do.

Q. You may recall at the end of yesterday we were talking about exchanges of approved delivery commitment schedules?

A. Yes.

Q. I want to just have a few more questions on that subject. Let me have another document marked and show it to you.

(Slater Exhibit No. 17 was marked for identification.)

BY MR. SHAPIRO:

Page 242

have an allocation in this year or, B, you've exceeded the allocation to which you're entitled, you need to provide me with a DCS that is consistent with the terms and conditions of the standard contract, and we understand those to mean.

Yankee resubmitted and submitted identical DCS's. So this is discussing that second letter, because that would -- from the department. The second letter from Yankee submitting the same DCS's would have kicked us into let's sit down and talk about this and try to understand why we don't seem to be able to come to closure on this issue.

So this was at the end of that process. There is a formal response required. And it is a final decision, if you will.

Q. Now, I want to point your attention to the second page of this memorandum, one of the points in the middle, where it says submitting acceptable DCS's would not preclude their rights under the contract should the department subsequent to rulemaking grant such priorities. Do you see that?

A. Yes.

Page 243

Q. What was meant there?

A. Oh, I recall that precisely. Yankee's concern as expressed to us was that, well, suppose I submit a DCS to you, suppose I have a ten MTU allocation in the first year, I don't recall what it was precisely. I really want to empty my site in five years.

And that would mean that I need to submit a DCS to you for 100 MTU. If I go ahead and submit a ten MTU DCS to you now, does that mean after rulemaking, if everyone could agree that priority should be afforded to shutdown reactors, that I could still only deliver ten MTU.

And our response to them was no. Submitting an accurate DCS now does not preclude you from availing yourselves of the opportunity to ship additional fuel, more than ten MTU, were the decision made that priority should be afforded to shutdown reactors.

And the reason for doing this in rulemaking is again, as I have stated over and over again, this is a utility equity issue. And both, while I was at the utilities and at the DOE, I was personally involved and personally

Page 244

aware that the utility industry did not support priority for shutdown reactors. In fact, their stated consensus position was that priority should not be afforded to shutdown reactors.

Q. So it was not intended that the delivery commitment schedule process be a gotcha process?

A. A static process.

Q. Right, that, gee, you only requested five and now, even though we can accommodate 20, you've wanted all along to do 20, we're not going to let you because you only asked for five, that was not the intention?

A. That's correct, it was not our intention to do that.

Q. And we might have covered this yesterday, but let me just make sure it's clear, that the delivery commitment schedule was intended to indicate how much spent fuel the utility wanted to deliver up to the limit of their allocation?

A. In part, because recall that the discharge date of the fuel earned you a slot in the acceptance priority ranking, but the fuel you could actually deliver did not have to be the

Page 245

fuel that earned you the slot.

So simply going to the APR and drawing a line at 300 MTU wasn't a good way of predicting what you were likely to get, because people who had older plants might decide to put their older plant's fuel in dry storage and might want to empty the pools at some of the younger plants.

So the DCS was intended to provide us with an indication of the age of the fuel, the location of the fuel. Multiplant utilities could deliver from any site as long as they met the conditions established in the standard contract.

So it wasn't as clear as looking at the APR. The DCS was intended to provide a little bit more sound information for planning purposes.

Q. Focusing just on quantity then, the DCS was not intended to indicate what quantity the utility really wanted to deliver, it was limited to the allocation provided in the APR?

A. Right. Now, theoretically they could have delivered -- they could have said, jeez, I don't want to disrupt my operations and I'm not going to deliver at all. But they could not ask for -- they could not have more than what they

Page 246

were allocated because of the equity issue.
There's only so much system capacity. If I accept more from someone else, I accept less from someone else.
Q. And then briefly I want to point your attention to the next sentence on page 2 of Slater Exhibit 20 that says they have the contractual right to exchange allocations with other interested utilities, what was that referring to?
A. That's the DCS exchanges. They have the contractual right to exchange their slot in the queue with someone else in the queue and conceivably either obtain the ability to deliver in a year in which they weren't originally scheduled to deliver or obtain the ability to deliver more than they were scheduled to deliver.
Q. And so the availability of the right to exchange was being offered to the director of the program as another justification as to why it was appropriate to deny the priority request that Yankee Atomic was making, because they had the right to accomplish what they wanted through the exchange process?
A. Yes.

Page 247

Q. Perhaps if you could turn to page 3 of Slater Exhibit 20. And, on the right-hand side, it has that long list of concurrences. Could you run down that and tell me what was the role of the various people in that concurrence chain.
A. You know my role, I'm the originator, the technical lead, if you will. Alan Brownstein would have been the branch chief. Jim Carlson would have been the -- I think we called them divisions then, division director.
Q. It says RW-43, that was his division, Mr. Carlson's division?
A. Forty-three, right.
Q. What division would that have been?
A. I don't recall the name specifically. We've shifted names so many times.
Q. But approximately what --
A. Waste acceptance and transportation perhaps. Ron Milner would have been the office director.
Q. And that RW-40 is the designation for that office?
A. For that office. Dick Nelson and Jerry Saltzman would have been in what we called the front office as support directly to the director

Page 248

of the program.
Q. And their office is indicated as RW-2?
A. Yes. And Lake Barrett as RW-1, and I cannot make out the last one, I can't make the last one out. I believe it's Charlie Smith. And again that would have been front office support, support directly to the director of the program.
Q. So the director is the only one with RW-1?
A. Yes.
Q. And his support people are RW-2?
A. Yes. The deputy director of the program, for example, would be an RW-2 and there are usually two or three others who are support directly to the director.
Q. And you had pointed out previously an indication noting that you were the originator of the document. And there's a line below that, Correspondence Reviewer. What's the role of the correspondence reviewer?
A. I don't recall.
Q. And the concurrence line, there's no indication of a review by the contracting officer. Why would that have been?
A. That depends on the version of this

Page 249

that you pulled from the files. In fact, I have right now unrelated to this case a version of a document to review. I have a concurrence sheet and I will be concurring for myself and for the division director. It will be an attachment to a separate records package that, when put together with this, will form a complete picture.
Q. So there may have been another version of this memo with a concurrence by the contracting officer?
A. It would have been the same version of this memo that would have gone over separately for concurrence in another office because that would speed the process.
(Slater Exhibit No. 21 was marked for identification.)
BY MR. SHAPIRO:
Q. Ms. Slater, you've been handed what's been marked as Slater Exhibit 21. If you could take a look and tell us if you recognize this document?
A. Okay. I believe this is the letter that would ultimately have been sent to Yankee, to Mr. Buchheit, that would have been the result of the director's approval to communicate with

## Page 250

Yankee that we could not accept.
Q. So, after the director would have proved Slater Exhibit 20, then Slater Exhibit 21 would have gotten drafted?
A. Actually does this have a date on it? I cannot determine whether this is the letter that would have gone with the original DCS's that were incorrect or subsequent to the negotiations. If I were to do a cold reading of this --
Q. You asked about the date. Let me point your attention to the last page on the left, where there's that indication of you as originator that you pointed out in the previous document. It appears to be a date 6/24/93.
A. This would have been the final letter. I've read enough in the letter to know that it's the final letter.
Q. And, in fact, it appears that Slater Exhibit 20 and Slater Exhibit 21 were at least originated by you on the same day?
A. Actually not necessarily originated on the same day. But it was standard practice, when you submitted a memo like this to the director, to provide him with the opportunity to see the

## Page 251

letter itself so he knew what he was likely to be recommending be signed by the contracting officer. And that's what this would have been. So the total concurrence package would have contained both.
Q. So there would be no disconnect between the approval memo and the actual product that went out of the office?
A. Yes. And I cannot determine whose comments these would be on here.
Q. That was going to be one of my questions. There's some handwriting on the second page of Slater Exhibit 21. And you don't recognize that handwriting?
A. No, I don't.
Q. It's not your handwriting?
A. Certainly not mine. Mine would have been an absolutely clean copy. And actually --
Q. Can you tell from the concurrences, does that give you any clue as to whose writing it would have been?
A. No.
Q. Let me point your attention to the last paragraph of this draft letter, the second sentence in that paragraph that says, if an

## Page 252

acceptable year one DCS is not received within 30 days, the contracting officer will issue a decision regarding the status of YAEC's year one allocation. What was meant by that sentence?
A. You would have to question the contracting officer particularly concerning that. My recollection is that, if a utility does not submit an acceptable DCS, one of the concerns I do know, I do recall from the utility days is, if they decided not to submit an acceptable DCS, did that mean that then they were relinquishing their right to an allocation in that year.
And the utility's understanding at the time I was in the industry was that that's precisely what it meant. And this letter stopped short of saying, guys, the contract has requirements, you signed the contract. You need to behave consistent with the contract.
So I don't know precisely what the contracting officer envisioned as the ultimate consequence of not submitting an appropriate DCS. But I recall from the utility days that that's one of the things utilities were concerned about.
Q. So it would have been a fair

## Page 253

interpretation on Yankee Atomic's part on receiving that letter that this is saying submit the delivery commitment schedule we want or we're not going to give you any allocation at all?
A. No. It would be a fair interpretation to say submit the delivery commitment schedule that you were contractually obligated to submit, not the one we want, contractually obligated to submit, or we will have to make a further determination about where we go from here.
Q. Who would have drafted this particular language, would that have been you?
A. It could have been me, it could have been Alan Brownstein, it could have been Beth Tomasoni, it could have been Nick Graham.
Q. Who was Nick Graham?
A. I do not particularly remember drafting that paragraph. Nick Graham supported Beth Tomasoni. He would have been my equivalent, if you will, in terms of I reported to Alan, Nick reported to Beth.
Q. Now, you said the intent of that sentence that we just discussed was to tell Yankee Atomic to submit a delivery commitment schedule consistent with their obligations under

Page 254

the contract. Can you tell us what part of the contract you were referring to?

A. I can't recall the specific article number. But, if you go to the standard contract, you will find a section that is labeled delivery commitment schedules.

And under that section you will find that there are certain steps that must be executed by both the department and the purchaser. And there are timetables associated with each of those steps. And that's in there.

(Slater Exhibit No. 22 was marked for identification.)

BY MR. SHAPIRO:

Q. Ms. Slater, you've been handed what's been marked as Slater Exhibit 22. Would you take a look and tell us if you recognize this document?

A. I recognize this generally to be the contract executed by Yankee with the Department of Energy consistent with the standard contract. Knowing that these contracts were subject to individual modifications, for example, payment of fees, the schedule in which fees might be paid, I can't tell you what the particulars are.

Page 255

Q. But generally the terms of the contracts were largely the same?

A. Standard.

Q. Can you point us to the language of the contract you were just referring to as far as Yankee Atomic's obligation with respect to the delivery commitment schedule?

A. Yes, if you turn to page 11, it's Article V B.2., DOE shall approve or disapprove -- actually let's go to B.1., DOE shall approve or disapprove such schedules within three months after receipt. This is the initial submittal. In the event of disapproval, DOE shall advise the purchaser in writing of the reasons for such disapproval, which we discussed, and request a revised schedule from the purchaser to be submitted to DOE within 30 days after receipt of DOE's notice of disapproval.

DOE shall approve or disapprove such revised scheduled within 60 days after receipt. In the event of disapproval, DOE shall advise the purchaser in writing of the reasons for such disapproval and shall submit its proposed schedule. If these are not acceptable to the purchaser, the parties shall promptly seek to

Page 256

negotiate mutually acceptable schedules.

The terms and conditions for this process, this iterative process are very clear. And, in fact, you know, we did engage in the negotiations. In fact, another letter came back that said no.

Q. But what in the contract says that after the parties try to come up with a mutually agreeable result, it says that if they can't come up with something that both agree on, that the contracting officer gets to decide the issue?

MS. SULLIVAN: Objection. You're asking her for an interpretation of the contract. And Ms. Slater is not a lawyer. If you would like to ask her a question about her opinion or whether she finds guidance to that effect, that's fine. But her interpretation of the contract, she's not the contracting officer or an attorney.

BY MR. SHAPIRO:

Q. Answer the question.

A. That's why I stated earlier that I have no personal knowledge of how the last paragraph of Exhibit 21 which was the letter to Mr. Buchheit at Yankee Atomic was drafted,

Page 257

because it appears to me that that portion of the letter would have been drafted by the contracting officer or their staff. And I have no knowledge of what led them to those statements.

Q. So you can't point to a clause of the contract from your knowledge and experience working with it that says that the contracting officer gets to resolve those disputes that the parties can't agree upon, that the contracting officer gets to resolve that herself?

A. No; I can't point to anything in the contract that tells me where we go once the utility has repeatedly refused to honor the terms and conditions of the contract.

Q. You said when a utility refuses to honor the terms and conditions of the contract. What term and condition of the contract are you saying that Yankee Atomic wasn't honoring?

A. Submit an acceptable delivery commitment schedule.

MS. SULLIVAN: Give me a chance to object before you answer the question.

BY MR. SHAPIRO:

Q. What part of the contract tells you that Yankee Atomic's delivery commitment

Page 258

schedules weren't acceptable?

MS. SULLIVAN: Same objection. She can answer as to her opinion.

THE WITNESS: In my opinion I cannot give you a specific section because I haven't looked at this contract in years. I can refer you to the procedures, instructions that were provided to the utilities that were reviewed with the utilities that specifically state that an acceptable DCS is one which does not exceed the individual utility's allocation in a given year.

BY MR. SHAPIRO:

Q. Can you take a look now at the contract and tell me where that would be.

MS. SULLIVAN: Same objection to the extent you're asking for a legal interpretation of the contract.

You can answer the question.

THE WITNESS: You recall that we discussed the identification as part of the ACR issue resolution process, the issue of delivery commitment schedules. Do you recall that? If we need to discuss that again to refresh your memory, I'll be happy to.

One of those issues was delivery

Page 259

commitment schedules. And primarily the issue there was the need for the department to issue instructions on how to complete the form.

One of the issues associated with completing the instructions to complete the form was what is an acceptable DCS. Those instructions as I believe -- I'm not sure, I believe it was exhibit -- maybe it was seven yesterday. It was my handwritten meeting minutes from the standard contract task force.

I attended the meeting, Dave Zabransky I believe chaired that task force, at which we discussed with the utilities the contents of those instructions. So it was recognized by both the industry and DOE that clarification was required and an effort was embarked upon jointly to develop the instructions for completing the form.

Those instructions were formally issued to the utilities. And I base my definition of an acceptable DCS on that entire package which is not just the original contract, it is the supporting documents that are official including the instructions for completing those forms.

BY MR. SHAPIRO:

Page 260

Q. And I certainly understand that and I understand your counsel's objection that you were never the contracting officer. But, if I understand correctly, I mean you just took a little while to look at Yankee Atomic's contract. And looking at it you can't point to a particular clause or combination of clauses that you would have relied upon to say that Yankee Atomic's submitted delivery schedule were not acceptable?

MS. SULLIVAN: Same objection.

THE WITNESS: I believe that the discussion contained in the contract on the acceptance priority ranking and the annual capacity report, when viewed together and in the context of a theoretical acceptance capacity and repository, fairly clearly indicate what the amount of the allocation is for a utility in any given year.

BY MR. SHAPIRO:

Q. But you can't point to a clause in the contract that sets that out?

A. That sets what out?

Q. That sets out that Yankee Atomic's proposed delivery commitment schedules

Page 261

were not acceptable?

MS. SULLIVAN: Same objection.

THE WITNESS: No, I can't, because I'm not the contractual expert.

BY MR. SHAPIRO:

Q. Beth Tomasoni who was the contracting officer at the time of final denial of Yankee Atomic's proposed delivery commitment schedule, she might be able to tell us more specifically what clause of the contract was being relied upon?

A. She might be able to give you the basis for her approval of this letter.

Q. Who else might be able to tell us more specifically what contract provision was being relied upon?

A. That would be someone in the contracting officer's office, perhaps herself or himself at the time, herself and her staff.

Q. How large was the contracting officer's staff?

A. I really do not know.

Q. You didn't work closely with those people?

A. I worked closely with a couple of

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

\- - - - - - - - - - - - - - - - x

YANKEE ATOMIC ELECTRIC :
COMPANY, MAINE YANKEE ATOMIC :
POWER CO., and CONNECTICUT :
YANKEE ATOMIC POWER CO., : Case No. 98-126C
Plaintiffs : 98-474C, 98-154C
-v- : (Senior Judge
: Merrow)
UNITED STATES OF AMERICA, :
Defendant :

\- - - - - - - - - - - - - - - - x

Washington, D.C.
Thursday, June 13, 2002

Deposition of NANCY SLATER THOMPSON, a witness herein, called for examination by counsel for the Plaintiff in the above-entitled matter, pursuant to notice, the witness being duly sworn, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., at 9:40 a.m., Thursday, June 13, 2002, and the proceedings being taken down in Stenotype by DEBORAH K. WILKINS, RPR, and transcribed under her direction.

Page 86

of why we have a revision one and why you have not presented me with Rev. 0.

Q. I'll show you what I have got as the other version. Maybe you can offer a further explanation.

(Thompson Deposition Exhibit No. 8 was marked for identification.)

BY MR. SHAPIRO:

Q. Ms. Slater Thompson, I have handed to you what's been marked as Exhibit 8 which has on its title a 1992 ACR with a date of March, 1993. Do you recall this document?

A. Not explicitly, no.

Q. Does this help clear up for you at all the revision one issue that I just asked you about about Exhibit 7?

A. Not at all. In fact, what you have handed me, I can't determine whether or not this is a final or not.

Q. I take it then you don't recall issuing one draft of the 1992 Annual Capacity Report in March and then another one two months later?

A. No.

May I take a moment to read through

Page 87

this?

Q. Sure.

A. Thanks.

(Discussion off the record.)

BY MR. SHAPIRO:

Q. Did you say that you thought that Exhibit 8, the one dated March, 1993, might be a draft? It doesn't have the fancy cover that the other versions had.

A. Right. That's what confused me because this doesn't look like the finals that we have, even the one with the fancier artwork for '95.

No clue; it will remain one of life's mysteries.

Q. Turning to Exhibit 7, the May, 1993 version of the 1992 Annual Capacity Report, again I want to ask you about the acceptance waste projections that are on page 4 of this exhibit.

Do you recall how the acceptance waste -- acceptance rate -- waste projections in Exhibit 7 were developed?

A. No.

Q. I want to go back to the most recent ACR, the 1995 one, for a moment.

Page 88

I believe you testified that those acceptance rates were based in part upon the 10,000 MTU limit on the size of MRS. If that was the concern, why wouldn't it have been appropriate for DOE to accept waste at a faster rate and then have stopped at 10,000 MTU so as to provide more assistance to the utilities who needed waste accepted sooner?

MS. SULLIVAN: Objection, argumentative. Objection, vague. Objection, foundation.

A. My personal opinion, and as we have discussed before, there are numerous factors that would affect the rate at which you would work off delivery of spent fuel from reactor sites, and one of the most important being do you have enough casks in the transportation cask fleet to accept more even if you assumed for a moment that you had a facility that could accept more.

So I'm not entirely sure that you would have had the ability from a transportation cask standpoint to have accepted 10,000 MTU in the first year, for example. What would have prevented you from accepting 10,000 MTU in the first year? Logistically, I don't believe you

Page 89

could have done it. You didn't have the transportation capacity. That makes a lot of assumptions, again, that we had facility, that we had a license to receive and possess, but ...

Q. To what extent were the waste acceptance projections in the 1995 ACR reflective of a desire by the department to limit its commitments to utilities?

MS. SULLIVAN: Objection, vague. Objection to the extent it calls for a legal conclusion. Objection, foundation.

A. I have no knowledge of anything like that.

Q. You don't recall anybody discussing a desire to have relatively low acceptance projections in the ACR so as to limit the department's commitments to the utilities?

MS. SULLIVAN: Objection to the extent it calls for a legal conclusion. Objection, foundation.

A. No, I do not.

Q. Let's switch subjects to talk about the delivery commitment schedule process. Why don't we turn first to that provision in the contract, which is Exhibit 2. The part that I

fuel in any NRC licensed container, licensed by the NRC for transport?

MS. SULLIVAN: Objection to your characterization of the department's current plans. Objection, vague. Objection, foundation.

You can answer.

A. No, I am not focusing on anything related to transportation.

Q. The regulatory division that you are acting director of doesn't address transportation regulatory issues at all?

A. No, it does not. There is a separate transportation group that does that.

Q. The regulatory issues that your division is involved in are limited to those of the repository?

A. The repository, and I would say those in part two issues, that would be license and process issues.

Q. Has the issue of greater than class C waste come up in your role in the regulatory division?

A. No.

Q. Do you recall any discussion of whether or not to include greater than Class C



waste in the EIS for Yucca Mountain?

MS. SULLIVAN: Objection. Vague.

A. No, I don't.

Q. Has the issue of high-level waste come up in your role in the regulatory division?

MS. SULLIVAN: Objection, vague. Objection, foundation.

A. I'm not sure I understand what you are driving at here. I mean people know generically that we are accepting high-level waste.

Q. Have you ever had -- has the issue ever come up in the regulatory division in any way? Just to give you a couple examples, you know, how we are going to do it, which high-level waste, what form, how are we going to put it in containers. Have you had to actually focus on any issue concerning high-level waste in the regulatory division?

MS. SULLIVAN: Objection. Vague.

A. I am aware of those discussions. My personal involvement at this point is limited, for example, to issues like safeguards and security, which I explained to you before, and whether or not, for example, I need to tamper indicate canisters of high-level waste that are of low



strategic significance.

Q. A government argument that I have heard made at times, and I will ask if you've heard this before, not necessarily from government counsel, have you ever heard an interpretation of the contract that would say that the government would meet its obligation by accepting one fuel element from one utility by January 31, 1998?

MS. SULLIVAN: Objection to the extent it calls for a legal conclusion.

A. I have never heard that.

Q. Has such an interpretation ever played a role in your work in the waste acceptance division?

MS. SULLIVAN: Objection, foundation. Objection, vague.

A. I have never heard it, and I don't recall even considering that.

MR. SHAPIRO: That's all the questions I have for you at this time, Ms. Slater Thompson. I appreciate your help.

I should note that there's a small chance that we may seek to talk to you yet again, there is an issue concerning some documents that we may or may not get which may or may not address



issues that relate to you. I am sure we will have to deal with Ms. Sullivan and the government on that, but except for that possibility I don't think we will have further questions for you.

A. I understand. Thank you.

MS. SULLIVAN: I have a couple questions.

EXAMINATION

BY MS. SULLIVAN:

Q. Ms. Thompson, do you recall your testimony in response to some questions from Mr. Shapiro as to whether you had any knowledge as to what the approved DCSs would be used for?

A. Yes, I do, and I believe I had indicated to him that I didn't have a real knowledge of what others were using those for.

Q. Sitting here today, do you have an understanding as to what aspects of the program would use approved DCSs for planning purposes?

A. I think it would be safe to say that the transportation group would probably find the most utility in the DCSs.

Q. Do you have or have you ever had responsibility for transportation planning for the program?

Page 150

A. No.
Q. Ms. Thompson, while you were in the waste acceptance division, do you recall disapproving delivered commitment schedules delivered by utilities?
A. Yes.
Q. Given your testimony that delivery commitment schedules are largely for planning purposes only, why would you disapprove a delivery commitment schedule?
A. There could be multiple administrative reasons like the DCS not signed, signed by a person not identified as having ability to sign, but primarily for exceeding their allocation for a particular year.
Q. And do you have an understanding as to the effect of the utility's failure to submit a DCS in a year in which they have an allocation?
A. Yes. I believe it was always our intent that if a utility failed to submit a DCS in that year that it would be a waiver of their desire to deliver, and we would have reallocated that capacity to the next utility or utilities in the cue.
Q. I believe Mr. Shapiro has asked you

Page 151

previously today about the provision of the Standard Contract or whether there was a provision of the Standard Contract that told purchasers that they were limited in their DCSs to the allocation set forth in the ACR.
Other than in the Standard Contract, is there another place that purchasers were informed that they were limited to the amount set forth in the ACR when submitting their DCSs?
A. I am positive it's in the DCS instructions.
Q. Could you turn to Exhibit 10, please, to your deposition.
Are these the DCS instructions to which you are referring?
A. Yes.
Q. Could you point to me where in these instructions purchasers were informed that they were limited to the amounts set forth in the ACR?
A. Give me a minute.
Q. Sure.
A. Page 2, number 7E, the last sentence.
Q. Could you read that for me, please?
A. Exceeding the allocation will result in disapproval of the DCS.

Page 152

Q. Thank you.
While you were in the waste acceptance division at DOE, what was your understanding of the effect of the DCSs with regard to DOE's performance in 1998, if DOE had begun performance in 1998?
MR. SHAPIRO: Objection. Vague.
Q. Do you want me to clarify the question?
A. Please.
Q. I believe you testified that in your opinion the DCSs were for planning purposes only. While you were in waste acceptance, did you ever have an understanding as to the role of the DCSs if DOE had started performance in 1998?
MR. SHAPIRO: Objection. Vague.
A. My understanding of the role of the DCSs, if we had begun to accept in 1998, is that those individuals who had submitted DCSs and had them approved for year 1, which the question you are posing would be 1998, those would be the utilities that I would expect to receive FDSs from, and they would be the utilities that would deliver in that year.
Q. I am not sure whether Mr. Shapiro

Page 153

asked you this specific question. Is it your understanding that the final delivery schedules submitted by purchasers and approved by DOE would be binding on the parties?
A. Are you asking me for my personal opinion?
Q. Yes.
A. My personal opinion is that given that the FDSs are submitted a year before actual acceptance is to start that they are supposed to include the actual reactor, the actual age, discharge date of the fuel, and that that's the basis on which we actually begin to mobilize the system to come get it, yes.
Q. And one final question with regard to multi-element sealed canisters, or MESCs, that we discussed. Do you have an understanding as to whether, while you were in the waste acceptance division, those were considered a standard waste form?
A. My recollection is that they were not.
MS. SULLIVAN: Thank you.
MR. SHAPIRO: I just have a couple follow-up questions for you.
EXAMINATION

# Victor Trebules

# Victor W. Trebules, Jr.

Page 1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
-------------------------------------------X
YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
MAINE YANKEE ATOMIC POWER COMPANY :
(98-474C)(Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C)(Wilson, J.) :
NORTHERN STATES POWER COMPANY :
(98-484C)(Wiese, J.) :
DUKE POWER, a Division of DUKE ENERGY CORP.:
(98-485C)(Sypolt, J.) :
INDIANA MICHIGAN POWER COMPANY :
(98-486C)(Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C)(Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY, et al. :
(98-614C)(Merow, S.J.) :
COMMONWEALTH EDISON COMPANY :
(98-621C)(Hewitt, J.) :
BOSTON EDISON COMPANY :
(99-447C) (Allegra, J.) :
GPU NUCLEAR, INCORPORATED :
(00-440C)(Bush, J.) :
WISCONSIN ELECTRIC POWER COMPANY :
(00-697C)(Merow, S.J.) :
POWER AUTHORITY OF THE STATE OF NEW YORK :VOLUME
(00-703C)(Damich, J.) : I
OMAHA PUBLIC POWER DISTRICT :
(01-115C)(Bush, J.) :
NEBRASKA PUBLIC POWER DISTRICT :Discovery
(01-116C)(Sypolt, J.) :Judge:
TENNESSEE VALLEY AUTHORITY :(Judge
(01-249C)(Bruggink, J.) :Sypolt)
Plaintiffs, :PAGES
v. :1 - 241

Page 2

THE UNITED STATES, :
Defendant. :
-------------------------------------------X

Deposition of Victor W. Trebules, Jr.
Washington, DC
Wednesday, April 17, 2002

Reported by: Denise Dobner Vickery, RMR, CRR
JOB NO. 144458

Page 3

April 17, 2002
9:32 A.M.

Deposition of Victor W. Trebules, Jr., held at the offices of:

Jenner & Block
601 13th Street, NW
12th Floor
Washington, DC 20005

Pursuant to notice, before Denise Dobner Vickery, a Registered Merit Reporter, Notary Public of the District of Columbia.

Page 4

APPEARANCES:

Jenner & Block
For the Plaintiff COMMONWEALTH EDISON
One IBM Plaza
Chicago, IL 60611-7603
(312) 222-9350
BY: Theodore T. Eidukas, Esq.

Shaw Pittman Potts & Trowbridge
For the Plaintiffs NORTHERN STATES POWER COMPANY, et al.
1650 Tysons Boulevard
McLean, VA 22102-4859
(703) 770-7962
BY: Devon E. Hewitt, Esq.

Arnold & Porter
For the Plaintiffs SOUTHERN NUCLEAR OPERATING COMPANY, et al.
555 Twelfth Street, NW
Washington, DC 20004-1206

# Victor W. Trebules, Jr.

Page 13

Q. Mr. Trebules, if you can specify a date that you were working on the planning for the disposal of radioactive waste and spent nuclear fuel while at the Office of Nuclear Energy Programs, that would be helpful.

A. Let me try to clarify what I think you asked. I don't remember exactly when ERDA switched over to the Department of Energy. My guess, that was sometime in the 1980s. But in 1977, I joined the Office of Nuclear Energy Programs, which may have been part of ERDA or, you know, Atomic Energy Commission or ERDA or Department of Energy. It was 1977 and at that time I was involved in the planning activities for nuclear energy programs, which included breeder reactor development like the Clinch River breeder reactor, and I was responsible for preparing what was called the Fish and Energy Program Plan for the Department of Energy, which included some at that time it was called fuel cycle activities, which included handling of radioactive waste.

Q. Did that planning for the handling of nuclear radioactive waste that you just described, did that

Page 14

involve planning for the disposal of those wastes in a deep geologic repository?

MR. SHULTIS: Objection, relevance.

BY MR. EIDUKAS:

Q. Generally, when your lawyer objects --

MR. SHULTIS: You still have to answer.

BY MR. EIDUKAS:

Q. You still have to answer unless he instructs you not to, if you're able to.

A. As best as I could remember, we did in the Fish and Energy Program document talk about reactor development and waste activities, and it did include I believe reprocessing at that time. This was prior to the ban on reprocessing and ultimate disposal of radioactive waste.

Q. Did those plans that you worked on go so far as to discuss the design of a repository? Did it get that specific?

MR. SHULTIS: Objection, relevance.

THE WITNESS: As best as I could remember, I don't believe we got involved in the -- at least I didn't get involved in the design of repositories for

Page 15

the disposal of waste. My primary area of emphasis at that time was on reactor development. As I said, the Clinch River breeder reactor and, for example, Whitewater breeder reactor.

BY MR. EIDUKAS:

Q. At some point did your position at either ERDA or the Department of Energy change?

MR. SHULTIS: Objection, vague.

THE WITNESS: I had a number of activities during my career. As I mentioned, I stayed in the Office of Nuclear Energy Programs for a while and then soon after the passage of the Nuclear Waste Policy Act, about a year or two after the act was passed, then I joined the Office of Civilian Radioactive Waste Management.

BY MR. EIDUKAS:

Q. When you joined the Office of Civilian Radioactive Waste Management, you say a year or two after the act was passed, so we're talking somewhere in the 1983-1984 time frame?

A. That's correct.

Q. What was your first position at the Office of

Page 16

Radioactive Waste Management?

A. I don't remember the title of my first position. It was probably program analyst or something like that, but I'm not exactly sure.

Q. What did that position entail? What were your responsibilities in that position?

A. First major assignment I could remember was coordinating the preparation of the mission plan for the Civilian Radioactive Waste Management Program.

Q. Was there anything else that your role entailed in that position?

MR. SHULTIS: Objection, vague.

THE WITNESS: That preparation of the mission plan was pretty much a full-time activity for a number of years. So there might have been other minor assignments I was given, but, you know, overall it was primarily the mission plan.

BY MR. EIDUKAS:

Q. Okay. Did there come a time when your position at the Office of Civilian Radioactive Waste Management changed from program analyst working on the mission plan?